UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA               CRIMINAL NO. 6:12-CR-00146

VERSUS                                 JUDGE FOOTE

ALEXANDER DERRICK REECE (01)           MAGISTRATE JUDGE HANNA
DREW T. GREEN (02)
THOMAS WILLIAM MALONE, JR. (03)
BOYD ANTHONY BARROW (04)
JOSHUA ESPINOZA (05)
CURIOUS GOODS LLC (06)
RICHARD JOSEPH BUSWELL (07)
DANIEL JAMES STANFORD (08)
DANIEL PAUL FRANCIS (09)
BARRY L. DOMINGUE (10)

## <u>REPORT  AND  RECOMMENDATION</u>

Currently pending before this Court is the motion to dismiss the superceding

indictment that was originally filed by defendant Barry L. Domingue (Rec. Doc. 205)

and then adopted by defendants Alexander Derrick Reece (Rec. Doc. 218), Richard

Joseph Buswell (Rec. Doc. 222), Daniel Paul Francis (Rec. Doc. 248) and Daniel

James Stanford (Rec. Doc. 220).  The motion was referred to the undersigned for

review, report, and recommendation in accordance with the provisions of 28 U.S.C.

§ 636 and the standing orders of this Court.  (Rec. Doc. 245).  For the following

reasons, the undersigned recommends that the motion be denied.

## Factual Background

The superceding indictment (Rec. Doc. 57) charges the defendants with sixteen substantive counts and also contains a forfeiture allegation. Fourteen counts (Counts 3-16) include one count for money laundering conspiracy and thirteen counts of money laundering, one count is for conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce (Count 2), and one count (Count 1) is for conspiracy to distribute and possess with the intent to distribute a schedule I controlled substance through application of the analogue statute.

The superceding indictment alleges that, as of March, 2011, the synthetic cannabinoid JWH-018 was a schedule I controlled substance. The other synthetic cannabinoids identified in the indictment are analogues of JWH-018 and include AM-2201, JWH-081, JWH-250, and UR-144. After JWH-018 was added to schedule I, bulk quantities of synthetic cannabinoids were supplied by defendant Reece to a business known as NeutraGenomics which was owned and operated by Defendants Green and Malone. NeutraGenomics supplied the synthetic cannabinoids used to manufacture "Mr. Miyagi" to Pinnacle Products Group. Pinnacle was controlled by defendants Barrow and Espinoza. Pinnacle manufactured Mr. Miyagi and supplied it to Curious Goods. Curious Goods was controlled by defendant Buswell and sold Mr. Miyagi to the public. Mr. Miyagi contained the synthetic cannabinoid AM-2201.

-2-

The indictment also alleges that, through a corporation called Retail Compliance Association, defendants Stanford and Francis trained, advised, and instructed franchise owners of defendant Curious Goods LLC and their employees on how to store, display, and sell Mr. Miyagi products, how to detect and evade law enforcement, and how to respond to their customers' questions about Mr. Miyagi.

A controlled substance analogue is a "designer drug" that resembles a controlled substance in molecular structure and actual or intended physiological effect. Schedule I analogues are treated as though they too are listed on the schedule. In Count 1 of the superceding indictment, the defendants are charged with conspiracy to violate 21 U.S.C. § 846, which prohibits the knowing or intentional manufacture, distribution, or dispensing of a controlled substance as well as the possession with intent to manufacture, distribute, or dispense, a controlled substance. Through the application of 21 U.S.C. § 813, the prohibitions of § 846 are extended to the analogues of scheduled substances.

In the instant motion, the defendants seek to have the superceding indictment dismissed, arguing that AM-2201, the synthetic cannabinoid allegedly used in manufacturing Mr. Miyagi, was not an analogue of a scheduled substance at any relevant time because the Drug Enforcement Administration ("DEA") did not comply

with the necessary statutory requirements when five synthetic cannabinoids including JWH-018 were temporarily added to schedule I in March 2011.

## THE CONTENTIONS OF THE PARTIES

The defendants argue that JWH-018 was never listed as a schedule I controlled substance because the DEA failed to provide Congress and the Comptroller General with reports required by the Congressional Review Act ("CRA"), 5 U.S.C. § 801 *et seq*. Consequently, the defendants argue that they cannot be prosecuted for possessing, distributing, or conspiring to possess or distribute Mr. Miyagi, because the AM-2201 in Mr. Miyagi cannot be considered to be an analogue of a scheduled substance since JWH-018 was not properly scheduled. In support of these arguments, the defendants contend that, even though JWH-018 was added to schedule I by means of an order under 21 U.S.C. § 811(h), the DEA was not relieved of its obligation to comply with the CRA's requirement that Congress and the Comptroller General be notified of the proposed revision to schedule I before it occurred. The defendants also argue that the DEA was not entitled to avail itself of the good cause provision of 5 U.S.C. § 808, which, if applied, would have permitted the revised schedule to take effect at such time as the DEA determined. The defendants also review the history of the DEA's scheduling of some other substances, attempting to distinguish

-4-

the actions taken by the DEA with regard to the five synthetic cannabinoids scheduled in March 2011 and those taken with regard to other substances. The defendants also argue that the DEA's alleged failure to comply with the CRA is subject to judicial review, anticipating the government's argument that judicial review is not permitted. In support of their arguments, the defendants rely in large part upon legislative history for their interpretation of the CRA.

In response to the defendants' motion, the government argues that the good cause provision of the CRA applies and that the DEA's implication of the good cause exception is not subject to judicial review. The government also argues that the five synthetic cannabinoids, including JWH-018, were properly added to schedule I under the procedure set forth in 21 U.S.C. § 811(h).

## ANALYSIS

The issue currently before this Court is whether the DEA's failure to notify Congress and the Comptroller General before issuing the March 1, 2011 order adding JWH-018 to schedule I pursuant to 21 U.S.C. § 811(h) precludes prosecution of the defendants with regard to their alleged conspiracy to distribute AM-2201, an analogue of JWH-018.

## A.    STATUTORY CONSTRUCTION

The issue presented is one of statutory construction, the defendants contending that the DEA failed to follow certain notice procedures set forth in the Congressional Review Act at 5 U.S.C. § 801(a)(1)(A), resulting in the five synthetic cannabinoids addressed in the March 2011 order not actually being added to schedule I.

As in all cases involving statutory construction, this Court's starting point must be the language used by Congress in crafting the relevant statutes and the assumption that the legislative purpose is expressed by the words used in the statutes.[1] This is the starting point because the fundamental tenet of statutory construction is that Congress "says in a statute what it means and means in a statute what it says there."[2]  In other words, "[s]tatutory language reflects the intention of Congress, and 'Congress' intention is the law and must be followed.'"[3] Thus, "when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms."[4]

---

[1]    *Russell v. Choicepoint Services, Inc.*, 302 F.Supp.2d 654, 664 (E.D. La. 2004), citing *INS v. Phinpathya*, 464 U.S. 183, 189 (1984).

[2]    *United States v. Vickers*, 540 F.3d 356, 365 (5th Cir. 2008), citing *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

[3]    *Russell v. Choicepoint Services, Inc.*, 302 F.Supp.2d at 664, quoting *Blue Cross & Blue Shield v. Shalala*, 995 F.2d 70, 73 (5th Cir. 1993).

[4]    *United States v. Pruett*, 681 F.3d 232, 242 (5th Cir. 2012), citing *Hartford Underwriters v. Union Planters Bank*, 530 U.S. 1, 6 (2000).

> We are rescued from immersion in the sea of legislative history by the general principle that we must not refer to legislative history if the statutory language is clear. This salutary doctrine is predicated upon the notion that since Congress is presumed to have meant what it said, we must look first to the literal meaning of the words of the statute in order to determine how best to effectuate the Congressional intent. Of course, we must not allow such literalmindedness to lead us to absurd or unreasonable conclusions at war with the very policy that Congress intended to implement in the statute in question.[5]

Avoiding reliance on legislative history when a statute is clear and unambiguous is important because "Congress adopted and the President signed only the act itself. The reports of committees and the congressional debates did not become law. A court should depart from the official text of the statute and seek extrinsic aids to its meaning only if the language is not clear or if apparent clarity of language leads to absurdity of result when applied."[6]

Furthermore, "[t]he canons of statutory construction dictate that when construing a statute, the court should give words their ordinary meaning and should not render as meaningless the language of the statute."[7]  On the other hand, "[w]hen a statute furnishes express definitions for words and terms used in the enactment, that

---

[5]    *Globe Seaways, Inc. v. Panama Canal Co.*, 509 F.2d 969, 971 (Canal Zone Cir. 1975) (internal citations omitted).

[6]    *American Trucking Associations, Inc. v. I. C. C.*, 659 F.2d 452, 459 (5th Cir. 1981) (internal citations omitted).

[7]    *White v. Black*, 190 F.3d 366, 368 (5th Cir. 1999).  See, also, e.g., *United States v. Hubbard*, 480 F.3d 341, 347-48 (5th Cir. 2007).

definition is usually controlling."[8]   In short, "[t]his court is bound by the words Congress chooses."[9]

Another "fundamental principle of statutory construction (and, indeed, of language itself) [is] that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."[10]

Finally, "[o]ne basic principle of statutory construction is that where two statutes appear to conflict, the statute addressing the relevant matter in more specific terms governs."[11]

## B.   THE RELEVANT STATUTES

---

[8]   *In re Barfknecht*, 378 B.R. 154, 159 n. 6 (Bkrtcy. W.D. Tex. 2007).  See, also, *Perrone v. General Motors Acceptance Corp.*, 232 F.3d 433, 435 (5th Cir. 2000), quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000) ("Courts give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress Intended them to bear some different import."

[9]   *Amberg v. Federal Deposit Ins. Corp.*, 934 F.2d 681, 688 (5th Cir. 1991).

[10]   *Emtel, Inc. v. Lipidlabs, Inc.*, 583 F.Supp.2d 811, 820 (S.D. Tex. 2008),quoting *Deal v. United States*, 508 U.S. 129, 132 (1993).

[11]   *In re Armstrong*, 206 F.3d 465, 470 (5th Cir. 2000).  See, also, *In the Matter of Prescription Home Health Care, Inc.*, 316 F.3d 542, 548 (5th Cir. 2002); *Mennor v. Fort Hood National Bank*, 829 F.2d 553, 557 (5th Cir. 1987).

In 1970, Congress enacted the Controlled Substances Act.[12]  The Act, which is codified at 21 U.S.C. § 801 *et seq*., "establishes five categories or 'schedules' of controlled substances, the manufacture, possession, and distribution of which the Act regulates or prohibits.  Violations involving schedule I substances carry the most severe penalties, as these substances are believed to pose the most serious threat to public safety."[13]  Under the Act, it is "unlawful for any person knowingly or intentionally. . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."[14]  It is equally unlawful to conspire to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.[15]

The Act authorizes the Attorney General to add substances to a schedule, to remove substances from a schedule, and to move a substance from one schedule to another.[16]  In 1973, the Attorney General delegated his powers under the Controlled

---

[12]    *Touby v. United States*, 500 U.S. 160, 162 (1991).

[13]    *Touby v. United States*, 500 U.S. at 162.

[14]    21 U.S.C. § 841.

[15]    21 U.S.C. § 846.

[16]    *Touby v. United States*, 500 U.S. at 162, citing 21 U.S.C. § 811(a).  See, also, *United States v. Kinder*, 946 F.2d 362, 368 (5th Cir. 1991).

Substances Act to the DEA.[17]  Both the Fifth Circuit[18] and the United States Supreme Court have held that this delegation was not unconstitutional.[19]  Thus, the DEA has the authority to add substances to a schedule, remove substances from a schedule, and move substances from one schedule to another.  Substances may also be added to schedule I on a temporary basis.  "The power to add new drugs temporarily to Schedule I was granted in 1984 when Congress amended the Controlled Substances Act adding subsection 811(h)."[20]

The Act also addresses controlled substance analogues, which are defined in the Act as substances with a chemical structure substantially similar to that of a controlled substance listed in schedule I or II, which have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than that of the scheduled substance, or which is represented or intended to have such an effect.[21]  To the extent that they are intended for human consumption, analogues are treated identically to substances that are actually listed on schedule I.[22]

---

[17]    *United States v. Caudle*, 828 F.2d 1111, 1112 n. 1(5th Cir. 1987).

[18]    *United States v. Gordon*, 580 F.2d 827, 840-41 (5th Cir. 1978).

[19]    *Touby v. United States*, 500 U.S. at 169.

[20]    *United States v. Caudle*, 828 F.2d at 1112.

[21]    21 U.S.C. § 802(32)(A).

[22]    21 U.S.C. § 813.

Therefore, it is illegal to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, an analogue, and it is also illegal to conspire to do so.

In this case, the defendants are charged with conspiring to distribute and possess with the intent to distribute a product containing AM-2201. Although AM-2201 was not listed on schedule I at any relevant time, it is alleged in the superseding indictment that this substance is an analogue of JWH-018, which is a synthetic cannabinoid that was temporarily added to schedule I by the DEA in March 2011. Reading §§ 841 and 846 together, distribution of AM-2201, possession of AM-2201 with the intent to distribute it, and conspiring to do either is unlawful under the Act.

Because analogues are "drugs which have been chemically designed to be similar to controlled substances, but which are not themselves listed on the controlled substance schedules,"[23] they are sometimes referred to as "designer drugs." "To combat the 'designer drug' problem, Congress in 1984 amended the Act to create an expedited procedure by which the Attorney General can schedule a substance on a temporary basis when doing so is 'necessary to avoid an imminent hazard to the

---

[23]    *United States v. Granberry*, 916 F.2d 1008, 1010 (5th Cir. 1990).

public safety.'"[24]  This procedure is codified at 21 U.S.C. § 811(h).  As explained by

the United States Supreme Court,

> [t]emporary scheduling [under 21 U.S.C. § 811(h)] . . . allows the Attorney General to bypass, for a limited time, several of the requirements for permanent scheduling.  The Attorney General need consider only three of the eight factors required for permanent scheduling.  Rather than comply with the APA [Administrative Procedures Act] notice-and-hearing provisions, the Attorney General need provide only a 30-day notice of the proposed scheduling in the Federal Register.  Notice also must be transmitted to the Secretary of HHS, but the Secretary's prior approval of a proposed scheduling order is not required."[25]

The Court went on to explain that

> [b]ecause it has fewer procedural requirements, temporary scheduling enables the Government to respond more quickly to the threat posed by dangerous new drugs.  A temporary scheduling order can be issued 30 days after a new drug is identified, and the order remains valid for one year.  During this 1-year period, the Attorney General presumably will initiate the permanent scheduling process, in which case the temporary scheduling order remains valid for an additional six months."[26]

In this case, the defendants do not argue that the temporary scheduling of JWH-

018 and other drugs in March 2011 did not comply with the provisions of 21 U.S.C.

§ 811(h).  Indeed they cannot, since the government established that the procedure

used by the DEA for doing so complies with that statute.  Use of the procedure set

---

[24]     *Touby v. United States*, 500 U.S. at 163.

[25]     *Touby v. United States*, 500 U.S. at 163 (internal citations omitted).

[26]     *Touby v. United States*, 500 U.S. at 164.

forth in 21 U.S.C. § 811(h) requires (1) a finding that temporary scheduling is

necessary to avoid an imminent hazard to public safety; (2) based upon consideration

of three factors:  the substance's history and current pattern of abuse; the scope,

duration, and significance of abuse; and the risk, if any, to the public health; (3)

publication of a notice of intention in the Federal Register; (3) transmittal of a notice

to the secretary of Health and Human Services; (4) followed by a delay of at least

thirty days before (5) the issuance of a temporary scheduling order.  On October 6,

2010, the DEA sent a letter to DHHS, advising of its intent to temporarily add the

substances to the schedule.[27]  On November 24, 2010, DEA published in the Federal

Register notice of its intent to temporarily place the five synthetic cannabinoids,

including JWH-018, on schedule I.[28]  The notice includes a finding that placing the

five substances on schedule I "is necessary to avoid an imminent hazard to the public

safety."[29]  The notice also reviews the three necessary factors on which such a finding

must be based.[30]  On January 13, 2011, the DEA published a correction to the

November 24, 2010 notice in order to correct certain administrative errors made in

---

[27]     Rec. Doc. 228-1.

[28]     Rec. Doc. 205-3 at 7-11.

[29]     Rec. Doc. 205-3 at 9.

[30]     Rec. Doc. 205-3 at 9-10.

-13-

the original notice.[31]  On March 1, 2011, the DEA published a final order temporarily placing the five synthetic cannabinoids, including JWH-018, on schedule I.[32]  The defendants do not argue that the DEA failed in any way to comply with the procedure set forth in 21 U.S.C. § 811(h), and the undersigned finds that this procedure was complied with in all material respects.

The defendants argue, instead, that the DEA should have followed a different or additional procedure in adding the five synthetic cannabinoids to schedule I and that its failure to do so makes it impossible to enforce § 846 or § 813 with regard to these substances or their analogues.  More specifically, the defendants argue that JWH-018 was not actually added to schedule I in March 2011 because the DEA did not comply with the notice requirements of the Congressional Review Act set forth in 5 U.S.C. § 801(a)(1)(A).

## C.    JUDICIAL REVIEW IS AVAILABLE

The defendants argue that they are entitled to seek judicial review of the scheduling of JWH-018 under 21 U.S.C. § 811(h) even though 21 U.S.C. § 811(h)(6) states that "[a]n order issued under paragraph (1) is not subject to judicial review" and even though 5 U.S.C. § 805 states that "[n]o determination, finding, action, or

---

[31]      Rec. Doc. 205-3 at 12-14.

[32]      Rec. Doc. 205-3 at 15-19.

-14-

omission under this chapter shall be subject to judicial review." The government counters that the plain language of these statutes bars judicial review. The undersigned finds that the defendants are correct.

The essence of the defendants' argument is their contention that the substance that they possessed (or its chemical analogue) was never properly added to schedule I, barring their prosecution for the alleged violation of 21 U.S.C. § 846 in correlation with 21 U.S.C. § 813. The United States Supreme Court has addressed this issue, and has found that although Section 811(h)(6) bars judicial review, another section of the Act, 21 U.S.C. § 877, expressly permits judicial review. "Thus, the effect of [Section 811(h)(6)] is merely to postpone legal challenges to a scheduling order . . . until the administrative process has run its course. . . . [Section 811(h)(6)] does not preclude an individual facing criminal charges from bringing a challenge to a temporary scheduling order as a defense to prosecution."[33]

Since the defendants are facing criminal charges, the United States Supreme Court has recognized their right to challenge the temporary scheduling of JWH-018. The undersigned therefore finds that this Court has the power and authority to resolve the motion now before it.

---

[33]    *Touby v. United States*, 500 U.S. at 168.

-15-

### D.  THE TEMPORARY SCHEDULING ORDER WAS PROPERLY OBTAINED

In general terms, federal agencies must, in making rules and carrying out their functions, comply with the Administrative Procedures Act ("APA"), which is codified in Subchapters I and II of Title 5 of the United States Code.  Chapter 8 of that title addresses congressional review of agency rulemaking and is sometimes referred to as the Congressional Review Act ("CRA.")  As stated by the defendants in their brief, the CRA "requires federal agencies to submit all of their final ***rules*** to both houses of Congress and the Comptroller General before they can take effect."[34]  This requirement is set forth in 5 U.S.C.§ 801(a)(1)(A), which reads as follows:  "Before a ***rule*** can take effect, the Federal agency promulgating such ***rule*** shall submit to each House of the Congress and to the Comptroller General a report containing – (i) a copy of the ***rule***; (ii) a concise general statement relating of the ***rule***, including whether it is a major ***rule***; and (iii) the proposed effective date of the ***rule***."  [Emphasis added.] Implicit in the defendants' argument is their characterization of the DEA's scheduling of the five synthetic cannabinoids in March 2011 as the making of a new agency rule. That, however, is not what occurred.

---

[34]      Rec. Doc. 205-2 at 6 (emphasis added).

"It is long settled that words in statutes should be given their ordinary, popular meaning unless Congress clearly meant the words in some more technical sense."[35] Here, the defendants repeatedly use the word "rule" in referring to the March 2011 scheduling, but that usage is inaccurate because Congress gave specific meanings to certain critical words used in the statute.  The term "rule" is defined in the CRA, at 5 U.S.C. § 804(3), as having "the meaning given such term in section 551" with certain exceptions that are not applicable to the instant motion.  5 U.S.C. § 551(4) states that "'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. . . ."  "It is a basic principle of statutory construction that specific words within a statute may not be read in isolation from the remainder of the entire statutory scheme."[36]  Thus, it is important that the CRA also defines other critical words.  In 5 U.S.C. § 551(5), the term "rule making" is defined as "agency process for formulating, amending, or repealing a rule."  The same statute, in § 551(6), defines another critical word.  It states:  "'order' means the whole or a part of a final

---

[35]    *United States v. Nat'l Broiler Marketing Ass'n*, 550 F.2d 1380, 1386 (5th Cir. 1977).

[36]    *In re Thalheim*, 853 F.2d 383, 387 (5th Cir. 1988), citing *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987).

disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." Thus, the CRA defines the terms "rule," "rule making," and "order," giving those words technical definitions in this context, and distinguishing rules from orders. Expressly, an order is created by an agency in a process "other than rule making."

Therefore, it is clear from the plain language of the CRA that rules and orders are two different things. It is also clear from the plain language of the CRA that the notice requirements set forth in 5 U.S.C. § 801, which the defendants rely upon in arguing that the five synthetic cannabinoids were not properly added to schedule I, apply only with regard to rules and do not apply to orders. As quoted by the defendants in their brief, the statute says "[b]efore a *rule* can take effect, the Federal agency promulgating such *rule* shall submit to each House of the Congress and to the Comptroller General a report. . . ." [Emphasis added.] Therefore, if the DEA had added the five synthetic cannabinoids to schedule I by rule, the DEA would have been required to comply with the notice requirement of 5 U.S.C. § 801. That, however, is not what was done.

When Congress enacted 21 U.S.C. § 811(h), it created a procedure that is, in essence, an exception to the general procedural requirements of the Administrative Procedures Act and the Congressional Review Act. Section 811(h) permits temporary

-18-

addition of a substance to schedule I by order instead of by rule.  The statute clearly states:  "If the Attorney General finds that the scheduling of a substance in schedule I on a temporary basis is necessary to avoid an imminent hazard to the public health, he may, by *order*. . . schedule such substance in schedule I. . . ."  [Emphasis added.] When Congress uses particular words in a statute, especially when the words are defined as having particular meanings, it must be presumed that the lawmakers deliberately intended to use the chosen words, and those words must be given their intended meanings.

The procedure outlined in Section 811(h) is a specific procedure that can be used only for the temporary, emergency addition of substances to schedule I.  As such, it is a more specific statute that operates as an exception to the general rules of agency functioning set forth in the APA and the general rules of Congressional review that are set forth in the CRA.  "One basic principle of statutory construction is that where two statutes appear to conflict, the statute addressing the relevant matter in more specific terms governs."[37]  Here, it appears that the procedure set forth in 21 U.S.C. § 811(h) conflicts with that set forth in 5 U.S.C. § 801(a)(1)(A) because the former permits adding a substance to schedule I by order without first providing a report to Congress and the Comptroller General as required by the latter.  But the

---

[37]    *In re Armstrong*, 206 F.3d at 470.

latter statute, which is a part of the CRA, sets forth a general procedure applicable to all agency rule making while the former statute is much more specific and applies only in the particular context of temporary emergency additions of substances to schedule I.  Accordingly, Section 811(h) is a more specific statute.  "[I]t is well established that a more specific statute controls over a more general one."[38]

In this case, the government has established, as described above, that the DEA complied with the procedural requirements of Section 811(h) in adding the five synthetic cannabinoids to schedule I in March 2011.  The undersigned therefore finds that, because the DEA complied with the requirements of the more specific statute creating a procedure for the temporary emergency addition of substances to schedule I, there was no need for the DEA to also comply with the more general requirements of Section 801.  The undersigned also finds that the DEA would have been obligated to comply with the notice requirements of Section 801 had it added the five synthetic cannabinoids to schedule I by rule; having added them by order, however, the DEA was not required to provide the notices addressed in Section 801.  The undersigned also finds that the plain language of the statutes is sufficiently clear that resort to the legislative history is unnecessary.

---

[38]     *Prescription Home Health*, 316 F.3d at 548.

Having found that the DEA was not obligated to first report to Congress and the Comptroller General before issuing the order of March 1, 2011 adding JWH-018 and four other synthetic cannabinoids to schedule I, the undersigned also finds that the defendants' motion lacks merit.

**E.    THE DEFENDANTS' REMAINING ARGUMENTS NEED NOT BE CONSIDERED**

Having already found that the defendants' motion lacks merit because the DEA complied with the necessary procedural requirements in adding JWH-018 to schedule I in March 2011, it is unnecessary to address the defendants' arguments concerning the good cause provision of 5 U.S.C. § 808 or the procedures used by the DEA in scheduling other substances. Further discussion of those topics is accordingly pretermitted.

**CONCLUSION**

For the foregoing reasons, the undersigned finds that the DEA complied with the procedural requirements of 21 U.S.C. § 811(h) in adding JWH-018 to schedule I in March 2011 and further finds that the DEA's failure to comply with the notice requirement of 5 U.S.C. § 801(a)(1)(A) did not preclude the addition of JWH-018 to schedule I. Therefore, the undersigned further finds that JWH-018 was a controlled substance on and after March 1, 2011 and that its chemical analogue AM-2201 should also be treated as such pursuant to 21 U.S.C. § 813. Accordingly, the undersigned

-21-

recommends that the defendants' motion (Rec. Docs. 205, 217, 219, 221) should be denied.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana, on March 25, 2013.

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE