UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA

CRIMINAL NO. 6:12-CR-00146-08-06

VERSUS

JUDGE FOOTE

ALEXANDER DERRICK REECE (01)       MAGISTRATE JUDGE HANNA
DREW T. GREEN (02)
THOMAS WILLIAM MALONE, JR. (03)
BOYD ANTHONY BARROW (04)
JOSHUA ESPINOZA (05)
CURIOUS GOODS LLC (06)
RICHARD JOSEPH BUSWELL (07)
DANIEL JAMES STANFORD (08)
DANIEL PAUL FRANCIS (09)
BARRY L. DOMINGUE (10)

## REPORT AND RECOMMENDATION ON MOTION TO DISMISS FOR PROSECUTORIAL/GOVERNMENTAL MISCONDUCT
### (Rec. Doc. 313)

Before the court on referral from the district court for report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Cr.P. 59(b)(1) is

defendant Stanford's (08) motion to dismiss the superceding indictment for

prosecutorial/governmental misconduct [Rec. Doc. 313] which was adopted by

Curious Goods L.L.C. (06), [Rec. Docs. 320, 332] and opposed by the

government. [Rec. Doc. 439]  An evidentiary hearing was held by the undersigned

on April 26 and May 2, 2013.  Supplemental briefing was provided by Stanford on

July 8, 2013 [Rec. Doc. 602] to which the government responded on July 29, 2013. [Rec. Doc. 622] Considering the evidence, the briefs, and the arguments of counsel, and for the reasons recited on the record of that proceeding, it is recommended that the motion be denied.

### *Factual and Procedural Background*

The superceding indictment [Rec. Doc. 58][1] charges the defendants with sixteen substantive counts and also contains forfeiture allegations. The pertinent factual allegations contained in the indictment are that, as of March 2011, the synthetic cannabinoid JWH-018 was a schedule I controlled substance. The other synthetic cannabinoids identified in the indictment are allegedly analogues of JWH-018 and include AM-2201, JWH-081, JWH-250, and UR-144.[2] After JWH-018 was added to schedule I, bulk quantities of synthetic cannabinoids were allegedly supplied by defendant Reece to a business known as NeutraGenomics which was owned and operated by defendants Green and Malone.[3]

---

[1]    Although a motion was filed seeking to revise the language used in the superseding indictment which was granted, all references to the indictment in this report are to the superseding indictment filed on September 4, 2012 [Rec. Doc. 58].

[2]    By separate report and recommendation, the undersigned recommended, without opposition from the government, that JWH-081, JWH-250, and UR-144 be stricken from the indictment. [Rec. Doc. 486] The district court adopted the recommendation on July 1, 2013. [Rec. Doc. 591] Therefore, discussion will center on AM-2201.

[3]    Green and Malone have entered guilty pleas and Reece has been severed.

NeutraGenomics supplied synthetic cannabinoids to Pinnacle Products Group, which was controlled by defendants Barrow and Espinoza,[4] to be infused into a product called Mr. Miyagi. Pinnacle manufactured Mr. Miyagi and acted as the exclusive supplier of Mr. Miyagi to Curious Goods. Curious Goods, which was controlled by defendant Buswell, sold Mr. Miyagi to the public who would ingest it, typically by smoking it, in order to achieve a high.[5] Mr. Miyagi contained the synthetic cannabinoid AM-2201. Defendants Stanford and Domingue allegedly received funds in excess of $245,000 from Pinnacle and Curious Goods derived from the sale of Mr. Miyagi.

The government further alleges that Stanford and defendant Francis formed an entity known as the Retail Compliance Association (RCA) and that they trained, advised, and instructed franchise owners of Curious Goods L.L.C. and their employees how to store, display, and sell Mr. Miyagi products, how to detect and evade law enforcement, and how to respond to their customers' questions about Mr. Miyagi. The franchise owners were allegedly required to join the RCA and pay dues which were determined by the sales volume of each store.

In Count I, the defendants are charged under 21 U.S.C. §846 with

---

[4]    Barrow and Espinoza have entered guilty pleas.

[5]    Buswell has also entered a guilty plea.

conspiracy to violate 21 U.S.C. §841(a)(1), which prohibits the knowing or intentional manufacture, distribution, or dispensing of a controlled substance as well as the possession with intent to manufacture, distribute, or dispense a controlled substance.

In Count II, it is alleged that the defendants conspired to introduce misbranded drugs into interstate commerce by packaging Mr. Miyagi in a manner that violated the Federal Food, Drug and Cosmetic Act. (21 U.S.C. §321 *et seq*.)

In Count III, it is alleged that certain defendants, including Stanford, conspired to commit money laundering using proceeds from the sale of Mr. Miyagi, in violation of 18 U.S.C. §1956(h).  The remaining substantive counts allege various instances of money laundering by Barrow, Espinoza, Stanford, Buswell, and Domingue in violation of 18 U.S.C. §1957.

In his motion, Stanford contends the indictment should be dismissed based on acts of "Prosecutorial/Governmental Misconduct" (individually or in the aggregate) which can be summarized in four categories:

(1) Government agents, with knowledge that he was represented by Stanford, conducted an ex parte recorded interview of Richard Buswell while he was incarcerated after his pre-trial release had been revoked in an unrelated case.[6]

---

[6]     *United States v. Buswell et. al.* 6:11-cr-198.

Further, Stanford contends the agents used service of allegedly defective state law forfeiture paperwork as a pretext to facilitate the interview.

(2) The government failed to disclose the existence of the recorded interview prior to the hearing on the government's motion to evaluate conflict of interest which led to the disqualification of Stanford as Buswell's counsel in *United States v. Buswell* (6:11-cr-198).

(3) Agents of the government were untruthful in their testimony to this Court and/or the Grand Jury.

(4) The prosecution of Stanford has been undertaken in "bad faith," is vindictive and selective against Stanford because of his profession as a criminal defense lawyer, and the allegations against him regarding various statements made are violative of his First Amendment rights to free and commercial speech.

In response, the government denies the allegations of bad faith and misconduct, but does admit the ex parte recorded interview of Buswell took place and that it did not disclose the interview prior to the conflict hearing. However, in the evidentiary hearing, the testimony of the witnesses and evidence submitted refutes Stanford's claim of prosecutorial misconduct.

### *Findings of Fact*

1. Richard Buswell was indicted on multiple fraud violations on August 10, 2011

-5-

in *United States v. Buswell*, 11-cr-198 (henceforth the securities fraud case). At the time of arraignment, Stanford was enrolled as Buswell's retained attorney. Buswell was granted pre-trial release subject to conditions.

2.  On December 9, 2011, an arrest warrant was issued for Buswell based on a petition in which violations of the conditions of his pre-trial release were alleged. Multiple hearings were held by this Court and on December 15, 2011, this Court revoked Buswell's pre-trial release and ordered him detained pending trial.[7]  One of the reasons Buswell's pre-trial release was revoked was because he had been arrested on December 8, 2011 by Lafayette Metro Narcotics and charged with violating Louisiana Revised Statute 40:964 pertaining to the manufacture and distribution of synthetic cannabinoids in conjunction with the operation of the entities known as Curious Goods.[8]

3. As part of its investigation into the Curious Goods operation, interviews were conducted by government agents. Among them were interviews of Paul Buswell, brother of Richard Buswell, some of which were recorded on February 15 and 16, 2012 without his knowledge. Paul Buswell indicated Richard wanted to speak with government agents about defendants Barrow and Espinoza and Paul was

---

[7]    See *United States v. Buswell*, 6:11-cr-198, Rec. Doc. 48.

[8]    *Id*.

asked to inquire of Richard whether he would be willing to talk with government agents about the Curious Goods operation.[9]  It was disclosed to Paul Buswell that approval of the prosecutors would have to be obtained because the government agents wanted to talk to Richard Buswell "without his legal representation being there."[10]   Monitored telephone conversations from the Iberia Parish jail between Buswell and his family also indicated a desire by Buswell to speak to Agent Will White concerning the Curious Goods operation.[11]

4. On April 5, 2012, while he was incarcerated, Buswell was personally served by DEA Task Force Agent Will White with forfeiture paperwork prepared by, and served at the direction of,  the Assistant District Attorney for the 15th Judicial District for the State of Louisiana in conjunction with the commencement of the state's forfeiture proceedings.  White was directed to serve the paperwork because he was with Lafayette Metro Narcotics and was the case agent initially assigned for the state's Curious Goods investigation following the search and seizures in December 2011. He was assigned to the DEA Task Force in the spring of 2012. At the time of service there was no criminal case pending against Richard Buswell in

---

[9]        Rec. Doc. 519, pp. 188-189, Evidentiary hearing Ex. S-23, pp. 58-60.

[10]       Evidentiary hearing Ex. S-23, p. 58.

[11]       Rec. Doc. 478, pp. 75, 99.

either state or federal court arising out of the operation of Curious Goods.[12]

5. White's supervisor, DEA Agent Don DeSalvo, accompanied White who was wearing a recording device to the jail and a lengthy recorded interview was conducted with Buswell.  Prior to conducting the interview, DeSalvo and White sought the advice of the assistant United States attorneys assigned to the securities fraud case and the investigation in the instant case regarding what to do if Buswell wanted to talk about the Curious Goods matter after he was served with the forfeiture paperwork.[13] While recording the conversation was "mainly" for the protection of the agents, it is not known what specific advice, if any, was given to DeSalvo and White by any of the prosecuting attorneys beyond giving Buswell his *Miranda* rights before talking about the Curious Goods operation, terminating the interview if he asked to speak to an attorney before being questioned about the Curious Goods operation and not talking to Buswell at all about the securities fraud case.[14]  The testimony and the recording of the interview reflects that, upon the agents arrival, the conversation was directed to serving the forfeiture

---

[12]    La.R.S. 40:2601 et. seq.;  Rec. Doc. 478, pp. 15, 20-22, 25-27, 32-36, 41, 43-44, 110-112; Rec. Doc. 519, pp. 120-124, 174-175, 180.

[13]    Rec. Doc. 478, pp. 74-75, 79-83, 112; Rec. Doc. 519, pp. 127-130, 148, 180-182.

[14]    Rec. Doc. 478, pp. 78- 83, 100, 114; Rec. Doc. 519, pp. 134-135, 167-169, 180-182.

paperwork and Buswell indicated he would not be signing for service of the forfeiture paperwork without Stanford's assistance. It is clear to this Court that Buswell believed Stanford was his attorney for purposes of the forfeiture proceedings.  Agents DeSalvo and White did not question Buswell about the securities fraud case at all and did not question Buswell on the Curious Goods specifics until after Buswell had been given his *Miranda* rights. Agent White read Buswell his *Miranda* rights, Buswell acknowledged his understanding of his rights, agreed to answer the questions of the agents and there is no evidence to suggest he was coerced or that his statements were in any way involuntary.[15] Agent White returned to the Iberia Parish jail to serve additional forfeiture paperwork for the state on April 24, however, there was no recording and there is no evidence Buswell was questioned about either the securities fraud case or the Curious Goods investigation.[16]

6.  This Court finds that at the time of the April 5 interview, Agents White and DeSalvo, as well as the prosecuting attorneys in this case, were aware that Stanford was Buswell's attorney in the securities fraud litigation and that he was also representing Buswell at the state level associated with his arrest and forfeiture

---

[15]      Rec. Doc. 406 Exs. 1,2, pp. 1-11; Rec. Doc. 478, pp. 82-87, 113-116, Rec. Doc. 519, pp. 139-140, 150-151, 167-169, 180-183.

[16]      Rec. Doc. 478, p. 88-98, 107-110, 114-117.

proceedings in the Curious Goods matter.[17] The Court finds that, while the stated purpose of Agent White's visit to Buswell was to serve forfeiture paperwork as he had been directed to do by the assistant district attorney for the 15th Judicial District, both agents and the attorneys for the government recognized the opportunity this face-to-face meeting created for the agents to speak to Buswell outside the presence of counsel. The Court further finds that the two agents were given advice by the attorneys for the government in response to the agents' inquiry as to what they should do once Buswell had been served with the forfeiture paperwork if he wished to talk to them about the Curious Goods operation, as he had indicated to members of his family he wanted to do. The Court further finds that there is insufficient evidence to establish that the agents were acting as the alter-ego of the attorneys for the government.

7. On April 18, 2012 the government filed a motion to evaluate conflict of interest in the securities fraud case which was the subject of an evidentiary hearing held on May 14, 2012.[18] Agent DeSalvo testified at that hearing but did not disclose the existence of the recorded interview he and White had obtained from Buswell.[19]

---

[17]     Rec. Doc. 478, pp. 78-83; Rec. Doc. 519, pp. 118, 167-169.

[18]     See 11-cr-198, Rec. Docs. 74, 79, and 88.

[19]     Rec. Doc. 519, pp. 152-153.

However, in that hearing, Agent De Salvo was not specifically asked if there was a recorded interview.  There was an ongoing investigation into matters that had not been made public, including investigation of individuals subsequently named in the original and superceding indictments, and disclosure to Stanford at that time, who was a subject of the investigation himself, could have hampered the investigation.[20]

8. On May 18, 2012, the same date as DeSalvo testified before the Grand Jury for the first time,  Richard Buswell, Boyd Barrow and Josh Espinoza were indicted in the instant case.[21] Buswell was arraigned on June 13, 2012 and Ian Hipwell was appointed as his defense attorney.[22]  Stanford has never enrolled or been appointed to represent Buswell in this case.

9.  On May 22, 2012, after receiving supplemental briefing, a second hearing on the motion to evaluate conflict of interest was held by this Court in the securities fraud case in which Stanford was identified as a "target" in the Curious Goods investigation.[23] On June 25, 2012 this Court issued an order disqualifying Stanford

---

[20]    Rec. Doc. 519, pp. 202-203.

[21]    Rec. Doc. 1.

[22]    Rec. Doc. 40.

[23]    See 11-cr-198, Rec. Docs. 83 p. 4 and 92.

as defense counsel in the securities fraud case.[24]  That order was appealed on August 3, 2012 and in that appeal it was disclosed that Stanford was made aware of the recorded interview on July 16, 2012.[25]

10. Buswell's statement was given to his appointed counsel in this case, who shared it with Stanford, who brought it to the attention of the court in the securities fraud case.[26] On August 20, 2012, the district court in the securities fraud case remanded the disqualification order to the undersigned for further consideration in light of the disclosure of evidence not presented at the time of either the May 14 or May 22 hearing.[27]  On September 4, 2012, the superceding indictment was returned in this case in which Stanford and others were named as defendants.[28] On September 28, 2012, after reviewing the tape and transcript of the April 5 interview, this Court denied the motion for reconsideration of the disqualification order in the securities fraud case.[29]  That order was not appealed.

11. Of the ten defendants named in the superceding indictment, all were charged

---

[24]     See 11-cr-198, Rec. Doc. 93.

[25]     See 11-cr-198, Rec. Doc. 105, p. 3-4.

[26]     Rec. Doc. 519, pp. 213-214.

[27]     See 11-cr-198, Rec. Doc. 106.

[28]     Rec. Doc. 57.

[29]     See 11-cr-198, Rec. Doc. 109.

in the three conspiracy counts and all were named in the forfeiture counts.
Stanford, along with some of the other defendants, was also charged with multiple
counts of money laundering, and is the only lawyer who actively practices
criminal defense law. For every count in which Stanford is alleged to have
committed money laundering, a specific monetary transaction is identified.

### *Applicable Law and Analysis*

In order to dismiss an indictment based on government misconduct the
defendant must show that the conduct is "so outrageous that it violates the
principle of 'fundamental fairness' under the due process clause of the Fifth
Amendment." *United States v. Mauskar,* 557 F.3d 219, 232-233 (5th Cir. 2009)
(quoting *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir.1995) citing *United
States v. Russell*, 411 U.S. 423, 431-32 (1973)); *United States v. Sandlin,* 589 F.3d
749, 759-60 (5th Cir. 2009). "Such a violation will only be found in the rarest
circumstances." *Id*.  "The standard for proving outrageous governmental conduct
is extremely demanding" and the defendant bears "an extremely high burden of
proof." *United States v. Sandlin*, 589 F.3d at 758; *United States v. Gutierrez,* 343
F.3d 415, 421 (5th Cir. 2003); *United States v. Asibor*, 109 F.3d. 1023, 1039 (5th
Cir. 1997). Where a defendant seeks to have an indictment dismissed based on
cumulative error analysis, such an analysis is unnecessary if the contention as to

each issue fails. *United States v. Orr,* 163 Fed. Appx. 632, 642 (5th Cir 2005).

Factors which do not cross constitutional boundaries individually may not violate

the Constitution in the aggregate. *United States v. Stokes,* 124 F.3d 39, 43 (1st Cir

1997).

### 1. The Interview of Richard Buswell Does Not Warrant Dismissal of the Indictment.

Stanford goes through great detail to describe the events surrounding the ex

parte interview of Richard Buswell by Agents Will White and Donald DeSalvo as

evidence of prosecutorial misconduct.  This Court disagrees that there was any

prosecutorial misconduct sufficient to justify dismissal of the indictment on these

grounds based on the factual findings.

Stanford contends that "[t]he government's ruse was nothing short of a

transparent attempt to violate Richard Buswell's 5th and 6th amendment rights and

was also a violation of the Louisiana Rule of Professional Conduct prohibiting ex

parte communication with a represented party."[30]   In this case, Buswell filed a

motion to suppress the statement obtained by White and DeSalvo which was

adopted by Stanford.[31] Both prior to and after the time Buswell entered his plea of

---

[30]    Rec. Doc. 313-1, p. 27.

[31]    Rec. Doc. 250, adopted by Stanford at Rec. Doc. 338, 346.

guilty, the government indicated it would not use the statement of Buswell in its case in chief.[32]  On September 5, 2013, after Buswell entered his plea of guilty, this Court recommended the motion be denied as moot, and since Stanford adopted that motion, this Court found that Stanford lacked standing to challenge an alleged violation of Buswell's Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel as they are personal rights which may not be vicariously asserted.[33] *See Bellis v. United States,* 417 U.S. 85, 89-90 (1974), *United States v. Scallion* 533 F.2d 903, 916 (5th Cir. 1976) where the Fifth Amendment right against self-incrimination was at issue;  and *Faretta v. California,* 422 U.S. 806, 832 (1975), *United States v. Johnson* 267 F.3d 376, 380 (5th Cir. 2001) where Sixth Amendment right to counsel was at issue. The district court adopted this Court's  recommendation without objection by Stanford and ordered that the motion be denied.[34]

The issue of standing in this context is different as it has been recognized that "a defendant may assert [his] own fifth amendment right to a fair trial as a valid objection to the introduction of statements extracted from a non-defendant

---

[32]     Rec. Doc. 406, p. 1, Doc. 637, p. 7.

[33]     Rec. Doc. 641.

[34]     Rec. Doc. 649.

by coercion or other inquisitional tactics" because "the admission at trial of a coerced out-of-court statement from a non-defendant may violate the defendant's right to a fair trial as guaranteed by the due process clause of the fifth amendment." *United States v. Merkt*, 764 F.2d 266, 274 (5th Cir 1985). In order to prevail, the defendant must show prejudice or that the government's investigation methods will result in a "fundamentally unfair trial." *Id., United States v. Johnson,* 68 F.3d 899, 902 (5th Cir. 1995). Keeping in mind the government has represented it would not use the statement in its case in chief, it is nonetheless necessary to examine the circumstances surrounding the interview of Buswell to determine if the statement was obtained in such a manner that its use would violate Stanford's rights to a fair trial, and therefore, potentially rise to the level of prosecutorial misconduct.

An intentional breach of the attorney-client relationship by the government does not necessarily warrant dismissal of the indictment. *United States v. Cross,* 638 F.2d 1375, 1379 (5th Cir. 1981). Dismissal of an indictment for Fifth and Sixth Amendment violations arising out of prosecutorial misconduct is "extraordinary relief" and as the Supreme Court has indicated:

> Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily

infringe on competing interests. . . [W]hen before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence. . . More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate. This has [also] been the result where a Fifth Amendment violation has occurred . . .

*United States v. Morrison* 449 U.S. 361, 363-366 (1981).

The Sixth Amendment right to counsel "does not attach until 'at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *United States v. Fortna*, 796 F.2d 724, 731 (5th Cir. 1986) (quoting *United States v. Gouveia* 467 U.S. 180, 188 (1984)).  At the time of the interview, *judicial* criminal proceedings had not been initiated against Buswell or Stanford in this case and the record is clear there were no discussions with Buswell regarding the securities fraud case.

Even if one were to assume a Sixth Amendment violation occurred in the pending securities fraud case, that would not necessarily warrant suppression of the statement in this case because:

[E]vidence obtained by governmental actions which violate an individual's Sixth Amendment rights with respect to an offense as to which adversary judicial criminal proceedings had been initiated

when the actions occurred, [i.e. the securities fraud case] is not inadmissible under the Sixth Amendment in a trial (or presumably in a grand jury proceeding leading to indictment) of the same individual for a different offense as to which adversary proceedings had not been initiated when those same actions took place.

*United States v. Fortna,* 796 F.2d. at 731 (citing *Moran v. Burbine,* 475 U.S. 412, 431(1986)).

Therefore, whether pertaining to Buswell or Stanford, no Sixth Amendment violation occurred in *this case* as a result of the interview.

As to the Fifth Amendment claim based on Buswell's self incriminating statements, this Court finds Buswell was properly *Mirandized* before he was questioned about the Curious Goods operation, he chose to answer the agents' questions and did not ask to seek the advice of counsel before he did. There is no evidence that his statements were coerced or in any way involuntary. Therefore, there were no Fifth Amendment violations arising out of self incriminating statements made in the course of the interview.

Buswell would not be able to demonstrate a violation of either his Fifth Amendment right against self-incrimination or Sixth Amendment right to counsel in this case arising out of the interview. Therefore, Stanford, cannot demonstrate sufficient prejudice to *his* case arising out of the interview to show a violation of his Fifth Amendment right to due process that would warrant the "extraordinary

relief" he seeks.

Stanford's contention that the indictment should be dismissed due to the alleged violation of Rule 4.2 of the Louisiana Rules of Professional Conduct is also without merit. The alleged violation is based on the prosecuting attorneys' knowledge of the interview and the advice given to White and DeSalvo.

Pursuant to the Citizens Protection Act, 28 U.S.C.§530B(a) enacted in 1998:

> An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.[35]

An assistant United States Attorney meets the definition of "attorney for the Government" as used in this statute. 28 U.S.C. §530B(c), 28 C.F.R. §§77.2(a), 77.3. However, that regulation excludes "attorneys employed as investigators *or other law enforcement agents* by the Department of Justice who are not authorized to represent the United States in criminal or civil law enforcement litigation or to supervise such proceedings." (Emphasis added) Thus, while there can be no violation by DEA Agents White and DeSalvo individually under this rule as they do not meet the definition of an "attorney for the government," their actions can be

---

[35] LR 83.2.4 of the Western District adopts the Louisiana Rules of Professional Conduct.

imputed to the prosecuting attorneys in certain circumstances.

Pursuant to 28 C.F.R. §77.4(f):

A Department attorney shall not direct an investigative agent acting under the attorney's supervision to engage in conduct under circumstances that would violate the attorney's obligations under section 530B. A Department attorney who in good faith provides legal advice or guidance upon request to an investigative agent should not be deemed to violate these rules.

Rule 4.2 of the Louisiana Rules of Professional Conduct provides in pertinent part:

Unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order, a lawyer in representing a client shall not communicate about the subject of the representation with:
(a) a person the lawyer knows to be represented by another lawyer in the matter . . .

In a well-reasoned analysis a Utah district court recently found that a violation of Rule 4.2 of Utah's Rules of Professional Conduct was a violation of federal law (28 U.S.C. §530B) and denied the defendant due process under the Fifth Amendment. *United States v. Koerber* 2013 WL 4434215, 17-18, 23-24, 28-31 (D. Utah 2013) The violation was based on the advice given by prosecuting attorneys to agents who were conducting overt interviews of the defendant knowing him to be represented. Although factually distinguishable, there are parallels with this case.

-20-

First, the Utah no-contact rule is similar to that of Louisiana in that it applies to a "person" rather than a "party". This distinction was cited by the Utah court as the basis to "sever [the] link" between the initiation of proceedings and the attachment of the Sixth Amendment right to counsel and is consistent with the issues to be considered in the United States Attorneys Manual. *Id.,* at 19-20; 9 USAM, §13.296(B) (2013).

Also similar to the Louisiana rule, the Utah no-contact rule "applies even though the represented person initiates or consents to the communication."  Cf. Rule 4.2 Utah R.Prof.Conduct, cmt.[4]; Rule 4.2 La. R.Prof.Conduct, cmt. [3]. The court found these aspects of the Utah rule consistent with the same section of the United States Attorneys Manual,  which states that "It is the lawyer's consent, not the client's, that is required to authorize contact with a represented person." 9 USAM §13.296(F).

The Utah court found that *overt* interviews were not a "well-established investigatory technique" that were authorized by law which would fall within the exception to the no-contact rule. *Id.,* at 21. See 9 USAM §13.296(G). Under 9 USAM §13.297, overt communications are limited to determining whether someone is represented "concerning the subject matter of the investigation or proceeding", and "discovery procedures or judicial or administrative process in

-21-

accordance with the orders or rules of the court or other tribunal where the matter

is pending . . ." Thus, service of the forfeiture paperwork in conjunction with the

state court proceeding would fall within this exception.

Of particular relevance to this Court's analysis is 9 USAM §13-296(D)

which provides in pertinent part:

> The contact rule only governs communications with represented
> persons about the subject matter for which they are represented. A
> lawyer who represents a person or entity cannot assert a blanket
> representation by which that lawyer purports to represent the person
> or entity on all subjects and all matters. The rule does not govern
> communications with a represented person concerning matters
> outside the representation. Matters outside the representation can
> include new or separate criminal conduct. Whether a matter is a
> separate matter from that on which a person is represented is not
> necessarily determined by the fact that a different proceeding is
> involved. Department attorneys should be particularly aware of this
> issue when there are parallel administrative/civil investigations or
> proceedings and a criminal investigation or proceeding.

Under the regulations applicable to 28 U.S.C. §530B, there is no violation

of the rule if a government attorney, "in good faith provides legal advice or

guidance upon request to an investigative agent." 28 C.F.R. §77.4(f) While this

Court does find that the agents and attorneys for the government knew Stanford

represented Buswell in conjunction with his arrest by the state in December of

2011 and the forfeiture proceedings, there is evidence of which the agents were

aware in the form of jail house recordings of Buswell obtained on February 3, 2012, before the interview, that cast a least some doubt on the extent of his representation.  Buswell stated that Stanford was "not a Curious Goods attorney," had "nothing to do with potpourri or Curious Goods," had "never represented himself to be a potpourri attorney or a Curious Goods Attorney,"and was Buswell's "federal lawyer."[36]  While this was seen by some as Buswell's attempt to deflect attention away from Stanford, the evidence is nonetheless a factor to be considered.

The evidence in this case shows that the agents sought the advice of the prosecuting attorneys on what to do if Buswell wanted to talk to them about Curious Goods, as he had indicated he wanted to do on more than one occasion, after the forfeiture paperwork was served. Overt communications pertaining to service of the forfeiture paperwork could be done without contravening the applicable USAM provisions. At the point in time the agents requested advice of the government attorneys, no other judicial proceedings pertaining to Curious Goods had been commenced.  The agents were advised not to discuss anything pertaining to the subject matter for which Buswell was represented, the securities fraud case, and if after giving Buswell his *Miranda* rights Buswell asked to speak

---

[36]     *United States v. Buswell*, 11-cr-198, Gov't Ex. 11-E admitted in conflict hearing.

with an attorney, they were to stop questioning him.

In *Koerber*, the defendant, who was a target and had not been indicted, made it clear that he believed he was represented in the matter under investigation and on which he was being questioned.  He was not given his *Miranda* rights. After the first interview in which the defendant indicated his belief he was represented in the case under investigation, the prosecutors in *Koerber* scripted a number of questions dealing with trial strategy and attorney-client privilege to be asked by the agents in a second interview. The  court found, under these facts, the agents were the "alter ego" of the prosecutors, that a violation of Rule 4.2, and consequently, a violation of 28 U.S.C. 530B, had occurred which effectively denied the defendant of his due process rights under the Fifth Amendment.

In this case there is no evidence that advice was given to the agents other than (1) to wear a recording device for their own protection, (2) not to discuss the securities fraud case at all; (3) not to discuss the Curious Goods matter without advising Buswell of his *Miranda* rights and (4) if Buswell asked to speak to his attorney before speaking to the agents, to shut down the interview.  This Court does not find the evidence adduced supports a finding of alter-ego of the attorneys for the government on the part of the agents, rather, the evidence is supportive of the exception found in 28 C.F.R. §77.4(f).  Finding that exception applies, this

Court concludes there is no violation of federal law, and therefore, there is no violation of Buswell's Fifth Amendment right to due process on this basis.

If Buswell can show no Fifth Amendment due process violation, there is no basis for Stanford to claim that *his* Fifth Amendment right to due process has been violated. Even assuming Buswell could demonstrate a Fifth Amendment violation based on a violation of 28 U.S.C. §530B, the evidence does not warrant the dismissal of the indictment against Stanford based on the recorded interview as Stanford has not demonstrated substantial prejudice to his case or that the government's investigative methods impair his right to a fundamentally fair trial.

**2. The Failure to Disclose the Recorded Statement at or Prior to the Conflicts Hearing in an Unrelated Case does not Warrant Dismissal of the Indictment in this Case.**

In the securities fraud case, the government filed its motion to evaluate conflict of interest after the April 5 interview took place. The record in that proceeding will reflect that the subject matter of the conflict hearing on May 14, 2012 in which Agent DeSalvo testified was directed primarily to Stanford's alleged participation in the Curious Goods operation and representations made to the Court in previous detention/revocation hearings in the securities fraud case. At the time of the first conflict hearing, neither Stanford nor Buswell had been indicted in this case.

Four days later, on May 18 after Desalvo first testified before the Grand Jury, Buswell was indicted along with Barrow and Espinoza. At the time of the second hearing on May 22, the government indicated Stanford was a "target' of their investigation but no additional testimony was adduced pertaining to Stanford or Curious Goods.[37]  Stanford contends that he was entitled to the recorded interview of Buswell at or prior to the first conflict hearing in the securities fraud case on May 14.

Pursuant to Fed.R.Cr.P. 26.2(a), a statement of a witness other than the defendant who has testified on direct examination must be produced, on motion of a party who did not call the witness, by the party in possession of the statement if it relates to the subject matter of the witness's testimony. However, the rule applies to testimony given at trials, preliminary hearings, sentencings, hearings to modify or revoke probation or supervised release, detention hearings and habeas proceedings. Fed. R.Cr. P. 26.2(g). The government is not required to produce statements made by prospective government witnesses except as required by 18 U.S.C. §3500 (the Jencks Act) even if the statements contain *Brady-Giglio* material. Fed.R.Cr. P. 16(a)(2)*, United States v. Campagnuolo ,* 592 F.2d 852, 859-61 (5th Cir. 1979); *United States v. Anderson*, 574 F.2d 1347, 1352 (5th Cir.

---

[37]        *United States v. Buswell*, 11-cr-198, Rec. Doc. 83, pp. 3-4.

1974); *United States v. Brown,* 699 F.2d 704, 709 (5th Cir. 1983).

Since the hearing in which Agent Desalvo testified on direct was a hearing to determine conflict of interest, neither Rule 26.2 nor the Jencks Act would require disclosure before, during or immediately after the hearing.

Had the question been asked whether the interview was recorded and the agent responded affirmatively, there is no guarantee the statement would have been produced at the time over a government objection under Rule 16(a)(2) as the substance of the statement did not concern the "investigation or prosecution" of the securities fraud case.  Rather, it concerned the investigation of a case that had not yet been presented to the Grand Jury and its disclosure in an unrelated case could have hampered that investigation as individuals were identified in the statement who became defendants in the original and superceding indictments.

On request, "the government must disclose to *the defendant* the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." Fed.R.Cr.P. 16(a)(1)(A). (emphasis added) The government must also disclose to *the defendant* any relevant recorded statement by the defendant within the government's possession, custody or control that "the attorney for the government knows-or through due

diligence could know–that the statement exists." Fed. R.Cr. P. 16(a)(1)(B)(I). (emphasis added)

Buswell was indicted on May 18. He was arraigned on June 13 and his current counsel was appointed at that time.[38]  A discovery request under the court's standing scheduling order was made on July 6.[39] The statement was disclosed to Buswell's counsel shortly thereafter and was in Stanford's possession within ten days of the request being made.  There is no indication the statement would have been used in the trial of the securities fraud case. Even so, the timing of the disclosure was such that *Buswell* was not prejudiced in his ability to use the statement, if appropriate, at trial in either case. The government acknowledged on more than one occasion that it would not seek to introduce the statement at trial in its case in chief, and therefore, *Buswell* was not prejudiced in this case. Absent prejudice to Buswell that would even warrant suppression of the statement in this case, Stanford cannot show prejudice to his case that would warrant the "extraordinary relief" of dismissal of the indictment.

---

[38]    Rec. Doc. 39.

[39]    Rec. Doc. 49.

### *3. There is no Evidence of Material Misrepresentations to this Court or the Grand Jury that Warrant Dismissal of the Indictment.*

Stanford contends DeSalvo testified falsely to this Court and the Grand Jury. Upon review of the transcript in the evidentiary hearing and conflict hearing, this Court finds that, while there is an instance of at least one minor discrepancy in the testimony of Agent DeSalvo between the two hearings regarding cash belonging to Paul Buswell that ended up in the possession of Stanford, this Court finds his explanation was reasonable, the discrepancy does not rise to the level of perjury and would certainly not justify dismissing the indictment against Stanford.

Stanford also speculates as to what DeSalvo's testimony to the Grand Jury could have been, however, he makes no specific allegations of misconduct. The proceedings before the Grand Jury are entitled to a presumption of regularity which is not easily overcome. *Hamling v. United States*, 418 U.S. 87, 139 fn. 23 (1974); *Beverly v. United States* 468 F.2d 732, 743 (5th Cir. 1972).

As such, the defendant must establish that "particularized and factually based grounds exist to support the proposition that irregularities in the grand jury proceedings may create a basis for dismissal of the indictment." *United States v. Abcasis* 785 F.Supp. 1113, 1119 (E.D.N.Y. 1992) ("Conclusory allegations or speculative allegations of misconduct" are not enough.) *Id*. at 1119. "Even in

camera inspection of grand jury minutes by a district court judge is inappropriate absent specific factual allegations of government misconduct." *United States v. Vaughan* 2010 WL 3025648 *3 (S.D.N.Y. 2010) (citing *United States v. Torres* 901 F.2d 205, 233 (2nd Cir. 1990)); *See also United States v. Wysinger* 2010 WL 2802507 *3 (S.D. Ill. 2010) and *United States v. Velasquez-Lopez* 2010 WL 1996605 *1 (D. Az. 2010) .

Even assuming, as Stanford would have this Court conclude based on his rhetorical questions, that misleading or inaccurate information was given to the Grand Jury by DeSalvo, the relief he seeks would not be justified. In *Bank of Nova Scotia v. United States,* 487 U.S. 250 (1988)  the Supreme Court stated:

> The District Court found that, to the prejudice of petitioners, IRS agents gave misleading and inaccurate summaries to the grand jury just prior to the indictment. Because the record does not reveal any prosecutorial misconduct with respect to these summaries, they provide no ground for dismissing the indictment. The District Court's finding that the summaries offered by IRS agents contained evidence that had not been presented to the grand jury in prior testimony boils down to a challenge to the reliability or competence of the evidence presented to the grand jury. We have held that an indictment valid on its face is not subject to such a challenge. *United States v. Calandra*, 414 U.S. 338, 344-345, 94 S.Ct. 613, 618-619, 38 L.Ed.2d 561 (1974). To the extent that a challenge is made to the accuracy of the summaries, the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment. See *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408-409, 100 L.Ed. 397 (1956) (holding that a court may not look behind the indictment to determine if the evidence upon which it was based is

sufficient).The mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment," and that "a challenge to the reliability or competence of the evidence presented to the grand jury" will not be heard.

*Bank of Nova Scotia v. United States,* 487 U.S. at 260-261.

This Court has issued multiple reports and recommendations to the district court concluding that the indictment is valid on its face which have all been adopted.  Therefore, challenges to the reliability or competency of the evidence presented will not be considered.  However, where the government presents false testimony to the Grand Jury, the indictment may be dismissed if the perjured testimony is knowingly sponsored by the government and material to the decision to indict. *United States v. Strouse*, 286 F.3d 767, 773-74 (5th Cir. 2002). (A statement is material if it is "capable of influencing the tribunal on the issue before it.") *Id*. at 771.

This Court has reviewed the transcripts of Agent DeSalvo's testimony before the Grand Jury *in camera* and considered all the evidence adduced at the hearing.  This Court finds no evidence of government misconduct that would warrant dismissal of the indictment.

This Court is mindful that the testimony of DeSalvo has not been produced to the defendant as DeSalvo was not called on direct examination by the

government at the evidentiary hearing. In response to motions for production of Grand Jury transcripts of Agent DeSalvo, the government has repeatedly represented that it will "promptly" comply with its obligations under *Brady v. Maryland,* 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) pursuant to Fed.R.Cr.P. 26.2(a).[40] As previously set forth, timely compliance with Rule 26.2(a) and the Jencks Act is considered as timely compliance with *Brady.*

In *United States v. Harris*, 458 F.2d 670, 676-77 (5th Cir. 1972) the court held that the failure to make pretrial disclosure of the grand jury testimony of a government witness did not violate due process because it did not prejudice the defendant. After the evidentiary hearing in this case, this Court ruled that disclosure of DeSalvo's grand jury testimony remains subject to disclosure under *Brady, Giglio,* the Jencks Act and Rule 26.2(a) but did not require disclosure at that time.[41] For the reasons stated, and the representations by the government that it will timely disclose any *Brady/Giglio* material, this Court sees no basis to alter or amend its previous ruling.

**4. There is No Evidence of Prosecutorial Vindictiveness that would Warrant Dismissal of the Indictment.**

---

[40]    Rec. Doc. 514, pp. 3-4.

[41]    Rec. Doc. 514, p. 5.

Stanford contends that he is being "selectively and vindictively prosecuted because he is a criminal defense lawyer who was at all times relevant to these matters a fierce advocate for his clients."[42]  As such, he contends his rights to equal protection under the Fifth and Fourteenth Amendment have been violated. He also asserts that his "conduct in this case involves what, how, when, and where he made statements to various individuals regarding his role as a criminal defense lawyer."[43]  By prosecuting him for these actions, he contends the government is seeking to punish him for exercising his right to free and commercial speech in violation of his First Amendment rights.

The defendant bears the burden of proving prosecutorial vindictiveness by a preponderance of the evidence. *United States v. Krezdorn,* 718 F.2d 1360, 1365 (5th Cir 1983) (en banc); *United States v. Saltzman* 537 F.3d 353, 359 (5th Cir. 2008).  In *Saltzman*, the court examined the jurisprudential standards applicable to a prosecutorial vindictiveness claim in a pre-trial setting and explained:

> In general, there are two ways in which a defendant can prove a claim of vindictiveness. First, a defendant may prove actual vindictiveness by presenting objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights. Second, in certain circumstances, a defendant may show sufficient facts to

---

[42]    Rec. Doc. 313-1, p. 44.

[43]    Rec. Doc. 313-1, p. 45.

give rise to a presumption of vindictiveness. . .  The presumption of vindictiveness is a prophylactic rule designed to protect a defendant's due process rights where a danger exists that the government might retaliate against him for exercising a legal right. . . . To determine whether the presumption of vindictiveness applies, the court must examine the prosecutor's actions in the context of the entire proceedings. There is no presumption of vindictiveness if in the context of the entire proceedings any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision ... was motivated by some purpose other than a vindictive desire to deter or punish.

*United States v. Saltzman,* 537 F.3d at 359-360. (Citations and quotations omitted)

Although not articulated as such, by not asserting or arguing objective evidence exists that the prosecutor's actions in this case were designed to punish him for representing criminal defendants, this Court assumes Stanford is arguing that, based on the evidence asserted, this Court should find a presumption of vindictiveness.  This Court declines to do so.

In the indictment, all of the defendants are charged in the conspiracy counts. Implicit in each those charges is an agreement by two or more persons to commit a crime and the defendant's participation in that conspiracy.  As set forth in this Court's report and recommendation on Stanford's Motion to Dismiss Counts I, II and III of the Superceding Indictment, the government need not prove an overt act in Counts I and III, and in Count II, proof of an overt act by a single member of the conspiracy establishes guilt as to each and it is not necessary to show any other

conspirator was present.

In Count I, it is alleged that Stanford received e-mail correspondence documenting the presence of AM-2201 in Mr. Miyagi by way of lab reports after the time when AM-2201 was allegedly designated a "controlled substance analogue." It is also alleged that Mr. Miyagi, which contained AM-2201 that was supplied by Pinnacle Products, was sold by Curious Goods. It is also alleged that Stanford received checks totaling approximately $156,921.00 from Pinnacle and Curious Goods , LLC.

In Count II, it is alleged that Mr. Miyagi was labeled as "not for human consumption" and that this labeling was false and misleading. It is also alleged that Stanford and Francis, the two individuals associated with the Retail Compliance Association (RCA), trained and instructed the franchise owners on how to evade law enforcement, etc. and that these franchise owners would have to pay the RCA money based on the volume of sales.

In Count III, all of the defendants are charged with money laundering conspiracy tied to the acquisition of AM-2201, and its distribution and sale in Mr. Miyagi whether to or by Curious Goods.

With three exceptions, for each of the money laundering counts with which Stanford is charged, a specific monetary transaction is identified involving a

transaction between Curious Goods, Richard Buswell and Stanford. One count alleges co-mingling of funds and the other two allege checks issued from the account where deposits had been made with funds obtained from Curious Goods/Buswell.

The forfeiture allegations are addressed to all defendants where appropriate. The allegations reference the funds in the accounts of Curious Goods, Pinnacle Products and the funds in the accounts alleged in the money laundering counts against Domingue and Stanford. There is also a  parcel of land and immovable property titled in Stanford's name.  That allegation is tailored to the payment of $200,000 toward the mortgage with funds allegedly derived from the operation of Curious Goods.

The evidence adduced at the hearing is that the government has pursued seizure and forfeiture against the defendants in this case where possible. Although Stanford adduced evidence of people and entities apparently not pursued in other parts of the country, that does not negate the fact that in this prosecution, based on the entirety of the case as presented by the pleadings and the evidence adduced at the hearing, the defendants have been charged with specific allegations of criminal misconduct and there are multiple objective events to "indicate to a reasonable minded defendant that the prosecutor's decision ... was motivated by some purpose

other than a vindictive desire to deter or punish."

## *Conclusion and Recommendations*

Stanford has not demonstrated that any of his contentions, standing alone, rise to the level of prosecutorial misconduct so as to warrant dismissal of the indictment. In the absence of any such violations, he cannot seek dismissal based on an aggregate or cumulative errors analysis. He has not demonstrated the likelihood of substantial prejudice against him based on the allegations of actions taken by the government toward Buswell. This Court does not find the government has knowingly sponsored misconduct before the Grand Jury and Stanford has failed to meet his burden to show the prosecution against him has been vindictive.

Therefore, based on the foregoing, it is recommended that the Motion to Dismiss be denied.

Under the provisions of 28 U.S.C. § 636(b)(1) and Fed.R.Cr.P. 59(b)(2), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation, or on a date specified by the district court, to file specific, written objections with the Clerk of Court.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within

fourteen days following the date of its service, or on a date set by the district court, shall act to waive the party's right to review by the district court. Fed. R.Cr. P. 59(b)(2).

Signed at Lafayette, Louisiana on this 22nd day of November, 2013.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE