UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

UNITED STATES OF AMERICA                     CRIMINAL NO.: 12-CR-0146-08

VERSUS                                                   JUDGE ELIZABETH FOOTE

DANIEL JAMES STANFORD                     MAGISTRATE JUDGE HANNA


**<u>AMENDED REPLY BRIEF</u>**


NOW INTO COURT comes DANIEL STANFORD, Pro Se, in Reply to the government's Response (Rec. Doc. 892) to Stanford's Motion for New Trial (Rec. Doc. 878).  Stanford submits this Reply in Support of his Motion for New Trial, Discovery, and an Evidentiary Hearing.

"A lie can travel halfway around the world while the truth is putting on its shoes."

– Mark Twain.

The Court instructed the jury that "**[t]he law does not require a defendant to prove his innocense or produce any evidence at all . . .**"  (Pg. 2, ¶ 3, Court's Jury Instructions, *U.S. v. Stanford*).  Our system of justice is a truth seeking process where an accused should receive all information relevant and necessary for the preparation of his defense.  The accuser should present truthful witnesses and credible evidence at trial.   These principles are paramount to a fair trial and to the fair administration of justice.   No one can receive a fair trial when favorable information is withheld; when key cooperating witnesses knowingly contrive false statements;  and when false and misleading testimony is presented to the fact finder, the jury, at trial.

Stanford did not receive a fair trial.  Favorable evidence was knowingly withheld from

Stanford and key cooperating witnesses knowingly gave contrived and false testimony to the jury against Stanford.  Under those circumstances, no one could prepare and present an effective defense and receive a fair trial.  Stanford was placed in the ongoing position of having "to prove his innocense" at trial when confronted with unanticipated, and knowingly contrived false testimony.

Stanford did not and could not anticipate the amount and magnitude of false and misleading testimony that cooperating government witnesses gave to the jury.  To be clear, Stanford is not making baseless and unsupported claims after the fact.  Stanford's claims are supported by credible information most of which was known to the prosecution team before and during trial.

The  prosecution team intentionally withheld favorable information obtained during their investigation of this case.  The prosecution has an obligation to turn over information helpful to Stanford pursuant to *Brady[1]*, *Kyles[2]*, *Jencks[3]*, and *Giglio[4]*.  The prosecution team did not.  Members of the prosecution team had knowledge and information that these cooperating witnesses were not being truthful and would testify falsely at trial.  However, members of the prosecution team stood by silently prior to trial and during trial while these witnesses gave knowingly false testimony to the jury.  Stanford was left to prepare and formulate his defense and opening statement absent critical and material discovery information, along with having to face unknown, unanticipated, false and misleading testimony.

---

[1]     *Brady v. Maryland*, 373 U.S. 83, 87 (1963)("The United States wins its point whenever justice is done its citizens in the courts.")

[2]     *Kyles v. Whitley*, 514 U.S. 419 (1995).

[3]     *Jencks v. United States*, 353 U.S. 657 (1957).

[4]     *Giglio v. United States,* 405 U.S. 150 (1972).

2

Moreover, the government's discovery process in this case was a disorganized electronic production of vast amounts of unindexed scanned documents formatted in a way that made it extremely difficult to electronically search through any of the documents.  Stanford received  over seventy thousand discovery documents that had been randomly dumped into directory formats in single-page [TIFs][5] i.e., single page documents scanned into files that must be reviewed document by document, page-by-page, without anyway to perform any type of electronic program search.  The discovery amounted to being provided with a giant haystack and then trying to locate needles inside the giant haystack.

A review of the testimony given at trial against the evidence now being presented to this Court proves that witnesses knowingly contrived and presented false testimony to the jury in order to obtain a verdict against Stanford.   Stanford's Reply and exhibits show a cumulative pattern of intentional withholding of information from Stanford,  and the presentation of knowingly false and misleading testimony to the jury at trial.

## STANDARDS OF REVIEW UNDER FED.R.CRIM.P. 33(a)

Although Federal Rule of Criminal Procedure 29( c) and Rule 33(a) deal with similar issues, the two rules are governed by different standards of review.  On a motion for a judgment of acquittal, pursuant to Rule 29(c), a court is required to approach the evidence from a standpoint most favorable to the government, and to assume the truth of the evidence offered by the prosecution.  On a motion for a new trial pursuant to Rule 33(a); however, the power of the court is much broader and the court may weigh the evidence and consider the credibility of the witnesses.  See Charles Alan Wright, Nancy King & Susan Klein, *Federal Practice and Procedure* § 553(3d ed.2004).

---

[5]        "Tagged Image File."

3

Rule 33 of the Federal Rules of Criminal Procedure provides that, on motion of a defendant, the Court may grant a new trial "if the interest of justice so requires."  Fed.R.Crim.P. 33(a).  "The trial judge may weigh the evidence and assess the credibility of the witnesses in considering the motion."  *United States v. Arnold*, 416 F.3d 349, 360 (5th Cir.2005).  A motion for a new trial under Rule 33(a) "may be premised upon the argument that the jury's verdict was against the manifest weight of the evidence."  *United States v. Hughes,* 505 F.3d 578, 593 (6th Cir.2007).  When considering the defendant's motion for a new trial, the court may act as a "thirteenth juror, assessing the credibility of witnesses and the weight of the evidence."  *Hughes,* 505 F.3d at 593.  "Such a standard requires the district court to balance the alleged errors against the record as a whole and evaluate the fairness of the trial."  *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir.1988).  "The power to grant a new trial ... should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict."  *Arnold,* at n. 18.  "However, if a court finds that a miscarriage of justice may have occurred at trial, ... this is classified as such an exceptional case as to warrant granting a new trial in the interests of justice."  *United States v. Sipe,* 388 F.3d 471, 493 (5th Cir.2004).

**ARGUMENT**

I.      **A New Trial Should Be Ordered, with Discovery and an Evidentiary Hearing**

1.      ***Brady***[6]***, Kyles***[7]***, Jencks***[8]**, and *Giglio*[9] violations**[10].

Federal prosecutors and their agents document their interviews with witnesses by writing notes and preparing investigative reports.  However, in this case, the prosecution team not only documented interviews by note taking and preparing investigative reports but also made "secret" audio recordings of witness interviews.   FBI, DEA, and local law enforcement agencies  were part of the prosecution team.   These law enforcement agencies regularly prepare reports on interviewed witnesses.  Francis, Barrow, and Espinoza all testified that they were interviewed before they plead, numerous times after they plead, and also in preparation for trial.  Stanford was not given any witness statements for any witnesses the government used at trial.

The failure to prepare and memorialize a key witness' prior statements denies the defendant the opportunity to effectively prepare his defense and to confront the witness with relevant information to attack that witness' credibility and damage the prosecution's case.  Stanford did not receive a single investigative interview report on Dan Francis, Boyd Barrow, Josh Espinoza, Drew Green, Alexander Reece, Johnny Cosper, or Brady Becker.  Stanford did not receive a single

_____

[6]      *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[7]      *Kyles v. Whitley*, 514 U.S. 419 (1995).

[8]      *Jencks v. United States*, 353 U.S. 657 (1957).

[9]      *Giglio v. United States*, 405 U.S. 150 (1972).

[10]      In the aftermath of the Senator Ted Stevens case, a *Brady* statute has been proposed to provide for disclosure of favorable information in federal criminal prosecutions. *See* Fairness in Disclosure of Evidence Act of 2012, S 2197, 112th Cong. (2d Sess. 2012).

investigative interview report on any witness called by the government.   Stanford could have used this information to effectively prepare his defense and a conduct pointed attack on the credibility of the government's witnesses and its investigation.

Did the prosecution team intentionally not take notes and prepare witness interview reports to prevent Stanford from having favorable information that was damaging to the government's case?  Needless to say, the withholding of witness investigative reports prevented Stanford from learning about information from these witnesses that was favorable to Stanford, revealed false and inconsistent statements in a witness' account, and denied Stanford the ability to confront the witness' testimony with relevant impeachment material.  As one court observed, such a practice  is a "risky business" and "demeans" the primary duty of prosecutors to see that justice is done.[11]

The government submitted a 5k1.1 motion on behalf of Francis and has acknowledged that he was **interviewed** and **debriefed** by the prosecution team on numerous occasions. (Rec. Doc. 888, ¶ 3).  Francis testified that he met with the prosecution team and "[t]hree in preparation of testimony." (III pg 545 ln1-3).  Francis testified that he was interviewed by the prosecution team prior to his plea and subsequent to his plea.  Francis testified that the prosecution team including agents took notes at his interviews. (III pg 545 ln 1-24)  Francis was asked how would anyone know whether his prior statements were consistent with his testimony at trial without having reviewed any of his prior statements.  Francis response was "[b]ecause I committed to the truth."  (III pg 546 ln 15-22) and that he practiced "rigorous honesty."  (III pg 547 ln 2-5).  Stanford was unable to effectively prepare to cross examine and impeach Francis' false testimony without having received

---

[11]        *United States v. Houlihan*, 92 F.3d 1271, 1289 (1st Cir. 1996); *see also United States v. Rodriguez,* 496 F.3d 221, 225 n.3 (2nd Cir. 2007).

any of Francis' numerous previous statements which certainly contained *Brady* information.

During trial, Stanford was unable to introduce an e-mail from Francis regarding a meeting in New Orleans he attended with Barrow and Espinoza.  (Def. Proffer 2).  Francis wrote that Espinoza told him that he believed that his involvement with the Mr. Miyagi product "was legal" until he was told that it was "illegal at his debrief."  This is consistent with Espinoza's conduct post December 8, 2011.  Espinoza e-mailed Stanford on January 4, 2012 at 11:57AM "Subject: Letter" "Attachments: MWP Opinion letter.pdf."  The attached letter was the March 7, 2011, Dr. Lantz opinion letter.  (Trial Exhibit D-56).  Francis wrote that  Barrow and Espinoza discussed plea deals and the impact of plea deals.  Francis stated that Barrow and Espinoza stated that they had conversations with Thomas Malone.  A fact that Barrow denied at trial.  Barrow and Espinoza were both provided ongoing interviews before and after pleading guilty and in preparation for trial.  None were provided to Stanford.

The government is also required to disclose *Brady* information contained in rough notes of witness interviews taken by prosecutors and their agents.[12]  Stanford did not receive any witness interviews or any notes of witness interviews from the government.  The government has an obligation to notify Stanford of any favorable  information even if it is not written and the government also has a legal and ethical obligation to prevent a witness from falsely testifying.

Stanford requests that this Honorable Court order the government to provide Stanford with all witness interviews of Boyd Barrow, Josh Espinoza, Dan Francis, Drew Green, Alexander Reece,

---

[12]     *United States v. Andrews*, 532 F.3d 900, 906 (D.C. Cir. 2008); *United States v. Harrison*, 524 F.2d 421, 427 (D.C. Cir. 1975). See also, Subverting Brady v. Maryland and Denying a Fair Trial: Studying the Schuelke Report, 64 Mercer L. Rev. 683, 2013 (Report to Hon. Emmett G. Sullivan of Investigation Conducted Pursuant to Court Order in U.S. v. Theodore F. Stevens (Senator Ted Stevens) No. 98-cr-231 (EGS).

Johnny Cosper, and Brady Becker.

The government issued search and seizure warrants/subpoenas for these email accounts:

1.    Pinnacleproductsgroup@gmail.com  Defense Exhibit 19.

2.    josh@pinnacleproductsgroup.com  Defense Exhibit 17.

3.    boyd@pinnacleproductsgroup.com  Defense Exhibit 18.

4.    stanatty@bellsouth.net  Defense Exhibit 15.

5.    rgb52798@hotmail.com  Defense Exhibit 16.

6.    Paulbuswell@yahoo.com  Defense Exhibit 20.

7.    Barrydomingue@cox.net  Defense Exhibit 21.

All of Stanford's e-mails from stanatty@bellsouth.net with any co-defendant and/or anyone else involved with this case was pulled by the government and provided in discovery.  Agent Errol Catalon testified that he prepared a search warrant for Stanford's e-mail account stanatty@bellsouth.net and obtained all of Stanford's e-mails from the Internet service provider.  (II pg 197-198).  Agent Catalon was asked if any of the e-mails were "deleted e-mails."  Agent Catalon testified that all of the e-mails "were saved in the e-mail account. (III pg 352 ln 13-19).

All of Richard Buswell's e-mails  rgb52798@hotmail.com were pulled and copied by the government and provided in discovery.

**Richard Buswell's iPhone**

The prosecution team intentionally withheld favorable information that it obtained from a content search of Richard Buswell's iPhone.  Richard Buswell was arrested at Stanford's office on December 8, 2011 without incident.  Stanford turned over Buswell's cellular phone, iPhone, to the arresting officers.  (Def. Ex. 58).  The prosecution team obtained a search and seizure warrant to

8

search the contents of Buswell's iPhone.  (Def. Ex. 23).   If Stanford would turn over Richard Buswell's iPhone to law enforcement on December 8, 2011, why would he tell Boyd Barrow to destroy his computer and cellular phone?  That did not happen.  Stanford heard this story for the first time during trial when the words came out of Barrow's mouth.

A search of Buswell's iPhone was done and the contents of the iPhone downloaded into an FBI database.  The FBI then retrieved all of Buswell's text messages from his iPhone.  The text messages begin in March 2011 through to December 8, 2011, the date the iPhone was turned over to law enforcement.  The prosecution team intentionally withheld all text messages between Buswell and Barrow, Espinoza, and Francis during 2011.[13]  On December 8, 2011, the day of the raids, the only text between Buswell and Francis shows that neither Barrow, Espinoza, or Francis had previously told Buswell that AM2201 was in Mr. Miyagi.  Buswell sent Francis a text of a news story that listed banned substances.  Buswell texted Francis "Are any of these chemicals used."  Francis texted a response that reads "No 1-5(Flouropentyl)-1H-Indole-3-YI-(Napthalen-1-YI)-Methanone and five MEO Dalt."  (Def. Ex. 24, pg 89 of 203 & 90 of 203).   Similarly, e-mails between Barrow, Espinoza, and Francis between themselves and other co-defendants and co-conspirators were information that should have been provided and were not provided to Stanford.

Stanford  did  not  receive  any  e-mails  from  the   Pinnacleproductsgroup@gmail.com, josh@pinnacleproductsgroup.com and boyd@pinnacleproductsgroup.com between January 1, 2011 and December 31, 2011.   Boyd Barrow and Josh Espinoza's e-mails between January 1, 2011 and December 31, 2011 are *Brady* information that should have been provided to Stanford.  Barrow and

---

[13]     Only one December 8, 2011 text message between Buswell and Francis was provided to Stanford in discovery.

Espinoza's e-mails would have supported Stanford's defense and compromised the government's case.   Stanford did not receive them.  Stanford was only given the one Barrow October 27, 2011 email from Barry Domingue referencing the Tulane lab reports.   The June 30, 2011 e-mail between Barrow and Francis about the Louisiana law was forwarded to Richard Buswell and in discovery. That e-mail shows that neither Francis nor Barrow were concerned about the Louisiana law.  The Pinnacle, Barrow, and Espinoza e-mails would have given Stanford favorable information and would have established a time line of when Barrow and Espinoza were in Lafayette.  Additionally, the e-mails would prove that there were no discussions with Stanford regarding the Mr. Miyagi product, AM2201, the attorney general, protection etc.

Dan Francis used at least three (3) email accounts, dan@coglib.org, dan@therca.org, and www.therca.org.  Stanford only received Dan Francis e-mails only from the month of January 2011 in *Jencks* material.  The January 2011 emails are between Francis, Malone, attorney Don Wirtshafter, and Boyd Barrow where there were discussions of forming the RCA and discussions  regarding state and federal laws and proposed bans.  Francis' February, March, April, May, June, July, August, September, October, November 2011 e-mails between himself and Barrow, Espinoza, Malone, Green, and Wirtshafter are discoverable material information.  Stanford only received one e-mail from Dan Francis to Tommy Malone and Drew Green in discovery.  (Trial Exhibit D-37).

Francis testified that he only became directly involved in the industry after he came to Louisiana and the Louisiana RCA was formed.

> "No.  I was not involved with the industry directly - - or with a manufacturer directly for the sake of the product specifically until the RCA that we formed was complete, so that actually occurred here." (III pg 535 ln 5-8).

Francis testified that his "primary role" with the RCA had been to track different laws and/or legislation targeted at the synthetic canniboid industry, advise retail stores and attend congressional hearings in Washington D.C. to track legislation.   (III pg 379 ln 1-25). Francis repeatedly downplayed his involvement in the industry throughout his testimony.   Francis was shown a September 20, 2011 at 12:39PM e-mail from dan@coglib.org to Drew Green and Tommy Malone "Subject: Re: Final details regarding ZZ-1."   Stanford asked Francis if he was working for the Coalition for Cognitive Liberty and the RCA simultaneously.   Francis testified "No, I'm not." Francis was asked if he was working with Malone and Green and testified that "they were trying to get various opinions.  I was given this just to do my own outside independent opinion on it." (III pg 574 ln 12-22).

Francis knowingly testified falsely about working for both the CCL and the RCA at the same time.   Francis was essentially an employee of Drew Green and Thomas Malone.   Francis was being paid up to $4,000. a month by the CCL i.e., Malone and Green and received a $10,000. check from the CCL in January 2011.  (Def. Ex. 29).

Francis was the single most important cooperating government witness.   Stanford did not receive one interview report on Francis and none of Francis' e-mails with other co-defendants like Barrow, Espinoza, Green, and Malone.   The prosecution team intentionally withheld this favorable information from Stanford.

Stanford did not receive any of Dan Francis' e-mails from dan@therca.org, or www.therca.org. and no e-mails from dan@coglib.org between February 1, 2011 through December 8, 2011.  Dan Francis' emails are extremely significant to Stanford's defense.   The e-mails prove that Francis first met Stanford in November 2011, there were no telephone communications between

Stanford and Francis, and they did not discuss creating a Louisiana RCA.  On cross-examination,

Stanford asked Francis:

> Q. Okay.  Let me just ask you a very simple - - well, a simple, straightforward question.  Do you have anything other than your word to show the date, time, or place that we met?
>
> A. No, I don't.
>
> Q. Okay.  And this document here is the first document that evidences that we're going to be meeting on November 2nd, right?
>
> A. Sure.
>
> Q. Okay.
>
> A. I don't know if it's the first one.
>
> Q. Have you seen any other documents?
>
> A. I believe there are other e-mails.  There's a section of e-mails that are missing from the evidence, and that would be at my RCA e-mail address which I primarily used to communicate with you.  You see occasionally in here that I used dan@coglib.org because that was my default e-mail, that's the one that automatically presented itself, and so during busy times I often just used it.
> (Vol. III of XI, Pages 588-89, lines 14-25 & lines 1-6 "hereinafter III pg 588 ln 14").

Francis was shown an e-mail that he sent to Boyd Barrow on June 30, 2011 at 4:07PM

"Subject: LA law" pulled from Richard Buswell's e-mail account rgb52798@hotmail.com.  Francis

testified that the e-mail was part of "chain of e-mails" and that he could identify this particular e-mail

without being able to see the preceding e-mails.  ( IV pg 693 ln 5-21 and D-46).  Stanford was unable

to effectively cross examine Francis without having all of Francis' and Barrow's 2011 e-mails.

Every e-mail from Francis to Stanford introduced at trial used the dan@coglib.org e-mail

address.  Francis is testifying to the jury that there are other e-mails between himself and Stanford

from his RCA e-mail addresses at dan@therca.org. or www.therca.org that are missing and

supportive of Francis' testimony. Francis is either testifying falsely with the government's knowledge or the government intentionally withheld *Brady* information.

Stanford requests that the Court order the government to turn over the emails from Pinnacleproductsgroup@gmail.com, josh@pinnacleproductsgroup.com, boyd@pinnacleproductsgroup.com, dan@coglib.org, dan@therca.org, and www.therca.org. between the time periods of January 1, 2011 and December 31, 2011.

### **False and Misleading Testimony of Cooperating Co-Defendants**.

Dan Francis, Boyd Barrow, and Josh Espinoza knowingly lied to the jury on every single significant issue of fact. Francis, the government's key witness, testified falsely on every material issue of fact in exchange for the plea agreement to the least serious charge in the indictment. Stanford did not receive a single witness interview report on Francis, Barrow, or Espinoza. Stanford learned of Francis, Barrow, and Espinoza's falsely contrived version of events for the first time at trial.

The prosecution team knew that Francis, Barrow, and Espinoza were not being truthful during pre-trial interviews and when they testified at trial. On September 30, 2014, the government filed a motion for departure pursuant to section 5k1.1 on behalf of Francis. (Rec. Doc. 888). The government claims in the motion that "defendant DANIEL PAUL FRANCIS testified truthfully at the trial of one of his co-defendants." (Rec. Doc. 888, ¶ 2). The government further wrote that the prosecutors "as well as the agents of the government involved in this case, are satisfied that the information furnished by defendant DANIEL PAUL FRANCIS, during **debriefings** and **interviews** was accurate and truthful, and as such, in conformity with the requirements of the plea agreement." (Rec. Doc. 888, ¶ 3).

The following information proves that Francis, Barrow, and Espinoza's testimony was intentionally false and misleading.

* Stanford AT&T cellular phone voice, text, and data  records for number 337-580-5000.  Def. Ex. 1.
* Forensic recovery of the text message communication from Stanford's cellular phone with Dan Francis and Boyd Barrow. Def. Ex. 2.[14]
* FBI subpoena Stanford's cellular number 337-580-5000. Def. Ex. 3.
* FBI toll activity summary Stanford's cellular number 337-580-5000.  Def. Ex. 4.
* FBI toll records Stanford's AT&T cellular voice 337-580-5000. Def. Ex. 5.
* FBI toll records Stanford's AT&T cellular text 1 337-580-5000. Def. Ex. 6.
* FBI toll records Stanford's AT&T cellular text 2 337-580-5000. Def. Ex. 7.
* Stanford office land line 337-232-2272 June 2011. Def. Ex. 8.*
* Stanford office land line 337-232-2272 July 2011. Def. Ex. 9.*
* Stanford office land line 337-232-2272 August 2011. Def. Ex. 10.[15]*
* Stanford office land line 337-232-2272 September 2011. Def. Ex. 11.*
* Stanford office land line 337-232-2272 October 2011. Def. Ex. 12.*
* Stanford office land line 337-232-2272 November 2011. Def. Ex. 13.*
* Stanford office land line 337-232-2272 December 2011. Def. Ex. 14.*
* FBI Subpoena Richard Buswell cellular phone 337-852-2255. Def. Ex. 22.
* FBI Search Warrant Richard Buswell cellular phone 337-852-2255. Def. Ex. 23.
* FBI Forensic recovery of text messages from Richard Buswell cellular phone 337-852-2255.  Def. Ex. 24.[16]
* FBI toll activity summary (1-01-11 - 12-31-11) Richard Buswell cellular 337-852-2255. Def. Ex. 25.
* FBI toll activity summary (12-08-11 - 12-15-11) Richard Buswell cellular 337-852-2255. Def. Ex. 26.
* FBI subpoena Dan Francis cellular  706-531-6286. Def. Ex. 27.

---

[14]     The time stamp on this exhibit is based on Coordinated Universal Time "UTC" also referred to as Greenwich Mean Time "GMT".  The times reflected on the time stamp based on UTC will be six (6) hours ahead of Central Standard Time "CST."

[15]     Stanford's office land line number, 337-232-2272 was programmed with call forwarding feature.  Every call made to Stanford's office land line number of 337-232-2272 was automatically forwarded to Stanford's cellular number 337-580-5000.  The AT&T land line telephone records reflect that all incoming calls to 337-232-2272 were in fact forwarded to 337-580-5000.  All calls to Stanford's office land line number of 337-232-2272 are reflected in Stanford's AT&T cellular telephone records.

[16]     The call times are reflected in GMT and are six (6) hours ahead of CST.  See, footnote 13.

\* FBI subpoena Dan Francis land line 706-216-4481. Def. Ex. 28.
\* CCL checks to Dan Francis 12-10 through 1-12.  Def. Ex. 29.
\* RCA check to Dan Francis. Def. Ex. 30.
\* RCA Proforma document. Def. Ex. 31.
\* RCA Business Plan. Def. Ex. 32.
\* Transcript audio interview between Stanford and Francis 9-28-12. Def. Ex. 33.
\* Pinnacle Wells Fargo checks September 2011. Def. Ex. 34.
\* Barrow August 17-18, 2011 e-mail with Lafayette flight itinerary.  Def. Ex. 35
\* Pinnacle Wells Fargo bank account records July 2011. Def. Ex. 36.
\* Pinnacle Wells Fargo bank account records August 2011. Def. Ex. 37
\* Pinnacle Wells Fargo bank account records September 2011. Def. Ex. 38.
\* Pinnacle Wells Fargo bank account records October 2011. Def. Ex. 39.
\* Pinnacle Wells Fargo bank account records November 2011. Def. Ex. 40.
\* Pinnacle Chase bank account records October 2011. Def. Ex. 41.
\* Pinnacle Chase bank account records November 2011. Def. Ex. 42.
\* Pinnacle July 2011 Invoices. Def. Ex. 43.
\* Barrow July 18, 2011 e-mail to Buswell. Def. Ex. 44.
\* Barrow July 29, 2011 e-mail to Buswell. Def. Ex. 45.
\* Alpha Wells Fargo bank records July 2011. Def. Ex. 46.
\* Alpha Wells Fargo bank records August 2011. Def. Ex. 47.
\* Alpha Wells Fargo bank records September 2011. Def. Ex. 48.
\* Alpha Wells Fargo bank records October 2011. Def. Ex. 49.
\* Alpha Wells Fargo bank records November 2011. Def. Ex. 50.
\* Alpha Chase bank records October 2011. Def. Ex. 51.
\* Alpha Chase bank records November 2011. Def. Ex. 52.
\* Domingue/Espinoza e-mail string December 4-6, 2011 re: meeting/Agenda. Def. Ex. 53.
\* Espinoza January 4, 2012 e-mail. Def. Ex. 54.
\* Domingue email to Buswell re: advertisement. Def. Ex. 56.
\* Domingue email to Buswell re: advertisement. Def. Ex. 57
\* December 8, 2011, Buswell arrest with iPhone. Def. Ex. 58.
\* Richard Buswell receipt of property. Def. Ex. 59.
\* Paul Buswell affidavit March 26, 2013. Def. Ex. 60.
\* Paul Buswell receipt of property. Def. Ex. 61.
\* Bonnie Buswell's printed text messages.  Def. Ex. 62.

**Creation of the Coalition for Cognitive Liberty and the Retail Compliance Association**

Francis testified that he was first involved as the executive director of the Coalition for Cognitive Liberty ("CCL") (III pg371 ln 17-19 & pg 534 ln 8-24 & pg 525 ln 1-24).   Barrow

testified that his company Pinnacle Products was a member of the CCL[17].  Francis testified that it was decided that a retail version of the CCL needed to be formed.

> "Yeah.  It became abundantly clear that the - - Don Wirtshafter again, the attorney most familiar with this stuff, he made it abundantly clear that he felt that the access point for law enforcement, where we're really going to interact with a shut-down or an attempt to criminally prosecute this industry, would be at the retail level because they're most exposed, right?  They're sitting there at their counters with the product on the shelf.  It's very easy for the cop on the beat to walk in there, demand a package or even buy a package, and have it tested, find out it's illegal, then, you know, start up the chain. . . . So it became abundantly clear we needed to form a retail organization, something to educate the retailer to try to create, at the very minimum, stumbling blocks for law enforcement." (V.III pg 374 ln 24-25 & pg 375 ln 1-9 & ln 23-25 & pg 376 ln 1).

Francis testified that he incorporated the "Retail Compliance Association" ("RCA") in California. (III pg 376 ln 3 - 6).  Boyd Barrow testified that his company Pinnacle Products was a member of the RCA.

Francis testified that his "primary role" with the RCA was to track different laws and/or legislation targeted at the synthetic cannabinoid industry and advise retail stores.  Francis also attended congressional hearings in Washington D.C. to track legislation.  Francis testified that "[w]e held conference calls sometimes weekly if the bills were progressing" and interacted with attorney "Don Wirtshafter" who "had another aspect of the RCA . . ." (III pg 379 ln 1-25).   Francis testified that he created various RCA documents for retail store owners. (III pg 395 ln 4-21; G-218, 219, 220, 221, 222, & 223).   Francis also created and operated an RCA website for members where he regularly posted information on state and federal laws and current issues within the industry. (III pg 534 ln 2-7).

Francis also testified that in early 2011 he was aware that Louisiana had aggressive laws and

_____

[17]     Stanford does not have the portion of the trial transcript with Barrow's testimony and is using notes taken during trial.

law enforcement regarding synthetic cannabinoids.  Francis testified:

> A. . . . Louisiana is acting first.  And also the Louisiana Legislature was very proactive. It was always one of the first to move laws forward to ban these compounds. . . .

Francis testified that Louisiana was "[p]retty much a dangerous state to do business."  (III page 383 lines 13-19).

**Francis advising Barrow and Espinoza on Louisiana law**

Francis testified that in June 2011 he was advising Barrow, Espinoza, Malone, and Green on Louisiana law.  Francis testified that Boyd Barrow/Pinnacle Products were members in good standing of his RCA.  (IV pg. 766 ln 23-25).

> "I was trying to keep up with the laws, so yeah, occasionally if they would specifically ask for advise, I would produce what we called opinion letters, which would be just that, my opinion of the law.  Right or wrong, that's what it was."

Francis was asked if Barrow asked him about Louisiana law?

> "It seems like he asked me about several states.  It wouldn't be surprising at all to know he asked me about the Louisiana law, but I don't recall it specifically." (IV pg 619 ln 14-25).

Francis testified that on June 30, 2011 at 4:07PM he sent an email from dan@coglib.org to Boyd Barrow "Subject: LA law."  The first sentence reads, "it is very susceptible to challenge.  The **fifth class of compounds are also hormone stimulants (testosterone)** and include many products." (D-46).  The fifth class of compounds in the Louisiana statute is "Phenylacetylindoles" which is also a hormone stimulant.  Francis explains to Barrow that there is no way for a police officer to enforce the statute because  law enforcement is "supposed to be able to identify indeed any product contains any amount of any illegal ingredients, they are invisible."  Francis also writes to Barrow that a police officer would walk into a retail store and:

> "see 'Incense' being sold, in sealed opaque containers, you are looking for an ingredient,

which is not listed on the label, and there are lab tests showing the product to contain no illegal ingredients.  Where in the law does it instruct the officer on how to act from this point forward?"  (D-46).

Francis compares the "vagueness" of the statute to a failed law enforcement attempt "in Salt Lake City were law enforcement "illegally searched 38 smoke shops . . . and they give no direction to the cops on how to go forward with an investigation without violating 4th and 14th Amendment rights . . ."  Francis denied on cross examination that the letter was about the Louisiana law and testified falsely that the e-mail was about "Utah."

> "Yeah.  We were probably discussing Louisiana law in the chain of e-mails.  I mean, I wrote it in there.  So to me it seems like it is - - 'very susceptible to challenge' is not a complete sentence, so if you have the previous content, that would be helpful."  (IV pg 691 ln23-25, pg 693 ln 2-25).

If Stanford had been provided with the Francis and Barrow e-mails between themselves and Espinoza it would have been favorable information for Stanford.  Francis' testimony here is false and intentionally misleading.  Francis did not want to identify his letter to Barrow as his opinion letter on the pending Louisiana law.  If Francis had testified truthfully about the letter it would have shown that neither Barrow, Espinoza, or Francis had any concern over the pending Louisiana law.  Instead, Francis lied and claimed the letter was about "Utah."

The June 30, 2011 e-mail is an opinion letter from Francis to Barrow advising Barrow that there is nothing to worry about regarding the new Louisiana law.   This fact directly conflicts with Barrow's contrived story of having concern about the pending Louisiana law and that  led him to contact Richard Buswell and Barry Domingue.  This is when he was supposedly told that Buswell and Domingue had law enforcement protection, the district attorney, a letter from the attorney

18

general and Mr. Miyagi was tested at a state crime lab.   The truth also conflicts with Barrow's creating a "warranty" letter to shift compliance to Louisiana as more fully discussed below.

**Boyd Barrow July 18, 2011 e-mail to Richard Buswell**

Boyd Barrow testified falsely that he was concerned about the pending Louisiana law and suspended the sale of the Mr. Miyagi product to Louisiana in July 2011.   Barrow testified that he called Buswell and Domingue and told them he was suspending sales of his Mr. Miyagi product to Louisiana because it was made with AM-2201 a naptholyindole that was being banned in Louisiana. Barrow testified that he would "need a legal team to work on it or he would not ship" Mr. Miyagi to Louisiana.   Barrow testified that he received assurances from Buswell and Domingue who told him they had connections with the District Attorney, a letter from the Attorney General and had Mr. Miyagi tested at a state crime lab where the lab results showed that it "does not fall under the new ban."  Barrow also testified that he created a "**Warranty**" letter to shift Louisiana compliance to Curious Goods.   This is simply not true.

On July 18, 2011, at 12:45p.m. Barrow sent an email to Buswell with "Subject: Invoice/Warranty."  The email reads: "**See attached - Please read and sign warranty and email back or fax (562-372-3333) - I don't have one on file from you - new procedure we started since your last order. Thanks.**"  Attached to the e-mail are an  "**Invoice**" dated "**July 18, 2011**" invoice number "CG71811" **for an order of 875 packages of Mr. Miyagi for a total of "$8,625.00**"; RTP Lab Report dated June 23, 2011; and a two(2) page  "Warranty Information, Legal Notices and Liability" document.  (Def. Ex. 44).

Richard Buswell dated, printed his name and signed his name on the second page and wrote "562-372-3333" on the top of the first page and faxed it to Pinnacle Products.  (Trial Exhibit G-87).

19

Barrow had already sent a substantial order of the Mr. Miyagi product to Curious Goods/Richard Buswell prior to having a signed copy of the "Warranty" letter. **On July 18, 2011, Curious Goods wired two payment to Pinnacle Product totaling $16, 125. for receipt of Mr. Miyagi product prior to July 18, 2011.** (Def. Ex. 36, pg 8 of 12).

Barrow and/or Pinnacle Products never suspended sales to Louisiana. Barrow testified falsely about having concerns over the Louisiana law and suspending sales to Louisiana. Moreover, Pinnacle Products invoices for July 2011 show an increase in sales between Pinnacle Products and Curious Goods. Pinnacle Products bank statements also show an increase in sales between Pinnacle and Curious Goods**.** (Def. Ex. 43) (Trial Exhibit G-369).

**This was the first time that Stanford had heard anything about Pinnacle Products suspending sales, Barrow calling Buswell and Domingue and receiving assurances, or Barrow creating a warranty letter.**

**On July 29, 2011 at 16:50pm Barrow emailed Buswell** "Subject: FW: New Time Out Lab Report" and attached a copy of the "RTP Laboratory Analysis Report" dated "July 29, 2011" regarding a "product analysis" of "Mr. Miyagi Timeout." (Def. Ex. 45). Barrow does not mention compliance, Louisiana law, protection, attorney general letter, or district attorney.

**Barrow visits Lafayette for the first time August 17, 2011**

Barrow flew into Lafayette on August 17th at approximately 12:54pm and left Lafayette on August 18, 2011 at approximately 1:19pm. (Def. Ex. 35). This was Barrow's first visit to Lafayette, Louisiana. Barrow had two (2) charges while in Lafayette on his Wells Fargo Debit card**.** (Def. Ex. 37 at pgs 12 &13). Barrow testified that Buswell picked him up at the airport and that he stayed at Buswell's home that night. Barrow testified that he met with Buswell and Barry Domingue at

Buswell's home where they discussed the Mr. Miyagi product.  Barrow was introduced to Barry Domingue as the "corporate attorney" and "head of compliance" for Curious Goods.  Among other things Barrow testified that Domingue and Buswell told him that they had the Mr. Miyagi product "tested at a state crime lab" and that none of the Mr. Miyagi ingredients were banned in Louisiana.

According to Barrow, he was told first in July and then in August 2011 that his Mr. Miyagi product had been tested at a Louisiana state crime lab and it did not test positive for any banned substances in Louisiana.  This is more contrived and false testimony.  If any of this was true, Barrow would have known that any state crime lab that tested his product would have definitely determined that his product tested positive for Damiana and AM2201, both illegal in Louisiana.

**Stanford heard this story for the first time during the trial.**

**Josh Espinoza knowingly testified**[18] **falsely that Barrow traveled to Lafayette in early July 2011** to "pick up some money" that Richard Buswell owed him and to get Buswell to sign the "warranty letter."  First, Pinnacle's Wells Fargo Bank records show that Curious Goods was wiring money to Pinnacle Products and wired $64,725. to Pinnacle Products in July 2011.  (Trial Exhibit G-369)(Def. Ex. 36).   Additionally, Barrow's first trip to Louisiana was approximately one month later on August 17th, and 18th, 2011.  (Def. Ex. 35 & 37 pgs 12-13).

**Espinoza also testified falsely that he and Barrow drove to Lafayette in August 2011.** Espinoza's was nowhere near Lafayette in August 2011.  Espinoza's Wells Fargo Alpha check card transactions for August 2011 do not have him in Louisiana.  Espinoza's transactions place him in Las Vegas, Nevada from July 31st through August 4th, 2011.  Espinoza is in Georgia the rest of the

---

[18]        Stanford does not have trial transcripts of Espinoza's testimony and is relying on notes taken during trial.

month of August 2011 and travels back to  Las Vegas, Nevada on August 24th through August 28th, 2011 and returns to Georgia. (Def. Ex. 46 and 47).

**Espinoza falsely testified** that he and Barrow drove into Lafayette on a Sunday and went to Ruth's Chris Restaurant.  Espinoza testified that they met  with Patrick Chauvin, Richard Buswell, Barry Domingue, and Daniel Stanford.  Espinoza testified that Domingue and Stanford where sitting on "each side of Richard" at a "round table."   Espinoza testified that Domingue was introduced as the "Curious Goods attorney" and Stanford was introduced as the "corporate attorney."   Espinoza testified that at the meeting "Barry Domingue said that Mr. Miyagi was approved by the Attorney General, District Attorney, and local authorities."  Espinoza testified that "they [Pinnacle] were doing great without Louisiana."   Espinoza testified that Stanford didn't say anything when Domingue talked about the "DA" and the "AG" and "local authorities."    Espinoza testified that Stanford must have overheard Domingue and/or Buswell talk about the "DA", "AG", and "local authorities" about "one-half dozen times" and never said anything.  Espinoza testified that he stayed in Lafayette for "two or three days."   Espinoza testified that he visited the Curious Goods Store "Northside store" and also visited the "RA shop."

**Espinoza's first trip to Lafayette was on September 27, 2011**

Espinoza falsely testified that his first trip to Lafayette was in August 2011 and his second trip to Lafayette was in September 2011.  Espinoza's financial transactions show that Tuesday, September 27, 2011 was his **first** visit  to Lafayette.  Espinoza financial data shows that he was in Lafayette from September 27, 2011 through October 4, 2011.  (Def. Ex. 48 pg 5 of 7) (Def. Ex. 49 pg 2 of 8).  Boyd Barrow is also in Lafayette between September 27, 2011 and October 4, 2011.  Espinoza and Barrow were staying at the Hilton Hotel in Lafayette during that time period.  (Def.

Ex. 38 pg 14 of 18)(Def. Ex. 39 pg 3 & 4 of 16).  Barrow and Espinoza testified that they  retained attorney Barry Domingue on September 29, 2011 and Pinnacle Products bank statements shows a check number 2506 written to Domingue on date.  (Def. Ex. 34).  Domingue incorporates Pinnacle Products and Alpha Products in Louisiana during this visit.  Barrow also opened up a Pinnacle Products Chase Bank account on September 30, 2011.  (Def. Ex. 41).

Stanford was out-of-town from September 257th through September 28th, and returned to Lafayette on September 29th, 2011.  Stanford was at Richard Buswell's home on the evening of September 29, 2011, the day Richard Buswell was served with his summons on the Federal Securities case.  The only other individual at Richard Buswell's home that evening was his mother, Bonnie Buswell.  Bonnie Buswell testified that she was at Richard Buswell's home on the evening of September 29, 2011, the day he was served with the summons.  Espinoza testified at trial that he did not learn that Richard Buswell had been indicted on federal charges until the day of the raids, December 8, 2011.

### Stanford and Barrow met for the first time October 25, 2011

Stanford met Boyd Barrow for the first time on October 25, 2011 in Lafayette.  Stanford met Barrow through Richard Buswell and Barry Domingue.   Barrow was moving into his apartment at River Ranch.  On October 26, 2011, at 1:13 p.m., Stanford sent a text message to Barrow at 770-330-6782 that read "Boyd.  This is Daniel.  If you would like my assistant to help you with shopping for apartment furnishings let me know and I will send her over."  (Def. Ex. 2, at pg 1)(Def. Ex. 1, PDF pg 1499 item 12553)(Def. Ex. 6, PDF pg 96 line 4633).  Stanford also met with Barrow on October 28, 2011 at Stanford's law office where Barrow wrote Stanford a check with "retainer." (Trial Exhibits G-371).

**On November 8, 2011, Stanford and Francis make initial telephone contact**

On direct, Francis falsely testified that he was told that he was going to meet with Stanford and communicated with Stanford via telephone and e-mail.

Q. "Okay.  And prior to coming down and meeting with Mr. Buswell, the owner of Curious Goods, and others, were you also advised that you were going to meet with Mr. Stanford?"

A. "Yes, I was."

Q. "And in preparation for that meeting with Mr. Stanford, did you have any communication with him by way of **telephone calls** or e-mails?"

A. "Yeah.  We had an initial **phone call**, which was just cordial, just saying hello, and I e-mailed him some of the RCA documents that had been previously created."

Q. "Did you randomly send him these documents or **did you advise him that you were going to be sending him these documents**?"

A. "**I advised him I would be sending those documents**.  They were pertinent to establishing an existence of an RCA or however that was going to manifest.  Whether it be the one I was currently operating or doing wasn't known at the time, but it was important to establish the groundwork, you know, the foundation of thought that the RCA came with." (Vol. III page 387 lines 3-20).

**This was the first time that Stanford learned that Francis was claiming that he and Stanford had telephone contact in August 2011 and that they were discussing "establishing an existence of an RCA" prior to Francis e-mailing  Stanford the August 22, 2011 RCA documents**.  Stanford prepared his defense based on the truth.  Stanford received unsolicited e-mails from Francis on August 22, 2011.

On cross examination Francis identified his cellular number as 706-531-6286.  Francis testified again that he first spoke with Stanford by telephone then e-mailed the RCA documents to Stanford.

"I don't know what the exact first time was, but it seems to me it was probably right around

the **middle of August of 2011, because we made contact which resulted in that e-mail where I attached those documents.**" (III pg 590 ln 11-14).

On re-direct examination, Francis testified:

Q. Do you recall your testimony where you stated that **in August of 2011 you communicated with Mr. Stanford by telephone?**

A. I do, yes.

Q. Did Mr. Stanford ask you a series of questions about those communications in court previously?

A. Yes.

Q. Are we to take your word for the fact that you communicated with Mr. Stanford?

A. I suppose that's what you're left with. (IV pg 788 ln 8-16).

**Francis lied about calling and speaking with Stanford in August 2011.**   That did not happen.  Francis knowingly testified falsely and the prosecution team allowed him to give false testimony to the jury.

FBI toll records of Stanford's cellular number 337-580-5000 show that Stanford and Francis first had telephone contact on November 8, 2011 at 1:44pm.  (Def. Ex. 5, pg 61, ln 2949; Def. Ex. 6, & 7 pg 25, ln 5893).   Stanford's AT&T cellular phone records for 337-580-5000 show first telephone contact between Stanford and Francis on November 8, 2011. (Def. Ex. 1 pg 688, item #13236 & Def. Ex. 2 pg 12).   Stanford's AT&T office telephone records for 337-232-2272 show that Francis never called Stanford's office telephone number.  (Def. Ex. 8, 9, 10, 11, 12, 13, & 14).

 FBI summary of Stanford's cellular calls from 337-580-5000 show that Boyd Barrow's cellular number in 2011 was **770-330-6782**.  (Def. Ex. 4, pg 2).  FBI summary of Richard Buswell's cellular calls from 337-852-2255 show that Boyd Barrow's cellular number in 2011 was **770-330-**

**6782**. (Def. Ex. 25 pg 1)(Def. Ex. 24 pg 49 of 203, #366).   Stanford and Barrow first made telephone contact on October 26, 2011. (Def. Ex. 1, pg 630 item #12154 & Def. Ex. 5, pg 48 item #2335).  Stanford and Barrow had a total of thirty-four voice contacts for a total of 31 minutes 48 seconds. (Def. Ex. 1, pg 630 -783)(Def. Ex. 5, pg 48 - 81). (This includes voice messages).

On November 2, 2011, Boyd Barrow's  cellular number **770-330-6782** text Stanford's cellular number 337-580-5000 and forwarded a namecard "Dan_Francis.vcf" with Francis' telephone numbers "706-216-4481" and "706-531-6286." (Def. Ex. 2, at pg 3 "Attachments").   Dan Francis' cellular number is **706-531-6286** and his land line is **706-216-4481**.  FBI sprint mobile subpoena for Dan Francis' cellular number 706-531-6286. (Def. Ex. 27).  FBI Windstream subpoena for Dan Francis' land line number 706-216-4481. (Def. Ex. 28) (Def. Ex. 24, pg 55 of 203, #428).

FBI toll records for Stanford's cellular number show that Stanford and Francis first had telephone contact on November 8, 2011 at 1:44pm.  (Def. Ex. 5 Voice, PDF pg 61 item# 2949, 1:44pm; Def. Ex. 7 Text, PDF pg 25, item #5893, 1:45pm).   Stanford's AT&T cellular records, voice, data, text, show on November 8, 2011: 1) Stanford's cellular number 337-580-5000 called Francis' number 706-531-6286 at 1:44pm;  (Def. Ex. 1, PDF pg 688, item#13236); 2) Stanford cellular number 337-580-5000 sent a text to Francis' number 706-531-6286 at 1:45pm. (Def. Ex.1, PDF pg 1533, item #13813).   Stanford's forensic text messages show Stanford's number 337-580-5000 sending Francis' number 706-531-6286 a text message at 1:45pm that read "**Hey Dan.  This is Daniel.  Give me a call when u get a chance.**"  (Def. Ex. 2, pg 12, Messages).   Neither of Francis' numbers ever contacted Stanford's office number of 337-232-2272. (Def. Ex. 8, 9, 10, 11, 12, 13, 14, & Def. Ex. 1, 5, 6 & 7).

On November 9, 2011 at 9:24 a.m., Francis' land line 706-216-4481 called Stanford for the

first time and left a voice message.  Stanford retrieved the voice message and called Francis back on

his land line at 12:38p.m.  (Def. Ex. 1, pg 692 item #13315 & pg 694 item #13336)(Def. Ex. 5, pg

62 item #2993 & pg 62 item #3006).  From November 8, 2011 and December 8, 2011, Francis and

Stanford had telephone voice contact a total of 16 times for a total of 26 minutes and 39 seconds.

(Def. Ex. 1 pgs 688 - 790).  (this includes voice messages).

### August 18th  and 19th, 2011 e-mails between Barrow, Francis, and Buswell

Francis testified that on August 18, 2011, at 8:43AM, he e-mailed Barrow from

dan@coglib.org regarding federal legislative bills S 605 and HR 1254.  Barrow sent Francis a reply

and asked "[d]oes this list all senators/congressmen involved?"  Francis responded to Barrow

regarding the pending federal legislation.  On August 18, 2011 at 9:40AM Barrow sent an e-mail to

Buswell "Subject: Fwd: Fed Bills."  (Trial Exhibit D-31).  On August 18, 2011 at 7:11PM, Richard

Buswell sent an e-mail to Francis "**This is Richard Buswell please call me at 337-852-2255 when

your free.**"  On August 19, 2011 at 8:47AM Francis responded to Buswell and wrote "**Will you be

available at 11 am your time, Ill be open for awhile then..Sorry I missed this email last night.

Dan.**"  (Trial Exhibit D-32) (III pgs 547-551).  Francis was asked if he called Richard Buswell.

Francis testified that "**I don't recall ever making phone contact with Mr. Buswell**."

(III pg 551 ln 17-18).  Francis also testified that "I talked to Richard Buswell on the phone almost

never . . ." (IV pg 639 ln 9).  Francis testified that "I primarily only used - - I had an office in my

house.  I primarily used that phone."  (III pg 544 ln 9-10).  Francis also testified that "I did most of

my phone calls from the land line."  (III pg 590 ln 17).  Francis lied to the jury about this fact.

### FBI Telephone toll records of calls between Richard Buswell and Dan Francis

The FBI subpoenaed and received all of Richard Buswell's cellular phone toll records from

AT&T on 337-852-2255 and uploaded the data into its telephone application database.  (Def. Ex. 22).  The FBI created a toll summary record that showed a total of 273 telephone contacts between Buswell and Francis between August 2011 and December 15, 2011.  The FBI toll summary shows that Francis' cell phone number 706-531-6286 had **257 contacts** with Richard Buswell's cellular number 337-852-2255 between August 2011 and December 15, 2011.  The FBI toll summary shows that Richard Buswell's cellular number 337-852-2255 had **16 contacts** with Francis' land line number 706-216-4481.  The FBI toll summary records show 6 contacts in August 2011, 13 contacts in September 2011, 5 contacts in October 2011, 43 contacts in November 2011, and 206 contacts in December 2011.  (Def. Ex. 25, pg 2 & 6).

**FBI Telephone toll records of calls between Stanford and Francis**

The FBI subpoenaed and received all of Stanford's cellular phone toll records from AT&T on 337-580-5000 and uploaded the data into its telephone application database.  The first telephone contact between Stanford and Francis was on November 8, 2011.  (Def. Ex. 1, at PDF pg 688, item #13236)(Def. Ex. 2 pg 12)(Def. Ex. 5 PDF pg 61 item #2949)(Def. Ex. 7 PDF pg 25, item #5893).  The FBI created a toll summary of all calls between Stanford's number 337-580-5000 and Francis' numbers 706-531-6286 and 706-216-4481.  (Def. Ex. 4).  In November 2011, there were a total of **20 telephone contacts** between Stanford and Francis.  There were **19 contacts** between Stanford's number 337-580-5000 and Francis' number 706-531-6286 and **1 contact** between Stanford's number 337-580-5000 and Francis' number 706-216-4481.  In December 2011, there were a total of **25 contacts** between Stanford's number 337-580-5000 and Francis' number 706-531-6286.  There were a total of 44 telephone contacts in between November 8, 2011 and December 8, 2011 between Stanford's number 337-580-5000 and Francis' numbers 706-531-6286 and only one telephone

contact with Francis's land line 706-216-4481.  (Def. Ex. 1, 2, 4, 5, 6, & 7).

**On August 22, 2011, Francis e-mails RCA Documents to Stanford**

On August 22, 2011, Stanford received an initial e-mail from Francis at  7:53AM from dan@coglib.org with RCA attachments with numerous briefs on various state laws.  Francis wrote, "Here are analysis of different state laws.  This is not all of them, just places where an attorney for a member asked for the review.  More to come . . ." (Trial Exhibit G-206).  Stanford received a second e-mail at 8:05AM "Subject: RCA membership related documents" "Attachments: RCA proforama for year 1.xls; RCA product labeling and display guidelines for retailers 8_11.pdf; RCA Police interaction guide.pdf; RCA list of cannabimimetis compunds and common products.pdf; RCA FAQ.pdf; RCA DEA Jurisdiction paper.odt; RCA BP brief 3_11.pdf." (Trial Exhibit G-217 e-mail full header; G-218 RCA Proforma; G-219 RCA Police interaction guide; G-220 RCA FAQ; G-221 RCA Guidelines for display and sale of Herbal Incense Products; G-222 RCA List of Compounds; G-223 Issues regarding Jurisdiction).  Stanford received a third e-mail from Francis at 8:12AM "Subject: Research papers for the RCA."

**AUGUST 26, 2011 E-MAILS**

On August 26, 2011 at 10:56AM Francis sent Stanford and e-mail from dan@coglib.org "Subject: RCA" and wrote: "Stan" and asked whether Stanford had received his August 22, 2011 e-mails.  (Trial Exhibit G-224).  On August 26, 2011 at 11:27AM Stanford responded to Francis' and wrote that he had "received the documents" and "reviewing" and would contact Francis the following week.  (Trial Exhibit G-225).

On direct Francis testified that he received confirmation that Stanford had received his e-mails.  (III pg 411 ln 17-25).  Francis was specifically asked if he and Stanford were continuing to

talk.  Francis testified "yes."  (III pg 412 ln 1-2).  Francis is continuing to falsely testify that he and Stanford are having voice and/or telephone communications.

On cross examination of Francis it was pointed out to Francis that he and Stanford had never talked on the telephone and that Francis' sent the August 26, 2011 e-mail without having received anything from Stanford or having spoken to Stanford.    Francis continued to testify that he had called Stanford and that they had spoken over the telephone several times.  Stanford showed Francis Government Exhibit 225 and asked "I didn't call you the first week of September 2011, did I?" Francis testified "No.  I called you."  Stanford asked Francis if he had anything to show that he had in fact called Stanford and Francis testified "I believe you and I both know we talked."  (III pg571-573).

### SEPTEMBER 2011

On direct Francis was shown Government Exhibit 226 an e-mail Stanford sent on September 21, 2011 at 4:39PM where Stanford asked Francis to provide him with the legislative numbers for Stanford to "track the progress of the bill."  (Trial Exhibit G-226)(III pg 421 ln 21-25 & pg 422 ln 1-18).   Francis testified that Stanford's September 21, 2011 email was **in response to his first meeting with Stanford in Lafayette and ongoing telephone  communications with Stanford.**

Q. "I'm going to show you what's marked as Government Exhibit Number 226, please.  On September 21st, 2011, did you receive this e-mail from Mr. Stanford?"

A. "Yes, I did."

Q. "That states at the top, the subject: Regarding research papers for RCA?"

A. "Yes."

Q. "And what is Mr. Stanford asking you about in this e-mail?"

30

A. "He's asking me about the two federal bills that were floating at the time."

Q. "These two bills Mr. Stanford is referencing that he's, **I guess, not spontaneously asking you about**, is he asking you these questions - - **are these the same bills that y'all discussed previously?"**

**A. "Yes."**

Q. "So all this stuff that you previously e-mailed Mr. Stanford around August of 2011, Mr. Stanford has now sent you this e-mail about a question that he has regarding two of the House bills?"

A. "That's correct.  He's asking me if I know the legislative numbers, or the numbers that they assign bills in the House.  It's H.R. and whatever number.  In the Senate, it's the capital letter "S."

Q. "Did you reply to Mr. Stanford's e-mail?"

A. "I did."

Q. "I show you Exhibit Number 227.  Can you identify the e-mail and tell me what this is?"

A. "That's my response.  I utilized a website.  I was a member of this website called govtrack which tracks bills.  There's numerous styles of these websites.  I liked that particular format. So those two bills were - - those links brought Mr. Stanford to the spot on the govtrack website where he could observe the progress of these bills, and they would list what committee voted on them, what amendments had changed, and the various versions of it as it progressed."  (III pg 421 ln 21-25, pg 422 ln 1-25, & pg 423 ln1-6).

On September 22, 2011 at 9:02am, Francis emailed Stanford from dan@coglib.org with two

hyperlinks to track HB 1254 and S 605. (Trial Exhibit G-227).

Francis' August 22, 2011 emails did not mention anything about federal legislative bills HB

1254 or S 605.  Francis and Stanford had not spoken on the telephone or met with each other at the

time Stanford sent his September 21, 2011 email. (Trial Exhibit G- 226).  The government and

Francis are giving false testimony to the jury that Stanford and Francis had met before September

21, 2011 and were having ongoing telephone communications.

31

Stanford's was not "**spontaneously asking**" for information from Francis about the two federal bills in his September 21, 2011 email.  Stanford's request for the information was a direct result of being advised by Barry Domingue about an RCA conference call scheduled for September 22, 2011 at 2:00pm to discuss "the progress of the federal bills, HR 1254 and S 605." (Trial Exhibits G-295).

### Francis did not speak with Stanford on September 23, 2011

The government used the cover page of Exhibit 295 a document purported to be an e-mail header from a search of Richard Buswell's e-mail account.  (Trial Exhibit G-295).  The cover for G-295 does not show that an audio file is attached and the government was aware of this fact. Moreover, the government had subpoenaed and received every e-mail and attachment sent or received by Stanford.  The government did not produce an e-mail from Stanford's e-mail account showing that on September 22, 2011 Stanford received an e-mail from Domingue with an audio file attached.  Agent Errol Catalon testified he had retrieved all Stanford's e-mail's from  account stanatty@bellsouth.net from the Internet service provider.  (II pg 197-198).  Agent Catalon testified that none of the e-mails were deleted e-mails and were all were saved in the e-mail account. (III pg 352 ln 13-19).   However, the prosecution and Francis intentionally present false and misleading testimony to the jury regarding this fact

> Q. "You see: Friends, attached is an audio of the conference call in case anyone missed it. They arbitrarily moved it up an hour. Do you see that e-mail."  Government Exhibit 295, page 1 of 3.
>
> A. "I do."
>
> Q. "And did you see a disc of the call that was sent as well?"
>
> A. "Say it again."

Q. "Did you see a disc of the conference call, the recording, that was attached to the series of e-mails.?"

A. "I did."

Q. "Okay.  And on here do you see in the subject line that Mr. Stanford is cc'd as a recipient of these e-mails and ultimately a recipient of the attachment of the conference call that was sent as well to the participants?"

A. "Yes."
(III pg 427 ln 3-17).
            * * * * * * * * * * * * * * * * * * *

Q. "**Now, the same disc that was attached to the emails, that you are a part of and that was sent according to this e-mail attachment to Mr. Stanford, did you review it?**"

A. "**Yes, I did.**"

(III pg 429 ln 1-4).

The government is misleading the jury by stating that Stanford received the audio attachment.   The cover page to G-295 reads "Subject: FW: RCA conference call TOMORROW September 22, 2011 at 2:00 CT."  The cover page does not reference that there is an attachment included and/or an audio attachment.   The government's own search and seizure of Stanford's e-mail account proves that Stanford did not get an audio recording via an e-mail or otherwise. (Def. Ex. 15).

The government and Francis continue to present false evidence through Francis' testimony that Stanford received an e-mail with an audio of the conference call and that Stanford and Francis discussed the issues raised in the conference call on September 23, 2011.

Q. "**And, again, the audio portion of what we heard was sent out to many individuals, including Mr. Stanford; is that correct?**"

A. "**That's correct.**"

Q. "**Now, the day after this call occurred, did you have a communication with Mr. Stanford.**"

33

**A. "Yes, I did."**

**Q. "And did the two of you discuss what happened during the conference call?"**

**A. "We did."**

Q. "What did y'all discuss?"

A. "We discussed, in general, the content of the call, how it would move us forward.  We talked about different issues that were brought up."

Q. "**So after listening to this, the two of you, you and Mr. Stanford, were continuing to have discussions on how to move what forward?"**

**(III pg 435 ln 10-25).**

**A. "The RCA**."

Q. "Okay.  Was it apparent to you at this point that there was an interest in beginning an starting a Louisiana version of your Retail Compliance Association?"

A. "I was becoming aware of that.  Like I said before, I was trying to keep it in-house and keep it under the blanket of the existing RCA.  I don't think Mr. Stanford made me aware of that.  I think Boyd Barrow made me aware of that at that time."

**Q. "Okay.  And as you're progressing and having these discussions with Mr. Stanford, did the topic of alternate uses for naphthoylindoles come up and AM-2201?"**

A. "Yeah, for synthetic cannabinoids.  The idea came about that we needed to come up with products that already have these compounds or something like these compounds in them."

Q. "Why?"

A. "Because we needed to assimilate it to something in the market that existed so there could be and identified purpose other than potpourri that was being consumed."

Q. "Was Mr. Stanford specifically questioning you about this?"

A. "Yeah.  On numerous occasions he asked me
about that."

Q. "And when asking you about it, was he just asking you, or asking you and wanting you to do further research?  What was he wanting you to do?  What did he express to you that he

34

wanted you to do?"

A. "It was part of my job as well.  I was subordinate to any lawyer, so in working with lawyers, I would do research that they asked me to do in an effort to try to provide them food for thought, you know, for their legal minds.  I was not a lawyer, so I couldn't determine what was good legally and what's not good legally. I just did the research trying to connect different dots for them so that maybe they could sensibly address an issue."

(III pg 436 ln 1-25 & pg 437 ln 1-6).

Francis and the prosecution are continuing a pattern of presenting false evidence through Francis' testimony.  Francis is testifying that up to and including September 23, 2011, he has met with Stanford and is having ongoing his telephone conversation with Stanford.  This testimony and evidence  is false and misleading.    The government's own telephone investigation of this case shows that Stanford and Francis had telephone contact for the first time on November 8, 2011.  (Def. Ex. 5, pg 61, ln 2949 & 7 pg 25 ln 5893).  Stanford's AT&T phone records also show that Stanford and Francis first communicated via telephone on November 8, 2011. (Def. Ex. 1, pg 688 item #13236 & Ex. 2 pg 12).

**Francis first met Stanford on November 2, 2011.**

Francis testified that his first visit to Louisiana was in August or September 2011.

Francis was asked on direct:

Q. "In early September of 2011, you were contacted by Boyd Barrow with Pinnacle Products about customers in Louisiana that were getting serious about having ties to **your Retail Compliance Association**?"

A. "Yes, I was."

( III page 384, lines 7-11)

* * * * * * * * * * * * * * *

Q. "And, again, coming to Louisiana, you already know, like you said previously, a lot about

35

Louisiana, right?"

A. "Yes."

Q. "It's a no sell to state pretty much, right?"

A. "Even Boyd Barrow would reiterate he's one of the people I heard that from.  He's one of the partners in Pinnacle Products."
( III page 385 lines 5-11)
* * * * * * * * * * * * * * * * * *

Q. . . . And you're asked to take a meeting.  Who were you brought to meet first?

A. I was brought to meet Richard Buswell first.

Francis testified that he was with Barrow and "Josh Espinoza" when he first met Mr.

Buswell.  ( III page 386 lines 18-20).

Q. "Mr. Francis, before we left off, before we took our break, we were discussing your traveling to Louisiana to meet with Mr. Richard Buswell, and you were traveling with Mr. Boyd Barrow to come down here and ultimately meet with Mr. Stanford, correct?"

A. "Yes."

Q. "Was this in August of 2011."

A. "**I believe it was August of 2011, yes**."

( III pages 393-94, lines 21-25 and lines 1-2)

* * * * * * * * * * * * * * * * * * * * *

Q. "And right now **this e-mail indicates this is the end of August, the 26th, when this e-mail was sent.  Did you come down in September of 2011?**"

**A. "I did."**

( III page 412 lines 5-8)

Francis is substantially assisting the government by testifying and/or agreeing with whatever

their position might be on any given issue.   Francis' false testimony was contrived create the

36

appearance to the jury that his relationship with Stanford started in August 2011 and that they maintained an ongoing and active relationship aimed at establishing an RCA presence in Louisiana and violating the law.

Boyd Barrow's financial data shows Barrow driving out of Atlanta, Georgia on November 1, 2011 and making gas and liquor store stops in Alabama and Mississippi. (Def. Ex. 40, pg 2 of 8). Boyd Barrow, Josh Espinoza, and Dan Francis are all in Lafayette on November 2, 2011. Francis is staying at the Spring Hill Suites at 321 Settlers Trace, Lafayette. (Def. Ex. 40,pg 3 of 8). Espinoza and Barrow have an apartment at the MainStreet Annex in River Ranch. (Trial Exhibit G-177). On November 2, 2011 at 10:09AM, Francis emails Stanford from dan@coglib.org "Subject: RCA docs" and "writes for the meeting today." (Trial Exhibit G-232). On November 2, 2011 at 2:34pm, Boyd Barrow's cellular number **770-330-6782** text Stanford's cellular number 337-580-5000 this message "Dans on the way. Had to drop Richard off for breathing treatment." (Def. Ex. 1, PDF pg 1515 item #13155 & Ex. 2 pg. 2)( Def. Ex. 7, PDF pg 12 ln 5235). On that same day at 7:21pm, Boyd Barrow forwarded via text a namecard "Dan_Francis.vcf" with Francis' telephone numbers "706-216-4481" and "706-531-6286." (Def. Ex. 2, at pg 3 "Attachments").

Stanford met with Francis on November 2nd and 3rd, 2011. Stanford had a jury trial set for Monday, November 7, 2011, in Evangeline Parish and was out of his office on November 7th and 8th, 2011. On November 8, 2011 at 1:45pm Stanford sent a text message to Francis at 706-531-6286 that reads "**Hey Dan. This is Daniel. Give me a call when u get a chance**." (Def. Ex. 2 at pg12; Def. Ex. 7 PDF pg 25 ln 5893; Def. Ex. 1 PDF pg 1533 item #13813). On November 9, 2011 at 9:24 a.m., Francis' land line 706-216-4481 called Stanford for the first time and left a voice message. Stanford retrieved the voice message and called Francis back on his land line at 12:38p.m. (Def. Ex.

1, pg 692 item #13315 & pg 694 item #13336)(Def. Ex. 5, pg 62 item #2993 & pg 62 item #3006). Francis must have been back home in Georgia on November 9, 2011.

**Francis lied about being paid $3,000. for his September 2011 first trip to Lafayette**

Francis testified on direct that he was paid $3,000. by Boyd Barrow via a Pinnacle Products check for his first visit in early September 2011 to Louisiana.

Q. "Were you paid to make the trip down to meet with Mr. Stanford?"

A. "Yes, I was."

Q. "Who were you paid by?"

A. "Pinnacle Products, Boyd Barrow."

Q. "How much were you paid to make this presentation to Mr. Stanford."

A. "I received a check for "3,000.""

**Francis again testified falsely**.    A search of Pinnacle Products Wells Fargo business checking account number 2000042279428 between July 1, 2011 and November 30, 2011, and J.P. Morgan Chase Bank, checking account number 000000992883585 do not show any checks written to Daniel Paul Francis, Daniel Francis, or Dan Francis from a Pinnacle Products account.   There is only one (1) Pinnacle check written in the sum of $3,000, check number 2410 written on September 2, 2011.   However, the Pinnacle check was not written to Daniel Paul Francis, Daniel Francis, or Dan Francis.  (Def. Ex. 34, 36, 37, 38, 39, 40, 41, and 42).

**Francis, Barrow, and Espinoza in Lafayette November 14th, 17th, 18th**

On November 14, 2011, Barrow returns to Lafayette.  (Def. Ex. 40, pg 4 of 8).  On November 17, 2011, Espinoza returns to Lafayette.  (Def. Ex. 52, pg 5 of 8).   On November 18, 2011, Dan Francis arrive in Lafayette.  (Def. Ex. 52, pg 5 of 8).  On November 20, 2011 at approximately 1:30

am Barrow runs over a lamp post in River Ranch and has contact with the police.   On Sunday, November 20, 2011Barrow flies out of Lafayette.  (Def. Ex. 42, pg 3 of 8).   Barrow testified that before he left town he came by Stanford's office and dropped off the ticket and explained the situation.   Barrow was not at Stanford's office on Sunday, November 20, 2011.   On Monday, November 21, 2011, Josh Espinoza is at Stanford's office and writes the $13,000. check with "Legal" in the memo section that is returned for non-sufficient funds.

**Francis was not at November 22, 2011 meeting with Johnny Cosper**

Francis returned to Lafayette on November 18, 2011.  (Def. Ex. 52 pg 5 of 8).   Stanford met with Francis on November 21, 2011.  (Def. Ex. 2 at pg 13 & 14).   Stanford's cellular phone records show Stanford cellular phone 337-580-5000 calling Sgt. Guilbeau at the Lafayette Field office at 337-262-3341 at 9:07a.m.  (Def. Ex. 1 pg 740 item #14189) (Def. Ex. 5 pg72 ln 3469 )(Def. Ex. 63). Sgt. Guilbeau testified that he received a call from Stanford on November 22, 2011, in the morning around 9 a.m.

On November 22, 2011, Francis is not at Stanford's office in the morning when Domingue, Buswell, Cosper, and Stevens are at Stanford's office.    Francis arrived at Stanford's office at 12:34pm sent Stanford a text message from his cellular phone 706-531-6286 that reads, "Im in ur lobby."  (Def. Ex. 2, pg 14) (Def. Ex. .

Francis testified that he was standing in Stanford's office and heard the entire conversation between Stanford and Sgt. Guilbeau because Stanford was talking on his **officer speaker phone**. Stanford's AT&T records and the FBI AT&T records of Stanford's cellular number 337-580-5000 prove that Stanford called Sgt. Guilbeau on November 22, 2011 at 9:07 a.m. from his cellular phone.

**Barrow was not in Lafayette on November 30, 2011**

39

Boyd Barrow testified that he was standing in Stanford's office on November 30, 2011, when Richard Buswell wrote the check for $19,000. and wrote in the memo section "Boyd's RCA dues to be deducted from Miyagi bill."  Barrow testified that he specifically told Buswell that he was not paying for Buswell legal fees in the federal securities case.  Boyd Barrow was testifying falsely that he was at Stanford's office when Buswell wrote that check and witnessed the whole thing.  If Barrow owed Stanford money and he was standing there he could have written Stanford a check or made arrangements.

On November 30, 2011,  Boyd Barrow is not even in Lafayette when Richard Buswell was at Stanford's office.  Barrow flew out of Lafayette on November 20, 2011, a Sunday that he testified that he came to Stanford's office and dropped off the ticket and explained the situation. Not likely on a Sunday.  Moreover, Barrow's Chase Bank records show that Barrow is at various bars in Atlanta and not in Lafayette.  (Def. Ex. 42 at pg 3 of 6). (Trial Exhibit G-371 at pg 3 of 6).

**Government omitted key attachments at trial from government exhibits 217 and 232**

The government  presented Francis with Government Exhibit 217 that had seven (7) attachments listed.    The government only included six (6) attachments with exhibit 217. Government Exhibit 218 (RCA Proforma budget), 219 (RCA Police Interaction), 220 (RCA FAQ), 221 (RCA Product labeling), 222 (RCA , and 223 (RCA DEA Jurisdiction).  The government failed to include the **RCA Business Plan in its exhibits (however, the government did include the business plan with government exhibit 232 and used it to question Francis and to mislead the jury by implying that it was a newly co-created document by Stanford and Francis for the Louisiana RCA.  This was false)**.  Defense Exhibit Y.   Francis was presented with the "RCA Proforma and Budget ongoing", and asked the following:

40

Q. "Now, we're looking at Government Exhibit 218, and this is an RCA Pro Forma Budget. Can you explain what this is?"

A. "Well, the pro forma budget is looking into the future, what's it going to cost to operate or establish business in the manner that's outlined in the business plan.  So these were projections of costs and potential revenue numbers.  It's a guess."

Q. "And this was if everything stayed status quo with what you were doing in California?"

A. "**Right.  Exactly.  What the California RCA was at the time and what effect potentially the Curious Goods addition would have**."

The "RCA Proforma and Budget ongoing" is a document that combines both the Coalition for Cognitive Liberty and the RCA and was created by Francis in January 2011 without having anything to do with Stanford or Curious Goods.  Francis and the government are misleading the jury with this testimony.  Francis and the government are falsely implying that this document was created by Francis in anticipation of "**what effect potentially the Curious Goods addition would have**" to the California RCA.

Francis was presented with Government exhibit 232, a November 2, 2011 email to Stanford that had four (4) attachments.     However, the government only had three (3) attachments with exhibit 232 that included:  exhibit 233 (RCA Products labeling) which is also a duplicate of exhibit 221; exhibit 234 (RCA Business Plan) which was not included with government exhibit 217; exhibit 235 (RCA Police Interaction Guide) which is a duplicate of exhibit 219.  The RCA Proforma budget was not included with exhibit 232.  **Similarly, the government intentionally excluded the RCA Business Plan as an attachment to Government Exhibit 217 when questioning Francis.** Defense Exhibit Y.  The government omitted the RCA Business Plan from 217 to prevent Stanford from

showing that the November 2011 "RCA Business Plan", government exhibit 234, was the exact same document and was not a newly created document put together through a collaborative effort by Francis and Stanford.   The government and Francis were presenting false and misleading testimony to the jury to create the false inference that Stanford and Francis had been working on this since August 2011.

Q. "And there are a series of attachments that you previously sent, you stated, but there were some new attachments as well; is that correct?"

A. "Yes.  This one contained a budget."

Francis is again testifying falsely.  The attached budget was previously sent on August 22, 2011.  However, the budget document was not attached as part of government exhibit 217.

Q. "Now, can you identify this document for me, please?"

A. "I can.  It is a summary business plan for the formation of an RCA in Louisiana."

Q. "Now, this is new?"

A. "Yeah, this is new."

Q. "And the additional documents that you're sending, does it reflect the progression that you and Mr. Stanford are making on your way to form a Louisiana Retail Compliance Association.?"

A. "Yeah, in addition to my conversations with Mr. Stanford and conversations with Boyd Barrow, which were manifesting from Richard Buswell encouraging this type of thing, so, yes."

Francis is testifying falsely about the RCA business plan.  This is the exact same document, word for word, that Francis sent to Stanford on August 22, 2011 in an email and was deliberately

omitted from Government exhibit 217.   This is part of what was an ongoing pattern of deceptions and false testimony on the part of the government and Francis to mislead the jury.   Defense Exhibit Y.  In fact, there were no new documents created by Francis for the Louisiana RCA or for anything else.

### December 8, 2011 Text Messages between Buswell and Francis,  Stanford and Francis

On December 7, 2011, Stanford attended the "meeting" at Buswell's house briefly.  The government was allowed to introduce Government Exhibit 122 although it was a completely hearsay document.  (Trial Exhibit G-122).  The document was supposedly found during a search of a franchise store but no one knew who wrote the document or when it was written.  However, the government showed the document to witness after witness and allowed them to testify that the unknown handwritten notes were an accurate depiction of what happened at the meeting.

On December 8, 2011, while law enforcement is executing the search warrants at Curious Goods stores, Buswell texted Stanford regarding the raid on Curious Goods and the news story listed several banned synthetic cannabinoids in the State of Louisiana.  Buswell then forwarded the news story to Francis via text message.  Buswell then text Francis and asked him if any of those chemicals were used in  the Mr. Miyagi product.  Francis texted back and told Buswell that MEO Dalt 5 was in Mr. Miyagi.  Later that day, Stanford forwarded the Buswell text to Francis and asked Francis if any of those substances were in Mr. Miyagi.  Francis texted back that AM2201 was in Mr. Miyagi and that it was in a class called naphtholyindoles.  This was the first time that Francis had ever stated that AM2201 was in Mr. Miyagi and/or that AM2201 was considered to be a naphtholyindole.

After the trial, stumbled across  his old Samsung cell phone.  Stanford charged the phone

and opened it up to see if any of the text messages were still on the phone.  Stanford was shocked to find the text messages between himself , Dan Francis and Boyd Barrow.   Stanford had even less contact with Barrow and Francis than he initially remembered.  Below are some of the text messages from December 8, 2011.  All of the other text messages are attached as Defense Exhibit 2, forensic retrieval of the text messages from the phone.  Defense Exhibits 1, Stanford's AT&T voice, data, and text records; Defense Exhibit 5, FBI AT&T records of Stanford's cellular voice calls; Defense Exhibit 6 & 7, FBI AT&T cellular text messages; and Defense Exhibit 24, FBI information retrived from Richard Buswell's cellular iPhone.  (Def. Ex. 2)(Def. Ex. 24).

### Richard Buswell to Stanford

**(Page 88 of 203              Bates #007419)**

**(On December 8, 2011, at 12:32:58 Richard Buswell texted Dan Stanford (Exhibit reflects GMT "Greenwich Mean Time" which is 6 hours ahead of CST "Central Standard Time") this message:)**

| 439 | 13375805000 Dan | 12/08/11 18:32:58 (GMT) | Sent | Outgoing |
|-----|-----------------|-------------------------|------|----------|

"Six Curious Goods stores in three parishes are being searched for illegal weed.  Search warrants are being served at three locations in Lafayette, two in New Iberia and one in Vermillion parish.  What's supposed to be considered legal weed sold at the stores was found to be illegal according to Lafayette Metro Narcotics Task Force Capt. John Babin said Agents previously determined illegal products and returned today to determine if other weed products are indeed illegal. Legal weed is sold and labeled as "potpourri."  It looks similar to marijuana, is smoked like it and gets users high.  Unlike marijuana, its legal to buy.  A Louisiana law, passed in August 2010, made some synthetic marijuana illegal.  The law bans certain synthetic chemicals used to make "legal" weed.  Beginning on August 15, 2010, Louisiana made the following synthetic cannabinoids illegal: * 2-[(1R,3S)-3-hyroxycycloohexyl]-5-(2-methyloctan-2-yl)phenol {also

44

known as CP 47, 497 and its C6, C7, C8, and C9 homologues}
(b) (6aR,10aR)-9-(hydroxymehtyl)-6, 6-dimethyl-3-(2-methyloctan-2-yl)-6a,7, 10, 10a-
tetrahydrobenzo [c]chromen-1-o1 {also known as 1-Pentyl-3-(1-naphthoyl)indole or JWH-018}
(d) Naphthalen-1-y1-(1-butylindol-3-yl)methanone [also known as 1-Butyl-3(naphthoyl)indole or JWH-073}


**(Page 89 of 203          Bates #007420)**

**(Page 90 of 203          Bates #007421)**

**Richard Buswell to Dan Francis**

**(On December 8, 2011, at 12:33:08 Richard Buswell texted Dan Francis (Exhibit reflects GMT "Greenwich Mean Time" which is 6 hours ahead of CST "Central Standard Time") this message:)**

| 440 +17065316286 | Dan Francis | 12/08/11 18:33:08 (GMT) | Sent | Outgoing |
|---|---|---|---|---|

"Six Curious Goods stores in three parishes are being searched for illegal weed. Search warrants are being served at three locations in Lafayette, two in New Iberia and one in Vermillion parish. What's supposed to be considered legal weed sold at the stores was found to be illegal according to Lafayette Metro Narcotics Task Force Capt. John Babin said Agents previously determined illegal products and returned today to determine if other weed products are indeed illegal. Legal weed is sold and labeled as "potpourri." It looks similar to marijuana, is smoked like it and gets users high. Unlike marijuana, its legal to buy. A Louisiana law, passed in August 2010, made some synthetic marijuana illegal. The law bans certain synthetic chemicals used to make "legal" weed. Beginning on August 15, 2010, Louisiana made the following synthetic cannabinoids illegal: * 2-[(1R,3S)-3-hyroxycycloohexyl]-5-(2-methyloctan-2-yl)phenol {also known as CP 47, 497 and its C6, C7, C8, and C9 homologues}
(b) (6aR,10aR)-9-(hydroxymehtyl)-6, 6-dimethyl-3-(2-methyloctan-2-yl)-6a,7, 10, 10a-
tetrahydrobenzo [c]chromen-1-o1 {also known as 1-Pentyl-3-(1-

naphthoyl)indole or JWH-018}

(d) Naphthalen-1-y1-(1-butylindol-3-yl)methanone [also known as 1-Butyl-3(naphthoyl)indole or JWH-073}

**(On December 8, 2011, at 6:37:44pm Richard Buswell text Dan Francis the following message:)**

| 441 | 17065316286 | *Dan Francis | 12/08/11 18:37:27 (GMT) | Outgoing |
| --- | --- | --- | --- | --- |
| | | | | **Are any of these chemicals used** |

**(Page 91 of 203        Bates #007422)**

**(On December 8, 2011, at 6:47:44pm Dan Francis texted Richard Buswell the following response:)**

| 445 | 17065316286 | *Dan Francis | 12/08/11 18:47:44 (GMT) | Incoming |
| --- | --- | --- | --- | --- |
| | | | | **No 1-5(Flouropentyl)-1H-Indole-3-Y1-(Napthalen-1-Y1)-Methanone and five M E O Dalt** |

**DEFENSE EXHIBIT 24.**

These text  message show that Richard Buswell had not previously talked to Dan Francis about what chemical was in Mr. Miyagi.

**Stanford text messages to Dan Francis**

**DEFENSE EXHIBIT 2, AT PG 17.**

**On December 8, 2011 at 5:40pm Daniel Stanford forwarded the following text message received from Richard Buswell to Dan Francis:**

"Six Curious Goods stores in three parishes are being searched for illegal weed.  Search warrants are being served at three locations in

46

Lafayette, two in New Iberia and one in Vermillion parish.  What's supposed to be considered legal weed sold at the stores was found to be illegal according to Lafayette Metro Narcotics Task Force Capt. John Babin said Agents previously determined illegal products and returned today to determine if other weed products are indeed illegal. Legal weed is sold and labeled as "potpourri."  It looks similar to marijuana, is smoked like it and gets users high.  Unlike marijuana, its legal to buy.  A Louisiana law, passed in August 2010, made some synthetic marijuana illegal.  The law bans certain synthetic chemicals used to make "legal" weed.   Beginning on August 15, 2010, Louisiana made the following synthetic cannabinoids illegal: * 2-[(1R,3S)-3-hyroxycycloohexyl]-5-(2-methyloctan-2-yl)phenol {also known as CP 47, 497 and its C6, C7, C8, and C9 homologues}

(b) (6aR,10aR)-9-(hydroxymehtyl)-6, 6-dimethyl-3-(2-methyloctan-2-yl)-6a,7, 10, 10a-

tetrahydrobenzo [c]chromen-1-o1 {also known as 1-Pentyl-3-(1-naphthoyl)indole or JWH-018}

(d) Naphthalen-1-y1-(1-butylindol-3-yl)methanone [also known as 1-Butyl-3(naphthoyl)indole or JWH-073}

**On December 8, 2011 at 5:41PM, Daniel Stanford sent the following message to Dan Francis:**

**"Dan r any of these substances in myagi"**

**On December 8, 2011 at 6:03PM Dan Francis Responded:**

**"Am I ok?**
**"is there a warrant for me"**
_____

**On December 8, 2011 at 6:10PM Daniel Stanford sent the following message:**

**"No warrant."**
_____

**On December 8, 2011 at 6:11PM Dan Francis responded:**

**"Thanks"**

_____

**PG 18** _____

On December 8, 2011 at 6:11PM Daniel Stanford sent the following message:

**"R any of those substances in Myagi?"**

_____


December 8, 2011 at 6:13PM Dan Francis responded:

**"No but the law also names classes and am2201 is a napthyolindole...AM2201 is not specifically named in the LA law."**


**DEFENSE EXHIBIT 2 AT PAGES 17, AND 18**.

This message shows that Stanford and Francis had not previously discussed the Louisiana law, napthyolindole or AM2201.

**September 28, 2012 Interview between Stanford and Dan Francis**

On October 20, 2014, Stanford was cleaning out his office and desk and found an old flash drive.  Stanford connected the flash drive into his computer and was astonished to discover that it contained a consensual recorded interview between himself and Dan Francis on September 28, 2012. Stanford had misplaced and forgot about the recorded interview.  Stanford immediately had the recording transcribed.  Francis' statements about his role with the RCA and Stanford's role with Francis and the RCA are completely contradict his trial testimony.   During the conversation, Francis states that Stanford never trained anyone associated with Curious Goods and that Francis was in the kitchen at Buswell's house for most of the meeting and didn't hear what was said.  (Def. Ex. 33 pg 3 ln 1-23).   Francis stated that he was paid $6,000. as a consultant to assist with bringing Stanford up to speed on what he should know about federal legislation.  (Def. Ex. 33 ln 15-25).

Francis states that he and Stanford never discussed AM2201 or the Louisiana law other than its vagueness and the possibility of a challenge.  (Def. Ex. 33 pg 7 ln 5-6).   Francis stated that there were no compliance concerns prior to the December 8, 2011 raids.  (Def. Ex. 33 pg 8 ln 14-25).  Francis stated that Domingue handed Stanford lab reports while they were in court on December 9, 2011.  (Def. Ex. 33 pg 9, ln 16-25).

Francis stated that the Louisiana RCA did not get to do anything.  (Def. Ex. 33 pg 10 ln8-16).  Francis stated that he did not understand the Louisiana law. (Def. Ex. 33 pg 12 ln 1-20).  Francis claimed that the RCA was an organization that sought to understand and work with constitutional issues. (Def. Ex. 33, pg. 13 ln 1-8).  Francis stated that the RCA's goal was one of education of all sides on complex issues. (Def. Ex. 33, pg. 16 ln 5-21).  Francis stated that the purpose and goal of the RCA was not to circumvent the law, just the opposite.  (Def. Ex. 33, pg17 ln 21-25).  Francis remembers Stanford being at the December 7, 2011 meeting very for a short time.  (Def. Ex. 33, pg 18 ln 21-22).  Francis stated that Dr. Lantz was a PhD chemist from a DEA certified lab and believe his opinion.  (Def. Ex. 33, pg 22 ln 7-25).

Francis stated that he and Stanford did not spend a lot of time together. (Def. Ex. 33 pg 25, ln 8-15).  Francis discussed the September 22, 2011 conference call and the discussions.  (Def. Ex. 33, pg 26 ln 1-18).  Francis stated that his first time in Lafayette was late October 2011 around Halloween.  (Def. Ex. 33 ln 21-25).  Francis stated that he was unable to meet Stanford during his first visit but they met sometime in early November 2011.  (Def. Ex. 33 ln 3-15).

**Bonnie Buswell and the box of metals**

The government interviewed Paul Buswell on numerous occasions very extensively.  Paul Buswell never told the prosecution team that he had ever given me any money on December 8, 2011

49

or had ever given me anything else of value after December 8, 2011.  Paul Buswell voluntarily signed an affidavit on March 26, 2013 stating under oath that he did not given Stanford any money on December 8, 2011 and that he never gave Stanford anything of value after December 8, 2011. (Def. Ex. 60).  Richard Buswell was given receipts for money he gave to Stanford for bonding purposes on December 8, 2011.  (Def. Ex. 59).  Richard Buswell represented that the money was his money and Stanford returned the unused portion to Richard Buswell after posting bond.  (Def. Ex. 59).  Paul Buswell retrieved a gun safe that was being stored at Stanford's house for Richard Buswell on November 18, 2013.  Paul Buswell signed a receipt acknowledging taking custody of the gun safe.  (Def. Ex. 61).

Bonnie Buswell turned over her cellular telephone to the prosecution team in August 2013. All of the information from her cellular phone was downloaded by the FBI and every text message between December 14, 2011 and July 13, 2013 was pulled and printed.  (Def. Ex. 62).  Not one time does Bonnie Buswell ever mention that Paul Buswell or anyone else had ever given anything of value including a box of silver or gold for Stanford to hold for safe keeping.  (Def. Ex. 62).  Bonnie Buswell testified that this occurred after her son Richard Buswell had gone to jail or after December 15, 2011.  All of the law enforcement activity had already occurred and the only residence searched was Richard Buswell's home on December 8, 2011.  There was no gold or silver or precious metals found at Richard Buswell's home on December 8, 2011.

## CONCLUSION

A district court has discretion to order discovery and an evidentiary hearing post-trial in appropriate circumstances, including when newly discovered information comes to light.  *United States v. Velarde*, 485 F.3d 553, 560 (10th Cir. 2007).  "According to the Supreme Court, 'where

specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is' entitled to a new trial, 'it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.'" *Id.* (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). "In fulfilling this duty, a district court had broad discretion to fashion discovery mechanisms suitable to the case before it" and "is required to conduct [an] evidentiary hearing . . . if the admissible evidence presented by the petitioner, if accepted as true, would warrant relief as a matter of law." *Id. See also, e.g. See United States v. Kelly,* 790 F.2d 130, 134 (D.C. Cir. 1986) (holding that district court abused its discretion in denying an evidentiary hearing "[i]n the absence of countervailing sworn evidence from the government"); *United States v. Koubriti,* 297 F. Supp 2d 955, 959, 972 (E.D. Mich. 2004) (court conducted post-trial evidentiary hearing to ascertain the impact of government's failure to disclose letter containing arguably exculpatory information; Court ordered non-party to produce relevant documents). As the D.C. Circuit has noted, "Factual findings are particularly important where, as here, the governmental misconduct charged is extraneous to the trial and so is not documented in the trial record." *Kelly*, 790 F.2d at 139.

The attached documents especially Stanford's telephone records and Barrow and Espinoza's bank records clearly prove that Dan Francis, Boyd Barrow, and Josh Espinoza testified falsely at trial regarding material issues of fact. The prosecution team also withheld favorable information from Stanford. Stanford request that this Honorable Court review the fact and information provided in the interest of justice.

Respectfully submitted,


/s/ *Daniel Stanford*
DANIEL STANFORD, Pro Se


## **CERTIFICATE**

I HEREBY CERTIFY that on October 27th , 2014 a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/EMF system.  Notice of this filing and a copy of this pleading and attachments will be sent to counsel of record by operation of the court's electronic filing system.


/s/ *Daniel Stanford*
DANIEL STANFORD, Pro Se