UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA                 CRIMINAL ACTION NO. 12-00146-08

VERSUS                                   JUDGE ELIZABETH FOOTE

DANIEL J. STANFORD                       MAGISTRATE JUDGE HANNA

<u>**MEMORANDUM RULING**</u>

On August 29, 2014, following a ten day jury trial, the Defendant, Daniel J.
Stanford, was convicted of Counts 1, 2, 3, 4, 5, 10, 11, and 13 of the Superseding
Indictment filed against him. [Record Documents 57 and 859]. He was acquitted on
Counts 6, 7, 8, 9, and 12. [Record Document 859]. Now before this Court is a Motion for
New Trial filed by the Defendant, who represented himself at trial, that alleges
numerous deficiencies by the Court and in the Government's prosecution of the case.
[Record Document 878]. Under Federal Rule of Criminal Procedure 33, a court is
permitted to vacate any judgment, upon a defendant's motion, and grant a new trial "if
the interest of justice so requires." Fed. R. Crim. P. 33(a). It is the movant's burden to
show that a new trial is warranted. <u>United States v. Soto-Silva</u>, 129 F.3d 340, 343 (5th
Cir. 1997).

After due consideration of the Defendant's claims, the Court finds that justice
does not require vacating the jury's verdict and granting a new trial. Thus, for the
reasons addressed individually below, the Defendant's Motion for New Trial is hereby
**DENIED**. [Record Document 878]. Furthermore, because the record in this case is

complete and the Defendant's claims can be resolved without the need for additional evidence, the Defendant's request for an evidentiary hearing is also hereby **DENIED**.

I.      **The Defendant's Claims that the Government Failed To Prove Beyond a Reasonable Doubt the Conspiracy and Money Laundering Charges**

Under Rule 33 of the Federal Rules of Criminal Procedure, district courts considering whether to grant a motion for new trial may "weigh the evidence and may assess the credibility of the witnesses." United States v. Robertson, 110 F.3d 1113, 1117 (5th Cir. 1997) (citing Tibbs v. Florida, 457 U.S. 31, 37-38 (1982)). Although the discretion of a district court is broad, it is not unlimited: "The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable. The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." Id. at 1118 (citations omitted); see also United States v. Wright, 634 F.3d 770, 775 (5th Cir. 2011). Granting a new trial is an extreme measure, and "it is not the role of the judge to sit as a thirteenth member of the jury." United States v. O'Keefe, 128 F.3d 885, 898 (5th Cir. 1997). Even though district courts are vested with the ability to grant a new trial when the interests of justice require it, "this power should be exercised infrequently by district courts, unless warranted by 'exceptional' circumstances." United States v. Tarango, 396 F.3d 666, 672 (5th Cir. 2005) (citing United States v. Scroggins, 379 F.3d 233, 239 (5th Cir. 2004)).

A.      **Count 1: Conspiracy To Distribute or Possess with Intent To Distribute a Controlled Substance Analogue**

In support of his claim on Count 1, the Defendant focuses on what he views as the "incongruent and oxymoronic positions" the Government adopted, despite evidence

presented at trial to the contrary. Record Document 878, p. 11. The Defendant claims that his limited involvement with his co-defendants is not enough to support the jury's verdict and that the Government's theory of the case is without evidentiary support or merit. In particular, he states that there is no evidence to support the Government's assertions that he was responsible for any increase in consumer demand for Mr. Miyagi or that he was able to convince the other co-defendants to sell Mr. Miyagi in Louisiana, even though they regarded it as a "no sell state." Id. Instead, the Defendant counters that these co-defendants decided to sell Mr. Miyagi in Louisiana, despite their concerns about its legality, based on the representations of co-defendants Richard Buswell ("Buswell") and Barry Domingue, who claimed to have agreements with state law enforcement agencies protecting them from prosecution. Id., at pp. 8-9. Moreover, the Defendant claims that any evidence of communication between him and co-defendant Daniel Francis ("Francis") failed to establish a conspiracy to distribute Mr. Miyagi and AM-2201, because there were no references in this communication to concerns over legality, law enforcement protection or agreements, or training of Curious Goods employees on how to deal with law enforcement. Id., at pp. 12-13. According to the Defendant, it was only after the raids on the Curious Goods stores on December 8, 2011, that e-mails between the Defendant and Francis began to discuss the legality of AM-2201. Id.

The Defendant's recitation of the facts presented at trial omits much of the evidence the Government presented to the jury. As the Government explains, there was evidence that showed the Defendant was a member of the conspiracy as early as late-July or August 2011 for purposes of distributing Mr. Miyagi. Record Document 892, pp.

3-4. This evidence included testimony concerning checks the Defendant received from Curious Goods and Pinnacle Products for dues to the Retail Compliance Association ("RCA"), meetings with co-defendants to assuage their concerns that Louisiana was a "no sell state," e-mail correspondence regarding the RCA, and the Defendant's alleged agreement with state law enforcement agencies. Id., at pp. 4-5; Gov. Ex. 217; Gov. Ex. 369, p. 25. Additionally, refuting the contention made by the Defendant, the Government states that the evidence showed that Curious Goods' purchasing of Mr. Miyagi from Pinnacle Products increased dramatically after August 2011, when the Defendant allegedly joined the conspiracy. Id., at p. 5.[1]

Here, in assessing all the evidence and testimony, the Court cannot find that it would be a miscarriage of justice to allow the jury's verdict to stand. See Tibbs, 457 U.S. at 37-38; Robertson, 110 F.3d at 1117. Given the evidence submitted, the jury's determination that the Defendant was involved in a conspiracy to purchase, possess, and distribute Mr. Miyagi and AM-2201 is not misplaced, and the evidence does not "preponderate heavily against the verdict." Robertson, 110 F.3d at 1118. The testimony concerning the Defendant's participation, along with his correspondence with these co-defendants, established clear evidentiary support that the Defendant was involved with a conspiracy to distribute Mr. Miyagi. The evidence provided by the Government also demonstrates when the Defendant became a part of this conspiracy and the extent to which he coordinated with other co-defendants to promote Mr. Miyagi's distribution.

---

[1] As the Government notes, evidence provided at trial demonstrates that Curious Goods purchased $155,231.82 worth of Mr. Miyagi from Pinnacle Products, in the months before the Defendant joined the conspiracy, and $1,381,252.31 worth after August 2011. Record Document 892, p. 5; Gov. Ex. 369.

Rather than finding the Government's arguments "incongruent and oxymoronic," the jury found the Government's presentation was cogent and the vast amount of evidence and testimony demonstrated the Defendant's guilt beyond a reasonable doubt as to Count 1. As a result, the Court finds that this claim is without merit.

### B.     Count 2: Conspiracy To Introduce or Cause To Be Introduced Misbranded Drugs into Interstate Commerce

According to the Defendant, the evidence presented as to Count 2 only showed that the other co-defendants knowingly and intentionally mislabeled Mr. Miyagi in an illegal manner and that these co-defendants exclusively controlled the packaging and labeling of the product. Record Document 878, p. 13. The Defendant submits that there was no evidence to support his conviction on Count 2. He specifically argues that there was a lack of evidence that he "was ever involved with labeling or . . . entered into any type of agreement to cause the Mr. Miyagi product to be mislabeled." Id., at p. 14.[2]

In opposition, the Government makes two arguments. First, while there is a difference between misbranding a product and introducing a misbranded product into interstate commerce, the elements for Count 2 only require the knowing introduction of that product into interstate commerce. The Government presented evidence that the Defendant was aware of the branding requirements for Mr. Miyagi and the potential liability associated with a product that was for "human consumption." Record Document 892, at pp. 7-8; Gov. Ex. 332A. Testimony from Brady Becker established the Defendant's participation in a conference call on this issue, and the Government further

---

[2] In support of his claim, the Defendant contends that there was "no testimony that the words 'not for human consumption' ever came out of Stanford's mouth" or that he had ever seen and/or examined the packaging for Mr. Miyagi. Record Document 878, p. 14.

argues that the Defendant's knowledge that Mr. Miyagi potpourri was mislabeled was also evidenced at trial by his concern over selling Mr. Miyagi cookies and whether the Mr. Miyagi brand could then be associated with being for "human consumption," undermining the potpourri's labeling. See id.; Record Document 925 (Trial Transcript pp. 1689, 1704); Gov. Ex. 332A, pp. 25-27. So long as the Defendant knew Mr. Miyagi was a misbranded drug when it was introduced into interstate commerce, the Government concludes it did not have to establish the Defendant mislabeled Mr. Miyagi himself to be culpable. Id. Second, because Count 2 is a conspiracy charge, the Defendant's actions which caused the misbranded product to be introduced into interstate commerce are sufficient for criminal liability. Id., p. 6. By applying the basic tenets of conspiracy law, the Government contends that the Defendant joined an unlawful conspiracy and that his actions were responsible for the introduction of Mr. Miyagi into interstate commerce, including his actions and assertions with regard to the RCA and possible agreements with state law enforcement agencies. Id., at p. 10.

Considering the evidence presented at trial, the Court cannot find that the jury's verdict represents a miscarriage of justice. It is improper for this Court to "reweigh the evidence and set aside the verdict" because another result could be "more reasonable." Robertson, 110 F.3d at 1118. Though the evidence does not demonstrate that the Defendant engaged in the misbranding of Mr. Miyagi himself, such evidence is not required. It is reasonable for the jury to have concluded that the Defendant's actions either directly or indirectly, by means of his participation in an unlawful conspiracy, caused the introduction of a misbranded product into interstate commerce. See id. The Defendant has failed to establish that a miscarriage of justice will result if the jury's

verdict is permitted to stand as to Count 2. See United States v. Fuchs, 467 F.3d 889, 910 (5th Cir. 2006). For these reasons, the Court finds this basis for a new trial is without merit.

      **C.    Count 3: Money Laundering Conspiracy**

      As to Count 3, the Defendant claims that the Government failed to prove beyond a reasonable doubt that he knew the proceeds in the financial transactions at issue involved revenue from the distribution of a controlled substance analogue and that he "intended to promote the carrying on of the specified unlawful activity." Record Document 878, p. 17. The Defendant also asserts that the Government was required, yet failed, to prove what percentage of Curious Goods' revenue was derived from the sale of Mr. Miyagi. Id., at pp. 17-18. Specifically, the Defendant contends that the Government failed to present any evidence that five checks he received from other co-defendants from July 2011 to December 2011 were ever cashed or deposited with the knowledge that the money was revenue from illegal activity or that it was accepted to promote such illegal activity. Id., at pp. 19-21. While evidence and testimony presented by the Government showed that certain checks were for "legal services" and "RCA dues," the Defendant questions the evidentiary basis of this charge if he "did not perform any RCA work." Id., at p. 21.

      The Government counters that the Defendant, in fact, promoted the sale of Mr. Miyagi, which he knew contained AM-2201, and was aware that the money he received was derived from the revenue generated by those sales. Record Document 892, p. 11. The RCA, according to the Government, was a conduit to pay both the Defendant and

Francis the proceeds from Mr. Miyagi's distribution. Id. As the Government points out, co-defendants Boyd Barrow ("Barrow") and Joshua Espinoza ("Espinoza") both testified that "RCA dues" were paid by Curious Goods and that the Curious Goods franchisees were told that "they would have to pay the RCA based upon a percentage of their sales, the vast majority of which were [from] Mr. Miyagi." Id.

In assessing both the witnesses and the evidence, the Court finds that the co-defendants provided credible testimony and that the evidence does not "preponderate heavily against the verdict" in such a way that it would be a miscarriage of justice to let the verdict remain. Robertson, 110 F.3d at 1118. The jury's conclusion that the Defendant was knowingly receiving money principally derived from the sale and distribution of Mr. Miyagi is not without merit, especially considering the witnesses' testimony, the instruction given to the Curious Goods franchisees, and four checks being drafted to the Defendant with "RCA dues" in the memo line. Gov. Ex. 369. The Court also notes that of the five checks the Defendant referenced in his brief, two were for "legal fees," and the jury acquitted the Defendant on the money laundering counts relating to other checks that he received for "legal fees."[3] However, a new trial on this count is not warranted merely by referencing these two checks alone, as the Government at trial presented numerous other checks that the Defendant received that were not for legal fees or services. Consequently, the jury's decision as to whether the Defendant took part in a conspiracy to launder the proceeds from Mr. Miyagi fails to rise to the level of an exceptional circumstance that permits this Court to set aside the jury's

---

[3] Specifically, the Defendant was acquitted of money laundering for checks he received for "legal fees" and "services" on Counts 6, 7, and 12. Record Document 859.

verdict. See Tarango, 396 F.3d at 672. Consequently, the Court finds this claim is without merit.

###### D.      Counts 4, 5, 10, 11, and 13: Money Laundering

In his Motion for New Trial, the Defendant alleges that the evidence failed to prove beyond a reasonable doubt that he engaged in money laundering by knowingly receiving proceeds from an unlawful activity and then knowingly engaging in transactions with those proceeds through a financial institution. Record Document 878, p. 2. However, the Defendant has failed to assert a clear argument and offers no evidence to support this allegation. The Defendant simply claims that the Government did not prove what percentage of Curious Goods' proceeds were derived from selling Mr. Miyagi and "should not be allowed to argue and assert that every penny of income by Curious Goods" came from that product. Id., at p. 18.

The Government contends that witness testimony and bank records presented at trial firmly establish that the proceeds from the sale of Mr. Miyagi were being received by the Defendant, who was then, in turn, conducting monetary transactions with those proceeds in excess of $10,000. Record Document 892, pp. 11-13. In terms of testimony, the Government explains that both Barrow and Espinoza stated that they paid their "RCA dues" using money derived from Mr. Miyagi. Id., at p. 11. The Government also uses invoices and bank records to demonstrate that the vast majority of the gross revenue generated by Curious Goods during the conspiracy was from the sale of Mr. Miyagi. According to the Government's calculation, "[w]hen $1,536,484.13, the amount paid by Curious Goods to Pinnacle Products, is multiplied by the Curious

Goods' markup rate, expected gross sales revenue is $5,121,613.77 a difference of only $14,501.59 greater than that actually generated." Id., at pp. 12-13; Gov. Ex. 14, 144, 369.[4] Because Curious Goods did not have a meaningful income stream other than Mr. Miyagi, the Government argues its calculation demonstrates that a significant amount of the revenue the stores generated is attributable to the sale of Mr. Miyagi, and these illicit proceeds were then received by the Defendant. Id.

Like the Defendant's previous claims, the evidence presented at trial does not indicate that the jury's determination was a miscarriage of justice or an exceptional circumstance such that this Court could set aside the verdict on these counts. Tarango, 396 F.3d at 672; Robertson, 110 F.3d at 1117. Given the testimony and evidence presented on Curious Goods' proceeds and the "RCA dues" received by the Defendant, the conclusion that the Defendant knew he was receiving the proceeds from the illicit sale of Mr. Miyagi is well supported. Furthermore, while the Government's revenue calculation is not definitive, it provides convincing support that a vast majority of Curious Goods' proceeds were derived from Mr. Miyagi's profitability as well. Thus, this claim is without merit.

## II.    The Defendant's Allegations that the Government Failed To Provide Summaries of Interviews It Conducted with Co-Defendants and Other Brady Material

The focus of the Defendant's next argument is the failure of the Government to provide summaries of pretrial interviews it conducted with certain co-defendants and to

---

[4] The Government calculated Curious Goods' markup rate based on the difference between the amount Curious Goods paid for Mr. Miyagi products from Pinnacle Products and the increased amount it sold those products for at its stores. Record Document 892, p. 12-13.

disclose e-mails it collected in anticipation of trial, pursuant to the Jencks Act and/or Brady. Without this documentation, the Defendant claims it was impossible for him to conduct effective cross-examination or impeach the credibility of the Government's witnesses. Record Document 878, p. 2.

### A.     The Defendant's Allegations Under the Jencks Act

As part of the Government's disclosure obligation, the Jencks Act requires the Government to provide a defendant with "statements" from a witness that relate to the subject matter upon which that witness testifies, including "(1) a written statement made by said witness and signed or otherwise adopted or approved by him" and "(2) a stenographic, mechanical, electrical or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(b),(e). However, in addition to strictly interpreting the definition of a "statement" under this Act, the Fifth Circuit has held that the Government is not required to record these interviews or reduce information gleaned from them into "statements" requiring disclosure. See, e.g., United States v. Martinez, 87 F.3d 731, 738-39 (5th Cir. 1996) (finding indirect quotes in a report were not "substantially verbatim recital[s]" requiring disclosure); United States v. Pierce, 893 F.2d 669, 674-75 (5th Cir. 1990) (explaining to qualify for disclosure, interview notes must be either "signed, read, or heard" in their entirety by the witness); see also United States v. Martino, 648 F.2d 367, 387 (5th Cir. 1981). Specifically, in United States v. Martino, the Fifth Circuit stated:

> No requirement has been brought to our attention that all interviews must
> be recorded or that interview notes must be reduced to writing and signed
> or otherwise approved by the witness. We cannot presume that the

prosecutor acted in bad faith by failing to reduce his notes to statement form.

648 F.2d at 387.[5]

In his initial brief, the Defendant makes no specific allegations on what statements or material the Government impermissibly failed to disclose under the Jencks Act. However, at the end of his lengthy "Summary of Testimony and Evidence from Trial," he does make a specific claim that "Drew Green, Dan Francis, Boyd Barrow, and Josh Espinoza all testified that they had been interviewed and/or debriefed multiple times by state and/or federal agents. Stanford was not provided with any witness statements or witness summaries pursuant to Brady, Kyles, and Jencks prior to trial or during trial." Record Document 878, p. 104. Although the Defendant's Reply Brief makes more factual allegations to support this claim, these accusations are still conclusory and imply that the Government intentionally failed to take notes or prepare reports during witness interviews, in an effort to avoid having to disclose this material. Record Document 898, pp. 5-7.

The Government counters that the Defendant cannot make such assertions without identifying what material was withheld in violation of the Jencks Act. Record Document 892, p. 15. As the Government argues, "Testimony during trial established that the government conducted witness interviews prior to trial, the witness interviews were not recorded, and no witnesses reviewed notes of these interviews or otherwise

---

[5] As the Fifth Circuit explained in United States v. Pierce, there is an obligation of the district court to conduct a hearing in camera if a defendant makes a request and "some indication exists in the record" that the material in question may meet the definition of a "statement" under the Jencks Act. 893 F.2d at 675 (citations omitted). However, even if there is a request by a defendant, there is no obligation to inspect the documents or notes in camera when there is no showing that the material will qualify pursuant to the act. Id. Here, the Defendant failed to make such a request or showing.

adopted something memorializing their statements." Record Document 904, pp. 3-4. The Government contends the interview materials sought by the Defendant are not "statements," and the Defendant has instead resorted to attacking the manner in which the interviews were conducted. Id., at pp. 4-5.

Here, the Defendant's conclusory and unsupported allegations do not demonstrate violations of the Jencks Act. The Defendant has failed to prove that the Government had, and then failed to disclose, Jencks statements. It is apparent that the Defendant's issue is with the lack of "statements" produced during these interviews. Yet, as Martino explains, there is no requirement that witness interviews or debriefs must be recorded or notes reduced to "statements" for purposes of the Jencks Act. 648 F.2d at 387. Although it may limit the Government's disclosure obligation, the failure of the Government to memorialize "statements" did not preclude the Defendant's opportunity to cross-examine these witness, and the Court will not presume the Government acted in bad faith in this case. See id. Without more than mere allegations, the Court finds that the Government satisfied its obligations under the Jencks Act.

**B.    The Defendant's Allegations Under Brady**

The law is clear that it violates a defendant's due process rights when the Government suppresses favorable evidence that is either exculpatory or could be used for impeachment purposes by a defendant. See Giglio v. United States, 405 U.S. 150, 154 (1972); Brady v. Maryland, 373 U.S. 83, 87 (1963). Of course, not all evidence is considered material for these purposes, and the burden of proof rests with the defendant.

[T]o establish a due process violation under Brady, a defendant must

show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment. 373 U.S. at 87, 83 S.Ct. 1194. Evidence is material under Brady when there is a "reasonable probability" that the outcome of the trial would have been different if the evidence had been disclosed to the defendant. See Bagley, 473 U.S. at 682, 105 S.Ct. 3375. A "reasonable probability" is established when the failure to disclose the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). As we noted in Gonzales, this standard does not require a defendant to establish that he would have been acquitted had the evidence been disclosed. 121 F.3d at 946. However, the defendant "must establish that the suppression of exculpatory evidence by the government 'undermines confidence in the outcome of the trial.'" Id. (quoting Kyles, 514 U.S. at 434, 115 S.Ct. 1555).

United States v. Runyan, 290 F.3d 223, 247 (5th Cir. 2002).

Similar to his previous claim, the Defendant implies that the Government withheld exculpatory and impeachment information in violation of Brady when it did not turn over information retrieved from Buswell's smart phone or the e-mail addresses that it subpoenaed as part of its investigation. Record Document 898, at pp. 8-12.[6] The crux of his argument is that these withheld e-mails could contradict details of the Government's account on the location of certain co-defendants at particular times, the co-defendants' concern over the legality of AM-2201 and Mr. Miyagi, and Francis' involvement in the industry and the forming of the RCA in Louisiana. Id. In particular, the Defendant alleges that Francis used two other e-mail accounts to communicate with the Defendant, but the Government did not disclose any e-mails from those accounts that could have proven

---

[6] The Defendant also briefly makes the claim that the Government was required to disclose any exculpatory or impeachment material that was created as part of the interviews with the co-defendants referenced above, even if that material did not meet the standards of the Jencks Act. Record Document 898, p. 7. However, as with his other Brady allegations, the Defendant does not provide any evidence or argument to support this claim or carry his burden of proof.

when the Defendant and Francis first met, when they communicated, and whether there

was any discussion of creating the RCA in Louisiana. Id., at pp. 10-12.[7] In making these

arguments, the Defendant actually seeks to prove a negative: if the Government

disclosed this information, it would show a lack of discussion between the Defendant

and the co-defendants on certain key issues, like Mr. Miyagi's legality. The Defendant

believes that because this information could possibly prove his lack of involvement, the

information should have been disclosed under Brady. See id., at p. 10.

    The Government submits that it satisfied all of its disclosure requirements,[8] so

the Defendant's claim to the contrary, without specific reference to what e-mails were

withheld, lacks merit. Record Document 892, at pp. 5-6. In particular, while the

Defendant targets the accounts and e-mails of Francis, the Government explains that it

did not even subpoena that information. Id., at p. 6. Rather, this information was

"recovered from one of two sources: other co-conspirators' email accounts or by Mr.

Francis' hand delivery of the email to the government." Id. Thus, even though the

Government did not subpoena the Francis material, it represents that it disclosed to the

Defendant all of the messages it received during its investigation. Id.

    Overall, the Defendant's Reply Brief is replete with unsubstantiated accusations

that the Government suppressed such material, especially in terms of e-mails. Besides

---

[7] The Defendant claims that this material, along with Francis' communications with co-defendants Drew Green and Thomas Malone, Jr., should have been disclosed by the Government. Record Document 898, pp. 10-12.

[8] The Government has provided the Court with a table detailing the e-mail accounts the Government retained information on and when that material was disclosed to the Defendant, as well as what accounts contained e-mails relevant to the case, from what accounts the Government recovered no e-mails, and how one e-mail account provider supplied a disk with corrupted information that could not be accessed. Record Document 904, pp. 5-6.

this lack of evidentiary support for his claims, the Defendant offers no jurisprudence in favor of his argument that the Government's disclosure obligation extends to the degree of allowing him to prove his lack of involvement by proving a negative. To establish a claim under Brady, the Defendant has the burden of proving that not only was evidence suppressed, but it was both favorable to the Defendant and material. See Runyan, 290 F.3d at 247 (citing Brady, 373 U.S. at 87). The Defendant has failed to carry his burden of demonstrating that any evidence was, in fact, suppressed and has made nothing more than bald allegations against the Government. Accordingly, the Court finds that the Defendant has failed to prove a Brady violation. As a result, the Court does not need to address the issue of whether the alleged information was favorable and material to the point that it "undermines [the Court's] confidence in the outcome of the trial." See Kyles v. Whitley, 514 U.S. 419, 434 (1995).

## III.    The Defendant's Allegations of the Court's Procedural Errors

When a defendant's motion for new trial is based on accusations that the district court erred in its rulings, a court retains its broad powers to examine the alleged missteps during the course of the trial. United States v. Mix, No. 12-171, 2014 WL 2625034, at *2 (E.D. La. June 12, 2014) (quoting United States v. Simms, 508 F. Supp. 1188, 1203 (W.D. La. 1980)). As the court in United States v. Simms explained:

> Where such a motion is presented based upon these grounds, the convicted defendant has the burden of showing that (1) some error was in fact committed and (2) that such error was prejudicial to him. In these circumstances, even if an error is found to exist, it will be disregarded as harmless unless found to affect defendant's "substantial rights" and the fairness of the trial. . . .
>
> The test to determine whether an error is of sufficient magnitude to warrant a new trial is to discover whether the court can conclude with a

fair assurance, after carefully examining all of the facts of the case, that
the verdict was substantially swayed by the error.

508 F. Supp. at 1203 (citations omitted). Such errors and "the resulting fairness of the

trial" must be reviewed against the whole record. United States v. Johnson, 713 F.

Supp. 2d 595, 602 (E.D. La. 2010) (citing United States v. Wall, 389 F.3d 457, 466 (5th

Cir. 2004)). If a new trial is sought based on alleged trial error, a court should apply the

plain error standard if the party objected and apply the harmless error standard if the

party did not. Mix, 2014 WL 2625034, at *3 (citing United States v. Logan, 861 F.3d

859, 864 n.3 (5th Cir. 1988)). This Court will now address the alleged procedural and

trial errors that could be identified from the Defendant's "Summary of Testimony and

Evidence from Trial."[9]

## A.    The Court's Pretrial Ruling Concerning the April 5, 2012, Recording of Richard Buswell

Among the different allegations the Defendant obscurely made toward the end of

his Motion for New Trial is the claim that this Court erred when it ruled that he was

barred from questioning DEA Task Force Agent William White and DEA Special Agent

Donald DeSalvo about an interview they conducted with Buswell on April 5, 2012.

Record Document 878, pp. 102-03. Specifically, he asserts that the pretrial ruling limited

his ability to cross-examine the agents and that non-hearsay information gleaned from

this recoding could have been relevant, exculpatory, and impeaching. Id. The

---

[9] In the Defendant's 104-page brief, he specifies a number of claims that the Court could easily
identify and analyze through the use of clear topic headings. However, based on the Court's reading, the
final eighty-three pages of this brief fail to meaningfully outline, organize, or articulate any claims for a new
trial until the last three pages. It is not this Court's task to locate and create arguments for the Defendant.
See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for
truffles buried in briefs.").

Government, in response, argues that "[b]ecause the recordings and the decisions to conduct the interview were patently irrelevant to the issues at trial, the Court properly foreclosed their admission into evidence." Record Document 892, p. 16.

Here, the Defendant misconstrues the Court's pretrial ruling on this matter. Rather than completely barring any cross-examination of the agents as to the Buswell recording, the Court stated it would allow questioning if the Defendant "first demonstrate[d] independent relevance to the Court" based on certain considerations, including the fact that the Government was not seeking to introduce the recording, that the comments Buswell may have made during it were "likely to be inadmissible hearsay," and that no allegations of prosecutorial misconduct could have been made in reference to this recording, given the Court's prior ruling on that issue. Record Document 779, p. 2 (citing Record Documents 670 and 699). At trial, the Defendant never demonstrated this independent relevance and now claims, without any jurisprudence in support, that this decision limited his ability to "present a full and meaningful defense." Record Document 878, p. 103.

The Court is unpersuaded that this pretrial decision was an error, let alone a prejudicial error, that affected the Defendant's substantial rights. See Mix, 2014 WL 2625034, at *2. In reviewing the record as a whole, there is no indication that the Court's decision to require the Defendant to demonstrate the independent relevance of this recording before questioning these agents had an effect on the trial's fairness. Johnson, 713 F. Supp. 2d at 602. The burden is on the Defendant to prove this decision was an error, but he only provides conclusory allegations that this interview contained exculpatory and impeachment evidence that was admissible at trial. Without evidence

or authority supporting his argument, this Court cannot find that the Defendant has carried his burden and that its pretrial decision, in hindsight, was one that could have substantially swayed the jury's verdict. <u>See</u> <u>Simms</u>, 508 F. Supp. at 1203. As such, the Court finds that this basis for a new trial is without merit.

> **B.      The Court's Ruling on the Introduction of Business Records Pursuant to Federal Rules of Evidence 803 and 902**

The Defendant next alleges the Court erred by ruling that he could not introduce business records under Rules 803 or 902 of the Federal Rules of Evidence, despite his claims that he complied with the evidentiary requirements. Record Document 878, p. 103. The Court found as a matter of fact that the Defendant had not complied with the notice requirements of Rule 902 when he filed his notice and the corresponding documents into the record under seal, because he failed to include this notice when he provided those same documents to the Government via e-mail. Record Document 780; Record Document 926, p. 22 (Trial Transcript p. 1812). However, as the Government correctly explains, even though the Court ruled against the Defendant on introducing the business records under Rule 902, the Court never held that these records were inadmissible under Rule 803(6). Record Document 892, pp. 16-17. The Court, instead, explained that in order to comply with the provisions of that rule, the custodian of the records must be called to testify. <u>See</u> Record Document 926, p. 23 (Trial Transcript p. 1813) ("Now, as I said, [failing to provide notice in compliance with Rule 902] is not fatal to your getting this into evidence. It simply means you can't use the shortcut–you have to put Ms. Hanks on the stand or some other custodian of these records."). Because the Defendant never called the custodian of the records, potentially identified as Missy

Hanks, William Goode, or others, to testify, the evidence was never presented.

The decision not to call any custodian of the records as a witness was not the Court's error, but rather was a decision made by the Defendant. Therefore, the Court finds that such an allegation of error is without merit.

### C.    The Court's Rulings Limiting the Defendant's Cross-Examination of Witnesses by Admonishing Him for "Testifying" Before the Jury

During the course of the trial, the Defendant claims that this Court restricted his ability to cross-examine the Government's witnesses and admonished him for "testifying" in front of the jury when he was merely asking leading questions. Record Document 878, pp. 103-04. Although the Defendant does not reference a specific ruling or instruction by the Court, he does provide a rare citation to cases supporting his Sixth Amendment rights and those rights protected by the Confrontation Clause. Id. The Government notes the Court never "limited Mr. Stanford's use of leading questions during cross examination" and, by way of illustration, outlines examples of the Court sustaining objections to the Defendant's "testimony" on cross-examination. Record Document 892, pp. 17-18.[10]

While precluded from "testifying" on cross-examination, the Defendant was not hampered in his ability to cross-examine Government witnesses, nor was he denied the right to testify at trial. He could have taken the witness stand, but as the Government speculates, he was unwilling to subject himself to cross-examination. Id. Again, it is the

---

[10] For example, after instructing him that he was testifying during cross-examination, the Court kindly reminded the Defendant that he merely needed to "ask the question in a better manner," even providing a model for the Defendant shortly thereafter: "How about this, 'that isn't it correct that, at a later date, the same amount is paid in two different checks to Mr. Goode?'" Record Document 926, p. 94 (Trial Transcript p. 1884).

Defendant's burden to prove that the Court not only erred in "limiting" his cross-examination, but that it was prejudicial. Given the absence of any specific limitations imposed on him, the Court does not find that its instructions on the basic parameters of cross-examination and the use of leading questions constitute prejudicial error, especially when reviewing the record as a whole. Johnson, 713 F. Supp. 2d at 602 (citing Wall, 389 F.3d at 466). It is the right of all defendants to take the stand and defend oneself against the accusations of the Government; however, in doing so, one must submit to the rigors of cross-examination and the possible consequences that come with it. In this case, the Defendant consistently sought to testify through his cross-examination of the Government's witnesses and yet not submit his own testimony to the same scrutiny. See California v. Green, 399 U.S. 149, 158 (1935) (explaining cross-examination is the "greatest legal engine ever invented for the discovery of truth") (citation omitted)). This claim is without merit.

###  D. The Court's Ruling Limiting the Defendant's Inquiry on the Possible Participation of Non-Witnesses in the Conspiracy

Without reference to any supporting law, the Defendant claims the Court erred in preventing him from inquiring about or mentioning the fact that an owner and operator of Curious Goods, Patrick Chauvin, was neither charged nor prosecuted by the Government, "despite his significant participation." Record Document 878, p. 104. As the Government explains more clearly, this ruling arose from the Defendant's request, pursuant to United States ex rel. Touhy v. Regan, 340 U.S. 462 (1951), for Government agents to testify as to the status of individuals not involved in the case. Record Document 892, pp. 18-19. This Court found that the Defendant was permitted to inquire

about any promises or enticements made to a testifying witness, but an examination of whether a non-witness was possibly involved in this investigation, yet was "not subject to prosecution," was irrelevant to the determination of the Defendant's own culpability. Record Document 779, pp. 4-5. While limited in his ability to question witnesses about the alleged illegal activities of non-witnesses who were not testifying at trial, the Defendant was, nonetheless, able to cross-examine witnesses about possible bias resulting from the promises or enticements offered to them by the Government. See id.

The Court does not find this decision was a prejudicial error. It is the Defendant's burden to show that an error was, in fact, committed and that the error was of a sufficient magnitude as to warrant a new trial. See Simms, 508 F. Supp. at 1203. He has failed to satisfy this burden. Thus, the Court finds that this final assertion of error is without merit and does not entitle the Defendant to a new trial.

## IV. The Defendant's Allegations that the Government Engaged in a "Systematic and Systemic" Pattern of Misleading and False Testimony

In the Defendant's Motion for New Trial, he directly asserts that the Government engaged in a "systematic and systemic pattern of intentionally presenting misleading and patently false testimony to the jury," violating 18 U.S.C. §§ 1621 and 1622, as well as Rule 3.3 of the Louisiana Rules of Professional Conduct. Record Document 878, p. 2. Although the Defendant merely alludes to such violations in his sprawling "Summary of Testimony and Evidence From Trial," he makes clearer claims in his Reply Brief and provides exhibits in support. See id., at pp. 21-104; Record Document 898.

It is well-settled law that convictions established through the known use of false testimony violate a defendant's due process rights, whether the prosecution solicits

false testimony or allows it to go uncorrected when it is presented. Napue v. Illinois, 360 U.S. 264, 269 (1959). Testimony that merely affects the credibility of a witness falls within this scope as well. O'Keefe, 128 F.3d at 893 (citing Napue, 360 U.S. at 269-70). To establish a proper claim for a new trial based on a Napue violation, a defendant must prove "(1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material." Id. (citing United States v. Blackburn, 9 F.3d 353, 357 (5th Cir. 1993)).

Often, it is a question of the materiality of the alleged falsehoods and the potential impact they may have had on the jury. "The judge's job, in connection with an alleged Napue violation, is to grant a new trial when the fact-finding function of the jury has been corrupted by a material falsehood of which the government was aware." Id. at 898. Such testimony becomes material for purposes of Napue when it creates a reasonable probability of a different outcome when examining the challenged testimony and evidence collectively. Id. at 894 (citing Kyles, 514 U.S. at 434-36); see also United States v. Renzi, 769 F.3d 731, 752 (9th Cir. 2014). Not all false statements rise to the level of being material, and there is a reluctance by courts to find a defendant's due process rights are violated under Napue when the Government has provided the defense with the information to impeach such alleged falsities, yet the defense fails to do so for possibly tactical or strategic reasons. See O'Keefe, 128 F.3d at 894-95; United States v. Bethley, 973 F.2d 396, 399 (5th Cir. 1992). "Thus, materiality is a method of maintaining the equal playing field between the prosecution and the defense necessary to allow the jury to perform its truth-seeking function." O'Keefe, 128 F.3d at 895.

In a lengthy, convoluted manner, the Defendant makes several interrelated claims that co-defendants Francis, Barrow, and Espinoza "lied to the jury on every single significant issue of fact." Record Document 898, pp. 13-43. Chief among these claims is that the Government allowed Francis to falsely testify as to his communications and relationship with the Defendant during the fall of 2011. The Defendant asserts that he received unsolicited e-mails from Francis and that Francis' testimony that they communicated meaningfully before November 8, 2011, especially by telephone, is false. Id., at pp. 23-27. This recitation of the evidence includes e-mail communications that began between the Defendant and Francis as early as August 22, 2011, when Francis sent an e-mail to the Defendant with detailed attachments concerning the RCA. In response, the Defendant acknowledged that he received the message and was reviewing the documents. Id., at p. 29; Gov. Ex. 225. The Defendant further argues that Francis falsely testified that he had spoken with the Defendant on the telephone prior to these e-mail messages and that they had ongoing phone conversations during the fall of 2011. Id., at pp. 29-35.

In line with his reconstruction of the evidence, the Defendant also refutes Francis' testimony about when he first visited Lafayette, Louisiana, concerning the RCA. Although Francis testified that he first met with the Defendant when he traveled to Lafayette with Barrow in August 2011, the Defendant counters that this testimony was false and gave the jury the false impression that the Defendant and Francis had a relationship aimed at creating the RCA in Louisiana prior to November 2011. Id., at pp.

36-37.[11] The Defendant relies on telephone and bank records to support his contention that he and Francis first met on November 2, 2011. Id.[12] This conflicting time line of communications, records, and e-mails involving Francis exemplifies the foundation of inconsistencies upon which the Defendant forms his claims of systemic dishonesty on the part of the Government's witnesses.

Beyond the above allegations, the Defendant uses other, less substantive inconsistencies to weave a conflicting narrative that he argues demonstrates the Government's presentation of dishonest testimony.[13] He alleges co-defendants falsely testified as to their concern on pending state legislation, as well as whether assurances about Mr. Miyagi's legality were ever provided. Id., at pp. 17-20. Relying primarily on bank and telephone records, the Defendant rejects Espinoza's testimony as to when both Espinoza and Barrow first traveled to Lafayette and met with the other co-defendants, including the Defendant. Id., at pp. 21-23. He also claims Barrow lied about being present in the Defendant's office on both November 20 and November 30, when, on the latter date, Buswell wrote the Defendant a check for Barrow's RCA dues. Id., at

---

[11] The Defendant also contends that the Government allowed Francis to falsely testify that the Defendant received an audio attachment of a RCA conference call conducted on September 22, 2011. See Record Document 898, pp. 32-33.

Similarly, the Defendant claims that the Government omitted key attachments from two of its exhibits of e-mail correspondence (Gov. Ex. 217 and 232) between him and Francis to further its theory of the case. Id., at pp. 40-43. However, each of these e-mails and their corresponding attachments would have been within the Defendant's control at trial, as they were messages sent to him by Francis, and he could have introduced them to impeach Francis' testimony.

[12] These records, as well as many of the exhibits the Defendant uses in support of his motion, are not considered "new evidence" for purposes of a new trial claim, and these evidentiary concerns are discussed more fully below.

[13] In support of his claims, the Defendant attached sixty-two exhibits to his Reply Brief, most of which consist of telephone records, bank records, and e-mail correspondence. See Record Document 898, pp. 14-15 (providing a brief explanation of each exhibit).

pp. 39-40. Last, the Defendant implies that Bonnie Buswell, the mother of co-defendant Richard Buswell, falsely testified that her other son, Paul Buswell, provided the Defendant with precious metals shortly after the Curious Goods stores were raided to protect the metals from seizure. Id., at pp. 49-50; Record Document 878, pp. 14-16.[14] Together, this alleged false testimony forms the basis for the Defendant's Napue claims.

In a terse response to these claims, the Government counters that the Defendant has failed to produce evidentiary support that it knew any of this testimony was false and argues that any alleged falsehood is merely an inconsistency that is immaterial for Napue purposes. Record Document 904, at pp. 7-8. Inconsistencies regarding co-defendants' trips to Lafayette or what time a meeting took place pale in comparison to the "weight of the evidence [that] crushes any doubt" about the Defendant's guilt. Id. The Government believes that, at worst, any difference between the exhibits submitted by the Defendant and the testimony presented at trial represents "mere inconsistencies" or honest mistakes by the witnesses. Id.[15]

Under Napue, the Defendant has to prove that false statements were made, the Government knew the testimony was false, and the false testimony was material. Here, the Court can dispose of the Defendant's arguments by focusing only on the third element: materiality. The trial's principal issues did not concern the method of

---

[14] Even though Bonnie Buswell was called by the Defendant, he claims she falsely testified because Paul Buswell denies ever giving the Defendant anything of value. See Record Document 898, p. 50. However, as she testified at trial, because the metals, which were silver and gold coins, were too heavy for her to pick up, it was Paul Buswell that loaded them into the Defendant's vehicle. Id.; Record Document 926 (Trial Transcript p. 2072).

[15] The Government also notes that the Defendant's "allegations are based upon using phone records and receipts that he found within materials that the government gave to Stanford in discovery to impeach" its witnesses and their recollections. Record Document 904, p. 7.

communication between the Defendant and Francis, as his motion appears to assert.
The dispute at trial was whether the Defendant was involved in a conspiracy to mislabel
and distribute Mr. Miyagi and launder the proceeds. See Renzi, 769 F.3d at 752. In this
regard, the Defendant's claims miss the forest for the trees. The alleged peripheral
inconsistencies upon which the Defendant focuses–methods of communication or dates
of travel–were immaterial to the trial's outcome. The jury's verdict, instead, was
supported by the records, checks, and witness testimony detailing the Defendant's
personal participation in the conspiracy, and it is this very evidence that the Defendant
ignores.[16] Even assuming there were minor falsehoods presented at trial, this
challenged testimony collectively only amounts to mere inconsistencies that do not
create a "reasonable probability" in a different outcome. See Kyles, 514 U.S. at 434.

Furthermore, this Court is hard-pressed to find that the Defendant's due process
rights have been violated when he was in possession of the very evidence necessary to
impeach these possible inconsistencies. See O'Keefe, 128 F.3d at 894-95; Bethley, 973
F.3d at 399. While the burden of correcting falsehoods is on the Government, a
defendant can waive impeachment and correction of a falsity by not calling a rebuttal
witness or presenting evidence to the contrary when that evidence is within his
possession. See O'Keefe, 128 F.3d at 897 (citing Bethley, 973 F.3d at 399). The bank
records, telephone records, e-mail correspondence, and the like that the Defendant
uses in support of his allegations were all pieces of evidence that were within his control

---

[16] It should be noted that, as previously discussed above, the Court has already determined that
the evidence presented does not preponderate so heavily against the verdict that the jury's decision on
any count represents a miscarriage of justice.

at the time of trial. Indeed, either the Government disclosed the records before trial or the Defendant possessed the records himself, as many of the exhibits he attached to support these allegations are his own telephone and e-mail records. See Record Document 904, pp. 14-15. With this evidence, the Defendant could have cross-examined the Government's witnesses to impeach their testimony on these alleged falsities. Instead, the Defendant made a tactical or strategical decision not to impeach the Government's witnesses on these grounds, but this decision was his and his alone. See O'Keefe, 128 F.3d at 894-95; Bethley, 973 F.3d at 399. As a result, this Court finds that even assuming that certain testimony was, in fact, false, the alleged inconsistencies, at worst, neither impaired the jury's fact-finding function nor affected the trial's outcome. The Defendant's claims are therefore without merit.

**V.      The Defendant's Use of Newly Discovered Evidence**

Finally, this Court must address an issue raised by the Government in its Sur-Reply concerning the exhibits the Defendant attached to support his claim for a new trial. Record Document 904, pp. 8-17. Because these exhibits were either disclosed to the Defendant before trial or known to him at the time of trial, the Government asserts that none of it is newly discovered evidence that can provide a basis for a new trial. Id., at p. 9. In fact, the Government believes that some of the exhibits actually bolster its theory of the case. Id., at pp. 8-17.

Granting a new trial based on newly discovered evidence is disfavored by the courts, and it requires a defendant to prove five separate elements to prevail:

> (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a

lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal.

United States v. Anderson, 755 F.3d 782, 800 (5th Cir. 2014) (quoting Wall, 389 F.3d at 467). A motion for a new trial on new evidence may not be based on inadmissible evidence, and more importantly, the Fifth Circuit has found that "evidence is not considered 'newly discovered' where a defendant is in possession of evidence before trial but does not realize its relevance." Id. (citation omitted); United States v. Jaramillo, 42 F.3d 920, 925 (5th Cir. 1995) (citation omitted), abrogated on different grounds by United States v. Vargas-Ocampo, 747 F.3d 299 (5th Cir. 2014).

Though the Defendant does not make a specific claim for a new trial based on newly discovered evidence, in an abundance of caution, the Court will analyze under this framework two remaining claims concerning the Government's presentation of allegedly false testimony that are purportedly supported by evidence that was not introduced at trial. These claims do not require extensive analysis, and each can be disposed of by examining the first two elements of the test for newly discovered evidence. First, the Defendant claims that after trial he "stumbled across his old Samsung cell phone [and] was shocked to find text messages between himself, Dan Francis and Boyd Barrow." Record Document 898, pp. 43-44. He uses this newly discovered telephone and the text messages on it to support his earlier argument that the Government's witnesses systematically presented false testimony. Id., at. pp. 23-28, 37-39, 43-48. This telephone and its records unequivocally represent items that were known to the Defendant at the time of trial and that could have been recovered with minimal diligence. See Anderson, 755 F.3d at 800. Even assuming he failed to realize

the importance of these records, this error on the Defendant's part does not constitute newly discovered evidence, since both the telephone and records were within his possession. Jaramillo, 42 F.3d at 925. Consequently, this Court cannot find that a claim for a new trial can be based on the Samsung telephone or its records.

Second, the Defendant explains he "misplaced and forgot" about a flash drive with a "consensual recorded interview between himself and Dan Francis on September 28, 2012," in which some of Francis' statements confirm that he falsely testified at trial. See Record Document 898, pp. 48-49. Forgetfulness or failing to realize the possible relevance of this recording does not allow the Defendant to now offer such "evidence" after the trial as "newly discovered." See Anderson, 775 F.3d at 800; Jaramillo, 42 F.3d at 925. Without addressing its admissibility or permissibility,[17] the Court finds that this recording was certainly known to the Defendant at the time of trial, as he recorded it himself. Therefore, this fails to warrant a new trial.

All remaining claims that the Defendant may have for a new trial based on newly discovered evidence are likewise without merit. Following a thorough review of all the exhibits submitted by the Defendant, the Court finds that he has failed to satisfy the five separate elements for a new trial based on newly discovered evidence. See Anderson, 775 F.3d at 800.[18]

---

[17] As the Government notes, Francis was represented by Joseph Lotwick at the time of this recording, who the Government states did not consent to such a discussion. Record Document 904, p. 11. Despite the Sixth Amendment issues raised by this recording, even if it were admissible, the Government represents that the recording is "completely at odds" with the Defendant's arguments and demonstrates that the Defendant and Francis "were indeed co-conspirators." Id., at pp. 12-13.

[18] Besides the evidence disclosed by the Government to the Defendant, the remaining exhibits attached to the Defendant's Reply Brief all represent records or documents that were either known to the Defendant at trial, like his telephone records, or could have been detected through due diligence. See Anderson, 775 F.3d at 800.

## VI.     Conclusion

For the foregoing reasons, the Defendant's Motion for New Trial [Record Document 878] and request for an evidentiary hearing are hereby **DENIED**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this ___11th___ day of December, 2014.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE