**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

---

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO.: 12-146 (08) |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| DANIEL JAMES STANFORD (08) | MAGISTRATE JUDGE PATRICK J. HANNA |

---

# MEMORANDUM RULING

Following a nine-day jury trial, Defendant Daniel James Stanford (08) was convicted of each of the following counts: Count One (1), Conspiracy to Distribute or Possess with Intent to Distribute a Controlled Substance Analogue, in violation of 21 U.S.C. §§ 813 and 846; Count Two (2), Conspiracy to Introduce or Cause to be Introduced Misbranded Drugs into Interstate Commerce, in violation of 18 U.S.C. §371; Count Three (3), Money Laundering Conspiracy, in violation of 18 U.S.C. §1956(h); and Counts Four (4), Five (5), Ten (10), Eleven (11), and Thirteen (13), which were individual money laundering counts, each in violation of 18 U.S.C. §1957. Stanford was acquitted of five other, individual money laundering counts, which were Counts Six (6), Seven (7), Eight (8), Nine (9), and Twelve (12). The jury further answered "yes" to a final fact inquiry, regarding whether or not Stanford knew, during the time period relevant to the superceding indictment, that AM-2201 was a controlled substance analogue. Upon return of the jury verdict on Friday, August 29, 2014, Stanford waived

his right to a trial by jury on the issue of forfeiture.[1] On Wednesday, September 3, 2014, the Court reconvened to receive evidence and testimony on the issue of forfeiture, which is now the only issue remaining for the Court's determination, prior to sentencing.[2]

The forfeiture notice in the superceding indictment lists several assets, allegedly forfeitable either as proceeds of the drug conspiracy, pursuant to 21 U.S.C. §853, or as property involved in the money laundering transactions or traceable thereto, pursuant to 18 U.S.C. §982(a)(1).[3] Of the assets listed, Stanford's ownership interests extend only to the real property identified as his residence and certain cash proceeds in the amount of $143,921.69.[4] At the forfeiture hearing, and subject to the reservation of his right to appeal his convictions, Stanford conceded that $56,500 is forfeitable as the

[1] The Government offered Defendant Stanford a voluntary forfeiture agreement, which remained viable until 12:00 p.m. (noon) on Tuesday, September 2, 2014. Stanford was ordered to advise both the Government and the Court, at that time, whether he would accept the Government's forfeiture agreement or elect to proceed to a forfeiture hearing before the Court. *See* Record Document 849.

[2] In addition to the testimony of case agent Will White and the oral arguments given at the forfeiture hearing, the Government moved to introduce all testimony and exhibits from trial, as evidence of the forfeitability of the property at issue. *See* Record Document 861; *see also United States v. Capoccia*, 503 F.3d 103, 109-10 (2d Cir. 2007) (district court has latitude, with respect to the information on which it bases its forfeiture order, and may consider trial evidence without requiring government to reintroduce such evidence at post-trial forfeiture hearing).

[3] *See* Fed. R. Crim. P. 32.2(a) ("A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute.").

[4] The residence is located at 120 Branton Drive, Lafayette, Louisiana. On January 26, 2005, Stanford entered into an "agreement to purchase and sell" the home for $649,000. *See* Record Document 879, p. 1. And, the "Government has no reason to quarrel with the appraisal presented at the forfeiture hearing valuing the residence at just under $1,000,000." Record Document 875, p. 21.

proceeds of money laundering, based on the jury's verdict as to the relevant counts.[5] Accordingly, the Court narrowed the pertinent issues to include the forfeitability of Stanford's residence, as well as the remainder of the cash proceeds, which amounts to $87,421.69. Of that $87,421.69, a total of $56,250 relates to the counts on which Stanford was acquitted. The Government seeks forfeiture of that portion of the cash proceeds, attributable to the counts of acquittal, under §853 only. It was equally clear to the Court, during the forfeiture hearing, that the Government was likewise seeking forfeiture of the remaining $31,171.69 under §853 only. However, as explained below, the Government has now modified its position to avoid any potential instances of double-counting, after the Court expressed concern over that legal issue.

Both sides submitted post-hearing briefs.[6] The Government contends that all money received by Stanford during the conspiracy represents drug proceeds and that the entire amount of proceeds, $143,921.69, is forfeitable under 21 U.S.C. §853. Additionally, as will be explained below, the Government now requests that the Court subtract $77,750 from that total, in order to account for the drug proceeds that the Government contends were also involved in money laundering traceable to Stanford's residence. Thus, in total, the Government seeks a final order of forfeiture to include Stanford's interest in his residence, pursuant to 18 U.S.C. §982(a)(1), and a personal money judgment against Stanford in the amount of $66,141.69, pursuant to 21 U.S.C.

---

[5] Record Document 861.

[6] Record Documents 875, 879, and 890.

§853 and Federal Rule of Criminal Procedure 32.2(6)(1)(A).[7]

Stanford, on the other hand, argues that the trial witnesses presented conflicting testimony regarding the dates and purposes of payments received; that the Government has failed to prove that Stanford's conduct promoted the carrying on of a specified unlawful activity or that Stanford intentionally conducted financial transactions with the specific intent to so promote; that the evidence failed to show that Stanford engaged in the relevant monetary transactions knowing that they involved criminally derived property, or that the proceeds were in fact criminally derived property; that the Government failed to prove that the transactions at issue affected interstate commerce; and, finally, that forfeiture of Stanford's residence would be grossly disproportional to his offenses of conviction and would therefore violate the Excessive Fines Clause of the Eighth Amendment.[8]

**LAW AND ANALYSIS**

Criminal forfeiture serves a punitive purpose; it is an aspect of the sentence

[7] According to the Government, $66,141.69 represents the total amount of forfeitable cash proceeds ($143,921.69) minus the amount of drug proceeds ($77,750) that Stanford deposited into the account used to complete the money laundering transaction involving his residence. *See* Record Document 875, p. 2. The Court notes, by the Government's purported calculation, $143,921.69 less $77,750, should actually total $66,171.69. Regardless thereof, for the reasons stated in this ruling, the Court does not adopt the Government's calculation.

[8] Regarding the issue of Stanford's knowledge, as it pertains to the forfeitability of cash proceeds under §853, the Court ruled at the forfeiture hearing that any argument thereon was foreclosed by the jury's verdict, with one limited exception. Stanford was allowed to argue, in post-hearing briefs, that particular payments might have been made prior to the time Stanford has been shown to have had knowledge of the drug conspiracy. The Court is unpersuaded by Stanford's arguments on this point and further finds compelling the jury's affirmative response on the final fact inquiry, indicating that Stanford knew, during the time period relevant to the Superceding Indictment, that AM-2201 was in fact a controlled substance analogue. As such, the question of Stanford's knowledge is not relevant to the Court's determination on the issue of forfeiture.

imposed, following conviction of a substantive criminal offense or offenses. *See Libretti v. United States*, 516 U.S. 29, 39-41 (1995). Federal Rule of Criminal Procedure 32.2(b)(1)(A) requires that the court determine what property is subject to forfeiture under the applicable statute and whether the Government has established the requisite nexus between any such property and the relevant offense. The Government has the burden to prove that nexus by a preponderance of the evidence. *United States v. Juluke*, 426 F.3d 323, 326 (5th Cir. 2005). As mentioned, the two statutes applicable to the forfeiture issues in this case are 21 U.S.C. §853 and 18 U.S.C. §982.

Title 21 U.S.C. §853(a) provides, in relevant part, that any person convicted of a qualifying violation shall forfeit "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation" and "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation." The Government can create a rebuttable presumption that property is subject to forfeiture if it establishes by a preponderance of the evidence that "such property was acquired by such person during the period of the violation ... or within a reasonable time after such period" and that "there was no likely source for such property other than the violation." 21 U.S.C. §853(d); *Juluke*, 426 F.3d at 326.

The Government argues that all money received by Stanford from Pinnacle Products and Curious Goods constitutes drug proceeds under 21 U.S.C. §853. The total amount is $143,921.69 and is comprised of the following: (a) $56,500, based on the jury's verdict of guilty as to Counts Four (4), Five (5), Ten (10), and Eleven (11); (b)

$56,250, based on Counts Six (6) through Nine (9) and Twelve (12), on which Stanford was acquitted;[9] and (c) $31,171.69, consisting of three checks from Curious Goods and two checks from Pinnacle Products. Stanford has conceded that $56,500 is forfeitable, pursuant to the jury's verdict of guilty as to the individual money laundering counts; therefore, the Court accepts that concession without further analysis. As to the amounts attributable to the counts of acquittal, it is clear to the Court that the jury acquitted Stanford as a result of the "safe-harbor" provision of 18 U.S.C. §1957(f).[10] That section clarifies that the term "monetary transaction," as it relates to money laundering violations under §1957, "does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution[.]" However, because there is no such safe harbor for drug proceeds under §853, the Government claims that said proceeds are still subject to forfeiture thereunder. *See United States v. Monsanto,* 491 U.S. 600, 614 (1989) ("there is no exemption from §853's forfeiture ... provisions for assets which a defendant wishes to use to retain an attorney"); *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617 (1989) (holding that neither the Fifth nor the Sixth Amendment requires Congress to permit a defendant to use forfeitable assets to pay that defendant's legal fees). Thus,

---

[9] This $56,250 is comprised of the following counts of acquittal and related amounts: Count Six (6), a November 17, 2011 Curious Goods check in the amount of $15,000; Count Seven (7), a November 18, 2011 Curious Goods check in the amount of $25,000; Count Eight (8), a November 28, 2011 $25,000 check drawn on Stanford's trust account; Count Nine (9), a November 28, 2011 $15,000 check drawn on Stanford's trust account; and Count Twelve (12), a December 6, 2011 Curious Goods check in the amount of $16,250.

[10] Stanford likewise agrees that the counts of acquittal fall under the safe-harbor provision of §1957(f). *See* Record Document 879, pp. 26-27.

the total amount of cash proceeds for which §853 forfeitability remains an issue is $87,421.69, the total amount of drug proceeds less the $56,500 attributable to the jury's verdict on Counts Four (4), Five (5), Ten (10), and Eleven (11).

In deciding whether the aforementioned proceeds are forfeitable under §853, it is necessary to first determine the period of time during which Stanford was involved in the conspiracy for which he was convicted on Count One (1). In doing so, the Court bears in mind that the language of §853 "is decidedly broad," as noted by the Fifth Circuit. *United States v. Olguin*, 643 F.3d 384, 396 (5th Cir. 2011). The Government argues that Stanford's active involvement began no later than August 2011 and continued until December 8, 2011, when the Curious Goods stores were raided and the Mr. Miyagi product was seized by law enforcement.[11] [12] The Court finds that there was ample evidence at trial to support this timeline, particularly the combined testimony of Dan Francis, Boyd Barrow, and Josh Espinoza. All funds paid to Stanford were drawn on the operating accounts of Curious Goods and Pinnacle Products, and as the testimony indicated, the vast majority of funds in those accounts was derived from sales of a controlled substance analogue. Each of these witnesses therefore supported the

---

[11] The Court does also acknowledge that there was evidence to suggest that Stanford intended to continue engaging in the broader effort to profit from the sale of products containing analogues, or new products containing potential analogues, after the December raids. The Court further acknowledges that there was credible testimony presented at trial, which indicated that Stanford also attempted to cover up his and other defendants' general knowledge of the presence of AM-2201 in Mr. Miyagi, at a revocation hearing held on December 15, 2011 before Magistrate Judge Hanna on behalf of Richard Buswell in an unrelated criminal matter. *See* Docket No. 6:11-cr-00198-RTH-PJH-1 (W.D. La.).

[12] The Government's brief makes several references to Stanford's period of involvement in the conspiracy as between August and December 2011. *See* Record Document 875, p. 9.

Government's theory that the checks paid to Stanford from both Curious Goods and Pinnacle Products were the direct result of drug proceeds from the sale of Mr. Miyagi, the product containing AM-2201.[13]

With one exception, all transactions underlying the cash proceeds at issue took place between October 12 and December 6, 2011. Additionally, the transactions involving the counts of which Stanford was acquitted consist of funds transferred from Curious Goods to Stanford via checks signed by Richard Buswell. The outlier, the only transaction which even arguably could fall outside of Stanford's alleged involvement in the conspiracy, consists of a July 21, 2011 payment of $2,500, drawn on a Curious Goods account and signed by Richard Buswell, with "legal fees" denoted in the memo line. As discussed above, there is no such safe harbor under §853; therefore, this "legal fees" designation is not determinative of the forfeitability of that $2,500. Further, as the Fifth Circuit has emphatically recognized, §853 "allows forfeiture of property a defendant 'obtained, directly or *indirectly*.'" *Olguin*, 643 F.3d at 398 (emphasis in original). The statute's "broad language...evinces a Congressional mandate to reach the ill-gotten resources" of the defendant. *Id.* at 397. There is no question that the lion's share of the proceeds which flowed through Curious Goods, during the time period relevant to the superceding indictment, was directly attributable to the sale of Mr. Miyagi. The evidence proves beyond dispute that the check, drawn on a Curious Goods

---

[13] This position was further bolstered by the testimony of Brady Becker, a Curious Goods franchisee, opining that the sales of Mr. Miyagi products also generated the majority of revenues from products other than Mr. Miyagi.

account during the conspiracy, consisted of ill-gotten gains.

Therefore, the foregoing proceeds totaling $87,421.69 are subject to the rebuttable presumption that they were acquired by Stanford during the period of his involvement in the drug conspiracy and that there was no likely source for those proceeds other than the sale of Mr. Miyagi. *See Juluke*, *supra*, 426 F.3d at 326. Because the evidence and testimony presented at trial support this presumption, and Stanford has not, and indeed cannot, rebut the weight of that evidence, the Court finds that a total amount of $143,921.69 is forfeitable pursuant to 21 U.S.C. §853. For clarification, once again, this $143,921.69 is comprised of the following: (a) $56,500, based on the jury's verdict of guilty as to Counts Four (4), Five (5), Ten (10), and Eleven (11); (b) $56,250, based on Counts Six (6) through Nine (9) and Twelve (12), on which Stanford was acquitted; and (c) $31,171.69, consisting of three checks from Curious Goods and two checks from Pinnacle Products.

The question remains whether Stanford's residence is subject to forfeiture, based on a January 18, 2012 payment made toward his home mortgage and drawn from the account into which Stanford deposited a portion of the drug proceeds. This transaction is the subject of Count Thirteen (13), of which Stanford was convicted.

Before directly addressing the forfeitability of Stanford's residence, it is necessary to clarify an underlying issue. As mentioned, the Government argued at the forfeiture hearing that it was only seeking forfeiture of the "remaining" cash proceeds – consisting of $87,421.69, which is the total amount of cash proceeds less the $56,500 for which Stanford conceded forfeitability – under §853 and forfeiture of Stanford's

residence under §982. When confronted with the Court's concern over the legal issue of potentially ordering forfeiture of the same cash proceeds under *both* the §853 and §982 theories of forfeiture, the Government cited *United States v. Neal*, No. Crim.A.03-35-A, 2003 WL 24309581 (E.D. Va. July 30, 2003) for the proposition that each unlawful transfer of money, in violation of 18 U.S.C. §1956, may be viewed as a separate and distinct violation, even if the same funds were moved more than once. Now, in post-hearing briefs, the Government seeks to "avoid any potential double-counting issue[,]" by arguing that $77,750 should be "credited" toward Stanford's above-calculated money judgment. The Government argues that $77,750 is attributable to Stanford's residence, as the amount of drug proceeds which were *also* involved in money laundering transactions traceable to the residence and therefore forfeitable under §982. Assuming that $56,500 of that $77,750 consists of the proceeds of money laundering to which Stanford conceded forfeitability, the Court is at a loss as to which specific transactions make up the remaining $21,250, as contended by the Government.[14] Because the Court finds that the Government's calculation is seemingly arbitrary, the Court rephrases the Government's request to consist of a $56,500 "credit" toward Stanford's money judgment, to account for the proceeds attributable toward the forfeiture of the residence. Regardless of whether $56,500 or $77,750 is attributable to the residence, Stanford argues that the forfeiture thereof would constitute a violation of

[14] The Court is reluctant to rely on these numbers in light of the fact that the Government has failed to explicitly state the source therefor, as well as the Government's own concession that "the government agrees that somewhere between approximately $50,000 and $77,750 of drug money was used in the Count 13 transaction[.]" *See* Record Document 875, p. 21. The Court is unimpressed by the lack of foundation for the Government's calculations.

the Excessive Fines Clause of the Eighth Amendment. The Court agrees.

Similar to §853, Title 18 U.S.C. §982(a)(1) is a mandatory criminal forfeiture provision. Section 982(a)(1) states that "[t]he court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." The Fifth Circuit has acknowledged "that merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture." *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997). However, in *Tencer*, the Fifth Circuit affirmed the district court's adoption of the facilitation theory, which is that "[c]riminal activity such as money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme." *Id.* at 1135 (citing *United States v. Contents of Account Numbers 208-06070 and 208-06068-1-2*, 847 F. Supp. 329, 334-35 (S.D.N.Y. 1994) (internal citation omitted)); *see also Juluke*, 426 F.3d at 326-27 (applying facilitation theory under §853(a) to property used to store and protect narcotics and proceeds thereof). "It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue." *Id.* (quoting *Contents of Account Numbers 208-06070 and 208-06068-1-2*, 847 F. Supp. at 334-35). Generally, the facilitation theory is limited by the requirement that the Government demonstrate that a defendant pooled the funds for the purpose of disguising the nature and source of his scheme, rather than the illegitimate funds having merely an incidental or fortuitous connection to illegal activity. *See id.* (citations omitted).

The Court does not find that the Government has met its burden of demonstrating that Stanford pooled this relatively small portion of drug proceeds with his mortgage account for the purpose of disguising the nature and source of his scheme. Instead, the Court finds that the commingling of the illegitimate and legitimate funds more likely than not stemmed from an incidental connection to the drug conspiracy. Certainly, the Court concedes that doing so was a reckless and foolish move on the part of Stanford, and when such stupidity coincides with the commission of serious federal crimes, consequences should follow. Nevertheless, this case seems to be an outlier, distinguishable from the cases cited by the Government. For instance, instead of seeking the forfeiture of legitimate *funds* commingled with illegitimate funds, as the Government sought in *United States v. Huber*, 404 F.3d 1047 (8th Cir. 2005), the Government here seeks to forfeit Stanford's *residence*, in addition to a personal money judgment of cash proceeds. And, unlike *United States v. Segal*, 495 F.3d 826 (7th Cir. 2007), which involved an eleven-year racketeering scheme, Stanford's involvement in the instant conspiracy was of a relatively limited duration, beginning no later than August of 2011 and culminating with the December 2011 raids by law enforcement. Thus, although the law does arguably allow for the forfeitability of a residence when a defendant finances legitimate mortgage payments with ill-gotten gains, the Court simply finds that to forfeit the residence in this case would require the Court to enforce a law of unintended consequences. The Court declines to do so and further finds that to hold otherwise would likewise violate the Excessive Fines Clause.

The Eighth Amendment provides: "Excessive bail shall not be required, nor

excessive fines imposed, nor cruel and unusual punishments inflicted." The Supreme Court has "explained that at the time the Constitution was adopted, 'the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense.'" *United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998)(quoting *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)). "The Excessive Fines Clause thus 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'" *Id.* at 328 (quoting *Austin v. United States*, 509 U.S. 602, 609-10 (1993) (emphasis and internal quotation omitted)). "Forfeitures–payments in kind–are thus 'fines' if they constitute punishment for an offense." *Id.* There is no question that the forfeitures in this case would constitute "fines" for Eighth Amendment purposes. In *Bajakajian*, the Supreme Court held "that a punitive forfeiture violates the Excessive Fines Clause if it is *grossly disproportional* to the gravity of a defendant's offense." 524 U.S. at 334 (emphasis added).

In fashioning this standard, the Supreme Court explained that "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise[,]" such that *strict* proportionality between punitive forfeiture and the criminal offense would be much too elusive. *Id.* at 336 (emphasis added). Acknowledging the discretion vested in this Court to determine whether forfeiture of Stanford's residence would constitute an excessive fine, the Court has tirelessly considered this question from every conceivable angle. It is beyond dispute that this case stems from a serious prosecution, involving the knowing and reckless distribution of a very dangerous controlled substance analogue. The Court heard testimony regarding the chemical

structure of AM-2201 and its dangerous pharmacological effects at trial. Likewise, the Court heard testimony suggesting that Stanford intended to continue his involvement in his co-defendants' efforts to distribute controlled substance analogues, even after law enforcement raided Curious Goods stores and stopped the sale of Mr. Miyagi products. It was one month after the raids that Stanford laundered the drug proceeds to pay down the mortgage on his residence. Although §982 deals exclusively with forfeitures related to violations of the money laundering statutes, the jury clearly convicted Stanford of the drug conspiracy *and* found that he knew that AM-2201 was a controlled substance analogue at all times relevant to the conspiracy. It was Stanford's financial gain from the drug conspiracy that provided the source of the criminal proceeds – the specified unlawful activity – for which Stanford was likewise convicted of the money laundering conspiracy and individual money laundering counts. Stanford stands convicted of his involvement in a comprehensive criminal conspiracy, involving co-defendants at each level of the supply chain, from which Stanford derived cash proceeds and then laundered said proceeds through his bank accounts to pay down his residential mortgage.

The Court recognizes the serious nature of Stanford's offenses and hesitates to even appear to minimize the recklessness of Stanford's actions as they relate to this drug conspiracy. Nonetheless, the Court is cognizant of the punitive purpose served by criminal forfeiture, *Libretti, supra*, 516 U.S. at 39-41, and, as the sentencing court, is entitled to consider the other components which will comprise Stanford's ultimate sentence. In doing so, the Court finds that an adequate and just sentence does not

include forfeiture of Stanford's residence, based on the unique facts of this case. The Court finds that, to hold otherwise, would be to impose a grossly disproportional fine, in violation of the excessive fines clause, and beyond the bounds of equity.

**CONCLUSION**

For the foregoing reasons, the Court does hereby enter a preliminary order of forfeiture to include a personal money judgment against Defendant Daniel James Stanford (08) in the amount of $143,921.69 in United States currency.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 12th day of December, 2014.

Elizabeth Erny Foote
United States District Judge