# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 6:12-00146-08 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| DANIEL JAMES STANFORD | MAGISTRATE JUDGE HANNA |

## <u>MEMORANDUM RULING</u>

Before the Court are a motion to vacate, set aside, or correct a judgment and sentence pursuant to 28 U.S.C. § 2255 and an amended motion to vacate, set aside, or correct a judgement and sentence pursuant to 28 U.S.C. § 2255 filed by Defendant Daniel James Stanford ("Stanford"). *See* Record Documents 1287 & 1292. The Court shall only consider the amended motion.[1]

In his § 2255 motion, Stanford makes three primary allegations: (1) the Government suppressed favorable and material evidence; (2) the Government knowingly used or failed to correct false testimony; and (3) the Assistant United States Attorneys prosecuting the case were not duly appointed pursuant to the Appointments Clause of the United States Constitution. *See* Record Document 1292. The Government opposes

---

[1] This Court ordered Stanford to cure several deficiencies in his original motion, including his failures to reference specific pages within an exhibit, identify the relevance or significance of an exhibit, and file the exhibits as separate attachments. *See* Record Document 1290. Stanford filed the amended motion in response. *See* Record Document 1292. Pursuant to LR7.6.1, "all amended pleadings must be reinstated in full and must not incorporate any prior pleading by reference." Accordingly, the Court shall only consider Stanford's amended motion.

Stanford's § 2255 motion and contends Stanford is not entitled to relief. *See* Record Document 1305. Stanford filed a reply. *See* Record Document 1314.

The Court subsequently ordered the parties to file additional briefing addressing Stanford's contentions about the Government's pretrial possession of his § 2255 exhibits. *See* Record Documents 1374 & 1382. The Government filed its response to that order. *See* Record Document 1385. Stanford filed a reply. *See* Record Document 1386.

For the reasons set forth below, Stanford's motions to vacate, set aside, or correct his judgment and sentence pursuant to 28 U.S.C. § 2255 [Record Documents 1287 & 1292] are **DENIED** and **DISMISSED WITH PREJUDICE**. Stanford's requests for an evidentiary hearing [Record Documents 1287 & 1292] are also **DENIED**.

Filed contemporaneously with this Court's Memorandum Ruling is a "Summary of Court Findings" chart summarizing the Court's findings for Stanford's evidentiary claims under *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*"), *Giglio v. United States*, 405 U.S. 150 (1972) ("*Giglio*"), and *Napue v. People of State of Ill.*, 360 U.S. 264 (1959) ("*Napue*"). The chart has two columns. The first column contains a short description of Exhibits 1-166, the exhibits upon which Stanford relies for his *Brady*, *Giglio*, and *Napue* claims. The second column outlines Stanford's *Brady*, *Giglio*, and *Napue* claims and summarizes the Court's findings as to both possession and materiality. This chart is intended to be used solely as an organizational tool and point of reference for Stanford's evidentiary claims. The chart is not intended to be dispositive or to reflect the Court's handling of Stanford's evidentiary claims. Should any inconsistency between the chart and this Memorandum

Ruling exist, the Court's findings in the Memorandum Ruling are intended to be the final ruling as to that claim.

## Background

Stanford seeks to set aside his convictions. *See generally* Record Document 1292. To that end, he challenges the presentation of the facts to the jury. *See id.* More specifically, he contends the Government either solicited false testimony from cooperating co-defendants or omitted material evidence that should have been presented to the jury for its consideration. *See id.* To understand Stanford's contentions, the Court finds it necessary to summarize the evidence presented to the jury. This summary will allow the Court to later compare the trial evidence with Stanford's presentation of facts in his § 2255 motion as necessary.

For this reason, the Court begins this memorandum ruling with a summary of background facts. Later in the memorandum ruling, the Court will discuss Stanford's factual contentions. In drafting this background section, the Court relied primarily on the factual background previously set forth by the United States Court of Appeals for the Fifth Circuit ("the Fifth Circuit"). *See United States v. Stanford*, 823 F.3d 814 (5th Cir. 2016) ("*Stanford I*").

This case revolves around a scheme by the defendants to distribute synthetic marihuana in the Western District of Louisiana. *See* Record Document 57. Synthetic marihuana is "a lab-created product designed to mimic organic marihuana." *Stanford I*, 823 F.3d at 822. JWH-018 and AM-2201 are both "naphthoylindoles that activate the cannabinoid receptors in the human body, producing a 'high.'" *Id.* at 823. Originally,

manufacturers used JWH-018 to make synthetic marihuana, but manufacturers swapped to AM-2201 following a federal ban of JWH-018. *See id.* at 822.

Drew Green ("Green") and Thomas Malone ("Malone") owned NutraGenomics,[2] a Georgia-based company that "formulated a line of synthetic marihuana they called 'Mr. Miyagi.'" *Id.* at 823. Boyd Barrow ("Barrow") owned Pinnacle Products ("Pinnacle"), "a company that distributed Mr. Miyagi to retailers in a number of states." *Id.* Joshua Espinoza ("Espinoza"), a Pinnacle employee, "personally mix[ed] batches" of Mr. Miyagi. *Id.* Defendants sold Mr. Miyagi as "potpourri" with a label stating it was "not for human consumption." *Id.*

Richard Buswell ("Buswell") owned Curious Goods, a chain of smoke shops in Lafayette, Louisiana. *See id.* at 822. In March 2011, Buswell met with Malone, Green, and Barrow to discuss stocking a synthetic cannabinoid at Curious Goods. *See id.* at 823. "Shortly thereafter, Mr. Miyagi arrived in Curious Goods' stores in Lafayette." *Id.* At that time, Pinnacle made Mr. Miyagi with AM-2201. *See id.*

In July 2011, Louisiana banned naphthoylindoles. *See id.* "Barrow and others were initially concerned, [but] Buswell assured Barrow that there would be no problem selling Mr. Miyagi in Louisiana." *Id.* That same summer, Barrow traveled to Lafayette to meet Buswell and Barry Domingue ("Domingue"), the corporate attorney for Curious Goods. *See id.* Buswell and Domingue informed Barrow "there would be no issues" selling Mr. Miyagi because "they had talked with law enforcement regarding Mr. Miyagi." *Id.*

---

[2] The parties seem to use "Nutragenomics" and "NutraGenomics" interchangeably. The Court will use "NutraGenomics."

Approximately a week later, Buswell called Barrow to inform him "he had hired a 'constitutional lawyer,' Stanford, 'who would lead our fight into . . . challenging the feds and challenging states with the ultimate goal of regulation.'" *Id.* (alteration in original).

Barrow traveled to Lafayette to meet with Stanford and Buswell. *See id.* In that meeting, Barrow described Mr. Miyagi, its manufacturing process, and its label ("specifically the 'not for human consumption' warning"). *Id.* At some point after the meeting, Buswell called Barrow to inform him that "Stanford was onboard—they had 'the big stick.'" *Id.* "Buswell also claimed that Stanford had secured an agreement with the Louisiana attorney general that Mr. Miyagi was the only 'potpourri' that could be 'sold in the state' and that Buswell had a letter to that effect from the attorney general's office." *Id.*

In either the second or third week of August 2011, Espinoza traveled to Lafayette to meet with Buswell, Domingue, Barrow, and Stanford. *See id.* at 824. Espinoza testified he was still concerned about the legality of selling Mr. Miyagi in Louisiana, but Domingue assured him the product had been "approved by the AG . . . the District Attorney . . . all the local authorities.'" *Id.* (alterations in original). Stanford did not comment on Domingue's representations. *See id.*

On August 22, 2011, Stanford received an email from Daniel Francis ("Francis"). *See id.* at 823. Francis had formed the Coalition for Cognitive Liberty, a political action committee created "to lobby and recommend manufacturing guidelines," and the Retail Compliance Association ("RCA"), a California corporation created "to keep retailers abreast of the latest regulatory developments and to track legislation affecting

cannabinoids." *Id.* Francis emailed Stanford "RCA membership related documents," including "documents describing the organization, guidelines for how to display synthetic marihuana products, and advice on interactions with police." *Id.* at 823-24. Francis testified he sent this email after he had an "introductory phone call" with Stanford. *Id.* at 824. On August 26, 2011, Francis emailed Stanford regarding those documents and the RCA and also "mentioned a possible misunderstanding 'on the call.'" *Id.* Stanford informed Francis he was reviewing the documents and would contact Francis the next week. *See id.*

In September 2011, Francis traveled to Lafayette to give a presentation at Buswell's house. *See id.* Barrow, Buswell, Espinoza, Stanford, and Domingue were present at the meeting. *See id.* During this presentation, Francis "went through his 'standard spiel' for attorneys." *Id.* Francis also discussed AM-2201, AM-2201's similarities to JWH-018, and the Drug Enforcement Agency ("DEA") ban. *Id.* At this meeting, "Barrow and Buswell suggested forming a Louisiana branch of the RCA." *Id.*

In October 2011, Barrow and Espinoza traveled to Lafayette to see the letter from the attorney general. *See id.* At this time, Stanford "confessed that there was no letter but insisted he had 'a gentleman's handshake agreement' with the attorney general allowing them to sell Mr. Miyagi in the state." *Id.*

On October 27, 2011, Domingue emailed Stanford. *See id.* The email referred to lab reports of Mr. Miyagi. *See id.* Although the reports were not attached, Domingue noted the lab reports detected AM-2201. *See id.* at 824-25. On November 2, 2011, Francis emailed Stanford RCA-related documents for a meeting. *See id.* at 825. On November 3,

6

2011, Stanford forwarded "a response to a story about a teenage boy who had died after smoking synthetic marihuana." *Id.*

Throughout November 2011, Francis and Stanford discussed forming a Louisiana branch of the RCA. *See id.* On November 8, 2011, Stanford emailed Francis asking to "discuss what it would take to make [Francis] a full time [sic] executive director." *Id.* That same day, Don Wirtshafter ("Wirtshafter"), "a lawyer who specialized in cannabinoids," informed Francis that "AM-2201 was included in Louisiana's ban of naphthoylindoles." *Id.* At trial, Francis testified he did not know AM-2201 was covered by the Louisiana ban until Wirtshafter informed him. *See id.* Francis testified he told Stanford about AM-2201 being covered by the ban during his next trip to Lafayette, and Stanford told Francis he would "have lunch with the attorney general." *Id.*

On November 28, 2011, the Louisiana branch of the RCA was incorporated in Louisiana. *See id.* Stanford was listed as the director and Francis as the president. *See id.* Barrow testified Pinnacle and Curious Goods had agreed to fund "the initial costs of getting the Louisiana RCA up and running . . . [and] settled on paying Stanford a combined total of $12,500 a week." *Id.*

Meanwhile, in mid-November 2011, "one of the Curious Goods franchisees had a run-in with law enforcement after an off-duty state trooper noticed a sign out front promoting Mr. Miyagi." *Id.* Stanford, Domingue, Francis, and Buswell met with the franchisee at Stanford's law office. *See id.* The franchisee testified that "either Francis or Domingue told him that Mr. Miyagi had been sent to the 'DEA's own lab' and found not

to contain 'any banned substances.'" *Id.* At the meeting, a lab report labeled "DEA Registered Analytical Laboratory" was on the table. *Id.*

On November 22, 2011, Stanford called the state trooper. *See id.* At trial, Francis testified that "Stanford told the trooper that the products were legal and offered samples to prove it, although he never actually did so." *Id.* Francis testified that this "conversation occurred after Francis had told Stanford about the Louisiana ban on AM-2201." *Id.* The chief of police testified that Stanford met with him in "late November" and "told him that 'everything that was inside the store was DEA cleared.'" *Id.* He further testified that Stanford agreed to give the police lab a sample of Mr. Miyagi for testing but never did. *See id.*

On December 7, 2011, Buswell, Stanford, Domingue, Francis, Espinoza, and Barrow met at Buswell's house to "educate Curious Goods employees and franchisees on selling Mr. Miyagi and how to handle law-enforcement inquiries." *Id.* at 826. Francis testified both he and Stanford spoke on behalf of the RCA at this meeting. *See id.* "Stanford was introduced as the 'big stick' and again claimed to have an agreement with the attorney general." *Id.* After the presentation, "Stanford allegedly admonished, 'remember, nobody talks, everybody walks.'" *Id.*

On December 8, 2011, "local narcotics agents raided Curious Goods stores, executing warrants and seizing Mr. Miyagi, computers, and other items. Buswell was arrested the same day." *Id.* Stanford initially represented Buswell but was eventually "disqualified in light of mounting evidence against himself." *Id.* Although Buswell had been arrested, "some of the conspirators and franchisees wanted to keep doing business

with a different product that had not yet been banned." *Id.* "Barrow testified that Stanford met with them and formulated new operational guidelines." *Id.* However, "[t]hose plans never went anywhere . . . and the distribution scheme came to an end." *Id.*

On May 18, 2012, Barrow, Espinoza, and Buswell were indicted on one count of conspiracy to distribute a Schedule I controlled dangerous substance, in violation of 21 U.S.C. § 846. *See* Record Document 1. On September 4, 2012, a superseding indictment was entered against Alexander Derrick Reece ("Reece"),[3] Green, Malone, Barrow, Espinoza, Curious Goods, Buswell, Stanford, Francis, and Domingue. *See* Record Document 57. Count One of this indictment charged Reece, Green, Malone, Barrow, Espinoza, Curious Goods, Buswell, Stanford, Francis, and Domingue with conspiracy to distribute and possess with the intent to distribute a Schedule I controlled dangerous substance, in violation of 21 U.S.C. § 846. *See id.* at 1-6. Count One was premised on a conspiracy to distribute and possess with intent to distribute AM-2201 that began on or about March 1, 2011, and continued until on or around July 25, 2012.[4] *See id.* at 3-4. In recounting Stanford's involvement, the superseding indictment focused on Stanford's involvement with the RCA, specifically noting Francis and Stanford "trained, advised, and instructed the individual franchise owners of [Curious Goods] and their employees[] on how to store, display and sell the 'Mr. Miyagi' products, how to detect and evade law

---

[3] Alexander Reece supplied synthetic cannabinoids to NutraGenomics through his businesses, Mountain Industries L.L.C. and Blue Sky International Broker L.L.C.

[4] The superseding indictment originally charged the defendants with the distribution and possession of AM-2201, JWH-081, JWH-250, and UR-144. *See* Record Document 57 at 4. The Court later struck all references to JWH-081, JWH-250, and UR-144 from the superseding indictment. *See* Record Document 591.

enforcement, and how to respond to customers who asked questions" about the use and effects of Mr. Miyagi. *Id.* at 3. The superseding indictment further noted that "[f]rom on or about July 11, 2011[,] to on or about December 6, 2011, [Stanford] received checks totaling approximately $156,921.00 from Pinnacle and [Curious Goods]." *Id.* at 6.

Count Two charged Reece, Green, Malone, Barrow, Espinoza, Curious Goods, Buswell, Stanford, Francis, and Domingue with conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce, in violation of 18 U.S.C. § 371. *See id.* at 6-10. The superseding indictment stated the conspiracy began on or about March 1, 2011, and continued until on or about December 31, 2011. *See id.* at 8. The identified label warned that "[o]ur Potpourri is not for human consumption." *Id.* at 9. As with Count One, the superseding indictment recounted that Francis and Stanford "trained, advised, and instructed the individual franchise owners of [Curious Goods] and their employees[] on how to store, display and sell the 'Mr. Miyagi' products, how to detect and evade law enforcement, and how to respond to customers who asked questions about" the use and effects of Mr. Miyagi. *See id.* at 9-10.

Count Three charged Reece, Green, Malone, Barrow, Espinoza, Curious Goods, Buswell, Stanford, and Domingue with a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). *See id.* at 10-13. The superseding indictment specifically stated defendants "knowingly conduct[ed] and attempt[ed] to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity." *Id.* at 11. The identified unlawful activity was "the distribution of a mixture and substance containing a detectable amount of AM-2201." *Id.* The superseding

10

indictment charged that the conspiracy began on March 1, 2011, and lasted until on or about May 1, 2012. *See id.* at 10.

Count Four charged Barrow, Espinoza, and Stanford with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 13. At issue in this count was the deposit of a $12,500.00 check from Pinnacle into Stanford's personal savings account on or about October 28, 2011. *See id.* Count Five charged Buswell and Stanford with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 13-14. At issue in this count was the deposit of a $12,500.00 cashier's check from Curious Goods into Stanford's personal savings account on or about November 14, 2011. *See id.* Count Six charged Buswell and Stanford with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 14-15. At issue in this count was the deposit of a $15,000.00 temporary check from Curious Goods into Stanford's trust account on or about November 17, 2011. *See id.* Count Seven charged Buswell and Stanford with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 15. At issue in this count was the deposit of a $25,000.00 temporary check from Curious Goods into Stanford's trust account on or about November 18, 2011. *See id.*

Count Eight charged Stanford with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 15-16. At issue in this count was Stanford's issuance of a $25,000.00 check from his trust account on or about November 28, 2011. *See id.* Count Nine charged Stanford with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 16. At issue in this count was Stanford's issuance of a $15,000.00 check from his trust account on or about November 28, 2011. *See id.* Count Ten charged Buswell and Stanford with money

laundering, in violation of 18 U.S.C. § 1957. *See id.* at 17. At issue in this count was the deposit of a $12,500.00 check from Curious Goods into Stanford's personal savings account on or about November 28, 2011. *See id.* Count Eleven charged Buswell and Stanford with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 17-18. At issue in this count was the deposit of a $19,000.00 check from Curious Goods into Stanford's personal savings account on or about November 30, 2011. *See id.* Count Twelve charged Buswell and Stanford with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 18. At issue in this count was the deposit of a $16,250.00 temporary check from Curious Goods into Stanford's personal savings account on or about December 6, 2011. *See id.* Count Thirteen charged Stanford with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 19. At issue in this count was Stanford's transfer of $200,000.00 from his personal savings account to his mortgage trust account on or about January 18, 2012. *See id.*

Count Fourteen charged Barrow, Espinoza, and Domingue with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 19-20. At issue in this count was the deposit of a $20,000.00 check from Pinnacle into Domingue's "JP Morgan Chase account" on or about September 29, 2011. *Id.* Count Fifteen charged Buswell and Domingue with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 20. At issue in this count was the deposit of a $12,000.00 cashier's check from Curious Goods into Domingue's "JP Morgan Chase account" on or about November 21, 2011. *Id.* Count Sixteen charged Buswell and Domingue with money laundering, in violation of 18 U.S.C. § 1957. *See id.* at 21. At issue

in this count was the cashing of a $21,000.00 cashier's check from Curious Goods that was made payable to Domingue on or about December 6, 2011. *See id.*

Green retained counsel, and on September 7, 2012, he pled guilty to Count One, the conspiracy to distribute and to possess with intent to distribute a controlled substance analogue. *See* Record Document 82. Malone retained counsel, and on September 19, 2012, he pled guilty to Count One. *See* Record Document 103. Barrow was appointed counsel, and on November 13, 2012, Barrow pled guilty to Count One. *See* Record Document 174. Espinoza was appointed counsel, and on November 13, 2012, he pled guilty to Count One. *See* Record Document 178. Buswell was appointed counsel, and on July 19, 2013, he pled guilty to Count One. *See* Record Document 613. Francis was appointed counsel, and on January 14, 2014, he pled guilty to Count Two, the conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce charge. *See* Record Document 687. Curious Goods was appointed counsel, and on March 24, 2014, pled guilty to Count One. *See* Record Document 770. On April 1, 2014, the Court granted the Government's motion to dismiss the superseding indictment against Reece.[5] *See* Record Documents 786 & 791.

Stanford and Domingue, each of whom represented himself *pro se*, proceeded to a jury trial. The jury trial began on March 31, 2014. *See* Record Document 788. On April

---

[5] Reece pled guilty to conspiracy to distribute a synthetic cannabinoid, in violation of 21 U.S.C. §§ 802(32)(A), 813, 846, 841(a)(1), and 841(b)(1)(C), in the United States District Court for the Middle District of Florida. *See* Record Document 786 at 1. As part of Reece's plea agreement with the Middle District of Florida, "the United States agreed to dismiss the Superseding Indictment pending against [Reece] in the Western District of Louisiana." *Id.*

2, 2014, the third day of trial, Domingue committed suicide. *See* Record Documents 796 & 800. Stanford subsequently made an unopposed oral motion for a mistrial, which this Court granted. *See* Record Documents 795, 796, & 797.

Stanford proceeded to trial again on August 18, 2014. *See* Record Document 834. Following a ten-day jury trial, the jury returned a considered verdict, finding Stanford guilty on eight counts and not guilty on five counts. *See* Record Document 859. The jury found Stanford guilty of Count One (conspiracy to distribute or possess with intent to distribute a controlled substance analogue), Count Two (conspiracy to introduce or cause to be introduced misbranded drugs into interstate commerce), Count Three (money laundering conspiracy), Count Four (money laundering: deposit of $12,500.00 check on or about October 28, 2011), Count Five (money laundering: deposit of $12,500.00 cashier's check on or about November 14, 2011), Count Ten (money laundering: deposit of $12,500.00 check on or about November 28, 2011), Count Eleven (money laundering: deposit of $19,000.00 check on or about November 30, 2011), and Count Thirteen (money laundering: transfer of $200,000.00 on or about January 18, 2012). *See id.* at 1-2, 4-5. The jury returned a not-guilty verdict as to Count Six (money laundering: deposit of a $15,000.00 temporary check on November 17, 2011), Count Seven (money laundering: deposit of a $25,000.00 temporary check on or about November 18, 2011), Count Eight (money laundering: issuance of $25,000.00 check on or about November 28, 2011), Count Nine (money laundering: issuance of $15,000.00 check on or about November 28, 2011), and Count Twelve (money laundering: deposit of $16,250.00 temporary check on or about December 6, 2011). *See id.* at 3-5.

Stanford moved for a new trial on several grounds. *See* Record Document 878.
Relevant here, Stanford argued the Government "engaged in a systematic and systemic
pattern of intentionally presenting misleading and patently false testimony to the jury
throughout the trial . . . ." *Id.* at 2. Stanford additionally challenged the Government's
failure to provide him with "summaries of interviews" of Green, Francis, Barrow, and
Espinoza. *Id.* In an amended reply brief, Stanford contended the Government withheld
exculpatory and impeachment information retrieved from Buswell's smart phone and
various email addresses. *See e.g.* Record Document 898 at 9. The Court rejected each of
Stanford's arguments and denied his motion for a new trial.[6] *See* Record Document 961.

On January 23, 2015, the Court sentenced Stanford to 121 months imprisonment
as to Count One (conspiracy to distribute or possess with intent to distribute a controlled
substance analogue) and Count Three (money laundering conspiracy), to be served
concurrently with one another, and to 60 months imprisonment as to Count Two
(conspiracy to introduce or cause to be introduced misbranded drugs into interstate
commerce) and Counts Four, Five, Ten, Eleven, and Thirteen (specific instances of money
laundering), to be served concurrently with one another and all other counts. *See* Record
Document 1055. Stanford was sentenced to six years of supervised release as to Count
One and to three years of supervised release as to Counts Two, Three, Four, Five, Ten,

---

[6] On January 14, 2015, Stanford filed a "Motion and Memorandum Requesting the Court
Conduct an Investigation to Evaluate Whether This Court Has Been the Victim of Fraud
Through Misconduct and Perjured Testimony." Record Document 1037. This motion was
not fully briefed until after Stanford had filed an appeal. The Court denied his motion on
the ground that it lacked jurisdiction to consider the merits of the claims raised therein
as those claims went to the merits of his appeal. *See* Record Document 1127.

Eleven, and Thirteen, to be served concurrently with one another and with Count One. *See id.*

Stanford subsequently appealed his conviction and sentence. *See Stanford I*, 823 F.3d 814. Stanford argued, *inter alia*, (1) "the district court erred by determining that knowledge that AM-2201 was a [controlled substance analogue] was not a required element under Count One;" (2) the Government "solicited (or failed to correct) false testimony in violation of *Napue*"; and (3) the Government "failed to disclose *Brady* material.[7] *Id.* at 827, 838, 841. Ultimately, the Fifth Circuit reversed Stanford's conviction on Count One after finding this Court erred "in ruling that the government was not required to prove that Stanford knew the synthetic marihuana compound distributed by the conspirators was a [controlled substance analogue]." *Id.* at 822. At oral argument, Stanford conceded this error "affect[ed] only Count One[, so] the reversal on that court [sic] ha[d] no effect on the sentence related to any other counts." *See id.* at 843 n.35. Therefore, the Fifth Circuit reversed Stanford's conviction and sentence on Count One but affirmed Stanford's convictions and sentences on all other counts and remanded the case to this Court for further proceedings. *See id.* at 852.

The Government declined to retry Stanford on Count One. *See* Record Document 1172 at 4. On March 21, 2017, the Court held a "resentencing" hearing. Record Document 1213. At the hearing, the Court explained that it understood it had no authority from the Fifth Circuit "to revisit all of its sentencing determinations upon remand." Record

---

[7] Stanford's *Brady* and *Napue* claims raised in his § 2255 motion are distinct from the *Brady* and *Giglio* claims raised in his appeal.

Document 1211 at 7. But the Court felt compelled to make a specific finding of the Guidelines range for Count Two, the misbranding count, because the Court had not clearly done so at the original sentencing. *See id.* at 8.

Despite the concession made in the Fifth Circuit and that Court's specific finding that all other sentences should stand as originally issued, Stanford argued the abrogation of Count One (1) should result in the abrogation of all the money laundering counts because the superseding indictment linked the offenses and (2) should result in a different and lower cross-reference for Count Two, the misbranding conspiracy. *See generally* Record Document 1200. The Court denied these objections and held that the underlying conduct for Count One was relevant conduct for purposes of sentencing as to Count Two. *See* Record Document 1211 at 27-28. The Court then explained "that the burden of proof at a sentencing hearing for proof of facts is different than it is at a trial on the merits." *Id.* at 28. That is, "the Court [wa]s not barred from considering the facts underlying the drug conspiracy if they [we]re established by a preponderance of the evidence." *Id.* As to the money laundering counts, the Court similarly declined to disturb the holding of the Fifth Circuit and gave similar reasons. *See id.* at 29-30. Therefore, the Court, having found the actions underlying Count One established by a preponderance of the evidence, used that relevant conduct to deny Stanford's objections to the calculation of his United States Sentencing Guidelines range. *See id.* at 31-63.

Thereafter, the Court sentenced Stanford to 121 months imprisonment as to Count Three (money laundering conspiracy) and 60 months imprisonment as to Count Two (conspiracy to introduce or cause to be introduced misbranded drugs into interstate

commerce) and Counts Four, Five, Ten, Eleven, and Thirteen (specific instances of money laundering), to be served concurrently with one another and Count Three. *See* Record Document 1215. Stanford was sentenced to supervised release for a term of three years as to Counts Two, Three, Four, Five, Ten, Eleven, and Thirteen, to run concurrently with one another. *See id.*

Stanford appealed. *See United States v. Stanford*, 883 F.3d 500 (5th Cir. 2018) ("*Stanford II*"). Relevant here, Stanford "alleg[ed] various errors in the district court's redetermination of his guideline range[] [and] argue[d] that the district court erred in denying his request for in camera review of various co-conspirator witness reports." *Id.* at 503. The alleged re-sentencing errors included "failing to select the applicable guideline in the manner prescribed by the Guidelines; and [] applying cross reference U.S.S.G. § 2N2.1(c)(2)" to Count Two, the misbranding conspiracy charge. *Id.* at 505. The Fifth Circuit first found that "[t]he district court did not err in concluding that the 'gravamen' of the conduct charged in the indictment rendered U.S.S.G. § 2N2.1 the most appropriate guideline." *Id.* at 511. In so finding, the Fifth Circuit noted that "the epicenter of the offense conduct charged in Count Two of the indictment concerns concealing Mr. Miyagi . . . ." *Id.* at 510.

The Fifth Circuit then turned to Stanford's argument that "cross reference U.S.S.G. § 2N2.1(c)(2) [did] not apply because 'offense' . . . requires two offenses of conviction— a requirement the Count One drug conspiracy could no longer satisfy." *Id.* at 511. The Fifth Circuit again disagreed, finding this Court did not plainly err in its "selection of cross reference U.S.S.G. § 2N2.1(c)(2)." *Id.* The Fifth Circuit found "it is sufficient that the

offense for which the defendant is convicted . . . was committed 'in furtherance of, or to conceal' another offense regardless of whether there is a jury conviction on the other offense." *Id.* at 513. As such, this Court did not plainly err in considering the relevant conduct of Count One. *See id.* The Fifth Circuit then rejected Stanford's *Brady* claim, finding any such claim was "forfeited because the issue was germane to the case prior to and during the appeal and he failed to raise it during that time." *See id.* at 515. The Fifth Circuit treated this Court's holdings as a re-sentencing as to Counts Two and Three only. *See id.* at 504. Ultimately, the Fifth Circuit affirmed the sentences on Counts Two and Three and this Court's denial of Stanford's *Brady* claim. *See id.* at 517.

On April 9, 2018, the Fifth Circuit denied Stanford's petition for rehearing and rehearing en banc, and on April 17, 2018, the Fifth Circuit issued its mandate affirming this Court's judgment. *See* Court Order Denying Pet. for Reh'g, *U.S. v. Stanford*, No. 17-30285 (5th Cir. April 9, 2018), ECF No. 103; Record Document 1242. Stanford served his prison term and was released on October 20, 2022. His term of supervised release will terminate on October 19, 2025.

On November 30, 2017, prior to the disposition of Stanford's second appeal, Green filed a § 2255 motion. *See* Record Document 1229. Green subsequently filed several supplemental motions, exhibits, and responses related to that motion. *See* Record Documents 1235, 1238, 1240, 1266, 1272, 1275, & 1278. Stanford claims "evidence proving prosecutorial misconduct . . . first came to light when [] Green filed his [§] 2255 memorandum, exhibits, and affidavits." Record Document 1292 at 10. On or about July 2018, Green authorized Anna Stanford, Stanford's wife, to "search through [Green's]

19

inbox and to use any documents for [] Stanford['s] case."[8]  Record Document 1386-2. The Court ultimately denied Green's § 2255 motion. *See* Record Document 1315.

On May 14, 2019, Stanford filed his § 2255 motion. *See* Record Document 1287. Pursuant to this Court's minute entry, *see* Record Document 1290, Stanford filed an amended § 2255 motion on June 26, 2019. *See* Record Document 1292. In his motion, Stanford claims the Government suppressed evidence to give itself "an unfair evidentiary advantage" and to "ambush Stanford with fabricated evidence and perjured testimony." *Id.* at 2. The purportedly suppressed evidence is attached to his § 2255 motion as 166 separate exhibits collectively spanning over 1,000 pages.[9] Stanford claims he received these exhibits from Green on or about July 2018. *See* Record Documents 1386 & 1386-2.

---

[8] Stanford's *Brady*, *Giglio*, and *Napue* claims may be procedurally barred for lack of due diligence. Green filed his § 2255 motion on November 30, 2017. *See* Record Document 1229. Stanford received access to Green's inbox in July 2018. *See* Record Document 1386-1. Stanford does not explain why he did not attempt to raise this alleged misconduct in his second appeal. The Court further notes these documents were in the possession of Green for several years after Stanford's trial, and Stanford did not attempt to access those documents through Green during that time.

In light of the foregoing, the Court could conclude Stanford did not exercise due diligence and that his claims are procedurally barred. However, procedural default is an affirmative defense that is waived if not raised. *See Trest v. Cain,* 522 U.S. 87, 89 (1997); *see also Magouirk v. Phillips*, 144 F.3d 348, 357 (5th Cir. 1998). As will be discussed more in-depth *infra*, the Government limited its procedural default argument to distinct claims. *See* Record Document 1305 at 42-43, 58-60. Therefore, the Court will not raise this issue *sua sponte*.

[9] The Court refers to the exhibits attached to Stanford's § 2255 motion by number. For example, "Exhibit 1" refers to the first exhibit attached to his motion.

Stanford asserts the Government's alleged misconduct "prejudiced [his] defense, violated his right to receive a fair trial on all counts, and undermines all confidence in the jury's verdict by undermining the truth seeking [sic] process of the trial." *Id.* at 5. Stanford additionally contends his convictions and sentences should be vacated because the Government allegedly violated the Appointments Clause. *See id.* at 183. Stanford moves to vacate his sentence and remand the case for a retrial. *See id.* at 189. The Government opposes Stanford's motion, arguing Stanford's claims are meritless and/or procedurally barred. *See* Record Document 1305. The Government primarily argues it did not possess almost all the exhibits underpinning Stanford's various claims.[10] *See id.* at 18-19.

On February 28, 2025, Stanford filed a petition for writ of mandamus. *See* Pet. for Writ of Mandamus, *In Re: Daniel James Stanford*, No. 25-30118 (5th Cir. Feb. 28, 2025), ECF No. 2. This Court responded to this petition, noting that the length of Stanford's motion accounted for the Court's delay in issuing a ruling. *See* Response, *In Re: Daniel James Stanford*, No. 25-30118 (5th Cir. March 31, 2025), ECF No. 25. The Fifth Circuit denied Stanford's petition without prejudice. *See* Order, *In Re: Daniel James Stanford*, No. 25-30118 (5th Cir. April 1, 2025), ECF No. 30.

On June 13, 2025, this Court issued a minute entry concerning the Government's representations as to its possession of certain exhibits. *See* Record Document 1374. The Court ordered the Government to explain what documents the Government's subpoenas, search warrants, and seizures gave it access to during discovery. *See id.* On June 30,

---

[10] Specifically, the Government maintains it did not possess Exhibits 2-4, 6, 8-12, 14-17, 23-29, 31-34, 36-38, 40-81, 83-91, and 93-166. *See* Record Document 1305 at 19.

2025, the Court convened a status conference to discuss the Court's minute entry.[11] *See* Record Document 1382. The Court explained that it issued the minute entry to receive more clarification about whether the Government possessed certain exhibits and, if so, whether the Government provided those exhibits to Stanford. *See id.* at 2-4.

To assist the parties with this inquiry, the Court created a chart outlining each of Stanford's § 2255 exhibits underpinning his evidentiary claims. *See* Record Document 1383. The Court's chart had two columns: the first summarizing the contents of the exhibits and the second explaining the Court's understanding as to whether the Government disputed pretrial possession and, where applicable, whether there existed an open inquiry as to the issue of possession. *See id.* The Court invited the parties to contradict, question, or clarify any information presented in that chart. *See id.* at 2. For the most part, neither Stanford nor the Government commented on the information presented in that chart.[12] As such, the Court finds its summary of the exhibits is accurate.

On July 14, 2025, the Government provided its response. *See* Record Document 1385. In this response, the Government continues to maintain it did not possess all of

---

[11] At this status conference, the Court also denied Stanford's motion to enroll in proper person because he is already represented by counsel in these proceedings. *See* Record Document 1382 at 1-2. The Court informed Stanford he could participate orally as to both factual and legal matters in this case and that he could participate in hearings and proceedings unless his participation became disruptive. *See id.* at 2. Despite this Court order, Stanford signed his reply brief "in proper person." *See* Record Document 1386 at 47. The Court again reiterates that Stanford has not been enrolled in proper person in this matter and may not submit filings in proper person. Nevertheless, because Stanford's retained counsel joined in this filing, the Court considered the brief.

[12] Stanford provided clarification regarding one specific exhibit. *See* Record Document 1386 at 28-35. Other than that clarification, Stanford did not contest the Court's summary of exhibits.

Stanford's § 2255 exhibits and that it turned over nearly all the exhibits which it did possess.[13] *See id.* For some of the identified exhibits, the Government notes it possessed similar or substantively identical evidence pretrial and that it produced this evidence to Stanford. *See id.* Therefore, the Government argues it fully complied with its *Brady* obligations. *See id.* In reply, Stanford argues the Government had access to these exhibits because it "possessed three Nutragenomics laptop computers and one hard drive; . . . Green had a Nutragenomics 'data base' from which Green provided information to the Government; . . . the Government had direct access to Green's Nutragenomics 'data base' through Green or through Green's username and password[;]" and Green primarily used the email address "dgreen@biogenixusa.com" to communicate with the Government, and that email address is the same email address "on the Gmail headers on Stanford's email exhibits." Record Document 1386 at 12.

On September 30, 2025, Stanford filed a petition for writ of mandamus with the Fifth Circuit. *See In Re: Daniel James Stanford*, No. 25-30551 (5th Cir. Sept. 30, 2025), ECF No. 2. The Fifth Circuit granted that petition, ordering this Court to issue a ruling by October 30, 2025. *See id.*, ECF No. 25.

---

[13] The Government concedes it possessed but did not produce Exhibits 7, 22, 30, and 92. *See* Record Document 1305 at 19. The Government disputes possession of Exhibits 2-4, 6, 8-12, 14-17, 23-29, 31-34, 36-38, 40-81, 83-91, and 93-166. *See id.*

## Law & Analysis

### I.    Relevant Law

In this section, the Court summarizes relevant law to provide context for Stanford's § 2255 motion.

### A. 28 U.S.C. § 2255

Under 28 U.S.C. § 2255, a prisoner may move to vacate, set aside, or correct a sentence imposed by a federal court if: (1) the sentence "was imposed in violation of the Constitution or laws of the United States[;]" (2) "the court was without jurisdiction to impose such sentence[;]" (3) "the sentence was in excess of the maximum authorized by law[;]" or (4) the sentence "is otherwise subject to collateral attack." *United States v. Scruggs*, 691 F.3d 660, 666 (5th Cir. 2012); 28 U.S.C. § 2255(a). "As the Supreme Court holds, [h]abeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *United States v. Cooper*, 548 F. App'x 114, 115 (5th Cir. 2013) (internal quotations and citations omitted) (quoting *Bousley v. United States*, 523 U.S. 614, 621 (1998)). After a defendant is convicted and exhausts the right to appeal, a court is "entitled to presume that the defendant stands fairly and finally convicted." *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991) (internal marks omitted) (quoting *United States v. Frady*, 456 U.S. 152, 164 (1982)).

"Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Young*, 77 F. App'x 708, 709 (5th Cir. 2003) (citing *United States v. Vaughn*, 955 F.2d

367, 368 (5th Cir. 1992)). Even where the issues raised are constitutional or jurisdictional in nature, a defendant may be procedurally barred from raising them in a collateral attack. *See Shaid*, 937 F.2d at 232. If the constitutional or jurisdictional claims were not raised on direct appeal, the defendant's claims can only be considered on collateral review if he can show "both 'cause' for his procedural default[] and 'actual prejudice' resulting from the error." *Id.*

To establish cause, the defendant "must show that some objective factor external to the defense impeded counsel's efforts to comply with the [relevant] procedural rule." *United States v. Vargas-Soto*, 35 F.4th 979, 993 (5th Cir. 2022) (alterations in original), *cert. denied*, 143 S. Ct. 583 (2023) (quoting *Davila v. Davis*, 582 U.S. 521, 528 (2017)). "Objective factors that constitute cause include interference by officials that makes compliance with the procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel at the prior occasion, and ineffective assistance of counsel in the constitutional sense." *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir. 1996), *as corrected* (Sept. 25, 1996). To demonstrate actual prejudice, a defendant must establish the error "worked to his actual and substantial disadvantage." *Frady*, 456 U.S. at 170 (emphasis removed). "A *Brady* violation can provide cause and prejudice to overcome a procedural bar on a habeas claim." *Thompson v. Davis*, 916 F.3d 444, 455 (5th Cir. 2019).

Alternatively, a court may consider a procedurally defaulted claim if the defendant can establish actual innocence by showing it is more likely than not that no reasonable

juror would have convicted the defendant of the offense. *See Bousley*, 523 U.S. at 623. Actual innocence "means factual innocence, not mere legal insufficiency." *Id*.

### B. *Brady v. Maryland*, **373 U.S. 83 (1963);** *Giglio v. United States,* **405 U.S. 150 (1972)**

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "To prevail on a Brady claim, 'a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material.'" *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018) (quoting *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016)). In *Giglio*, the Supreme Court held that the prosecutor's obligation to disclose exculpatory information under *Brady* extends to the disclosure of "evidence affecting credibility," i.e., impeachment evidence. *Giglio*, 405 U.S. at 154. "Th[e] duty to disclose exists irrespective of a request from the defense . . . and extends to all evidence known not just to the prosecutors, but to the others acting on the government's behalf in the case, including the police." *Floyd v. Vannoy*, 894 F.3d 143, 161-62 (5th Cir. 2018) (internal quotations omitted) (citing both *United States v. Agurs*, 427 U.S. 97, 107 (1976); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

"[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record." *Kyles*, 514 U.S. at 439. "Supreme Court precedent defines evidence tending to strengthen a defense as favorable evidence under

*Brady*." *Floyd*, 894 F.3d at 163. The Supreme Court has further held that "evidence impeaching a prosecution witness is favorable *Brady* evidence." *Id.*

"To constitute suppressed evidence under *Brady*, the evidence must not have been discoverable through the defendant's due diligence." *Dvorin*, 817 F.3d at 450. "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) (quoting *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993)). Nor is evidence suppressed "if the defendant, using reasonable diligence, could have obtained the information." *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994). "The *Brady* analysis regarding suppression focuses on the fact that the government need not 'furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence.'" *Dvorin*, 817 F.3d at 450 (quoting *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir.2002)).

"Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (internal quotations omitted). To prevail on a *Brady* claim, the defendant "need not show that he more likely than not would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to undermine confidence in the verdict." *See id.* (internal quotations omitted). The materiality of suppressed evidence is "considered collectively, not item by item." *Kyles*, 514 U.S. at 436.

"[W]hen the undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation occurs." *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir.

2004) (quoting *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir.1996)). "Similarly, when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material." *Sipe*, 388 F.3d at 478. But "if the impeaching evidence 'would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material.'" *Id.* (quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir.1989)).

### C. *Napue v. People of State of Ill.*, 360 U.S. 264 (1959)

"[A] conviction knowingly 'obtained through use of false evidence' violates the Fourteenth Amendment's Due Process Clause.'" *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025) (quoting *Napue*, 360 U.S. at 269). "To establish a *Napue* violation, [a defendant] must prove: (1) the witness testified falsely; (2) the government knew the testimony was false; and (3) the testimony was material." *United States v. Brumfield*, 89 F.4th 506, 519 (5th Cir. 2023) (internal marks omitted), *cert. denied*, 145 S. Ct. 244 (2024). "It is not enough that the testimony is challenged by another witness or is inconsistent with prior statements." *Kutzner*, 303 F.3d at 337. A new trial for a *Napue* violation "is warranted so long as the false testimony may have had an effect on the outcome of the trial . . . –that is, if it in any reasonable likelihood could have affected the judgment of the jury." *Glossip*, 604 U.S. at 246 (internal marks and quotations omitted). "In effect, this materiality standard requires the beneficiary of the constitutional error to prove beyond a reasonable

doubt that the error complained of did not contribute to the verdict obtained." *Id.* (internal quotations and marks omitted).

Thus, as with a claim under *Brady* and *Giglio*, the "critical factor is materiality," similarly defined "in terms of a reasonable probability of a different outcome, which results when nondisclosure places the case in a different light so as to undermine confidence in the verdict." *Brumfield*, 89 F.4th at 519 (internal quotations omitted). And, as with a claim under *Brady* and *Giglio*, "[e]vidence can be material even if it 'goes only to the credibility of the witness.'" *Glossip*, 145 S. Ct. at 628 (quoting *Napue*, 360 U.S. at 269).

## II.    Analysis of Stanford's § 2255 claims

In his § 2255 motion, Stanford raises three general types of claims: (1) an Appointments Clause violation, (2) *Brady* and *Giglio* violations, and (3) *Napue* violations. *See* Record Document 1292. The Court's analysis will proceed as follows. First, the Court will consider Stanford's Appointments Clause claim. Second, the Court will jointly consider Stanford's *Brady*, *Giglio*, and *Napue* claims. Where expressly raised by the Government, the Court shall additionally consider whether a particular claim is procedurally barred.[14]

---

[14] Procedural default is an affirmative defense that is waived if it is not raised. *See Trest,* 522 U.S. at 89; *see also Magouirk*, 144 F.3d at 357. The Government specifically asserted procedural default for the following claims: (1) "Stanford's claim concerning Francis's landline telephone;" (2) "Stanford's claims concerning dissenting opinions for UR-144 and JWH-250;" and (3) "Stanford's claim that the prosecuting attorneys were not properly appointed." *See* Record Document 1305 at 42, 58, 60. The Court considers procedural default for each of these claims. Because the Government did not raise procedural default for the remaining claims, the Court will discuss the merits of those claims.

## A. Stanford's Alleged Appointments Clause Violations

Article II, Section 2, Clause 2 of the United States Constitution, commonly referred to as the Appointments Clause, "lays out the permissible methods of appointing 'Officers of the United States,' a class of government officials distinct from mere employees." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 241 (2018). Stanford argues the Assistant United States Attorneys ("AUSAs" or "AUSA") in charge of prosecuting his case were not duly appointed pursuant to the Appointments Clause of the United States Constitution. *See* Record Document 1292 at 182-189.

As support, Stanford relies on information obtained via Freedom of Information Act ("FOIA") requests. He claims these FOIA requests demonstrate the AUSAs prosecuting his case had outdated appointment affidavits, appointment affidavits completed after his prosecution, and/or no valid oath of office. *See* Record Documents 1292 at 182-83, 1292-167, 1292-168, & 1292-169. Stanford contends that, because the AUSAs were not duly appointed, this Court had no subject-matter jurisdiction over his case, and thus, relief in his favor is warranted. *See* Record Document 1292 at 183. Stanford further asserts the presence of an unappointed AUSA tainted the grand jury proceedings. *See* Record Document 1314 at 29-32. The Government asserts his claim is procedurally barred. *See* Record Document 1305 at 60.

Ultimately, the Court finds Stanford's Appointments Clause claim is procedurally barred. Stanford does not proffer any explanation for his failure to raise this claim prior to trial or on appeal. He does not identify any objective factor that prevented him from raising this claim before now or during appeal, he makes no ineffective assistance of

counsel arguments, and both the factual and legal basis for the claim were reasonably available to Stanford prior to and during his appeal. Indeed, Stanford could have requested the FOIA documents that serve as the factual basis for his Appointments Clause challenge at any point, yet he failed to do so until shortly before the filing of the instant motion. His failure to do so at an earlier point does not constitute cause. *See Murray v. Carrier*, 477 U.S. 478, 486 (1986) ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). Therefore, Stanford's Appointments Clause violation claim is procedurally barred.

Even assuming *arguendo* this claim is not procedurally barred, the Court finds Stanford's claim without merit. First, at least one of the AUSAs (lead counsel, John Luke Walker) appears to have been properly appointed, meaning the United States would properly be considered a party in the matter. *See* Record Document 1305-1. The Court finds persuasive the reasoning in *United States v. Clark*, No. 15-CR-0126, 2019 WL 3290120 (N.D. Okla. July 22, 2019). The *Clark* court discussed the same cases cited by Stanford and found that an AUSA serves an "indefinite (though not life-time) appointment as an AUSA, subject to the attorney general's discretion." *Clark*, 2019 WL 3290120, at *4.

Second, an Appointments Clause violation would not divest this Court of jurisdiction. *See United States v. Hunter*, 744 F. App'x 876, 876-77 (5th Cir. 2018) (Even if the defendant's claim that "his prosecution was improper because the government attorneys involved in his case lacked sufficient written authority for their appointments"

31

was construed as a § 2255 claim, such claim "lacked arguable basis in law or fact."); *see also Davis v. United States*, No. 23-12420, 2025 WL 1202081, at *11 (11th Cir. Apr. 25, 2025) ("Issues related to the appointment of prosecuting attorneys . . . do not deprive the district court of jurisdiction.") (internal quotations omitted); *United States v. Anderson*, No. 11-CR-0601, 2019 WL 4678563, at *3 (N.D. Ga. Sept. 6, 2019) (collecting cases); *Adegoke v. United States*, No. 15-CR-38, 2019 WL 1283872, at *5 (W.D. Wis. Mar. 20, 2019) ("[E]ven if the [AUSA] had *not* been properly appointed, it would not affect the jurisdiction of the court.") (emphasis in original).

Therefore, because Stanford's Appointments Clause claim is both procedurally barred and meritless, Stanford is not entitled to relief on this basis.

### B. Stanford's *Brady*, *Giglio*, and *Napue* Claims

The basis of Stanford's remaining claims is that the Government allegedly withheld exculpatory and impeachment evidence and/or knowingly solicited false testimony. Before the Court begins its analysis, it notes a few difficulties it encountered when reviewing Stanford's § 2255 motion.

First, Stanford does not connect his *Brady*, *Giglio*, and *Napue* claims to any of his specific convictions. Instead, he routinely argues the Government's actions "violated his right to receive a fair trial on all counts." *See e.g.* Record Document 1292 at 5. The Court understands Stanford primarily argues the suppressed evidence would have allowed him to impeach the co-defendants, but the mere inconsistencies often relied upon by Stanford do not create a reasonable probability in a different outcome. His argument disregards

that materiality hinges on whether the evidence would undermine confidence in the verdict. *See Wearry*, 577 U.S. at 392; *Brumfield*, 89 F.4th at 519.

Stanford fails to acknowledge that his remaining seven convictions are for separate and distinct crimes: Count Two, conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce (namely, Mr. Miyagi, which was branded as "potpourri" and labeled "Not For Human Consumption"); Count Three, money laundering conspiracy; and Counts Four, Five, Ten, Eleven, and Thirteen, specific instances of money laundering. Each conviction is based on different factual elements, and the jury was instructed on these different factual elements. Stanford fails to link any of his arguments to the factual elements of any single conviction, and he fails to identify any single conviction he believes the evidence would impeach or undermine. Stanford's motion should fail on this ground alone, but the Court has done its best to conduct the materiality analysis notwithstanding this failure.

Relatedly, many of Stanford's contentions appear to center on his involvement in Count One, conspiracy to distribute and possess with intent to distribute AM-2201, a controlled substance analogue. For example, as will be discussed in more detail *infra*, Stanford repeatedly contends the co-defendants knew they were illegally distributing AM-2201 and other synthetic cannabinoids into Louisiana before his involvement in the conspiracy and thus would not have needed his promises of law enforcement protection to continue doing so. But his conviction on Count One has already been reversed by the Fifth Circuit. *See Stanford I*, 823 F.3d at 822.

Stanford in no way challenges that he received proceeds from the distribution of AM-2201 through the Louisiana branch of the RCA. Nor does he challenge that a misbranded drug was introduced into commerce.[15] In other words, Stanford's materiality analysis largely hinges on his involvement in Count One, a reversed conviction.[16] Although not explicitly argued by Stanford, the Court acknowledges the money laundering conspiracy and money laundering counts were predicated on "the distribution of a mixture and substance containing a detectable amount of AM-2201." Record Document 57 at 11. Similarly, Count Two, the conspiracy to introduce a misbranded drug, "is [] more aptly understood as evading the discovery of a [controlled substance analogue]" because the purpose of the misbranding was "concealing the involvement with Mr. Miyagi." *Stanford II*, 883 F.3d at 508-09. Thus, the facts underlying Count One are related to and relevant for the facts underlying Stanford's convictions in some respects.[17]

---

[15] Stanford does seemingly argue he did not advise the co-defendants on the label, *see* Record Document 1292 at 139-40, but this argument ignores that he need not have personally advised on the use of that label to be convicted of this conspiracy.

[16] In any event, Stanford's involvement in Count One was not premised solely on the protection agreement and instead encompassed his work for the Louisiana branch of the RCA. *See e.g.*, Record Document 57 at 3 (portion of superseding indictment stating Stanford "trained, advised, and instructed the individual franchise owners of [Curious Goods] and their employees[] on how to store, display and sell the 'Mr. Miyagi' products, how to detect and evade law enforcement, and how to respond to customers who asked questions" about the use and effects of Mr. Miyagi).

[17] Indeed, Count One was used as relevant conduct at Stanford's re-sentencing hearing. *See generally* Record Document 1211. As explained *supra*, the burden of proof at sentencing is lower than the burden of proof at trial. That is, the Court needed only to find by a preponderance of the evidence that the conduct underlying Count One occurred in order to use it for purposes of sentencing. *See id.* at 27-28. The sentences promulgated at the re-sentencing hearing were affirmed by the Fifth Circuit. *See United States v. Stanford*, 883 F.3d 500, 517 (5th Cir. 2018).

However, Stanford has not framed his materiality argument in that context. Instead, he routinely concludes that evidence is material without explaining how it pertains to any of his specific convictions. This framework often requires the Court to guess as to what Stanford believes the effect of the proffered evidence is on his remaining convictions. The Court has done its best to analyze materiality as it pertains to the remaining convictions but notes that Stanford, not this Court, bears the burden of proving materiality.

Second, many of Stanford's exhibits and arguments center on actions outside of the timeframe of the indictment and the timeframe of Stanford's involvement in the alleged conspiracies. The indictment alleges the illegal actions began on or about March 1, 2011. *See* Record Document 57 at 3, 8, 10. Standford's involvement did not begin until approximately July or August 2011. *Stanford I*, 823 F.3d at 823 (noting "[t]he first physically documented interaction Stanford had with the drug scheme occurred on August 22, 2011, but referencing testimony of meetings between co-defendants and Stanford in July 2011). Stanford often fails to show how facts predating the conspiracies at issue here undermine the substantial evidence supporting his convictions. Again, the Court has done its best to conduct the materiality analysis notwithstanding this failure.

Third, Stanford does not make any distinct claim related to Exhibits 1, 7, 35, and 124 that this Court can surmise.[18] "The burden of proof is on a § 2255 petitioner to prove

---

[18] The Court explains this finding more in-depth here. Stanford cites Exhibits 1, 7, and 35 to support authenticity and possession, but he does not appear to be raising an independent § 2255 argument premised on these exhibits. *See e.g.,* Record Document 1292 at 7-8. Similarly, the Court has found no citation to Exhibit 124 in Stanford's § 2255 motion and reply and cannot surmise any associated *Brady*, *Giglio*, or *Napue* claim. *See*

his allegations." *United States v. Mendoza-Mendoza*, No. 09-CR-024, 2011 WL 3815493, at *3 (W.D. La. Aug. 26, 2011). Thus, the Court will neither make arguments on Stanford's behalf nor review the record *sua sponte* to find support for Stanford's claims. This is especially so given the length of Stanford's § 2255 motion. Stanford's § 2255 motion and reply total approximately 244 pages, his exhibits total 1,234 pages, and his supplemental briefing totals 55 pages. *See* Record Documents 1292, 1314, & 1386. If Stanford could not articulate a specific *Brady*, *Giglio*, or *Napue* claim in that number of pages, the Court can safely presume that either no such claim exists or such claim is without factual or legal support.

Fourth, Stanford's organization in his motion is, at times, disjointed and difficult to follow. Although Stanford employs the use of headings, he often intermingles claims in those headings.[19] Additionally, sometimes Stanford separates his argument between different headings, which requires the Court to cross-reference sections to ensure it has fully addressed Stanford's claims. The Court has done its best to organize this Memorandum Ruling in a manner that addresses the often-building nature of Stanford's claims. The Court has additionally done its best to address each of Stanford's discrete

---

*generally* Record Documents 1292 & 1314. The Court will not make any § 2255 arguments related to Exhibits 1, 7, 35, and 124 on Stanford's behalf. Therefore, to the extent Stanford contends claims related to Exhibits 1, 7, 35, and 124 do exist, Stanford is not entitled to relief because he has not met his burden of proof. The Court shall consider Exhibits 1, 7, and 35 only to the extent that they support possession generally.

[19] For example, pages 119-122 are purportedly about Wirtshafter's involvement with the CCL, but Stanford also discusses evidence that he alleges impeaches Francis's testimony about Francis's involvement with the CCL and the purpose of the CCL. *See* Record Document 1292 at 119-122.

claims. To the extent the Court did not review a claim or specific evidence associated with a claim, the Court finds that claim was not adequately articulated for the Court's consideration.

Fifth, Stanford sometimes relies on statements made by Green in Green's § 2255 motion and attachments to that motion. Green filed his § 2255 motion over three years after Stanford's jury trial. For the most part, Stanford does not explain how the Government possessed pretrial statements made in and exhibits attached to a motion filed years after that trial. Where Stanford has not made an explicit argument in support of possession, the Court has done its best to determine possession using Stanford's possession arguments for similar exhibits.

Finally, Stanford seems to combine his *Brady*, *Giglio*, and *Napue* claims and does not always meaningfully distinguish those claims or which claim pertains to which exhibit. The Court consequently presumes Stanford intended to raise a *Brady*, *Giglio*, and *Napue* claim for each exhibit (except for Exhibits 1, 7, 35, and 124, for which he raises no discrete claim). This interpretation ensures that each of Stanford's claims are addressed.

Because Stanford often interweaves his *Brady*, *Giglio*, and *Napue* claims, the Court finds it would be prudent to address similarities between the analyses. Based on Stanford's framing of his arguments, one similarity between the analyses is the issue of possession. *Brady* and *Giglio* require the Government to suppress favorable evidence. *See Swenson*, 894 F.3d at 683. This element necessarily requires that the Government possessed that evidence, for if the Government did not possess favorable or exculpatory evidence, it could not suppress the same. *See Williams v. Dir., TDCJ-CID*, No. 06-CV-230,

37

2012 WL 5609644, at *10 (E.D. Tex. Sept. 21, 2012) ("*Brady* was not violated in this case. The prosecution did not maintain possession of the jacket and therefore could not have suppressed it.") *report and recommendation adopted*, No. 06-CV-230, 2012 WL 5593225 (E.D. Tex. Nov. 14, 2012).

Similarly, the *Napue* claims as framed by Stanford require proof of possession. While the *Napue* analysis does not traditionally require possession of certain evidence, here Stanford argues the Government knew testimony was false *because* it possessed exhibits purportedly demonstrating that falsity. *See e.g.,* Record Document 1292 at 95 ("[T]he prosecution possessed NutraGenomics shipping records and invoices . . . Therefore, the prosecution knew that Francis was testifying falsely . . . ."). Based on that framing, if the Government did not, in fact, possess that evidence, Stanford would not be able to show the Government knew the testimony was false and knowingly solicited false testimony. And if the Government did not know the testimony was false, it cannot be said to have violated *Napue*. *See Kutzner*, 303 F.3d at 337 ("[D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution *actually* knows or believes the testimony to be false or perjured.") (emphasis added); *Garcia v. Davis*, No. 17-CV-0369, 2018 WL 11236252, at *14 (S.D. Tex. Mar. 20, 2018) ("[T]he State's *unknowing* use of false testimony . . . does not, under current Supreme Court law, give rise to a federal constitutional violation.") (emphasis in original).

Because Stanford's claims require proof of possession, the Court starts its inquiry there. Stanford articulates several arguments to support his contention that the Government possessed each of his § 2255 exhibits. These arguments are predicated on

Green's possession of these exhibits. As explained *supra*, Green is a co-defendant who pled guilty prior to trial. *See* Record Document 82. He cooperated with the Government and testified against Stanford at Stanford's trial. Stanford generally argues (1) the Government possessed his § 2255 exhibits because Green possessed these exhibits, (2) the Government possessed his § 2255 exhibits because Green gave the Government direct access to a "data base" containing these exhibits, and (3) the Government possessed his § 2255 exhibits because it seized a hard drive and computers from NutraGenomics. *See* Record Documents 1292, 1314, & 1386. Additionally, Stanford argues the Government possessed certain subsets of exhibits, such as NutraGenomics business records, lab reports, and emails, based on its subpoenas, search warrants, and seizures. *See* Record Documents 1292, 1314, & 1386.

The Court will employ the following procedure when addressing possession. First, the Court will look at the Government's good faith representation as to whether it possessed the evidence prior to trial. In some instances, Stanford puts forth no evidence to refute that representation. In those instances, the Court will accept the Government's representation as unrefuted. In other instances, Stanford does allege facts for why he believes the Government possessed that exhibit. In those instances, the Court will consider the facts as set forth by Stanford and analyze possession in light of the law and logic. At all times, the Court will apply the rule that it is Stanford's burden to prove the Government possessed the particular exhibit pretrial. *See Swenson*, 894 F.3d at 683 ("To prevail on a *Brady* claim, a defendant must show: . . . the evidence was suppressed by the prosecution.") (internal quotations omitted); *Brumfield*, 89 F.4th at 519 ("To establish

a *Napue* violation, [a defendant] must prove: . . . the government knew the testimony was false . . . ."); *Mendoza-Mendoza*, 2011 WL 3815493, at *3 ("The burden of proof is on a § 2255 petitioner to prove his allegations.").

Once the Court has addressed possession, the Court will consider materiality. As explained *supra*, a common element of the *Brady*, *Giglio*, and *Napue* analyses is materiality. *See Swenson*, 894 F.3d at 683; *Brumfield*, 89 F.4th at 519. Consequently, if Stanford cannot show that these exhibits are material, his *Brady*, *Giglio*, and *Napue* claims are without merit and do not entitle him to relief under 28 U.S.C. § 2255.

The Court will employ the following procedure when addressing materiality. Stanford claims that if he had the exhibits attached to his motion before trial, he could have successfully impeached the Government's witnesses. *See e.g.,* Record Document 1292 at 16. Stated another way, Standard argues the materiality of these exhibits is their impeachment value. Therefore, in addressing materiality, the Court will first examine if these exhibits do in fact have any impeachment value. That is, the Court will determine whether an exhibit shows that the identified witness testified falsely as to some fact at trial. The Court will then alternatively examine whether the exhibit, if admitted into evidence, would have had a reasonable likelihood of affecting the jury verdict. That is, the Court will determine whether the exhibit demonstrates an alleged impeachment as to a material fact at issue in Stanford's convictions.

Out of an abundance of caution, the Court will address the materiality of all the exhibits which form the basis of any argument by Stanford. This includes those exhibits which the Court finds the Government did not possess, even though that fact alone is

40

dispositive of Stanford's claims under *Brady*, *Giglio*, and *Napue*. This also includes those exhibits which the Court finds the Government did possess but turned over to Stanford prior to trial, even though that fact is dispositive of his claims under *Brady* and *Giglio*.

With these principles in mind, the Court turns now to possession.

### a. Possession

The Court begins by noting that the Government does not dispute it possessed Exhibits 5, 13, 18-22, 30, 39, 82, and 92. *See* Record Document 1305 at 19. Because the Government possessed these exhibits, Stanford can reasonably charge the Government with knowledge of the information found therein to support his claims that the Government violated *Napue*. As such, the Court will proceed with the *Napue* materiality analysis for Exhibits 5, 13, 18-22, 30, 39, 82, and 92.

As for the *Brady* and *Giglio* claims predicated on those same exhibits, the Government contends it produced Exhibits 5, 13, 18-21, 39, and 82 to Stanford, and it submits evidence purportedly supporting that production. *See id.*; *see also* Record Documents 1305-5 (Exhibit 5); 1305-6 (Exhibit 13); 1305-8 (Exhibit 39); and 1305-9

(Exhibit 82). The Court finds that production sufficient for Exhibits 13,[20] 18-21,[21] 39,[22] and 82.[23] As such, Stanford's *Brady* and *Giglio* claims predicated on Exhibits 13, 18-21, 39, and 82 fail, for the Government cannot be said to have suppressed evidence that it did, in fact, produce.[24] *See United States v. Cisneros*, 738 F. App'x 295, 296 (5th Cir. 2018) ("[T]he government committed no *Brady* violation because it produced the video before Cisneros was convicted."); *United States v. Fatty*, No. 17-CR-161, 2018 WL 3708660, at *5 (E.D. La. Aug. 3, 2018) ("[I]f the government produces *Brady* material to

---

[20] Stanford's *Brady* and *Giglio* claims for Exhibit 13 are based on the alleged suppression of a spreadsheet. *See* Record Document 1292 at 89-90, 136-37. The Government produced that spreadsheet to Stanford on March 25, 2013. *Compare* Record Documents 1292-13 at 4-6 *with* 1305-6 at 1, 7-9. Thus, the Government did not suppress this evidence.

[21] The Government maintains it produced Exhibits 18-21. *See* Record Document 1305 at 19. Unlike with his other exhibits, Stanford has not addressed or rebutted that contention. Notably, Stanford does not seem to address the claim premised on those exhibits at all in his reply. *See generally* Record Document 1314. The Court further notes the Government experts' dissenting opinions formed the basis of a motion to strike all references to JWH-250 and UR-144 from the superseding indictment. *See* Record Document 284-4 at 2. This filing suggests the defendants possessed Exhibits 18-21 prior to trial. Thus, the Court finds Stanford possessed those exhibits.

[22] Stanford's *Brady* and *Giglio* claims for Exhibit 39 are based on the alleged suppression of NutraGenomics documents. *See* Record Document 1292 at 35, 38-39, 63. The Government produced those documents to Stanford on March 25, 2013. *Compare* Record Documents 1292-39 *with* 1305-8 at 1, 7-19. Thus, the Government did not suppress this evidence.

[23] Stanford's *Brady* and *Giglio* claims for Exhibit 82 are based on the alleged suppression of a spreadsheet. *See* Record Document 1292 at 24. The Government produced that spreadsheet to Stanford on March 27, 2014. *Compare* Record Documents 1292-82 at 2 *with* 1305-9 at 2. Thus, the Government did not suppress this evidence.

[24] Stanford's possession of these exhibits prior to trial (and his subsequent appeals) would support finding these *Napue* claims are procedurally barred. Again, however, because the Government did not raise this issue, the Court declines to raise it *sua sponte*.

defendant as it receives such material, no violation of *Brady* occurs."); *United States v. Robert*, No. 19-CR-260, 2023 WL 309052, at *4 (S.D. Miss. Jan. 18, 2023) ("The Government had produced the documents to all Defendants, so *Brady* is not at play.").

However, the Government's production as to Exhibit 5 is insufficient. Stanford relies on the email string in Exhibit 5 to support when Green began to cooperate with the Government. *See* Record Document 1292 at 8-9, 71-72. The Government produced the attachment to those emails, but it did not produce the email string. *Compare* Record Document 1292-5 *with* 1305-5 at 1, 5-18. The Government does not explain why it did not produce the emails between Agent William White ("Agent White") and Green nor does it attempt to dispute possession of those emails. Therefore, the Court finds the Government possessed Exhibit 5 but did not produce it. Additionally, the Government concedes it possessed but did not produce Exhibits 22, 30, and 92 to Stanford. *See* Record Document 1305 at 19. Because the Government possessed but did not produce Exhibits 5, 22, 30, and 92, the Court finds the Government suppressed the same for Stanford's corresponding *Brady* and *Giglio* claims. The Court proceeds with the *Brady* and *Giglio* materiality analyses for those exhibits *infra*.

The Court additionally finds the Government possessed and produced substantively similar evidence for Exhibits 10[25] and 63.[26] Thus, any related *Brady* and *Giglio* claims fail. The Court will proceed to the *Napue* analysis for these exhibits.

Finally, for Exhibits 61 and 162, the Government maintains it did not possess the entirety of those exhibits prior to trial. *See* Record Document 1385 at 3-4, 9. For Exhibit 61, the Government argues it received the email attachment in Exhibit 61 from another source and produced that attachment to Stanford on March 25, 2013. *See id.* at 3-4; Record Document 1385-2. For Exhibit 162, the Government argues it possessed and produced the attached lab report to Stanford on March 25, 2013. *See* Record Documents 1385 at 9 & 1385-6. Thus, for both exhibits, the Government states it possessed and produced the attachments but disputes possession of the email strings. *See* Record Document 1385 at 3-4, 9. The Government's production of the attachments is substantively identical to the attachments in Exhibits 61 and 162. *Compare* Record Document 1292-61 at 12-16 *with* 1385-2 at 2-8 & 1292-162 at 10 *with* 1385-6 at 2 (including an electronic signature but otherwise identical to Exhibit 162).

---

[25] The *Brady* and *Giglio* claims for Exhibit 10 are based on the alleged suppression of a July 21, 2010, laboratory analysis report of Mr. Miyagi. *See* Record Document 1292 at 78, 83, 90. The Government produced pretrial a substantively identical version of this lab report. *See* Record Document 1385-6 at 2. The only discernable difference is the presence of an electronic signature for Alston Sykes on the Government's production. *Compare* Record Document 1292-10 *with* 1385-6.

[26] The *Brady* and *Giglio* claims for Exhibit 63 are based on the alleged suppression of an email string. *See* Record Document 1292 at 45-47, 58. The Government produced pretrial a substantively identical version of this email string. *See* Record Document 1385-4. The only discernable difference between the Government's production and Exhibit 63 is that the Government's production includes an additional email from Barrow. *Compare* Record Document 1292-63 *with* 1385-4.

Stanford's *Brady*, *Giglio*, and *Napue* claims for Exhibits 61 and 162 are predicated on the suppression of both the email string and the attachment. *See* Record Document 1292 at 33, 43-46, 58, 171-72. However, as will be discussed *infra*, Stanford fails to show the Government possessed the email strings in Exhibits 61 and 162. Therefore, the Court finds the Government did not possess the email strings in Exhibits 61 and 162 but did possess and produce the attachments. Stanford's *Brady* and *Giglio* claims predicated on Exhibits 61 and 162 fail for either lack of possession (the email strings) or lack of suppression (the attachments). Only Stanford's *Napue* claims premised on the attachments in Exhibits 61 and 162 proceed to materiality.

The Government disputes possession of all remaining exhibits and further maintains it produced all favorable materials to Stanford and thus complied with its *Brady* obligations. *See* Record Documents 1305 & 1385. Stanford makes two types of arguments to support that the Government possessed these exhibits prior to trial. First, he argues the Government possessed each of his § 2255 exhibits through Green or its seizure of various equipment from NutraGenomics. The Court classifies these as "general possession arguments" because Stanford intends for these arguments to generally establish that the Government possessed all his exhibits. Second, Stanford argues the Government possessed certain subsets of documents for a specific reason. The Court classifies these as "specific possession arguments" because they are tailored to specific subsets of exhibits. The Court addresses each type of possession argument in turn.

### i. General Possession Arguments

Stanford generally argues the Government possessed each of his § 2255 exhibits prior to trial because (1) Green, a cooperating co-defendant, functioned as an "agent" of

the Government prior to Stanford's trial, so the Government can be deemed to possess any information Green possessed; (2) Green gave the Government direct access to a "data base" containing the exhibits, and the Government could directly request information from Green pursuant to his cooperation agreement; and (3) the Government seized a hard drive and computers from NutraGenomics that contained the exhibits. *See* Record Documents 1292, 1314, & 1386. The Court addresses each argument in turn.

### 1. Possession Via Green as an "Agent"

*Brady* obligates the Government "to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness." *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (quoting *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975)). "This duty includes learning of any favorable evidence 'known to the others acting on the government's behalf in the case, including the police.'" *United States v. Cross*, No. 22-CR-184, 2024 WL 707810, at *1 (E.D. La. Feb. 21, 2024) (quoting *Kyles*, 514 U.S. at 437). "It is well settled that if a member of the prosecution team has knowledge of *Brady* material, such knowledge is imputed to the prosecutors." *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009). The prosecution team "includes both investigative and prosecutorial personnel." *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979).

Determining whether an entity or other person is a member of the prosecution team pursuant to the principles of agency law requires "a 'case-by-case analysis of the extent of interaction and cooperation between [the prosecutor and alleged members of the prosecutorial team].'" *Cross*, 2024 WL 707810, at *1 (alterations in original) (quoting

*Antone*, 603 F.2d at 570); *see also Avila*, 560 F.3d at 308. "[T]he relevant inquiry is what the person *did*, not who the person *is*." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (emphasis in original) (cited in *Avila*, 560 F.3d at 308-09). For example, in *Avila*, the Fifth Circuit found that an expert witness was not a member of the prosecution team because the evidence did not suggest the expert witness's role in the prosecution was as "anything but a pathologist." *Avila*, 560 F.3d at 309; *see also Stewart*, 433 F.3d at 298-99 (finding that an expert witness was not a member of the prosecution team because he "acted only in the capacity of an expert witness" and was not "in any way involved with the investigation or presentation of the case to the grand jury").

Here, neither party disputes Green was a cooperating witness prior to and during Stanford's trial and that Green provided the Government with information pursuant to various cooperation requests. Based on this cooperation, Stanford asks the Court to impute Green's knowledge and Green's possession of certain evidence to the Government for purposes of the *Brady* and *Giglio* analyses. *See* Record Document 1314 at 27-29. Stanford maintains "anyone can act as an agent of the federal government when they are jointly engaged in activity with government officials." *Id.* at 27. Thus, Stanford concludes that because "the government affirmatively enlisted Green's cooperation in the investigation of Stanford" and "Green was a 'willing participant in joint activity' with prosecutors and agents in this case for over two (2) years," the Government can be "deemed to be in possession of all the favorable information in Green's email account, including the information in Stanford's Exhibits 1-17 and 22-166." *Id.* at 27, 29.

The Court does not agree. The Fifth Circuit does not appear to have directly considered when a cooperating witness may be deemed a member of the prosecution team for purposes of *Brady*. As such, the Court finds persuasive the reasoning of other circuits that have considered this issue. Where a cooperating witness has only provided information to the Government and testified at trial, other circuits have found that the cooperating witness is not a member of the prosecution team. *See United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (not imputing the cooperating witness's knowledge to the prosecution where the cooperating witness "did no more than provide information to the government and testify at trial. He played no role in the investigation or in determining investigation or trial strategy"); *United States v. Smukler*, No. 17-CR-563, 2018 WL 3632148, at *3 (E.D. Pa. July 31, 2018) ("The mere fact that a witness has provided information to the Government does not place that person under the control of the Government or on the prosecution team. . . . Accordingly, the Government is not required to turn over materials in the possession of its witnesses. . . ."); *United States v. Munchak*, No. 10-CR-75, 2014 WL 3557176, at *15 (M.D. Pa. July 17, 2014) (collecting cases holding that cooperating witnesses were not members of the prosecution team), *aff'd*, 648 F. App'x 195 (3d Cir. 2016).

Such is the case here. Nothing about the interaction and cooperation between the Government and Green suggests Green may properly be deemed a member of the prosecution team. Green did not help prosecute or investigate this matter. He responded to requests for information, and he testified at trial. While Green's actions may have *benefitted* the Government, that does not mean Green worked *for* the Government or on

the Government's behalf. At all times, Green retained the capability to decide how he would cooperate and the extent of that cooperation. The Court acknowledges Green cooperated with the Government on and off for over two years, but the Court does not find the extent of Green's cooperation a persuasive reason for deeming him a member of the prosecution team. None of the evidence proffered here demonstrates that Green was anything but a cooperating witness. Therefore, Stanford has failed to show that Green was a member of the prosecution team such that Green's knowledge and possession of certain evidence can be imputed to the Government.[27]

Stanford argues the inquiry is not whether Green "was a member of the prosecution team" but rather whether "Green was an agent of the federal government."[28] Record Document 1314 at 28. Stanford relies on *Antone* for this contention, citing its conclusion "that the state investigators functioned as agents of the federal government

---

[27] To the extent Stanford is arguing "all of Green's emails were readily available to the government via Green's cooperation agreement," *see* Record Document 1314 at 3, the argument likewise fails. Green's possession of these emails may not be imputed to the Government. Further, this argument assumes, with no evidence, that the Government knew of these emails and thus knew to request such information from Green. Even ignoring that assumption, the Government has no obligation to search for information in the possession of people who are not members of the prosecution team. *See United States v. Cross*, No. 22-CR-184, 2024 WL 707810, at *3 (E.D. La. Feb. 21, 2024) (finding that because the District Attorney ("DA") was not a member of the prosecutorial team, "[t]he federal prosecutor owe[d] no duty to Defendant under *Brady v. Maryland* to compel the DA's disclosure of its redacted files and to search it for *Brady* material."). Therefore, this argument for possession is likewise without merit.

[28] Stanford additionally discusses the standard for determining whether someone is a state actor for purposes of the Fourteenth Amendment. *See* Record Document 1314 at 28-29. However, Stanford directs the Court to no jurisprudence suggesting that is the standard the Court should apply for *Brady*, *Giglio*, and/or *Napue*, and the Court has found none in its independent review. As such, the Court finds this contention without merit.

under the principles of agency law . . . ." *Antone*, 603 F.2d at 570. Perhaps tellingly, Stanford omits the next sentence in *Antone*, which reads, "The state agents were in a real sense *members of the prosecutorial team.*" *Id.* (emphasis added). Subsequent Fifth Circuit jurisprudence likewise considers whether certain individuals are members of the prosecution team. *See e.g.*, *Avila*, 560 F.3d 299, 307-09 (5th Cir. 2009) (finding that an expert witness was not a member of the prosecution team). Thus, while the Court is guided by principles of agency law in its analysis, the Court must ultimately decide whether a certain entity or individual may properly be deemed a member of the prosecution team.

But even if the Court were to consider only whether Green was an "agent," the Court's conclusion would remain the same. Stanford focuses solely on whether Green provided information at the Government's request. This argument misses the mark. "[T]he concept of agency posits a consensual relationship in which one person, to one degree or another . . . , acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person." Restatement (Third) Of Agency § 1.01 cmt. c (2006). Stanford has not shown how Green had any ability to bind the Government. As such, Stanford fails to show that Green was an agent.

In sum, Stanford has not established that Green functioned as an agent or member of the prosecution team such that Green's knowledge and possession of exhibits can be attributed to the Government. Therefore, this argument fails to establish that the Government possessed each of the exhibits attached to Stanford's § 2255 motion.

## 2.  Access to Green's Emails and/or Data Base

Stanford next contends the Government possessed his § 2255 exhibits through subpoenas of Green's email accounts and its alleged access to a NutraGenomics "data base." *See* Record Documents 1292 at 9, 81; 1314 at 3; & 1386 at 8-9, 12. Neither contention has merit.

The Court begins with Stanford's allegation that the Government subpoenaed Green's email accounts. Stanford contends "the prosecution subpoenaed and received all of the email communications initiated and received by Green and Malone." Record Document 1292 at 9. This contention is not supported by the record. The Government subpoenaed emails from the following email accounts: pinnacleproductsgroup@gmail.com;                josh@pinnacleproductsgroup.com; boyd@pinnacleproductsgroup.com;  stanatty@bellsouth.net;  rgb52798@hotmail.com; paulbuswell@yahoo.com; and barrydomingue@cox.net. *See* Record Document 904 at 6. None of those email addresses are Green's.

Stanford seemingly challenges the Government's representation that it did not receive Green's emails on three fronts. First, Stanford queries how the Government "possess[ed] some of Green's emails but not others." Record Document 1314 at 3. This query ignores that the emails the Government agrees it possessed are the emails between Green and Agent White. That the Government personally received emails from Green via Agent White does not mean the Government possessed all of Green's emails or that it subpoenaed Green's email accounts.

Second, Stanford argues "Agent Donald DeSalvo testified that the government recovered all of the emails in Green's email accounts." *Id.* at 12-13. This is an incorrect statement. Agent Donald DeSalvo ("Agent DeSalvo") testified as follows during Stanford's direct examination of him at an evidentiary hearing:

> A    There were certain -- there were subpoenas sent to NutraGenomics, Pinnacle, a variety of e-mail accounts, yes, and there was information that was recovered. That part of the investigation was handled by Agent Erol Catalan, so I didn't see everything that was recovered. There was so much information, I didn't review everything, but I know that there was a lot recovered from NutraGenomics, Pinnacle, all those accounts which had e-mails from Drew Green and Tommy Malone.

Record Document 590 at 34. Stanford argues this testimony establishes that the Government subpoenaed Green's email accounts, but Stanford mischaracterizes Agent DeSalvo's testimony. Agent DeSalvo did not testify as to any specific subpoenaed accounts, and his testimony is entirely consistent with the Government's representations regarding the accounts it did subpoena. Thus, Agent DeSalvo's testimony does not establish that the Government possessed all of Green's email accounts.

Finally, Stanford argues that Green's testimony establishes that the Government recovered all of Green's emails. *See* Record Document 1314 at 26. This, too, is an incorrect statement. Green testified as follows during Stanford's cross-examination of him at trial:

> Q    And if [your story] hasn't changed, why did you need to meet with them three or four times to go over the same story?
>
> A    Well, according to my understanding, a lot of times they're trying to piece together all the different pieces through e-mails and conversations. So a lot of times you tell them

> something and they go back. They research. And then they have some more questions, maybe from a little bit different angle, to understand the big picture, because they weren't quite sure.
>
> They didn't have all the information at that point, so they brought me back in to clarify that information and sometimes ask me some different questions, to make it all piece together. You know, that's my understanding.

Record Document 923 at 64. Stanford interprets this testimony to mean "the government recovered all of Green's emails, reviewed them together with other information provided by Green, and then they met with Green to discuss the information." Record Document 1314 at 26. But this argument, too, is a mischaracterization of Green's testimony. Green did not testify at all about whether the Government subpoenaed his email accounts. His testimony is entirely consistent with the Government's representations that it only subpoenaed certain email accounts. In sum, Stanford has failed to establish that the Government subpoenaed Green's email accounts or all of Green's email communications.

The Court turns now to Stanford's allegation that the Government had access to a "data base" maintained by Green wherein he stored "all of his emails and Nutragenomics' business records, including invoices, spreadsheets, and accounting data." Record Document 1386 at 9. To the extent Stanford argues the Government had access to this data base simply because it had access to Green via his cooperation agreement, this argument is without merit. As explained *supra*, Green was not a member of the prosecution team, and the Government owed no duty to Stanford to search for exculpatory material wholly in Green's possession. *See Cross*, 2024 WL 707810, at *3.

However, Stanford makes an additional argument in relation to this data base. He contends Green "provided the Government with his username and password" to the "Nutragenomics data base." Record Document 1386 at 8. Stanford makes this argument for the first time in his response to the Court's request for supplemental briefing. The only reference to a password and username the Court can find in Stanford's earlier filings is his argument that "[Stuart] Mones[29] was given his own password and user name to access NutraGenomics' computer systems in order to review lab reports, invoices, purchase orders, chemical opinions and more." Record Document 1314 at 35; *see also* Record Document 1292 at 108. Thus, at no previous point has Stanford alleged or even indirectly suggested that Green gave the Government access to a "data base" containing this information. Stanford does not explain why he is raising this argument now, especially given the extensive nature of his original briefing.

In any event, Stanford provides no proof of the Government receiving access to this alleged data base. Stanford argues that several of his § 2255 exhibits show the "Government was aware Green had a Nutragenomics 'data base'" and that Green retrieved information from that data base. Record Document 1386 at 9, 13. But even assuming *arguendo* the Government knew of the data base, those exhibits do not show that Green gave the Government *direct access to* this data base. Quite the opposite. If Green had given the Government complete access to a data base that supposedly contained all of Green's emails and NutraGenomics documents, why would the

---

[29] The Court will discuss Stuart Mones ("Mones") *infra* but notes here that Mones represented Green in these proceedings.

54

Government need to make "specific requests to Green and rel[y] on him to retrieve information from his Nutragenomics 'data base'"? *Id.* at 10. And if Green had previously given the Government access to that data base, why would the Government not simply ask Green for access to these other data bases rather than rely on Green to channel that information? These exhibits do not demonstrate that Green gave the Government a username and password to access the NutraGenomics data base.

Stanford additionally relies on an affidavit executed by Green. *See* Record Document 1386-2. In this affidavit, Green attests that, "On or about July of 2018 I gave Anna Stanford permission to search through my inbox and to use any documents for Dan Stanford['s] case. I gave Anna Stanford my username and password related to all of my gmail accounts[30] with google." *Id.* Green does not attest that he provided the *Government* with access to this data base and/or email accounts.[31] Thus, this affidavit, too, fails to establish that the Government had a username and password to access the alleged NutraGenomics data base. Because Stanford's response is wholly devoid of any proof to support these assertions, Stanford has failed to establish the Government had access to his § 2255 exhibits through this alleged data base.

---

[30] The Court assumes *arguendo* the inbox and Gmail accounts are the "data base." *See* Record Document 1386 at 12 ("In July 2018, Green gave his username and password to his Nutragenomics 'data base' to Stanford's wife, Anna Stanford.").

[31] Indeed, the lack of evidence to support the Government had direct access to Green's email accounts and/or data base suggests that Stanford currently has broader access to this information than the Government.

In sum, Stanford has not shown the Government subpoenaed Green's email accounts or received access to a NutraGenomics data base such that it can be charged with possession of Stanford's § 2255 exhibits.

### 3. Seizure of Hard Drive and Computers

Neither party disputes that, on or about July 25, 2012, the Georgia Bureau of Investigations ("GBI") executed a search warrant at NutraGenomics.[32] *See* Record Documents 1385 at 5 & 1386 at 7-8. At that time, GBI seized, *inter alia*, three computers and a hard drive (collectively referred to as "NutraGenomics equipment"). *See* Record Documents 1292 at 81 & 1385 at 5-6. On November 14, 2012, Agent White asked Green to execute a "Consent to Search Form" that would authorize DEA agents to search the "electronic items, computers/hard drive, that were seized during the Search Warrant at NutraGenomics." Record Document 1292-1 at 1. Green executed that form on November 15, 2012. *See id.* at 4.

Stanford contends the Government possessed "thousands of business records, spreadsheets, SMS messages, and emails" through its seizure of the NutraGenomics equipment. Record Document 1292 at 81. It bears noting that Stanford's argument on this front has evolved throughout these proceedings. Originally, Stanford neither explained his basis for reasoning these exhibits were present on that equipment nor did he provide any evidence to that effect. For example, Stanford argued the Government

---

[32] In its response to this Court's request for supplemental briefing, the Government argues GBI did not give it any data regarding the seized NutraGenomics equipment. *See* Record Document 1385 at 5-6. With this argument, the Government seems to imply it complied with its *Brady* obligations by turning over any information it received from GBI. The Court discusses this issue *infra*.

possessed Exhibit 23 because "it executed a search and seizure warrant on NutraGenomics headquarters in Georgia." *Id.* at 26. But he did not provide any evidence showing Exhibit 23 was located on the seized equipment. Similar arguments abound throughout his § 2255 motion. Thus, Stanford's original argument required this Court to assume, based primarily on his own conclusory allegations, that the exhibits were present on the NutraGenomics equipment.

Stanford subsequently represented to the Fifth Circuit, but not this Court, that his § 2255 exhibits came from Green's Cloud account and that those exhibits are "back-up duplicates of documents" that could be found on the NutraGenomics equipment. *In Re: Daniel James Stanford*, No. 25-30118 (5th Cir. Feb. 28, 2025), ECF No. 2 at 12-13. Subsequently, in his response to this Court's request for supplemental briefing on the issue of possession, Stanford argued Green maintained a "data base" that stored "all of his emails and Nutragenomics' business records, reports, and spreadsheets." Record Document 1386 at 8. Because there does not appear to be any meaningful difference between the referred-to "data base" and "Cloud account," the Court presumes Stanford is arguing this alleged data base contains the emails and NutraGenomics business records, reports, and spreadsheets that comprise his § 2255 exhibits. The Court further presumes Stanford is arguing those exhibits are back-up duplicates of documents present on the NutraGenomics equipment. Even making these presumptions on Stanford's behalf, the Court finds this argument fails.

As with the other arguments advanced by Stanford, he again provides the Court with no evidentiary support for his claim that his exhibits are back-up duplicates of

information that can be found on the NutraGenomics equipment. Arguably, NutraGenomics business records may be found on the seized equipment, which means some of Stanford's exhibits are possibly back-up duplicates of those NutraGenomics documents.[33]

However, the bulk of Stanford's § 2255 exhibits are emails between co-defendants and other third parties, and Stanford's argument ignores one critical fact: none of the email addresses in his § 2255 exhibits are associated with a NutraGenomics email account. Further, while Stanford claims "[a]ll of the email communications within [his] exhibits are from [] *Green's NutraGenomics email inbox* and are emails initiated and received by Green, Malone, Barrow, and Francis," Record Document 1292 at 9-10 (emphasis added), a review of the exhibits clearly refutes this claim. None of Stanford's § 2255 exhibits include Green's *NutraGenomics* e-mail address. The email exhibits were either sent or received by Green's email accounts for his other businesses.[34] *See e.g.* Record Documents 1292-1 at 1 ("biogenixusa.com" email account), 1292-5 at 2 ("naturescientist.com" email account), & 1292-8 at 1 ("naturesuphoria.com" account). Stanford does not explain why the Government's seizure of NutraGenomics equipment would give it access to emails associated with other companies, even where those

---

[33] The Court discusses these specific exhibits in the relevant section *infra*.

[34] Some of the emails in which Green is carbon copied simply state "Drew NutraGenomics" with no associated email address. *See e.g.* Record Document 1292-16 at 1. However, other emails in the email string usually include that same phrase followed by "<drew@naturesuphoria.com>." *See id.* Thus, the Court finds that the account copied on emails notated with "Drew NutraGenomics" is the "naturesuphoria.com" account.

companies are owned by the same individuals.[35] As such, this argument for possession is without merit.

In sum, Stanford makes three general arguments to support the Government's pretrial possession of all of his § 2255 exhibits: (1) Green functioned as an "agent" of the Government, so the Government can be deemed to be in possession of any information Green possessed; (2) Green gave the Government direct access to a "data base" containing the exhibits, and the Government could directly request information from Green pursuant to his cooperation agreement; and (3) the Government seized a hard drive and computers from NutraGenomics. *See* Record Documents 1292, 1314, & 1386. The Court has considered each of these arguments and found them without merit. Thus, Stanford has not established either possession of each exhibit on these bases.

### ii. Specific Possession Arguments [Exhibits 11-12, 17, 23-29, 31-34, 45, 51, 60-61, 63-65, 71-72, 76, 78-79, 81, 105, 131, 141, 146, 160-162, & 166]

Stanford additionally argues the Government possessed specific subsets of documents based on its subpoenas, search warrants, and seizures. *See generally* Record Documents 1292, 1314, & 1386. In this section, the Court addresses (1) whether the Government's seizure of NutraGenomics equipment granted it access to NutraGenomics business records, (2) whether the Government's search warrants granted it access to lab reports from Research Triangle Laboratories, Inc. ("RTP Labs"), and (3) whether the

---

[35] All the exhibits except for Exhibits 18-21 and 24-25 contain a "Gmail" header with the following notation: "Drew Green <dgreen@biogenixusa.com>." *See e.g.,* Record Document 1292-1 at 1. This header further supports that the emails presented in Stanford's § 2255 motion were not present on NutraGenomics equipment.

Government's subpoenas granted it access to certain email strings that include emails from subpoenaed email accounts. The Court addresses each argument in turn.

### 1. NutraGenomics Business Records [Exhibits 17, 23-29, 31-32, 91,[36] & 105]

Exhibits 17, 23-29, 31-32, and 105[37] appear to be NutraGenomics business records. GBI seized and searched NutraGenomics equipment. *See* Record Document 1385 at 5-6. The Government argues GBI did not give it any data regarding the seized equipment. *See id.* at 6. Nevertheless, the Government maintains it produced all materials it received from GBI to Stanford. *See id.* at 5-6.

The Court cannot accept the Government's representation that it did not possess these NutraGenomics business records in good faith. It is, at the very least, arguable these records were present on the seized equipment and that the Government can be charged with possession of those documents. "[T]he affirmative duty to seek out *Brady* material [] extends to 'others acting on the government's behalf in the case.'" *Cross*, 2024 WL 707810, at *2 (quoting *Kyles*, 514 U.S. at 437). Because the Government's

---

[36] Exhibit 91 does not contain a NutraGenomics business record. *See* Record Document 1292-91. The Court includes this exhibit here only because a similar argument for possession applies to it.

[37] Exhibit 105 contains two documents related to attorney Don Wirtshafter ("Wirtshafter"). *See* Record Document 1292-105. The first is a NutraGenomics invoice indicating NutraGenomics shipped Bonsai 18, Bonsai 250, Bonsai 200, Bonsai 73, Bonsai 81, Mr. Miyagi, and other products to Wirtshafter. *See id.* at 3. The second is what appears to be pasted text from an email. *See id.* at 4-5. The text is identical to an email in Exhibit 60. *Compare id. with* 1292-60 at 5-6. Because Exhibit 60 contains the pertinent email information, such as who sent and received that email and when it was sent, the Court does not consider this portion of Exhibit 105. Where Stanford cites Exhibit 105 for the "email," the Court will instead consider Exhibit 60. When the Court considers Exhibit 105 *infra*, it is considering only the NutraGenomics invoice.

representations suggest that GBI helped it investigate this matter, GBI may properly be considered a member of the prosecutorial team. Therefore, the Government would have had an obligation to search for exculpatory material in GBI's possession.

Additionally, Green expressly authorized the federal government to search the seized NutraGenomics equipment, meaning the Government arguably had at least constructive possession of the NutraGenomics equipment. The Government did not directly search the NutraGenomics equipment, and its representations about this search do not disclaim the possibility that the NutraGenomics business records were present on the NutraGenomics equipment.

Based on this evidence, the Court finds the Government can be charged with pretrial possession of Exhibits 17, 23-29, 31-32, and 105. The Government did not produce these exhibits to Stanford. As such, the Court will proceed to the materiality of these exhibits for Stanford's related *Brady*, *Giglio*, and *Napue* claims.

Although Exhibit 91 does not contain NutraGenomics business records, the Court reaches a similar conclusion as to possession. Exhibit 91 was sent to a federal agent based in Kansas. *See* Record Document 1292-91. Arguably, then, the Government possessed this exhibit. As such, the Court will proceed to the materiality of Exhibit 91 for Stanford's related *Brady*, *Giglio*, and *Napue* claims.

## 2.  Lab Reports [Exhibits 11, 72, 79, 81, & 161][38]

Exhibits 11,[39] 72, 79, 81, and 161 appear to include lab reports from RTP Labs. The Government maintains it did not receive the lab reports found in these exhibits. *See* Record Document 1385 at 7-8. The Government represents it received "RTP Labs reports from three separate sources": (1) "Curious Goods store locations and through a subpoena duces tecum by the State of Louisiana following the search warrants executed at Curious Goods on December 7, 2011"; (2) "RTP Labs' response to a Federal subpoena issued in connection with the detention hearing where Stanford represented Richard Buswell"; and (3) "the email account search warrant returns." Record Document 1385 at 7-8. The Government represents that the reports it received through these sources were all produced to Stanford and that it did not receive any additional lab reports. *See id.* at 8.

The Court accepts the Government's argument in good faith. The Government's representation as to its search demonstrates that search was sufficient. Stanford has not shown these specific lab reports were accessible to the Government via the

---

[38] Although Exhibit 162 contains an RTP Labs lab report, the Court omits Exhibit 162 from this section because the Government produced the attached lab report to Stanford. *See* Record Document 1385-6 at 2. The only other possession arguments applicable to this exhibit are the "general possession arguments" dispensed with *supra*.

[39] The Government argues it produced the lab report found in Exhibit 11 to Stanford on March 25, 2013. *See* Record Document 1385 at 8. However, Stanford's *Brady*, *Giglio*, and *Napue* claims related to Exhibit 11 are premised on both the email string and attached lab report. *See* Record Document 1292 at 78, 83, 90, 171-72. Further, Stanford's attached lab report is dated July 28, 2010, and the Government's produced lab report is dated July 21, 2010. *Compare* Record Document 1292-11 at 11 *with* 1385-6 at 2. As such, the Court finds the Government did not produce Exhibit 11 to Stanford. However, Stanford has failed to show the Government actually possessed Exhibit 11 for the same reasons set forth in this section.

aforementioned sources, and the Court shall not assume as such. Therefore, the Court finds Stanford has failed to prove the Government possessed Exhibits 11, 72, 79, 81, and 161 prior to trial. Stanford's *Brady*, *Giglio*, and *Napue* claims premised on these exhibits fail for lack of possession.

### 3. Emails [Exhibits 12, 33-34, 45, 51, 60-61, 64-65, 71, 76, 78, 81, 131, 141, 146, 160, & 166]

Email strings found in Exhibits 12,[40] 33-34, 45, 51, 60-61, 64-65, 71, 76, 78, 81, 131, 141, 146, 160,[41] and 166 include emails from the subpoenaed email accounts for Barrow and Espinoza. The Government maintains it produced to Stanford the emails it received from Barrow's and Espinoza's email providers. *See* Record Document 1385 at 2. The Court accepts the Government's argument in good faith. The Government's representation as to its search demonstrates that search was sufficient. Stanford has not shown these specific emails were retrieved by the Government's subpoenas. Therefore, the Court finds Stanford has failed to establish that the Government possessed  Exhibits 12, 33-34, 45, 51, 60-61, 63-65, 71, 76, 78, 81, 131, 141, 146, 160, and 166 prior to

---

[40] The Government argues it produced the questionnaire found in Exhibit 12 to Stanford on March 25, 2013. *See* Record Documents 1385 at 2-3. However, the Government produced a different version of this questionnaire to Stanford. *Compare* Record Document 1292-12 at 3 (stating co-defendants "don't use JWH 018 in the manufacture of [their] product[s]") *with* 1385-1 at 3 (which does not contain that language). As such, the Government did not produce this exhibit to Stanford, so the Court considers Stanford's possession argument.

[41] The Government argues "[t]he emails and attachments concerning Dr. Lantz . . . were provided in discovery on March 25, 2013." Record Document 1385 at 5. However, the Government did not produce the email string found in Exhibit 160. *Compare* Record Document 1292-160 *with* 1385-5. As such, the Government did not produce this exhibit to Stanford, so the Court considers Stanford's possession argument.

trial. Stanford's *Brady*, *Giglio*, and *Napue* claims premised on these exhibits fail for lack of possession.

In sum, the Court has made the following findings as to the Government's possession of certain exhibits:

| FINDING | EXHIBIT(S)[42] |
|---|---|
| **The Government possessed and produced these exhibits.** | 10, 13, 18-21, 39, 63, 82 |
| **The Government possessed but did not produce these exhibits.** | 5, 17, 22-32, 91-92, 105 |
| **The Government possessed and produced a portion of these exhibits (the attachments) but did not possess the email strings.** | 61, 162 |
| **The Government did not possess these exhibits.** | 2-4, 6, 8-9, 11-12, 14-16, 33-34, 36-38, 40-60, 62, 64-81, 83-90, 93-104, 106-123, 125-161, 163-166 |

Out of an abundance of caution, the Court shall consider the materiality of each of these exhibits regardless of the Court's findings as to possession.

### b. Materiality

The Court does not rely on Stanford's organization in his § 2255 motion. Instead, the Court grouped Stanford's claims into general "topics": (1) the protection agreement; (2) the Buswell distribution agreement; (3) the chemical composition of Mr. Miyagi; (4) the roles of Stuart Mones ("Mones"), Wirtshafter, Dr. Robert Lantz ("Dr. Lantz"), other attorneys, and Stanford in the conspiracies; (5) the Coalition for Cognitive Liberty ("CCL");

---

[42] The Court omits Exhibits 1, 7, 35, and 124 from this chart because Stanford does not make any specific *Brady*, *Giglio*, or *Napue* claims for those exhibits.

(6) the California Retail Compliance Association ("RCA"); and (7) the cooperation of Green. Additionally, the Court created a "miscellaneous" topic for claims that do not fall neatly within the aforementioned categories.

The Court addresses each topic in turn.

### i. The Protection Agreement [Exhibits 22-32, 36-37, 42-43, 60-65, 71, & 79-82]

The Court prefaces this section with a summary of the relevant facts previously presented to the jury and set forth by the Fifth Circuit in its opinion. Green and Malone owned NutraGenomics and "formulated a line of synthetic marihuana they called 'Mr. Miyagi.'" *Stanford I*, 823 F.3d at 823. Barrow owned Pinnacle, a company that distributed Mr. Miyagi. *See id.* Espinoza worked at Pinnacle. *See id.* Buswell owned Curious Goods, a chain of smoke shops located in the Western District of Louisiana. *See id.* at 822-23. In March 2011, Buswell, Malone, Green, and Barrow met to discuss stocking a synthetic cannabinoid at Curious Goods. *See id.* at 823. "Shortly thereafter, Mr. Miyagi arrived in Curious Goods' stores." *Id.*

At that time, Mr. Miyagi contained AM-2201. *See id.* JWH-018 and AM-2201 are both "naphthoylindoles that activate the cannabinoid receptors in the human body, producing a 'high.'" *Id.* In July 2011, Louisiana banned naphthoylindoles. *See id.* "Barrow and others were initially concerned, [but] Buswell assured Barrow that there would be no problem selling Mr. Miyagi in Louisiana." *Id.* At a meeting between Barrow, Buswell, and Domingue, Buswell represented that he had hired Stanford. *See id.* Barrow later traveled to Lafayette, Louisiana, to meet Stanford and Buswell. *See id.* After that meeting, Buswell called Barrow to inform him "Stanford had secured an agreement with the Louisiana

attorney general that Mr. Miyagi was the only 'potpourri' that could be 'sold in the state' and that Buswell had a letter to that effect from the attorney general's office." *Id*. In August 2011, in a meeting between Buswell, Domingue, Barrow, Stanford, and Espinoza, Domingue assured Espinoza Mr. Miyagi had been "approved by the AG . . . the District Attorney . . . all the local authorities.'" *Id*. at 824. Stanford did not comment on Domingue's representations. *See id*.

Beginning in August 2011, Francis and Stanford began to communicate about the Retail Compliance Association ("RCA"). *See id*. at 823-24. In a September meeting involving Barrow, Buswell, Espinoza, Domingue, and Stanford, "Barrow and Buswell suggested forming a Louisiana branch of the RCA." *Id*. at 824. Throughout November, "Stanford and Francis continued to communicate . . . about forming a Louisiana RCA." *Id*. at 825. "On November 28, the Louisiana-based RCA was incorporated in Louisiana with Stanford as 'Director' and Francis as 'President.'" *Id*. Barrow testified "he and Buswell agreed that Pinnacle and Curious Goods would pay for the initial costs of getting the Louisiana RCA up and running" and "settled on paying Stanford a combined total of $12,500 a week." *Id*. As outlined by the Fifth Circuit, Stanford received the following payments:

| Date | Remitter | Amount | Description |
|---|---|---|---|
| 10/28/11 | Barrow/Pinnacle Products | $12,500.00 | Memo line says "Retainer" |
| 11/03/11 | Barrow/Pinnacle Products | $6,250.00 | Memo line says "RCA dues" |
| 11/21/11 | Barrow | $13,000.00 | Memo line says "Legal" |
| 11/30/11 | Buswell/Curious Goods | $19,000.00 | Memo line says "Boyd's RCA dues to |

| | | | be deducted from Miyagi bill" |
|---|---|---|---|
| 12/06/11 | Barrow (cashier's check) | $7,421.69 | Barrow claimed the check was intended to cover $6,250 in RCA dues plus $1,171.59 for damage he caused to a city light pole |

*Id.* On December 7, 2011, Buswell, Stanford, Domingue, Francis, Espinoza, and Barrow met at Buswell's house to "educate Curious Goods employees and franchisees on selling Mr. Miyagi and how to handle law-enforcement inquiries." *Id.* at 826. Francis testified that both he and Stanford spoke on behalf of the RCA at this meeting. *See id.* "Stanford was introduced as the 'big stick' and again claimed to have an agreement with the attorney general." *Id.* The raid on NutraGenomics took place the next day on December 8, 2011. *See id.*

At issue in this section is not whether the protection agreement existed—it did not[43]—but whether Stanford made promises of protection to the co-defendants that incentivized the distribution of Mr. Miyagi into Louisiana. Stanford asserts the Government withheld exculpatory evidence and/or solicited false testimony in relation to these promises of protection supposedly obtained by Stanford from the Louisiana Attorney General and other law enforcement. Stanford challenges the promised protection agreement on three fronts: (1) the co-defendants knowingly distributed illegal synthetic

---

[43] James Caldwell, the Louisiana Attorney General at that time, testified that no protection agreement existed. *See* Record Document 925 at 83-85. Kurt Wall, the director of the criminal division at the Louisiana Attorney General's office, likewise testified that no such agreement existed. *See id.* at 62-72, 74-76.

cannabinoids to Louisiana customers prior to Stanford's involvement and without a protection agreement in place; (2) the co-defendants testified the protection agreement was contingent on a specific formula, but Mr. Miyagi did not use that formula; and (3) the co-defendants only declared Louisiana as a no-sell-to state "after the fact"[44] and not prior to Stanford's involvement. *See e.g.,* Record Document 1292 at 22, 30-31, 50-51.

Stanford argues evidence of the co-defendants distributing "synthetic cannabinoids and Mr. Miyagi to Louisiana without a protection agreement and prior to Stanford's alleged involvement would destroy the prosecution's narrative that Louisiana was a no-sell-to state, refute the need for a protection agreement, and leave Stanford with no role and/or involvement in the conspiracies." *Id.* at 22. Put differently, Stanford avers "suppressed [] evidence proves that Stanford had absolutely nothing to do with cooperating co-defendant's decision to start and/or to continue distributing Mr. Miyagi into Louisiana." *Id.* at 21.

At the outset, the Court notes several flaws in Stanford's argument. First, evidence admitted at trial strongly corroborates the co-defendants' testimonies that Stanford made promises of protection. For example, Brady Brecker ("Brecker"), a Curious Goods franchisee, testified that Buswell informed him, in the presence of Stanford, that a letter from the Attorney General "gave [them] a two-year window to sell the products [they] were selling in the store." Record Document 925 at 161. Brecker stated Stanford "neither

---

[44] Stanford does not define "after the fact." Record Document 1292 at 24. The Court presumes he means the co-defendants declared Louisiana as a no-sell-to state at some point after the police raid on NutraGenomics in December 2011.

confirmed nor denied" this letter existed. *Id.* Brecker then stated he was not concerned about going to jail because "[they] had Dan Stanford, Dan Francis, and we had Boyd [Barrow] and Josh [Espinoza] all saying we were protected, and pretty much giving legitimate reasons backing that up." *Id.* at 166.

Brecker further testified he made an audio recording of a meeting in January 2012. *See id.* at 174. In this audio recording, which was admitted at trial, Stanford discusses the federal ban. *See* Record Document 863-6 at 45. He states:

> . . . when I first came into contact with Dan Francis and those guys. Okay. I looked up the statute. *And then I looked up what the federal legislation was okay and met with, with someone at the AG's office. And they were of the same opinion that I am. Okay. The feds haven't l-outlawed any of this non-specific compound.* . . . You have to know what's legal and what's not illegal. This broad classification doesn't give you or me or anyone else unless you're a trained chemist who can do the research the idea of what is banned and what's not banned. We know based on Louisiana law and the DEA, that the, the substance they found in Mr. Miyagi should not be considered a banned substance cause the DEA hasn't banned it.

*Id.* (emphasis added). Stanford later states:

> *So, and, in talking to the AG's office, they agreed with me on stuff that they interpreted it to mean the exact same way that I did.* I wouldn't of been looking for other compounds anyhow because I just looked at the ones that were banned by the DEA in the emergency ban. Ok? And I was assured— and they didn't lie to me about that—that none of those banned compounds were in Miyagi. . . .
>
> *And the AG said this is what they're focusing on right now until federal legislation changes.* That's why I was working with Dan Francis to monitor . . .
>
> what is the legislative process? Where are they going? Are they expanding it? . . .
>
> If they are expanding it, then we need to know to avoid any problems.

*Id.* at 60-61 (emphasis added). Brecker agreed these statements were consistent with "what [he] had heard about [Stanford] meeting with the AG's office." Record Document

925 at 179. This evidence strongly corroborates the co-defendants' testimonies that Stanford did, indeed, make promises of protection to the co-defendants.

Second, Stanford ignores the substantial evidence connecting him to the conspiracies beyond the promises of protection. For example, not once does he acknowledge his role in the creation and running of the Louisiana RCA. *See* Record Documents 57 & 961 at 4 ("This evidence included testimony concerning checks [Stanford] received from Curious Goods and Pinnacle [] for dues to the [RCA] . . . [and] e-mail correspondence regarding the RCA . . . ."); *Stanford I*, 823 F.3d at 823-26 (detailing Stanford's involvement with the RCA"). Therefore, the lack of a protection agreement would not "leave Stanford with no role and/or involvement in the conspiracies."  Record Document 1292 at 22.

Third, Stanford ignores that his conviction to distribute and to possess with intent to distribute a controlled substance analogue was reversed by the Fifth Circuit. *See Stanford I*, 823 F.3d at 822. Stanford fails to connect the promises of protection to his remaining counts or explain how the lack of those representations of promises would undermine his remaining convictions. In other words, Stanford's materiality analysis seems to hinge on his involvement in Count One, a reversed conviction. He fails to place that materiality analysis in the context of his remaining convictions.

Finally, the purported protection agreement was not predicated on the concept that the defendants knew Mr. Miyagi was illegal on a certain date.[45] Stanford ignores the

---

[45] As the Government aptly noted in closing argument, ". . . Mr. Stanford had to convince everybody that he had the connections to keep them from getting prosecuted. It was

wealth of testimony that the co-defendants were nervous about the legality of their actions, actively monitoring the changing panoply of state laws, and changing their products' formulas to stay ahead of the law. In any event, when exactly the co-defendants learned their distribution into Louisiana was illegal does not in any way negate Stanford's promise of a protection agreement or remove Stanford's role from the conspiracy to distribute those synthetic cannabinoids. Quite the contrary. Even if Stanford's evidence supports that the co-defendants learned of that illegality on an earlier date than testified to at trial, the co-defendants *continued to* distribute Mr. Miyagi after learning it was illegal. Notably, evidence at trial demonstrated that sales of AM-2201 into Louisiana dramatically increased after Stanford's involvement in the conspiracy. *See* Record Document 961 at 4 n.1 ("[E]vidence provided at trial demonstrate[d] that Curious Goods purchased $155,231.82 worth of Mr. Miyagi from Pinnacle, in the months before [Stanford] joined the conspiracy, and $1,381,252.31 worth after August 2011.").

With these issues in mind, the Court now turns to Stanford's claims.

### 1. Sales Prior to Stanford's Involvement [Exhibits 22-32, 36-37, 60-65, & 71]

Stanford's first challenge to the promises of protection relates to whether the co-defendants considered Louisiana to be a no-sell-to state. This challenge encompasses three discrete claims. First, Stanford argues suppressed evidence proves the co-defendants did not consider Louisiana to be a no-sell-to state because they illegally distributed synthetic cannabinoids to Louisiana prior to Stanford's involvement and the

---

never is this legal, it was always will we get prosecuted." Record Document 927 at 107-08.

purported protection agreement. *See* Record Document 1292 at 22-25. Second, Stanford argues suppressed evidence proves the co-defendants knew AM-2201 had been banned by Louisiana in early 2011, which purportedly contradicts their testimony that they learned of the illegality in late 2011. *See id.* at 45-46. Finally, Stanford argues Francis falsely testified about using a certain website to learn AM-2201 was a naphthoylindole. *See id.* at 47.

The Court addresses each argument in turn.

### a. Distribution of Synthetic Cannabinoids [Exhibits 22-32, 36-37, & 60-61]

Stanford argues Exhibits 22-32, 36-37, and 60-61[46] prove the "co-defendants learned that Louisiana had banned synthetic cannabinoids and Damiana" by August 2010, yet "they continued distributing synthetic cannabinoids to hundreds of Louisiana customers until January 2012." Record Document 1292 at 22. Therefore, he argues the co-defendants falsely testified that they considered Louisiana to be a no-sell-to state and "only distributed Mr. Miyagi to Louisiana because Stanford had a protection agreement with the Louisiana Attorney General." *Id.*

To determine whether these exhibits are material, the Court begins by summarizing the contents of these exhibits. Exhibit 36 is an August 5, 2010, email string including a Pinnacle email account, Malone, and Green. *See* Record Document 1292-36. In this email string, the Pinnacle account informs Malone that the NutraGenomics incense

---

[46] As found *supra*, the Government possessed but did not produce Exhibits 22-32. The Government did not possess Exhibits 36, 37, and 60. The Government possessed and produced the attachment in Exhibit 61 but did not possess the email string.

product is illegal in Louisiana because Louisiana banned Damiana[47] and other materials. *See id.* at 1. Malone responds, "the Louisiana blend we have does not use any of the herbs outlawed there. not to worry." *Id.* Exhibit 37 is a September 2010 email string. *See* Record Document 1292-37. In this email string, Malone asks if there is "a mechanism in the site that we can block out shipments of certain products to certain states. IE----Miyagi being sold in markets where its banned. Like Louisiana? . . . " *Id.* at 4.

Exhibits 60 and 61 also reference the Louisiana ban on Damiana. *See* Record Documents 1292-60 & 1292-61. Exhibit 60 is a January 23, 2011, email string that contains a label for Mr. Miyagi stating the product does not comply with Louisiana law because it contains Damiana. *See* Record Document 1292-60 at 3, 7. Exhibit 61 is a January 22, 2011, email string discussing state bans on synthetic cannabinoids. *See* Record Document 1292-61. The attachment to the email discusses the Louisiana ban of "[s]pice-type products." *Id.* at 13.[48]

Exhibits 22 and 30 detail shipments of various synthetic cannabinoids to Louisiana customers throughout 2010 and 2011. *See* Record Documents 1292-22 & 1292-30. The products sold to Louisiana customers prior to March 2011 include, *inter alia*, Bonsai 18, Bonsai 73, Bonsai 81, Bonsai 122, Bonsai 210, Bonsai 250, Bonsai WIN-FX, CB-4, and Mr.

---

[47] At trial, Green confirmed Damiana was "the vegetable material that the AM-2201 was infused with" in the co-defendants' products. Record Document 923 at 31; *see also* Record Document 921 at 56-57 (Francis testifying that Damiana is "a green, leafy plant that can be dried" and used to make synthetic cannabinoids).

[48] The Court notes these exhibits demonstrate that the co-defendants are hyperaware of the changing landscape and making changes to their products to circumvent various state and federal laws.

Miyagi Melt. *See* Record Documents 1292-22 & 1292-30. Exhibit 23 details sales to Louisiana customers but does not indicate what products were received or whether those products were synthetic cannabinoids.[49] *See* Record Document 1292-23. Exhibit 31 is an order sheet for a shipment of 4-MMC, MDPY, JWH-250, and JWH-081 to a Louisiana customer on October 25, 2010. *See* Record Document 1292-31 at 4. Exhibits 24-29 are "Sales by Item Summary" or "Sales by Item Detail" NutraGenomics documents that break down what "raw goods" were sold by NutraGenomics to customers from June to October 2011 and January 2012. *See* Record Documents 1292-24, 1292-25, 1292-26, 1292-27, 1292-28, & 1292-29. Exhibit 32 is a "Sales by Item Detail" NutraGenomics document showing sales of Mr. Miyagi to Louisiana customers on September 13, 2010, and December 17, 2010. *See* Record Document 1292-32 at 3, 5.

Ultimately, the Court finds these exhibits are not material. Stanford asserts the materiality of these exhibits is their ability to impeach Francis's, Barrow's, Espinoza's, and Green's testimony regarding their designation of Louisiana as a no-sell-to state. However, these exhibits do not necessarily impeach that testimony.

The Court begins with Francis's testimony. On direct, Francis testified "it was well-known in the industry" that Louisiana was a "dangerous state to do business." Record Document 921 at 54. Exhibits 22-32, 36-37, and 60-61 do not impeach this testimony. Francis testified only about Louisiana's reputation among the industry. Sales by NutraGenomics to Louisiana customers do not refute his testimony that Louisiana was

---

[49] Some of these sales may be cross-referenced to sales in other exhibits. In that case, this exhibit would be merely cumulative and thus would not be material.

generally considered by those in the synthetic cannabinoid industry to be a no-sell-to state. Additionally, Francis was not a party to the communications set forth in those exhibits, and Stanford has not shown that Francis otherwise knew of these sales.[50] As such, these exhibits do not impeach Francis's testimony.

Similarly, Stanford has not shown how Exhibits 22-32, 36-37, and 60-61 impeach Barrow's or Espinoza's testimony. Espinoza testified Louisiana was placed on the "no call list" because it "had banned everything." Record Document 923 at 145. On cross-examination, Espinoza agreed he and Barrow "had intentionally not shipped to Louisiana from June, 2010, until March of 2011." *Id.* at 228. Barrow similarly testified Louisiana was a "do-not-ship list" and that they hadn't "sold down there." Record Document 924 at 25-26.

As the Government aptly notes, "many of the invoices Stanford cites concern shipments to other Louisiana entities unrelated to the Curious Goods/Pinnacle/Nutragenomics supply chain." Record Document 1305 at 27. The invoices do not reflect that Pinnacle distributed these products or had any role in distributing these products. Plainly, documents of *NutraGenomics* sales through other distributors do not demonstrate that Barrow and Espinoza, who were *Pinnacle* employees, shipped synthetic cannabinoids to Louisiana.[51] Consequently, Exhibits 22-32, 36-37, and 60-61 do not

---

[50] This argument, like others advanced by Stanford, raises the issue of whether Stanford can use emails between other individuals to impeach Francis, a non-declarant. The Court pretermits a discussion on this issue because it finds the exhibits, regardless of their ability to impeach Francis at trial, are immaterial.

[51] Exhibit 31 suggests that "Nature's Chemistry" distributed the product for NutraGenomics. *See* Record Document 1292-31 at 4. Additionally, the "Sales by Item

impeach either Barrow's or Espinoza's testimony that they considered Louisiana to be a no-sell-to state.

Finally, on direct, Green testified he wanted to avoid Louisiana because it was "the most aggressive" and "even banned herbs like Damiana." Record Document 923 at 39. Green further testified he maintained a map in his sales office that designated Louisiana as a no-sell-to state.[52] *See id.* at 38-39. Exhibits 23-29 either do not indicate what products were purchased or evidence sales occurring after Buswell assured the co-defendants they could safely distribute their products in Louisiana.[53] Thus, Exhibits 23-29 are not inconsistent with Green's testimony. Additionally, Exhibits 24-29 are not material because they are cumulative of the evidence of sales between March 2011 and January 2012 presented at trial. *See Sipe*, 388 F.3d at 478 ("[W]hen the undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation occurs."). Although Exhibits 22, 30, and 32 document sales of synthetic cannabinoids and Mr. Miyagi to Louisiana customers prior to the purported promises of protection, the Court finds these exhibits, too, are not material. Isolated sales of Mr. Miyagi and other synthetic cannabinoids prior to the purported promises of protection do not necessarily mean Green did not want to avoid selling to Louisiana.

---

Detail" sheet for Mr. Miyagi lists "Pinnacle Products" as a separate customer, which suggests Pinnacle did not distribute the products listed on this sheet to Louisiana customers. *See* Record Document 1292-32 at 3-5.

[52] The Court discusses Stanford's specific claims related to this map *infra*.

[53] Barrow testified about promises of protection from Buswell in March of 2011. *See* Record Document 924 at 134. Stanford does not refute that Buswell may have made these promises of protection at that time.

Even if Stanford could use these isolated sales of Mr. Miyagi or other synthetic cannabinoids to impeach Green's testimony, this inconsistency would not undermine confidence in the jury's verdict. First, the sales documented in Exhibits 22, 30, and 32 fall outside of the conspiracy at issue here. Impeaching Green on whether he, personally, considered Louisiana to be a no-sell-to state does not refute or challenge the representations of a protection agreement underlying these conspiracies. Barrow and Espinoza were part of this conspiracy, and they were not included in these earlier sales. Therefore, as explained *supra*, the exhibits would not refute or challenge Barrow's or Espinoza's testimony that they relied on the promises of protection to feel comfortable distributing their products in Louisiana. Put differently, even if Green may not have considered Louisiana to be a no-sell-to state, this evidence does not contradict that Barrow and Espinoza testified they did not initially distribute their products in Louisiana and relied on promises of protection to feel comfortable doing so. Notably, the Government's evidence established a dramatic increase in sales following Stanford's involvement with the co-defendants. *See* Record Document 961 at 4 n.1.

Second, Stanford's materiality arguments for Exhibits 22, 30, and 32 rely partially on an omission of the facts presented to the jury. Stanford argues "evidence that cooperating co-defendants were already distributing synthetic cannabinoids and Mr. Miyagi to Louisiana without a protection agreement and prior to Stanford's alleged involvement would . . . leave Stanford with no role and/or involvement in the conspiracies." Record Document 1292 at 22. This argument ignores the vast array of

other facts connecting him to the conspiracies of which he was convicted. As the Government aptly notes:

> Whether [the co-defendants] found out about Louisiana's ban of damiana in the fall of 2011 or in August of 2010 does not change the content of the December 7, 2011 meeting with franchisees, the misrepresentations concerning a letter from the Louisiana Attorney General, Stanford's creation of the RCA, the money paid to Stanford in the form of RCA dues, his meetings with law enforcement on behalf of Curious Goods franchisees, or the representations Stanford made in a recorded discussion after the raids. The date that Barrow or any other conspirator learned about the particulars of a Louisiana ban are inconsequential when compared to the mountain of evidence showing Stanford joined the conspiracy and laundered the proceeds of that conspiracy.

Record Document 1305 at 33; *see also* Record Document 961 at 4; *Stanford I*, 823 F.3d at 823-26 (detailing Stanford's involvement). Thus, contrary to Stanford's assertion, Green's purportedly inconsistent testimony does not erase Stanford's role in the conspiracies.

As for the materiality of Exhibits 36, 37, 60, and 61, the Court likewise finds these exhibits are not material. Exhibit 36 supports that NutraGenomics was using a different blend that was not illegal in Louisiana. Exhibit 37 supports that NutraGenomics was concerned about illegal sales to Louisiana. As such, both support Green's testimony that NutraGenomics considered Louisiana to be aggressive and a state to be avoided. Exhibits 60 and 61 simply refer to the Damiana ban and do not independently demonstrate that the co-defendants distributed their products to Louisiana customers. These exhibits are not inconsistent with Green's testimony. To the extent these exhibits can be interpreted as being inconsistent with Green's testimony, the Court finds the exhibits are not material for the same reasons set forth *supra*: these exhibits do not refute the represented

existence of the protection agreement and do not leave Stanford without a role in the conspiracy.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether the co-defendants considered Louisiana to be a no-sell-to state. *See* Record Document 1292 at 22. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 22-32, 36-37, and 60-61, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### b. When Co-Defendants Learned of the Louisiana Ban on AM-2201 [Exhibits 61-65]

Stanford avers Barrow, Francis, and Green falsely testified about when they learned AM-2201 was a naphthoylindole and covered by the Louisiana ban. *See* Record Document 1292 at 42-43.

He relies on Exhibits 61-65.[54] The Court begins its materiality analysis by summarizing the contents of these exhibits. Exhibit 61 is a January 22-23, 2011, email string including Malone, Green, Francis, and Barrow. *See* Record Document 1292-61. In

---

[54] As found *supra*, the Government possessed and produced Exhibit 63, did not possess Exhibits 62 and 64-65, and possessed and produced the attachment in Exhibit 61 but did not possess the email string.

this email string, they discuss various state bans and how to keep track of those bans. *See id.* at 1-11. Barrow refers to the Nebraska and North Carolina bills, noting those states "describe[d] anything that could be considered a cannabinoid and much description at how a chemist would conclude that." *Id.* at 7. Attached to the email string is a "State Spice Bans" word document summarizing various state laws. *Id.* at 11-16. Exhibit 62 is a February 7, 2011, email string including Barrow, Malone, Green, and Francis. *See* Record Document 1292-62. Barrow informs everyone that the North Carolina bill had "been revised" to add "some chemical names to each category." *Id.* at 1. He remarks that the bill "[l]ooks like it encompasses everything we currently have." *Id.* The North Carolina bill defines AM-2201 as a naphthoylindole and additionally provides a definition of a naphthoylindole. *See id.* at 6.

Exhibit 63 is a March 29, 2011, email string including Barrow, Malone, Green, and Francis wherein they discuss the effective date for the North Carolina bill. *See* Record Document 1292-63. Exhibit 64 is an April 21, 2011, email string including Barrow, Green, and Malone wherein they discuss the federal ban. *See* Record Document 1292-64. Barrow notes the federal bill bans AM-2201, which was classified as a "(xi) 1-(5-fluoropentyl)-3-(1-naph18 thoyl)indole." *Id.* at 1-2. Finally, Exhibit 65 is an August 11, 2011, email string including Francis and Barrow wherein Francis forwards Barrow a portion of the Controlled Substances Act. *See* Record Document 1292-65. The excerpt proposes adding various

controlled substances to Schedule I, including "(xi) 1-(5-fluoropentyl)-3-(1-naphthoyl)indole (AM2201)." *Id.* at 2.[55]

Stanford argues Exhibits 61-65 "prove[] that Barrow, Francis, [and] Green . . . all knew in early 2011 that AM-2201 was a Naphthoylindole." Record Document 1292 at 47. Therefore, he contends these exhibits demonstrate they testified falsely at trial about the date they learned AM-2201 was a naphthoylindole. *See id.* at 44, 46.

At trial, Barrow testified as follows during his direct examination:

A    Yes. Like I said, we started shipping in March. It was just business as usual. In early July of 2011 I got a call from Dan Francis. He had just updated his state ban list that he did monthly with another attorney.

And he asked me if I knew about the pending ban in Louisiana. I said, well, no, I don't. And he said, well, it's something you need to take a look at right away.

He sent me a copy of what the proposed legislation was banning a class of chemicals. I immediately called Richard Buswell. And I said, are you aware of this pending ban you have in Louisiana, and he said, no, I don't know what you're talking about. I'm like, well, I'm sending it to you right now. You need to get with your legal counsel, and, you know, figure out what you want to do.

It was probably about an hour later that he called me with a lawyer on the phone, which I later understood to be Barry Domingue.

I told them, you know, that this is the ban. It's scheduled to go into effect, I think, a few days after that, around the middle of July. We need your legal -- you need a legal team to work on this down there or I'm not going to be able to ship your product, you know, because we don't know what this language means.

Record Document 924 at 28-29. Barrow later testified in his direct examination:

---

[55] Exhibits 61-65 demonstrate that the co-defendants are worried about and reviewing the changing legal landscape.

Q    So when you had these conversations with them, did you know specifically what, in Louisiana, was being banned at that point?

A    The way -- and I haven't read that bill in a long time, but the way it read was a class of chemicals known as naphthoylindoles.

Q    At that point in time, did you know that the chemical that you were supplying, AM-2201, was part of that class?

A    We did not.

Q    Okay. So you're calling down trying to figure out what's going on with the Louisiana ban, correct?

A    Right.

*Id.* at 30. On cross examination, Barrow testified as follows:

Q    Okay. Now, isn't it true that you said that in July [2011] you got a call from Dan Francis, and he updated the state bans and provided copies of proposed legislation in various states? Is that true?

A    Yes.

Q    Did Dan Francis say anything specifically about Louisiana?

A    Yes.

. . .

Q    Okay. And what did he specifically tell you about that statute?

A    That it was a blanket statute to ban a class of chemicals.

Q    Okay. What class of chemicals?

A    Naphthoylindoles.

*Id.* at 137-39. Barrow later stated:

A    We didn't know until November that AM-2201 was a naphthoylindole.

BY MR. STANFORD:

Q    When you say "we," you're talking about you and Dan Francis?

A    Yes.

*Id.* at 141.

Stanford argues Barrow's testimony was false on two fronts. First, Stanford argues

Barrow knew AM-2201 was a naphthoylindole in July 2011 and thus falsely testified that

he did not know what the Louisiana bill's language meant when he called Buswell. *See* Record Document 1292 at 48. Second, he contends Barrow knew AM-2201 was a naphthoylindole prior to November 2011. *See id.* at 42-43. Neither contention has merit.

Certainly, Exhibits 61-65 suggest Barrow participated in email discussions about other state and federal laws classifying AM-2201 as a naphthoylindole. But these exhibits do not contain in-depth discussions of the Louisiana law. In making this argument, Stanford assumes Barrow imputed the language in other laws to the ban in Louisiana. While other states may have specifically defined AM-2201 as a naphthoylindole, that does not mean the co-defendants, such as Barrow, had the chemical or legal knowledge to make the connection that AM-2201 would also be covered by the Louisiana ban. This is especially so considering that Louisiana ban did not specifically list AM-2201 as a naphthoylindole. *See generally* La. Stat. Ann. § 40:964(F) (eff. July 15, 2011, to May 27, 2012). Even if these exhibits could impeach Barrow, that impeachment does not go to a material issue. When exactly the co-defendants learned AM-2201 was a naphthoylindole does not affect Stanford's involvement[56] nor does it refute his representations of the protection agreement.

The Court turns now to Stanford's claim that Exhibits 61-65 impeach Francis's testimony. Francis testified as follows during the Government's direct examination of him:

A    I received a call from . . . Don Wirtshafter, and he asked me if I was still involved in Louisiana. I told him I was. Then he asked me if I knew that AM-2201 was banned.

---

[56] Once again, Stanford's argument hinges on an omission of his involvement with the RCA. Further, this evidence would not challenge or undermine his other convictions.

. . .

A    So, anyway, he was advising me that AM-2201, the chemical that is in Mr. Miyagi, was in fact banned in the state of Louisiana, which I should have known and I should have researched, but I hadn't. I had not come across that fact. . . .

So at this point, roughly about this time, somewhere around November 8th [,2011], I learned that AM-2201 was specifically banned in Louisiana.

BY MR. SIMS:

Q    What did you also learn that it was a part of?

A    A class of drugs.

Q    Called what?

A    Naphthoylindoles.

Q    And after receiving this information from Mr. Wirtshafter, did you do any of your own research to try and confirm the same?

A    Yeah. I immediately googled the word "naphthoylindole." I had run across it, but I had never researched it. I didn't think of these things in terms of class. I certainly have seen the word, but I thought they had to be -- like I said, I'm not an attorney, so I'm learning this as I go along. I'm thinking they have to be specifically banned where the chemical name is specifically listed, and here was a class of drugs.

AM-2201 is not just part of naphthoylindoles. It's part of an even greater class called aminoalkylindoles, which includes naphthoylindoles, and as a result, I just had missed this. I had not connected this bit of information until then.

Record Document 921 at 125-27. Once again, Exhibits 61-65 do not impeach Francis's testimony. Francis testified he was "not an attorney" and thus did not understand that AM-2201 would fall under the class of naphthoylindoles because it was also "part of an even greater class" of chemical. *Id.* at 127. In any event, the exhibits are not material for the reasons explained *supra*.

Finally, Green testified in his direct examination as follows:

Q    Okay. Did you ever come to learn that the state of Louisiana banned, specifically, certain chemicals in Louisiana?

A    Yes.

Q    Did you come to learn that your active ingredient in your product, AM-2201, Mr. Miyagi -- that the chemical was banned in Louisiana?

A    Yes.

Q    When did you find out and how did you find out?

A    I found out right after this time. Tommy told me.

Q    So sometime after the formation of the Retail Compliance Association [in November 2011]?

A    Correct.

Record Document 923 at 43-44. As with Francis and Barrow, Exhibits 61-65 do not impeach Green's testimony. Contrary to Stanford's assertion, Green did not testify that he learned AM-2201 was a naphthoylindole on a certain date. Rather, Green testified about when he learned *Louisiana* had banned AM-2201. Exhibits 61-65 are not inconsistent with his testimony because those exhibits include discussions of other state and federal bans of AM-2201. Thus, once again, the Court finds that Exhibits 61-65 are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to when Barrow, Francis, and Green learned AM-2201 was a naphthoylindole and covered by the Louisiana ban. *See* Record Document 1292 at 42-43. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 61-65, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected

the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255.

*Wearry*, 577 U.S. at 392 (internal quotations omitted).

### c. Francis's Use of Website [Exhibit 71]

Stanford claims Francis falsely testified about using the National Association for Model State Drug Laws website to discover AM-2201 was a naphthoylindole. *See* Record Document 1292 at 47. Stanford relies on Exhibit 71.[57]

The Court begins this materiality analysis with a summary of Francis's testimony. At trial, Francis testified as follows during his direct examination:

> Q    Once you received the phone call from Mr. Wirtshafter, and once you did your confirmation research, how long did it actually take you -- how much time did it actually take you to figure this out and confirm that Louisiana had banned all naphthoylindoles and that AM-2201 was, in fact, a naphthoylindole?
>
> A    Well, once I understood how the information connected together and Google searched it, it didn't take much time at all. There was a website that I had been using, which was changing nearly daily, called the National Association for Model State Drug Laws, and that's where I learned how this was working.

Record Document 921 at 127.

Stanford avers Exhibit 71 refutes Francis's testimony. Exhibit 71 is a February 19, 2011, email string including Francis, Wirtshafter (an attorney who will be discussed more in-depth *infra*), Barrow, Green, and Malone. *See* Record Document 1292-71. In Exhibit 71, Wirtshafter sent a link to a website entitled the "National Alliance for Model State Drug Laws." *Id.* at 1. The website purportedly summarized the state bans on cannabinoids. *See id.*

---

[57] As found *supra*, the Government did not possess Exhibit 71.

The Court does not agree this evidence impeaches Francis. That Francis received a link to the website previously does not mean Francis did not use the website after he received the call from Wirtshafter. Indeed, Francis's own testimony makes clear he was previously aware of the website and had been using it routinely. The testimony is not conflicting or inconsistent with Exhibit 71—it is only inconsistent with the exhibit as Stanford interprets it. Because that interpretation mischaracterizes the substance of Francis's testimony, the exhibit does not impeach Francis. Even if Exhibit 71 does somehow impeach Francis, that impeachment is not material. Whether Francis used a website in no way undermines any of Stanford's convictions. As such, Stanford has failed to demonstrate materiality.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis used a certain website to learn that AM-2201 was a naphthoylindole. *See* Record Document 1292 at 47. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibit 71, fail for lack of materiality. This exhibit does not "undermine confidence in the verdict" and, as such, is not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [this exhibit] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to his first challenge to the purported existence of the protection agreement. That is, the Court has addressed Stanford's argument that the co-defendants did not consider Louisiana to be

a no-sell-to state because they distributed synthetic cannabinoids into Louisiana prior to Stanford's involvement and without a protection agreement in place. *See* Record Document 1292 at 22. This category encompassed his arguments that (1) the co-defendants did not consider Louisiana to be a no-sell-to state, (2) the co-defendants falsely testified about when they learned AM-2201 was banned in Louisiana, and (3) Francis falsely testified about using a website to learn AM-2201 was a naphthoylindole. *See id.* at 22, 42-43, 47. These claims were predicated on Exhibits 22-32, 36-37, 60-65, and 71. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

## 2. Protection Agreement Contingent on Specific Formula [Exhibits 64 & 79-82]

Stanford's second challenge to the existence of the protection agreement relates to testimony about the protection agreement being contingent on the use of a specific formula. Stanford argues Barrow falsely testified both that the protection agreement "was contingent upon Mr. Miyagi using only the synthetic cannabinoid, AM-2201" and that the co-defendants only used AM-2201 in Mr. Miyagi after the March 1, 2011, ban. Record Document 1292 at 50. Stanford additionally argues Barrow falsely testified that he did not know what RCS-4[58] was. *See id.* at 56. The Court addresses each in turn.

---

[58] RCS-4 is a synthetic cannabinoid.

Stanford relies on Green's exhibits to his § 2255 filings[59] and Exhibits 79-82 to demonstrate that Barrow falsely testified about only using AM-2201 in Mr. Miyagi.[60] The Court begins its materiality analysis with a summary of the exhibits. Attached to Green's § 2255 filings are several RTP Labs lab reports of various Mr. Miyagi products. *See* Record Document 1240-1 at 31-36. These lab reports indicate that "Mr. Miyagi" contained JWH-250 and JWH-081 on July 21, 2010; "Mr. Miyagi Zero" contained CB-4, an unknown compound, and WIN-48098 on October 29, 2010; "Mr. Miyagi X" contained JWH-250 and JWH-081 on December 16, 2010; "Mr. Miyagi Zero" contained RCS-4 and AM-2201 on December 29, 2010; and "Mr. Miyagi Melt" contained JWH-250 and JWH-081 on December 29, 2010. *Id.* at 31-35. Additionally, another lab report indicates that "Mr. Miyagi (Zero)" did not contain various chemicals, including JWH-018, JWH-081, and JWH-250, on January 14, 2011. *Id.* at 36. This latter report does not reference AM-2201 and does not show what chemicals were present. *See id.*

Stanford's Exhibit 79 is a March 21, 2011, email between Malone, Green, and Alston Sykes, a chemist at RTP Labs. *See* Record Document 1292-79. Sykes refers to lab

---

[59] Stanford additionally relies on statements made by Green in Green's § 2255 motion. Stanford has not explained how the Government would have possessed prior to trial statements made by Green in a § 2255 motion filed over three years after the trial. As such, the Court will not consider these statements.

[60] As found *supra*, the Government did not possess Exhibits 79-81, and the Government possessed and produced Exhibit 82. To establish the Government's possession of Green's § 2255 exhibits, Stanford cites a portion of Green's § 2255 filing. *See* Record Document 1292 at 52. In that excerpt, Green argued the Government possessed these lab reports because "RTP Laboratories was raided on or about March 30, 2012." Record Document 1278 at 55. The Court has already considered and rejected this argument *supra* in the possession section. As such, Stanford has not shown the Government possessed Green's § 2255 exhibits prior to trial.

reports for samples of Mr. Miyagi Warpaint. *See id.* at 1. Although the reports are not attached to the email, Sykes states the product contained 5-MeO-DALT, AM-2201, RCS-4, and JWH-122. *See id.* Exhibit 80 is a March 22, 2011, email string including Green and Malone wherein Green states the ingredients for "WP1" are JWH-203, AM-2201, JWH-122, 5-MeO-DALT, and Silica. *See* Record Document 1292-80. Exhibit 81 is an August 24, 2011, email string including Barrow, Malone, and Green. *See* Record Document 1292-81. Barrow tells Green and Malone that they "can't have rcs4 in am 4." *Id.* at 1. Malone responds, "Am 4 is am 2201. theres not any rcs 4 in am 4." *Id.* at 2. Finally, Exhibit 82 is a March 20, 2014, email string including Green, Agent White, and Mones. *See* Record Document 1292-82. In this email string, Green sends the formula for "War Paint," which is designated as "WP-1" in the attached sheet. *Id.* at 1-2. This sheet indicates that the raw materials for "WP-1" include RCS-4, AM-2201, JWH-122, 5-MeO-DALT, and Silica. *Id.* at 2.

Stanford argues these exhibits prove "Mr. Miyagi was being made with a combination of synthetic cannabinoids and AM-2201 before the ban and after the ban." Record Document 1292 at 52-53. Thus, he contends Barrow testified falsely. With this argument in mind, the Court turns now to Barrow's testimony. At trial, Barrow testified as follows during his direct examination:

Q    And, again, the entire time that you were shipping Mr. Miyagi beginning March 1st, 2011, all the way through the course of this conspiracy, what was always the active ingredient that you were actually manufacturing it with?

A    From March forward, AM-2201.

Record Document 924 at 27. Barrow further testified:

Q    During the course of the time where you are having these meetings and supplying this product, were you ever asked, at different points in time, about have you made any changes to the product?

A    We were told we couldn't make any changes to the product.

Q    Why not?

A    Because it had been approved by the Attorney General's office the way that it was. . . . We were not to make any changes to it. That any changes made to the product could void our agreement, and we'd be out of business.

*Id.* at 54.

The Court does not agree the exhibits impeach Barrow. Even if Mr. Miyagi contained other synthetic cannabinoids, Barrow testified AM-2201 was the only active ingredient. That does not foreclose the possibility that other ingredients were present. Further, the Court notes that Green testified on direct examination that not every version of Mr. Miyagi used only AM-2201 as the active ingredient:

Q    Did you have to mix AM-2201 with other synthetic cannabinoids to get the result that you wanted?

A    No.

Q    So was AM-2201 essentially the only active ingredient of Mr. Miyagi going forward?

A    In the one original product, yes, but we had many different sub-brands of those products, which had multiple different cannabinoids and other types of research chemicals. But AM-2201 -- I think out of 80 or 90 percent of the products, it was contained inside Mr. Miyagi. There were some that were completely free of AM-2201, but the majority of them, 90 percent, had AM-2201.

Record Document 923 at 30-31. This testimony suggests different variations of Mr. Miyagi existed. The selected lab reports do not indicate whether the sample had come from a version of Mr. Miyagi distributed into Louisiana. As such, it is difficult to conclude that Barrow falsely testified about AM-2201 being the only active ingredient present in the Mr.

91

Miyagi distributed into Louisiana. The lab reports would be entirely consistent with Barrow's testimony if the reports tested products sold in other states.

Even assuming *arguendo* this testimony is inconsistent with the proffered exhibits, the Court finds any impeachment is not material. As the Government aptly notes, it produced lab reports at trial that suggested other chemicals were present in Mr. Miyagi. *See* Record Document 1305 at 36. Additional evidence would have been merely cumulative. And, in any event, evidence that other synthetic cannabinoids were present in Mr. Miyagi besides AM-2201 does not "undermine confidence in the verdict." *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Quite the opposite. The jury considered evidence suggesting other synthetic cannabinoids were present, yet they convicted Stanford anyway.

This evidence does not obviate the promises of protection. It similarly does not lessen Stanford's role in any of the conspiracies of which he was convicted. Whether Mr. Miyagi contained only AM-2201 or a combination of AM-2201 and other chemicals, AM-2201 was still present in Mr. Miyagi, the defendants participated in a conspiracy to distribute the same (though Stanford's conviction was overturned), Stanford participated in a conspiracy to misbrand Mr. Miyagi and introduce it into interstate commerce, and Stanford received proceeds from the distribution of AM-2201. Therefore, Exhibits 79-82 are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony as to whether Mr. Miyagi only contained AM-2201 after the March 1, 2011, ban. *See* Record Document 1292 at 50. These *Brady*, *Giglio*, and

*Napue* claims, premised on Exhibits 79-82, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court turns now to Stanford's claim that Barrow falsely testified he did not know what RCS-4 was. *See* Record Document 1292 at 56. For this claim, Stanford relies on an exhibit presented at trial (Government's Exhibit 199) and his Exhibit 64.[61] The Court begins this materiality analysis with a summary of Barrow's testimony. Barrow testified as follows during his direct examination:

> Q     And here [in this lab report] is your product testing positive for -- do you see the compound, AM-2201?
>
> A     Yes.
>
> Q     Do you know what the other compound is?
>
> A     I have no idea, no.
>
> Q     To your knowledge, what was predominantly in Mr. Miyagi?
>
> A     AM-2201.

Record Document 924 at 61-62. The September 22, 2011, lab report being shown to Barrow during this questioning indicated Mr. Miyagi Zero tested positive for AM-2201 and RCS-4. *See* Record Document 863-3 at 51 (admitted as Government's Exhibit 199).

---

[61] As found *supra*, the Government did not possess Exhibit 64.

Stanford argues Government's Exhibit 199 and his Exhibit 64 demonstrate this testimony was false. *See* Record Document 1292 at 56. First, Stanford argues Government's Exhibit 199 "proves that Mr. Miyagi contained almost equal amounts of AM-2201 and RCS-4 and further proves Mr. Miyagi used a combination of synthetic cannabinoids in September 2011 and in violation of the supposed protection agreement." *Id.* These *Brady* and *Giglio* arguments miss the mark for one important reason: the Government admitted this exhibit at trial. *See* Record Document 863-3 at 51. As such, the Government cannot be said to have suppressed it. Indeed, Stanford specifically questioned Barrow about this exhibit during his cross-examination. *See* Record Document 924 at 169-70. Plainly, then, any related *Brady* or *Giglio* claim premised on this exhibit fails. To the extent Stanford is articulating a *Napue* claim, the Court finds that claim fails for lack of materiality. As explained *supra*, evidence that other synthetic cannabinoids were present in Mr. Miyagi besides AM-2201 does not "undermine confidence in the verdict." *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Nor would evidence that Barrow knew what RCS-4 was.

Second, Stanford argues Exhibit 64 "proves that Barrow knew that RCS-4 was a synthetic cannabinoid and that it was being used in Mr. Miyagi." Record Document 1292 at 56. This exhibit, too, is not material. Exhibit 64 contains an email from Barrow stating the federal ban has "specifically banned . . . 2201, 122, 203, and the RCs."[62] Record Document 1292-64 at 1. Stanford contends "Exhibit 64 leaves little doubt that Barrow

---

[62] "RCs" presumably includes RCS-4.

knew RCS-4 was a synthetic cannabinoid and that it was being used in Mr. Miyagi with AM-2201." Record Document 1292 at 54-55.

The Court does not agree. While the exhibit may suggest Barrow knew RCS-4 was a synthetic cannabinoid, it does not suggest RCS-4 was being used in Mr. Miyagi. Further, even if this exhibit is inconsistent with Barrow's testimony, any impeachment is not material. Once again, evidence that other synthetic cannabinoids were present in Mr. Miyagi besides AM-2201 or evidence that Barrow knew what RCS-4 was does not "undermine confidence in the verdict." *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Barrow knew what RCS-4 was. *See* Record Document 1292 at 56. These *Brady*, *Giglio*, and *Napue* claims, premised on Government's Exhibit 199 and Stanford's Exhibit 64, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to his second challenge to the existence of the protection agreement. That is, the Court has addressed Stanford's argument that the protection agreement was contingent on Mr. Miyagi only

containing AM-2201. This category encompassed his arguments that (1) Barrow falsely testified both that the protection agreement "was contingent upon Mr. Miyagi using only the synthetic cannabinoid, AM-2201" and that the co-defendants only used AM-2201 in Mr. Miyagi after the March 1, 2011, ban; and (2) Barrow falsely testified he did not know what RCS-4 was. Record Document 1292 at 50, 56. These claims were predicated on Exhibits 64 and 79-82. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### 3. Louisiana Designated as No-Sell-to State in 2012 [Exhibits 42-43]

Stanford's third challenge to the existence of the protection agreement relates to testimony about when the co-defendants first considered Louisiana to be a no-sell-to-state. More specifically, Stanford argues the co-defendants did not officially designate Louisiana as a no-sell-to state until 2012. *See* Record Document 1292 at 24, 29-31. This argument encompasses two discrete claims. First, Stanford argues Green falsely testified that a map in his sales office listed Louisiana as a no-sell-to state. *See id.* at 24, 29. Second, Stanford argues the co-defendants did not designate Louisiana as a no-sell-to state until January 31, 2012. *See id.* at 30-31.

The Court addresses each claim in turn.

### a. Map in Green's Sales Office [Exhibit 42]

Stanford argues Green falsely testified he maintained a map in his sales office that listed Louisiana as a no-sell-to state. *See* Record Document 1292 at 24, 29. Stanford relies on Exhibit 42 for this claim.[63]

The Court begins its materiality analysis with a summary of Green's testimony. At trial, Green testified during his direct examination as follows:

> Q     Okay. And in your sales office, did y'all maintain any kind of map of the United States?
>
> A     Yes.
>
> Q     What was the purpose of the map that you maintained of the United States in your sales office?
>
> A     It was to show what was being banned in which states. And it was also to show which states that we wanted to stay away from.
>
> Q     What was Louisiana?
>
> A     A no-sell-to state.
>
> Q     On that map?
>
> A     Yes.

*See* Record Document 923 at 38-39. The prosecution also referred to this map in its opening argument, stating:

> You're going to hear that everyone in this industry, from the suppliers of the synthetic drugs on down, knew that the state of Louisiana was a no sell to state, right? You're going to hear that. You're going to hear these guys had a map up of where -- what were the most friendly states on synthetic

---

[63] As found *supra*, the Government did not possess Exhibit 42. Stanford also relies on statements made by Green in his § 2255 filing. As previously explained by this Court, it will not consider these statements, for Stanford wholly fails to establish the Government's pretrial possession of the same.

drugs and which ones were not, which ones were flagged as a no sell to state. Louisiana x'd out, marked out. Do not sell in the state of Louisiana.

Record Document 920 at 41.

Stanford argues Exhibit 42 "proves that the sales map referenced by the prosecution and testified to by Green was created after the fact in April 2012." Record Document 1292 at 24. Exhibit 42 is an email sent by Green to Preston Ackerman ("Ackerman")[64] on April 13, 2012. *See* Record Document 1292-42. In that email, Green asks Ackerman: "can you please look up the laws in every state and write on the map about the state laws." *Id.* at 1. Attached to the email is a copy of the state map. *See id.* at 2. On this map, Louisiana is marked as "N/A." *Id.*

Based on this email, Stanford argues "Green would not have had Ackerman create a map if one already existed." Record Document 1292 at 30. However, support for this argument cannot be found in the exhibit. Nowhere in the email does Green direct Ackerman to "create a map." *Id.* Quite the opposite. Green directs Ackerman to "write on the map." Record Document 1292-42 at 1. This statement implies the map already exists. Alternatively, it could suggest the map referred to here by Green was but one of multiple maps. As such, Exhibit 42 does not impeach Green's testimony.

Because Exhibit 42's proffered materiality is purportedly its impeachment value, the Court finds Stanford has failed to establish materiality. Even if this exhibit can be construed as inconsistent with Green's testimony, the Court's conclusion would not change. Whether and when Green created a state map designating Louisiana as a no-

---

[64] Preston Ackerman signs this email as "Natures Uphoria Sales Manager." Record Document 1292-42 at 1.

sell-to state has no bearing on any of Stanford's convictions. Further, the creation of the map at a later point would in no way foreclose the possibility that the co-defendants, including Green, were concerned about selling in Louisiana prior to the map's creation. As such, this exhibit is not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to when Green created a map in his sales office designating Louisiana as a no-sell-to state. *See* Record Document 1292 at 24, 29. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibit 42, fail for lack of materiality. This exhibit does not "undermine confidence in the verdict" and, as such, is not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [this exhibit] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### b.  Sales Ceased on January 31, 2012 [Exhibit 43]

Stanford argues "suppressed NutraGenomics emails prove[] . . . that Louisiana was first designated as a no-sell-to state on January 31, 2012, after the fact." Record Document 1292 at 24. He relies on Exhibit 43.[65]

---

[65] As found *supra*, the Government did not possess Exhibit 43.

Ultimately, the Court finds this exhibit is not material because it does not impeach the co-defendants' testimony.[66] As the Government notes, "Stanford tries to make the email material by misrepresenting its content." Record Document 1305 at 32. A review of this January 31, 2012, email demonstrates that Malone told sales staff: "*As mentioned before on numerous occasions*. No chemical shipments at all no exceptions to the following states: . . . Louisiana." Record Document 1292-43 at 1 (emphasis added).[67] This exhibit thus suggests that NutraGenomics sales staff had been previously informed to not sell in Louisiana. Clearly, then, this email does not demonstrate that Louisiana "was *first* designated as a no-sell-to state on January 31, 2012, after the fact." Record Document 1292 at 24 (emphasis added).

In any event, that Malone officially informed certain sales staff to cease sales to Louisiana at this point would not preclude him or the other co-defendants from considering Louisiana to be a no-sell-to state prior to that point. Because Exhibit 43 fails to impeach any co-defendants' testimony, the Court finds it is not material. To the extent this exhibit could be deemed as impeaching the co-defendants' testimony, the Court finds it is not material for the same reasons set forth *supra*: this exhibit does not refute the representations of protection and does not leave Stanford without a role in the conspiracy.

---

[66] The Court discussed Barrow's, Green's, Espinoza's, and Francis's testimony related to Louisiana being a no-sell-to state *supra*.

[67] An additional issue not addressed by Stanford is that this email is from Malone, and Francis, Green, Barrow, and Espinoza are not included in that email. He does not explain how Malone's statement could be used to impeach Francis, Green, Barrow, or Espinoza.

The Court has now addressed each of Stanford's claims related to his third challenge to the existence of the protection agreement. More specifically, the Court addressed Stanford's claims about when the co-defendants officially designated Louisiana to be a no-sell-to state. *Id.* at 24, 29-31. This category encompassed Stanford's arguments that (1) Green falsely testified that a map in his sales office listed Louisiana as a no-sell-to state, and (2) the co-defendants did not designate Louisiana as a no-sell-to state until January 31, 2012. *Id.* These claims were predicated on Exhibits 42-43. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

In sum, the Court has now found Stanford's *Brady*, *Giglio*, and *Napue* claims related to the protection agreement are without merit. First, the Court addressed Stanford's claim that the co-defendants knowingly distributed illegal synthetic cannabinoids to Louisiana customers prior to Stanford's involvement and without a protection agreement in place. *See id.* at 22-24, 42-43, 45, 47. As part of this claim, Stanford argued the co-defendants knowingly distributed their products into Louisiana illegally without a protection agreement and therefore would not have relied on or needed a protection agreement to continue doing so. *See id.* at 22-24. Stanford further argued the co-defendants falsely testified about when they learned Louisiana had banned AM-2201. *See id.* at 42-43, 45. Finally, Stanford argued Francis falsely testified about how he learned AM-2201 was a naphthoylindole. *See id.* at 47. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 22-32, 36-37, 60-65, and 71. These claims failed for lack of possession, lack of suppression, lack of materiality, or all the foregoing.

Second, the Court addressed Stanford's claim that the co-defendants testified the protection agreement was contingent on a specific formula, but Mr. Miyagi did not use that formula. *See id.* at 50. The Court also addressed Stanford's claim that Barrow falsely testified he did not know what RCS-4 was. *See id.* at 56. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 64 and 79-82. These claims failed for lack of possession, lack of suppression, lack of materiality, or all of the foregoing.

Third, the Court addressed Stanford's claim that the co-defendants only declared Louisiana as a no-sell-to state "after the fact." *See id.* at 24, 29-31. As part of this claim, Stanford argued Green falsely testified that a map in his sales office listed Louisiana as a no-sell-to state. *See id.* at 24, 29. Additionally, Stanford argued the co-defendants first designated Louisiana as a no-sell-to state on January 31, 2012. *See id.* at 30-31. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 42 and 43. These claims failed for lack of possession and lack of materiality.

Thus, Stanford's *Brady*, *Giglio*, and *Napue* claims based on the protection agreement are without merit and do not entitle Stanford to relief under 28 U.S.C. § 2255.

### ii. The Buswell Distribution Agreement [Exhibits 27-28, 33-34, 38-39, 40-41, 44-59, & 66-70]

This claim category generally addresses Stanford's arguments that the Government withheld exculpatory evidence and/or solicited false testimony in relation to the distribution agreement with Buswell. This category includes Stanford's claims that (1) Green falsely testified that he did not know NutraGenomics was distributing Mr. Miyagi into Louisiana until November 2011, and (2) Barrow falsely testified he had Francis create a warranty in July 2011 to shift legal compliance responsibility to Buswell.

### 1. Green Knew of Illegal Distribution into Louisiana Via the Buswell Distribution Agreement [Exhibits 27-28, 33-34, 38-39, 40-41, & 44-59]

Stanford contends the Government suppressed evidence and knowingly solicited false testimony from Green about when Green knew NutraGenomics was distributing Mr. Miyagi to Louisiana. This argument is comprised of three claims: (1) Green falsely testified he did not know until November 2011 that NutraGenomics was distributing products into Louisiana, (2) Green falsely testified that internal business turmoil with Malone caused him to be less actively involved with NutraGenomics in 2011, and (3) Green falsely testified about when the internal turmoil with Malone began. *See* Record Document 1292 at 34, 38, 40, 63, 69-70.

The Court addresses each of Stanford's arguments in turn.

### a. Green's Knowledge of Distribution into Louisiana [Exhibits 33-34, 38-39, 40-41, & 45]

Stanford argues "[s]uppressed evidence proves that Green knew who Buswell was and that he was from Louisiana and that Green's approval was necessary for Pinnacle to distribute Mr. Miyagi to Buswell." Record Document 1292 at 38. Stanford additionally argues Green falsely testified that "Buswell's visit to NutraGenomics was random and unexpected." Record Document 1292 at 34. The Court addresses each claim in turn.

The Court first addresses Stanford's claim that Green knew Buswell was from Louisiana and thus knew NutraGenomics and Pinnacle were distributing into Louisiana prior to November 2011. *See id.* at 38. Stanford relies on Exhibits 33-34, 39, 40-41, and

45.[68] The Court begins the materiality analysis with a summary of Green's testimony. At

trial, Green testified during his direct examination as follows:

> Q    How did you become involved -- or when did your company become
>      involved in a relationship with the Curious Goods folks in Louisiana?
>
> A    Well, Tommy [Malone] -- one day Richard Buswell came to our office
>      in Alpharetta. Tommy introduced me to Richard. I only met him for
>      a few minutes. At that time I didn't even know he was in Louisiana
>      and that's where his shop was. But that's how I first met him. This
>      was around June -- May or June of 2011.

Record Document 923 at 36-37. Green then testified:

> A    Well, at the time I didn't know, when I met Richard Buswell, that he
>      was in Louisiana. I didn't find that out until a much later time. But,
>      yes, at a later time I found out from Boyd [Barrow] and Tommy
>      [Malone] in a meeting.

Id. at 39-40. During his cross-examination by Stanford, Green testified as follows:

> Q    And if I go over your time line, sometime in June -- May or June of
>      2011 you first met Richard Buswell, correct?
>
> A    Yes.
>
> Q    And y'all entered into an agreement to have Miyagi shipped from
>      Georgia to Louisiana, correct?
>
> A    I was unaware of that.
>
> Q    Okay. You became aware that it was being shipped to Louisiana at
>      some point, correct?
>
> A    Yeah. Like, after. In November.
>
> . . .
>
> Q    And you're saying in late November is when you found out that
>      Richard Buswell was from Louisiana, and that Miyagi was being
>      shipped to Louisiana?
>
> A    Correct.

---

[68] As found *supra*, the Government did not possess Exhibits 33-34, 41, and 45. The
Government possessed and produced Exhibit 39.

*Id.* at 60.

In sum, Green testified he did not know Buswell was from Louisiana and did not know Mr. Miyagi was being shipped to Louisiana until approximately November 2011. To determine whether Stanford's exhibits impeach this testimony, the Court turns now to the contents of those exhibits. Exhibit 33, a September 9, 2010, email, contains a confidentiality agreement between Pinnacle and NutraGenomics. *See* Record Document 1292-33. Nothing in Exhibit 33 suggests Green knew Buswell was from Louisiana or knew Mr. Miyagi was being shipped to Louisiana at an earlier point than he testified to. Even if this exhibit does impeach Green, evidence that Green may have known of the distribution agreement into Louisiana and that Buswell was from Louisiana at an earlier point does not "undermine confidence in the verdict." *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Thus, Exhibit 33 is not material.

Exhibit 40 supports that Green was a "Managing Member" of NutraGenomics. *See* Record Document 1292-40 at 1. Stanford argues this exhibit, considered alongside Exhibit 34 and the fact that Green was the "majority owner of NutraGenomics," demonstrates "it was necessary that Green . . . approve Pinnacle's distribution agreement with Buswell." Record Document 1292 at 38. Therefore, he argues "Green knew who Buswell was and that he was from Louisiana." *Id.*

A review of Exhibit 34 refutes his argument. Exhibit 34 is an independent contractor agreement that was edited by Barrow and sent to Malone and Green for their review on September 29, 2010. *See* Record Document 1292-34 at 1. Notably, this agreement *was not* executed by the parties. *See id.* at 20. Stanford does not explain why

an unexecuted agreement would bind the parties. But in any event, the agreement does not demonstrate that Green, even as a managing member or majority owner of NutraGenomics, had to approve the distribution agreement between Pinnacle and Curious Goods.

The agreement provides, "[Pinnacle] hereby agrees, unless otherwise approved in writing by [NutraGenomics], that is [sic] shall Not Solicit Existing Customers . . . as defined in Section 12 of this Agreement." *Id.* at 15. Section 12 provides:

> Covenant Not to Solicit Customers. During the "Restricted Period," [Pinnacle] shall not (except on behalf of or with the prior written consent of [NutraGenomics]), either directly or indirectly, solicit, divert, or appropriate to or on behalf of any Person, or attempt to solicit, divert, or appropriate to or on behalf of any Person, any business from any Customer or prospective Customer of [NutraGenomics] with whom [Pinnacle] has had Material Contact during the Term.

*Id.* at 8. "Customer" is defined as "any Person that has purchased or otherwise legitimately acquired Products directly from [NutraGenomics] or [NutraGenomics's] other Distributors during the Term of this Agreement." *Id.* "Material Contact" is defined to exist "between [Pinnacle] and any Customer . . . or any prospective Customer . . . with whom [Pinnacle] had actual interaction during the Term and where such interaction was undertaken with the purpose, by [NutraGenomics] or [Pinnacle], of attempting to further a business relationship between such Person and [NutraGenomics]." *Id.* The "Term" of the agreement was "One (1) Year from the Commencement Date." *Id.* at 5.

Stanford argues this agreement prohibits "Pinnacle from soliciting and/or distributing Mr. Miyagi to existing NutraGenomics customers without first obtaining approval from NutraGenomics." Record Document 1292 at 38. Therefore, the argument

runs that because Buswell had previously purchased products from NutraGenomics, Green had to approve any distribution agreement between Buswell and Pinnacle. *See id.*

Stanford's argument disregards the plain meaning of the agreement's provisions. When the provisions and the accompanying definitions are read together, the agreement prohibited Pinnacle from soliciting existing or prospective customers with whom Pinnacle had "Material Contact." Record Document 1292-34 at 8. While Exhibit 39 demonstrates Buswell purchased products from NutraGenomics from November 2010 to March 2011, *see* Record Document 1292-39 at 2-14, it does not suggest Pinnacle had material contact with Buswell. Put differently, Exhibit 39 does not show Pinnacle had "actual interaction during the Term"[69] with Buswell, and it further does not show that interaction (i.e., Buswell's purchases) were "undertaken with the purpose . . . of attempting to further a business relationship" between him and NutraGenomics. *Id.* at 8. Additionally, the independent contractor agreement does not appear to prohibit Pinnacle from entering into a distribution agreement with NutraGenomics, which is what happened here. Finally, the Court notes that Stanford's argument presupposes that (1) Green testified falsely about being absent from NutraGenomics, (2) an unexecuted distribution agreement was actually enforced between the parties, and (3) the parties did not otherwise agree to treat the Curious Goods agreement as an exception to the independent contractor agreement.

---

[69] Again, the Court notes the independent contractor agreement was not executed. *See* Record Document 1292-39 at 20. For Stanford's argument to make logical sense, the Court must presume Buswell's purchases fell within the contractor agreement term. The Court has done so *arguendo*.

In any event, even if Exhibit 34 can be interpreted as being inconsistent with Green's testimony, the Court would still find it is not material because it does not impeach him on an essential issue. Whether Green knew Buswell was from Louisiana has no bearing on whether the agreement was entered into by NutraGenomics, Curious Goods, and Pinnacle. Substantial evidence at trial supported and corroborated this agreement. Evidence that Green may have known of this agreement and that Buswell was from Louisiana at an earlier point than testified to would not "undermine confidence in the verdict." *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519.

Stanford next relies on Exhibits 39, 41, and 45 to establish that Green had "personal notice" that Buswell was from Louisiana. Record Document 1292 at 35, 64. Exhibit 45 is not inconsistent with Green's testimony. This October 21, 2011, email contains a breakdown of an August 2011 Pinnacle check. *See* Record Document 1292-45 at 1, 4-5. While the attached spreadsheet does list Curious Goods, it does not include Buswell's name and does not indicate where Curious Goods is located. *See id.* at 4-5. Thus, contrary to Stanford's contention, Exhibit 45 does not demonstrate, or even suggest, Green "knew that Richard Buswell's company, Curious Goods[,] was in Lafayette, Louisiana and was Pinnacle's biggest customer." Record Document 1292 at 64. As such, Exhibit 45 does not impeach Green's testimony and is not material.

Exhibits 39 and 41 do arguably support that Green may have known Buswell was from Louisiana. *See* Record Documents 1292-39 (shipments of NutraGenomics products to Buswell in Lafayette, Louisiana between November 23, 2010, and March 10, 2011) &

1292-41 (January 19, 2011, email informing Green that Buswell, the "newest CCL Member," was from Lafayette, Louisiana). However, even if Exhibits 39, 41, and 45 are inconsistent with Green's testimony, that impeachment does not go to an essential issue of trial and thus is not material. Once again, evidence that Green may have known of this agreement and that Buswell was from Louisiana does not "undermine confidence in the verdict." *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. As such, Exhibits 39, 41, and 45 are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to when Green first learned Buswell was from Louisiana and that Mr. Miyagi was being distributed into Louisiana. *See* Record Document 1292 at 38. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 33-34, 39, 40-41, and 45, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court turns now to Stanford's claim that Green's testimony about the initial meeting with Buswell "was misleading and gave the impression that Buswell's visit to

NutraGenomics was random and unexpected." Record Document 1292 at 34. Stanford

relies on Exhibit 38.[70]

The Court begins the materiality analysis with Green's testimony. At trial, Green

testified during his direct examination as follows:

> Q    How did you become involved -- or when did your company become
>      involved in a relationship with the Curious Goods folks in Louisiana?
>
> A    Well, Tommy [Malone] -- one day Richard Buswell came to our office
>      in Alpharetta [,Georgia]. Tommy introduced me to Richard. I only
>      met him for a few minutes. . . .

Record Document 923 at 36-37. A plain reading of this testimony does not suggest Green

testified the meeting was random and unexpected. Green simply testified Buswell came

to the office and Green only met with him for a few minutes before he went back to work.

*See id.*

Although Stanford argues Green's testimony implied the meeting was random and

unexpected, *see* Record Document 1292 at 34, Stanford cannot make Green's testimony

false by pasting his own unfounded impression on it. Certainly, Exhibit 38 suggests Green

and Malone knew Buswell was coming into the office for a visit. *See* Record Document

1292-38 at 1 (March 29, 2011, email from Malone stating, "[W]e have Richard Buswell

coming in on Friday"). But an email suggesting that Buswell's meeting was planned does

not impeach Green's testimony that he met with Buswell.

Even if this exhibit does somehow impeach Green, that impeachment is not

material. "Whether Green met Buswell by accident or due to a meticulously planned

---

[70] As found *supra*, the Government did not possess Exhibit 38.

encounter, is as important as the relevant humidity on the day of that meeting." Record Document 1305 at 34. Evidence that the meeting was planned does not go to any fact at issue for Stanford's conviction. Notably, evidence that the meeting was planned does not show Green knew Buswell was from Louisiana or knew of the distribution into Louisiana at an earlier point. Nor would that evidence dispute Green's testimony that he only met with Buswell briefly. In any event, evidence that Green may have known of this agreement and that Buswell was from Louisiana does not "undermine confidence in the verdict." *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. As such, Exhibit 38 is not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony about whether Green's meeting with Buswell was planned. *See* Record Document 1292 at 34. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibit 38, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to Green's knowledge of the distribution into Louisiana. *See* Record Document 1292 at 34, 38. This category encompassed his arguments that (1) Green knew Buswell was from Louisiana and that NutraGenomics was distributing into Louisiana at an earlier point than testified

to, and (2) Green falsely testified that Buswell's visit to NutraGenomics was random. *See id.* These claims were predicated on Exhibits 33-34, 38-39, 40-41, and 45. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### b. Internal Business Turmoil [Exhibits 27-28 & 44-59]

Stanford argues the Government manufactured an internal business conflict between Green and Malone "to explain why Green didn't know that his company was distributing Mr. Miyagi to a no-sell-to state, Louisiana." Record Document 1292 at 40. Stanford argues "[s]uppressed [] evidence proves that Green remained in charge of NutraGenomics throughout 2011 and that he was never absent." *Id.* Stanford additionally argues the internal turmoil between Green and Malone "[i]n truth" began "in November 2011[,] and, in March 2012, they executed an agreement terminating their working relationship." *Id.* at 69. The Court addresses each claim in turn.

Stanford relies on Exhibits 27-28 and 44-56 to support that internal business turmoil did not cause Green to be less active in NutraGenomics in 2011.[71] The Court

---

[71] As found *supra*, the Government possessed but did not produce Exhibits 27-28. The Government did not possess Exhibits 44-56.

The Court notes here that Stanford additionally argues Exhibits 73-78 "evidence Green's continued and ongoing direct involvement with NutraGenomics." Record Document 1292 at 68. Although these exhibits total nearly twenty pages, Stanford does not direct the Court to certain pages in those exhibits or offer any specific arguments for materiality for those exhibits.

This Court previously ordered Stanford to "pinpoint the relevance or significance of the exhibit being cited" by explaining "how it proves the fact asserted." Record Document 1290 at 1. The Court will not review those exhibits to find support for Stanford's arguments, and it will certainly not "guess as to the relevance of each exhibit." *Id.* That

begins the materiality analysis by summarizing the contents of the exhibits. Some of these exhibits do generally support that Green was sending NutraGenomics-related emails between July 2011 and November 2011. *See* Record Document 1292-27 at 1 (Green sending Karyn Graham pricing); 1292-44 (Green and Malone discussing an incoming payment from Pinnacle); 1292-48 (Green discussing gross margin reports with Malone and Karyn Graham); 1292-49 (Green discussing pricing with Tom Lau and Malone); 1292-51 at 1 (Malone discussing testing with Barrow and stating that Green told him to try a certain "strength"); 1292-52 (Green and Malone discussing pricing of AM-2201 and whether the Government will rescind banned chemicals); & 1292-55 (Green discussing shipping addresses with Tom Lau and planning a meeting with him and Malone).

Others do not, either because the email communications are not related to NutraGenomics or Green did not send an email. *See* Record Document 1292-28 (Green receiving an email from Karyn Graham but not responding); 1292-45 (Green receiving an email from Malone but not responding); 1292-46 at 2 (Green informing Barrow he would need to get a formula from a different individual); 1292-47 (Green receiving an email from Francis but not responding); 1292-50 (Green emailing his attorney about the Kansas investigation); 1292-53 (Green receiving an email from Karyn Graham but not responding); & 1292-54 (Green emailing his attorney about chemical formulas). One

---

burden is Stanford's. In any event, even if the Court were to consider these exhibits for the general proposition that Green was involved in NutraGenomics during 2011, such exhibits are not material for the reasons stated *infra*. As such, these *Brady*, *Giglio*, and *Napue* claims premised on Exhibits 73-78 fail.

exhibit suggests Green had issues getting in contact with Malone. *See* Record Document 1292-48 at 1 (directing Malone to call him back and to "jump on this").

Stanford further argues certain emails "demonstrate a solid working relationship between Green and Malone and do not reflect any internal turmoil." Record Document 1292 at 64. Stanford specifically highlights the communications in Exhibits 44, 52, and 56. Exhibit 44 is an October 21, 2011, email exchange between Malone and Green discussing an incoming payment from Pinnacle. *See* Record Document 1292-44. Green responds to Malone's email with "Nice. Bro." *Id.* at 1. Stanford contends "[t]his email exchange does not reflect any business conflict over money or that Green is away from NutraGenomics." Record Document 1292 at 40.

Exhibit 52 is a discussion between Malone and Green about AM-2201. *See* Record Document 1292-52. In this email exchange, Green states, "I think the government is going to recind [sic] a lot of the banned chemicals. I think we may have a lot more time left than originally thought!" *Id.* at 2. Stanford contends this exhibit shows "Green is communicating with Malone in a tone that indicates a good working relationship." Record Document 1292 at 66.

Finally, Exhibit 56 is an October 2011 email exchange between Green, Malone, and Green's wife. *See* Record Document 1292-56. Malone asks Green about dates for a California trip, stating he hopes the selected dates will allow them to have their "time out here together first." *Id.* at 1. Malone later invites Green and Green's wife to a party, and Green emails his wife, "tommy is a good guy." *Id.* at 2. Stanford contends this email

"show[s] that Green and Malone not only have a great working relationship but also a very good social relationship." Record Document 1292 at 68.

Ultimately, the Court finds these exhibits are not material for two reasons: they are not inconsistent with Green's testimony and, even if the exhibits do suggest an inconsistency, that inconsistency does not undermine confidence in any of the verdicts underpinning Stanford's convictions.

First, these exhibits are not necessarily inconsistent with Green's testimony. At trial, Green testified during his direct examination as follows:

> Q      Around this same time period [when the RCA was formed in November 2011] were you having any type of internal business turmoil with Mr. Tommy Malone?
>
> A      Yes. Since probably about May or June of that year of 2011, we were having business turmoil.
>
> Q      Were there often times in which you were absent?
>
> A      I was absent for long periods of time. And it was mainly he wanted more money. We had an argument about it because I was making more than him. So, yes.
>
> Q      Did there ever come a point in time in which you felt like you were being pushed out of the business, that there were deals going on that you were unaware of?
>
> A      Yes.
>
> Q      Did that cause some problems with you and him in this business relationship?
>
> A      It did, and that's why I stayed away.

Record Document 923 at 45.

On cross-examination, Green testified:

> Q      So you and Mr. Malone stayed in the loop of the Miyagi product from beginning to end, right?

A     I did stay in the loop, but I was out of the loop from about June of '11 onward. But, yes, we weren't -- he wasn't disclosing a lot of information to me at that point. I was just off doing my thing, not -- just trying to keep the peace.

Q     Now, have you seen any documents in evidence, or documents in this case, that suggest what you just said, that you were somewhere else between June of 2011 and whatever other time?

. . .

A     In a document? Well, I mean, I wasn't e-mailing as much. I wasn't present as much. I don't know if it's in a document, but if you look at my e-mails and my communications between them -- and I guess you'd consider that a document -- you'd probably see that, yes, I wasn't communicating as much.

But as far as a specific document that says, no, I wasn't here from this time to that time, no.

. . .

Q     Okay. And, again, since we have no -- nothing to memorialize any of your statements to the government, we just have to take your word for it, right?

A     Yes.

*Id.* at 69-70.

Quite simply, that Green sent some emails does not refute or otherwise impeach his testimony that he sent *less* emails or was less actively involved with NutraGenomics. Additionally, Stanford's argument ignores that he allegedly received these exhibits directly from Green's inbox. Green's inbox would not reflect whether Malone made deals without his knowledge because Green would not receive those emails. Further, while there are some social emails between Green and Malone, that does not foreclose that they had business turmoil. As such, these exhibits would not necessarily impeach Green's testimony.

116

Second, even if these exhibits are inconsistent with Green's testimony, that impeachment is not material. Evidence of the extent of Green's involvement with NutraGenomics during this time, his knowledge of any distribution agreement with Curious Goods, and the existence of any internal turmoil with Malone has no bearing on whether that distribution agreement was actually entered into by the co-defendants. It certainly has no bearing on Stanford's involvement with the conspiracies. Substantial evidence at trial supported and corroborated Stanford's involvement.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether internal business turmoil caused Green to be less active in NutraGenomics throughout 2011. *See* Record Document 1292 at 40. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 27-28 and 44-56, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court turns now to Stanford's claim that the internal turmoil between Green and Malone actually began in November 2011. *See* Record Document 1292 at 69. Stanford relies on Exhibits 57-59.[72]

---

[72] As found *supra*, the Government did not possess Exhibits 57-59.

Taken together, Exhibits 57-59 demonstrate that Malone and Green began to formally dissolve their business relationship in March 2012. *See* Record Documents 1292-57 (unsigned agreement between Green and Malone regarding membership interests in NutraGenomics and other companies dated March 2012), 1292-58 (unsigned agreement drafted by Green about money being owed that was sent in April 2012), & 1292-59 (April 5, 2012, email from Mones informing Malone and Green that he could not take sides in their dispute and would not be involved until they reached a mutual agreement).

As with the exhibits discussed *supra*, the Court finds Exhibits 57-59 are not material. First, these exhibits are not necessarily inconsistent with Green's testimony about when the internal turmoil began. That Malone and Green later took steps to dissolve their business relationship does not foreclose that the internal turmoil may have started at an earlier point or that Malone was making business deals without Green's knowledge.

Second, to the extent these exhibits can be interpreted as being inconsistent with Green's testimony, that inconsistency is not material. When exactly the turmoil between Green and Malone began has no bearing on whether the co-defendants entered into a distribution agreement with Curious Goods or Stanford's involvement with the co-defendants. Thus, Exhibits 57-59 are not material.

---

Stanford also relies on Green's § 2255 filings. Stanford has not shown the Government possessed prior to trial Green's statement in a § 2255 motion filed three years after that trial. As such, any *Brady*, *Giglio*, and *Napue* claims premised on this statement fail, for Stanford has not shown the Government suppressed this evidence or knowingly solicited false testimony in relation thereto.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to when the internal turmoil between Malone and Green began. *See* Record Document 1292 at 69. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 57-59, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to when Green knew NutraGenomics was distributing Mr. Miyagi to Louisiana. This category encompassed his arguments that (1) Green falsely testified he did not know NutraGenomics was distributing products into Louisiana, (2) Green falsely testified that internal business turmoil with Malone caused him to be less actively involved with NutraGenomics in 2011, and (3) Green falsely testified about when the internal turmoil with Malone began. *See* Record Document 1292 at 34, 38, 40, 63, 69-70. These claims were predicated on Exhibits 27-28, 33-34, 38-39, 40-41, and 44-59. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### 2. Creation of "Warranty Information, Legal Notices, and Liability" Document [Exhibits 66-70]

Stanford next argues "Barrow testified falsely that he had Francis create a 'Warranty Information, Legal Notices, and Liability' in July 2011 . . . to shift compliance responsibility to Buswell." Record Document 1292 at 48. Stanford relies on Exhibits 66-70.[73]

The Court begins this materiality analysis with a summary of Barrow's testimony. At trial, the Government questioned Barrow about a "Warranty Information, Legal Notices, and Liability" document that had been executed by Buswell on July 17, 2011. *See* Record Documents 863-1 at 17-18 & 924 at 30-33. Barrow testified as follows:

A    . . . ultimately this was created because I received a call back from Richard [Buswell] saying that his attorneys had looked into everything. Nothing we're doing falls under the Louisiana ban. They're completely comfortable with everything.

They had had a meeting with the DA's office, and that they had had a meeting with the Attorney General's office. Our product had been submitted to the state crime lab, and it does not come back as falling under this new ban.

Q    So is this around the same -- around the time period that he signed this right here, is this the time period in which you were concerned about the Louisiana laws?

A    Yeah.

I didn't have a lawyer in Louisiana, and I wasn't practicing law in Louisiana. So I had Dan Francis, an attorney that represented the RCA, Retail Compliance Association -- or that worked with the RCA, create this document. Basically the document was created to shift the responsibility of compliance to Curious Goods.

Record Document 924 at 30-31.

---

[73] As found *supra*, the Government did not possess Exhibits 66-70.

Stanford contends Barrow falsely testified that Francis created this document because Exhibits 66-70 show that attorney Wirtshafter drafted these documents.[74] *See* Record Document 1292 at 49-50. Exhibits 66-70 generally support that Wirtshafter drafted several documents entitled "Warranty Information, Legal Notices and Liability" in response to the federal DEA ban. *See* Record Documents 1292-66 at 1 (March 1, 2011, email from Malone directing Wirtshafter to create a "Liability Disclaimer Sheet"), 1292-67 (warranty for manufacturers), 1292-68 (warranty for suppliers), 1292-69 (warranty for distributors), & 1292-70 (warranty for retailers).

However, these emails do not impeach Barrow. Barrow was not part of these email exchanges, so these exhibits do not show Barrow knew Wirtshafter had previously drafted versions of this document. Nor do these exhibits show that Barrow received these warranties from Wirtshafter. Additionally, that Wirtshafter drafted these versions of the documents does not preclude the possibility that Francis drafted a different version for Barrow's use. Indeed, a comparison of the warranty executed by Buswell and the warranties drafted by Wirtshafter demonstrates that the warranties are not identical. For example, Buswell's warranty explicitly references Pinnacle and includes language that is not present in the other warranties. *Compare* Record Document 863-1 at 18 (requiring

---

[74] Stanford additionally contends this testimony was false because "Barrow knew that AM-2201 was a Naphthoylindole[,] [] that it was illegal in Louisiana[,] . . . [and] that Buswell was lying about the state crime lab results." Record Document 1292 at 48. Stanford does not direct the Court to evidence supporting that Barrow knew Buswell was lying about the state crime lab results. The Court has addressed and dispensed with Stanford's claim regarding Barrow's knowledge about AM-2201 being a naphthoylindole *supra.*

the "product . . . to be marketed for use only as directed on package" and stating the "supplier assumes no responsibility for misstatements or misuse of any products by purchaser") *with* Record Documents 1292-67, 1292-68, 1292-69, & 1292-70 (not including this language). As such, Stanford's cited exhibits do not demonstrate that "[t]he Warranty document was created by Wirtshafter . . . ." Record Document 1292 at 49.

In any event, testimony about who drafted the warranty is not material. Whether Francis or Wirtshafter drafted the document does not change that this warranty was sent and executed by Buswell. *See* Record Document 863-1 at 17-18. As such, the existence of the warranty agreement is "strongly corroborated by additional evidence." *Sipe*, 388 F.3d at 478. Further, who drafted the warranty does not in any way minimize Stanford's involvement and has no bearing on any fact at issue. "What matters is that Barrow sent it to Buswell, corroborating Barrow's testimony about his fear of a new Louisiana law banning synthetic cannabinoids." Record Document 1305 at 35. Thus, Exhibits 66-70 are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to who drafted the warranty sent by Barrow to Buswell. *See* Record Document 1292 at 48-50. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 66-70, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could

have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

Having addressed this claim, the Court has now found Stanford's *Brady*, *Giglio*, and *Napue* claims related to the Buswell distribution agreement are without merit. First, the Court addressed Stanford's argument related to when Green knew NutraGenomics was distributing Mr. Miyagi to Louisiana. *See* Record Document 1292 at 34, 38, 40, 63, 69-70. As part of this claim, Stanford argued Green falsely testified he did not know NutraGenomics was distributing products into Louisiana, Green falsely testified that internal business turmoil with Malone caused him to be less actively involved with NutraGenomics in 2011, and Green falsely testified about when the internal turmoil with Malone began. *See id.* These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 27-28, 33-34, 38-39, 40-41, and 44-59. These claims failed for lack of possession, lack of suppression, lack of materiality, or all the foregoing.

Second, the Court addressed Stanford's claim that Barrow falsely testified about who drafted the warranty executed by Buswell. *See id.* at 48-50. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 66-70. These claims failed for lack of possession and lack of materiality.

Thus, Stanford's *Brady*, *Giglio*, and *Napue* claims based on the Buswell distribution agreement are without merit and do not entitle Stanford to relief under 28 U.S.C. § 2255.

### iii.  Mr. Miyagi's Chemical Composition [Exhibits 8-21, 25-26, 72-78, & 133-134]

This claim category generally addresses Stanford's arguments that the Government withheld exculpatory evidence and/or solicited false testimony in relation to

Mr. Miyagi's chemical composition. This category includes Stanford's claims that (1) the co-defendants testified falsely about using JWH-018 in Mr. Miyagi; (2) the co-defendants testified falsely about the switch from JWH-018 to AM-2201; (3) Green testified falsely about considering ZZ-1 as a substitute for AM-2201; (4) Green and Francis falsely testified as to substantial similarity; and (5) the DEA had not conclusively determined the analogue status of AM-2201, JWH-081, JWH-250, and UR-144 at the time of Stanford's indictment. The Court addresses each in turn.

### 1. Use of JWH-018 [Exhibits 8-12 & 17]

Stanford argues Barrow, Green, Francis, and Agent DeSalvo falsely testified that NutraGenomics used JWH-018 in Mr. Miyagi. *See* Record Document 1292 at 76-92. Stanford relatedly argues that Francis falsely testified that he purchased JWH-018 from NutraGenomics. *See id.* at 93. The Court addresses each claim in turn.

Stanford relies on exhibits attached to Green's § 2255 filings and Exhibits 8-12 to support that JWH-018 was not present in Mr. Miyagi.[75] The Court begins its materiality analysis with a summary of the relevant testimony. Green, Barrow, and Francis testified that Mr. Miyagi contained JWH-018. *See* Record Documents 921 at 212-13 (Francis testifying on cross examination that he knew Mr. Miyagi contained JWH-018 because he "bought the product with that knowledge"); 923 at 13-17 (Green testifying on direct

---

[75] As found *supra*, the Government did not possess Exhibits 8-9 and 11-12. The Government possessed and produced Exhibit 10. Stanford has failed to show the Government possessed the affidavit and lab report attached to Green's § 2255 motion. The interview summary and DEA report, assuming their authenticity, were likely possessed by the Government prior to trial. It is, however, unclear whether those documents were suppressed.

examination about how he manufactured Mr. Miyagi with JWH-018); & 924 at 12-13

(Barrow testifying on direct examination that NutraGenomics originally manufactured Mr.

Miyagi with JWH-018, then swapped to JWH-250 and JWH-081 after a Georgia ban, and

then switched between a few more chemicals before settling on AM-2201). Finally, Agent

DeSalvo testified before the grand jury that the co-defendants used JWH-018 in Mr.

Miyagi, switched to a combination of JWH-081 and JWH-250, and then settled on AM-

2201.[76] *See* Record Document 1240-1 at 79-80.

Stanford argues Exhibits 8-12 and Green's § 2255 exhibits prove "JWH-018 was

never used in Mr. Miyagi." Record Document 1292 at 76. Green's § 2255 exhibits support

that Barrow previously stated JWH-250 was used in Mr. Miyagi prior to a switch to AM-

2201. *See* Record Document 1240-1 at 48, 54. Green and Preston Ackerman previously

stated Mr. Miyagi was "[i]nitially [] a blend of JWH-250/JWH-081" and then "transitioned

to AM-2201." *Id.* at 48, 58. Also attached to Green's filings are several RTP Labs lab

reports of various Mr. Miyagi products. *See id.* at 31-36. These lab reports indicate that

"Mr. Miyagi" contained JWH-250 and JWH-081 on July 21, 2010; "Mr. Miyagi Zero"

contained CB-4, an unknown compound, and WIN-48098 on October 29, 2010; "Mr.

Miyagi X" contained JWH-250 and JWH-081 on December 16, 2010; "Mr. Miyagi Zero"

contained RCS-4 and AM-2201 on December 29, 2010; and "Mr. Miyagi Melt" contained

JWH-081 and JWH-250 on December 29, 2010.  *Id.* at 31-35. Additionally, a January 14,

---

[76] The Court is unclear how Green came into possession of this excerpt from the grand
jury transcript.

2011, lab report of "Mr. Miyagi (Zero)" indicates that JWH-018 was not detected. *See id.* at 36.

Finally, Stanford cites Exhibits 8-12. Exhibit 8 is a July 9, 2010, email string. *See* Record Document 1292-8. In this email string, West Harris ("Harris")[77] asks for a lab test "to make sure there is NO JWH-018 in our products as we are selling these products in [Georgia] and other states where JWH-018 is now banned." *Id.* at 1. Exhibit 9 is a price sheet for "Mr. Miyagi Melt" that is "[e]ffective July 1, 2010." Record Document 1292-9 at 2. The price sheet states "Mr[.] Miyagi contains NO JWH 018 or 073 . . . ." *Id.* Exhibit 10 is the same July 21, 2010, RTP Labs lab report discussed *supra* that indicates Mr. Miyagi contained JWH-250 and JWH-081. *See* Record Document 1292-10 at 2. Exhibit 11 is a July 27, 2010, to July 28, 2010, email string between Green, Alston Sykes,[78] and Harris wherein Green asks Sykes to inform Harris that "kanabliss max" and "kanabliss regular" did not contain JWH-018. Record Document 1292-11 at 1. The attached July 28, 2010, RTP Labs lab report indicates that Mr. Miyagi contained JWH-250 and JWH-081. *See id.* at 8. Finally, Exhibit 12 is a questionnaire that Barrow completed on December 20, 2010. *See* Record Document 1292-12. In this questionnaire, Barrow represents that Mr. Miyagi did not contain JWH-018. *See e.g., id.* at 3.

Ultimately, the Court finds these exhibits are not material. First, these exhibits are not inconsistent with the testimony of Barrow, Green, Francis, and Agent DeSalvo.

---

[77] It is not exactly clear who West Harris is from this exhibit, but he appears to be a NutraGenomics customer of some sort.

[78] Alston Sykes was a chemist employed at RTP Labs.

Certainly, the evidence cited by Stanford supports that Mr. Miyagi did not contain JWH-018 at specific points or in specific products. But what Stanford ignores is that the co-defendants testified Mr. Miyagi's formula changed over time and that different Mr. Miyagi products used different formulas. For example, Green testified during his cross examination as follows:

> Q    Do you recall if you ever told any of the agents that Mr. Miyagi was developed in the summer of 2010, the initial substance, and it was JWH-250 and JWH-081?
>
> A    That was just one of the brands we used. We had multiple different formulas.
>
> Q    Okay.
>
> A    The first formula was 018 and 073. The second formula was 081 and 250.
>
> Q    And then the third formula was AM-2201?
>
> A    There were more formulas before that.
>
> Q    Okay.
>
> A    But they weren't big sellers, so that's why -- the 018 and 073 sold the most.

Record Document 923 at 70-71. This testimony supports both that Mr. Miyagi was made using different formulas and that JWH-081 and JWH-250 was one of the blends used to make Mr. Miyagi at one point. Consistent with this testimony, Barrow testified as follows during his direct examination:

> A    And, you know, at that time -- this was in May, June of 2010 -- there was a pending bill that we became aware of because it was in the news. And we looked it up.
>
> Then I went and met with Tommy [Malone] and said, do we use any of these chemicals? And he said, no, you know, that 018 was used in the original manufacturing in California, but they had not put that in my product in Georgia, and that they had switched. JWH-250 and 81 were the active ingredients.

127

Q    Okay. And, ultimately, what was settled upon? What became the active ingredient for Mr. Miyagi?

A    In the end?

Q    Yes.

A    AM-2201.

Record Document 924 at 13-14.

Stanford's exhibits are not inconsistent with this testimony because they do not "prov[e] that JWH-018 was never used in Mr. Miyagi." Record Document 1292 at 92. Instead, this evidence suggests Mr. Miyagi used different formulas for different variations of Mr. Miyagi and used different formulas at different times. That is exactly what the co-defendants testified to at trial.

In any event, even if these exhibits do suggest an inconsistency, that inconsistency is not material. The relevant substance for Stanford's convictions is AM-2201. Even if Mr. Miyagi did not contain JWH-018, that does not change that the product *did* contain AM-2201 at the relevant time. As the Government aptly notes, this evidence does not alter the facts that "Mr. Miyagi still contained . . . AM-2201 . . . . The conspirators still formulated Mr. Miyagi to get users high. Stanford still joined the conspiracy . . . . [, and] Stanford still designed and implemented a method to procure drug proceeds, launder them, and promote the distribution of Mr. Miyagi." Record Document 1305 at 38. Thus, these exhibits are not material.[79]

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Mr. Miyagi contained JWH-018. *See*

---

[79] The Court addresses Stanford's arguments about substantial similarity *infra*.

Record Document 1292 at 76-92. These *Brady*, *Giglio*, and *Napue* claims, premised on

Green's § 2255 exhibits and Stanford's Exhibits 8-12, fail for lack of materiality. These

exhibits do not "undermine confidence in the verdict" and, as such, are not material.

*Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519.

Therefore, Stanford has failed to meet his burden of establishing that "there is any

reasonable likelihood [these exhibits] could have affected the judgment of the jury" such

that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392

(internal quotations omitted).

Stanford next argues Francis falsely testified that he purchased JWH-018 from

NutraGenomics. *See* Record Document 1292 at 93. At trial, Francis testified that he

discovered NutraGenomics in 2010 and then purchased and ingested JWH-018. *See*

Record Document 921 at 27-28. Stanford argues this testimony is false because

NutraGenomics documents "show product shipments to Francis in June 2010, July 2010,

and November 2011 but there were no shipments of JWH-018 or Mr. Miyagi to Francis."

Record Document 1292 at 93. Stanford relies on Green's § 2255 filings and Exhibit 17.[80]

The Court begins its materiality analysis with a summary of the relevant exhibits.

Exhibit 17 includes several documents related to Francis. *See* Record Document 1292-17.

Attached invoices indicate that Francis purchased Bonsai WIN-FX on June 28, 2010,

Bonsai 81 and Bonsai 250 on July 6, 2010, and AM-4 and 5 MEO DALT on November 30,

---

[80] As found *supra*, the Government possessed but did not produce Exhibit 17. The cited exhibit from Green's motion also appears to be a NutraGenomics business record. *See* Record Document 1229-1 at 19. As such, the Court finds it is arguable the Government possessed but did not produce this exhibit.

2011. *See id.* at 4-6. The exhibit attached to Green's motion reflects that Francis received AM-4 on November 30, 2011. *See* Record Document 1229-1 at 19.

Ultimately, the Court finds Exhibit 17 and Green's exhibit are not material. First, these exhibits are not necessarily inconsistent with Francis's testimony. These invoices are from three months in 2010. As such, they do not preclude that Francis bought JWH-018 or Mr. Miyagi in a different month. Nor do they necessarily preclude that Francis bought the product through one of NutraGenomics's distributors. Second, Stanford relies on these exhibits because they show "a lack of evidence" of Francis purchasing JWH-018. Record Document 1305 at 44. Notably, Stanford could have made a similar argument at trial "[b]ecause there were no invoices available showing Francis ordering or receiving JWH-018 from any source." *Id.* He chose not to do so. Finally, even if this exhibit is inconsistent with Francis's testimony, evidence that Francis did not purchase JWH-018 does not undermine confidence in the verdict. As discussed *supra*, whether Francis purchased JWH-018 does not negate that Stanford participated in a conspiracy to distribute AM-2201. As such, any inconsistency, if it in fact exists, is not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis purchased JWH-018 from NutraGenomics. *See* Record Document 1292 at 93. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibit 17 and Green's § 2255 exhibits, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any

reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to whether Mr. Miyagi contained JWH-018. This category encompassed Stanford's arguments that (1) Barrow, Green, Francis, and Agent DeSalvo falsely testified that NutraGenomics used JWH-018 in Mr. Miyagi, and (2) Francis falsely testified about purchasing JWH-018 from NutraGenomics. *See* Record Document 1292 at 76-93. These claims were predicated on Green's § 2255 filings and Exhibits 8-12 and 17. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### 2. Switch from JWH-018 to AM-2201 [Exhibits 8, 10-11, 13-16, & 133-134]

This section addresses several claims related to the co-defendants' testimony about changing the synthetic cannabinoid in Mr. Miyagi from JWH-018 to AM-2201. First, Stanford argues the co-defendants falsely testified about switching the formula because of the federal ban. *See* Record Document 1292 at 77-78. More specifically, Stanford challenges the testimony about why the co-defendants switched from JWH-018. Second, Stanford argues Green falsely testified about when he learned of the DEA's proposed ban on certain synthetic cannabinoids and when he swapped to AM-2201. *See id.* at 90. Third, Stanford argues Green falsely testified that the focus of a December 2010 CCL meeting was finding a chemical replacement for JWH-018. *See id.* at 87. Fourth, Stanford argues

Green falsely testified about trying multiple compounds before deciding to use AM-2201. *See id.* at 89. The Court addresses each argument in turn.

### a.  Reason for Formula Change [Exhibit 8]

Stanford argues Barrow and Green falsely testified about switching the formula because of the federal ban. *See* Record Document 1292 at 77-78, 85. The Court prefaces this section with a reminder of relevant dates. The Court instructed the jury that, on March 1, 2011, the DEA "used their temporary scheduling authority to make JWH-018 a Schedule I controlled substance." Record Document 927 at 89. JWH-018 was permanently labeled as a Schedule I controlled substance by the United States Congress on July 9, 2012. *See id.*

In March 2011, Buswell, Malone, Green, and Barrow met to discuss stocking a synthetic cannabinoid at Curious Goods. *See Stanford I*, 823 F.3d at 823. Shortly thereafter, Curious Goods stores started selling Mr. Miyagi. *See id.* At that time, Mr. Miyagi contained AM-2201, which is a naphthoylindole. *See id.* In July 2011, Louisiana banned naphthoylindoles. *See id.* "Buswell assured Barrow that there would be no problem selling Mr. Miyagi in Louisiana." *Id.* At around this point, Stanford enters the conspiracy.

Stanford contends Barrow and Green "testified falsely that JWH-018 was used in Mr. Miyagi until the March 1, 2011 ban caused them to switch to other synthetic cannabinoids." Record Document 1292 at 78. Stanford relies on Exhibit 8.[81]

---

[81] As found *supra*, the Government did not possess Exhibit 8.

The Court begins its materiality analysis with a summary of Exhibit 8. Exhibit 8 is a July 9, 2010, email string. *See* Record Document 1292-8. In this email string, Harris copies Green and Malone in an email to Dr. Lantz. *See id.* at 1. Harris states it is "[o]ur request [] to test all of the samples that you received yesterday for JWH-018. It is our goal to make sure there is NO JWH-018 in our products as we are selling these products in [Georgia] and other states where JWH-018 is now banned." *Id.*

Stanford contends this exhibit "proves that NutraGenomics decision not to use JWH-018 was based on state law/bans and had nothing to do with the March 1, 2011 DEA ban." Record Document 1292 at 77-78. But this materiality argument fails because it depends on a mischaracterization or omission of the co-defendants' testimony. Barrow testified in his direct examination as follows:

> Q    So prior to you getting involved in this business, Mr. Miyagi was being manufactured by Tommy Malone and Drew Green with NutraGenomics?
>
> A    Correct.
>
> Q    Do you know what the product was prior to you getting involved, what the active ingredient was?
>
> A    JWH-018.
>
> . . .
>
> Q    Okay. And over time was there a change in what the active ingredient was with Mr. Miyagi?
>
> A    Yes. It initially switched to JWH-250 and JWH-081. When we became aware that, you know, Georgia had some pending legislation against 18, we switched to JWH-250 and JWH81. Over the course of the next couple of years, it shifted again to a few other chemicals, WIN-55 and ultimately AM-2201.

Record Document 924 at 12-13. Barrow then testified they switched to AM-2201 because of the pending federal ban. *See id.* at 19. In sum, then, Barrow testified they swapped

from JWH-018 to other chemicals because of a Georgia ban and then to AM-2201 because

of the pending federal ban. As such, Exhibit 8 is not inconsistent with Barrow's

testimony.[82]

> As for Green, Green testified in his direct examination as follows:
>
> A    We heard in December, early December, that the federal
>      government was going to ban JWH-018 and 073. It was, I think,
>      somewhere along the newswire we heard that. . . .
>
>      From there we decided to have our first meeting with the CCL right
>      after that time.
>
> . . .
>
> Q    Okay. And during that meeting what did y'all discuss? What were
>      y'all going to do about this impending ban?
>
> A    Our whole discussion was trying to find something that was going to
>      be similar to 18 that didn't cost an arm and a leg, that had the same
>      similar effect, and that wouldn't get us in trouble with the analogue
>      law. . . .

Record Document 923 at 28. Exhibit 8 is not inconsistent with this testimony. An email

from *Harris* explaining why he wants to ensure the product does not contain JWH-018 is

not necessarily attributable to *Green*.

Further, Barrow testified Malone informed him that the Georgia blend specifically

did not use JWH-018. *See* Record Document 924 at 13-14 (Barrow testifying that he

asked Malone if Mr. Miyagi contained JWH-018 and Malone informed him that "they had

not put that in [Barrow's] product in Georgia"). As such, evidence that NutraGenomics

may have changed the formula for Georgia blends does not preclude that NutraGenomics

---

[82] Interestingly, the exhibits attached to Green's § 2255 filings upon which Stanford relies
further support that Barrow's testimony was consistent. *See* Record Document 1240-1 at
48 (Barrow stating that "JWH-250 was used until *March 2011 DEA Ban*") (emphasis
added).

continued to use JWH-018 in other blends and swapped that chemical substance following the federal ban.

In any event, even if Exhibit 8 suggests an inconsistency in Barrow's and Green's testimonies, that inconsistency is not material. Why co-defendants swapped to AM-2201 does not negate that the co-defendants did, in fact, swap to that controlled substance analogue and that Stanford participated in a scheme to distribute that substance. Thus, Exhibit 8 is not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to why the co-defendants stopped using JWH-018. *See* Record Document 1292 at 77-78. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibit 8, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### b.  When Used AM-2201 [Exhibits 10-11, 13-16]

Stanford contends Green testified falsely about swapping to AM-2201 after learning of the DEA ban. *See* Record Document 1292 at 90. He argues suppressed evidence shows "AM-2201 was being used by NutraGenomics prior to Green finding out

about the pending DEA ban." *Id.* Stanford relies on the lab reports attached to Green's §

2255 filings and Stanford's Exhibits 10-11 and 13-16 for this claim.[83]

The Court begins its materiality analysis with a summary of Green's testimony.

Green testified in his direct examination as follows:

> Q    Before settling on a certain chemical, what are some of the chemicals
>      that you used in Mr. Miyagi after you moved away from JWH-018?
>
> A    We did use -- in the beginning we did use JWH-081 and JWH-250,
>      so we did have that one, too. But then after the [federal] ban we
>      started moving towards others. We tried a bunch of different ones,
>      but the one that we settled on was AM-2201.

Record Document 923 at 29.

The Court turns now to a summary of the cited exhibits. The Court has already

discussed Exhibits 10 and 11 *supra* but notes here that these exhibits contain lab reports

showing Mr. Miyagi contained JWH-250 and JWH-081 on July 21, 2010, and July 28,

2010. *See* Record Documents 1292-10 at 2 & 1292-11 at 8. The Court has also discussed

the lab reports attached to Green's § 2255 filings but notes that these reports indicate

that "Mr. Miyagi" contained JWH-250 and JWH-081 on July 21, 2010; "Mr. Miyagi Zero"

contained CB-4, an unknown compound, and WIN-48098 on October 29, 2010; "Mr.

Miyagi X" contained JWH-250 and JWH-081 on December 16, 2010; and "Mr. Miyagi Zero"

contained RCS-4 and AM-2201 on December 29, 2010.  *See* Record Document 1240-1 at

31-35. Additionally, a January 14, 2011, lab report of "Mr. Miyagi (Zero)" indicates that

JWH-018 was not detected. *See id.* at 36. Exhibit 13 presumably indicates NutraGenomics

---

[83] As found *supra*, the Government possessed and produced Exhibits 10 and 13. The
Government did not possess the lab reports attached to Green's § 2255 filings or Exhibits
11 and 14-16.

purchased AM-2201 from Mountain Industry on September 22, 2010.[84] *See* Record Document 1292-13 at 4. Exhibits 14-16 are emails between Green, Malone, and Wirtshafter sent from September 24, 2010, to September 27, 2010. *See* Record Documents 1292-14, 1292-15, & 1292-16. In these emails, Green, Malone, and Wirtshafter discuss the DEA's temporary ban on synthetic cannabinoids. *See* Record Documents 1292-14, 1292-15, & 1292-16.

Ultimately, the Court finds these exhibits are not material. Exhibits 14-16 do suggest an inconsistency in Green's testimony in that he is discussing the proposed federal ban in September 2011, three months prior to when he testified he learned of that ban. However, this inconsistency is immaterial. When exactly Green learned about the pending federal ban on JWH-018 has no bearing on the fact that NutraGenomics began to use AM-2201 in its products, that AM-2201 is a controlled substance analogue, and that Stanford participated in a conspiracy premised on the distribution of AM-2201. As such, this impeachment is not material.

As for the remaining exhibits, while Stanford makes much of Exhibit 13 demonstrating that NutraGenomics purchased AM-2201 in September 2010, he provides no evidence of AM-2201 being present in Mr. Miyagi until December 29, 2010.[85] Indeed,

---

[84] The Court uses "presumably" because it is not clear which entity purchased AM-2201 from Mountain Industry.

[85] The Court notes here an interesting nuance to Stanford's argument. Stanford relies on Exhibit 13 to presumably support that NutraGenomics used AM-2201 in Mr. Miyagi prior to the DEA ban. However, Exhibit 13 also recounts purchases of JWH-018. *See* Record Document 1292-13 at 4. By Stanford's own logic, then, one would presume the purchases of JWH-018 indicate NutraGenomics used JWH-018 in Mr. Miyagi. Stanford ignores these

Exhibits 10 and 11 contain lab reports from July 2010, prior to the discussion of the DEA ban in Exhibits 14-16, and neither lab report indicates that Mr. Miyagi contained AM-2201. As such, this evidence does not demonstrate Green testified falsely about selecting AM-2201 as a replacement chemical in Mr. Miyagi after learning of the pending DEA ban. In any event, once again, to the extent such an impeachment exists, it does not go to an essential issue. When AM-2201 was selected as a replacement for Mr. Miyagi does not in any way disturb the fact that AM-2201 was present in Mr. Miyagi at the relevant time.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to when Green learned of the federal ban of JWH-018 and when he selected AM-2201 as a substitute. *See* Record Document 1292 at 90. These *Brady*, *Giglio*, and *Napue* claims, premised on Green's § 2255 filings and Exhibits 10-11 and 13-16, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

---

purchases. This is but one example of Stanford omitting information when making his arguments.

The other interpretation of Stanford's argument is that Exhibit 13 shows NutraGenomics, and, through that entity, Green, knew of and used AM-2201 prior to the federal ban. This argument misses the mark, for this exhibit does not impeach the co-defendants' testimonies that they did not use AM-2201 in *Mr. Miyagi* until after the federal ban.

### c. December 2010 CCL Meeting [Exhibits 13 & 133-134]

Stanford argues Green and Francis falsely testified that CCL members discussed replacing JWH-018 with AM-2201 at a CCL meeting in December 2010. *See* Record Document 1292 at 87, 136. Stanford relies on Exhibits 13 and 133-134.[86]

The Court begins its materiality analysis by summarizing the contents of these exhibits. Exhibit 13 suggests NutraGenomics purchased AM-2201 from Mountain Industry on September 22, 2010. *See* Record Document 1292-13 at 4. Exhibit 133 is a December 10, 2010, email that contains a "Meeting Program" for a December 2010 meeting of the Board of Directors for the CCL. *See* Record Document 1292-133. The program states that "[t]he current issues surrounding Incense Products are The Coalitions [sic] focus for this meeting." *Id.* at 3. The program additionally states that attorneys will "present[] their strategies for successful injunction of the Drug Enforcement Administrations [sic] Emergency Ruling regarding JWH compounds and CP47 and one analogue." *Id.* Also included in this exhibit is a "Board Meeting Agenda" that indicates they will discuss the pending DEA action, legal options, and different proposals for addressing the DEA action. *Id.* at 4. Exhibit 134 is the minutes for a December 10-11, 2010, meeting for the CCL. *See* Record Document 1292-134 at 3-6. The minutes reflect that they discussed the pending DEA ban and proposals to fight that ban. *See id.* at 3-4.

Ultimately, the Court finds these exhibits are not material. Certainly, Green and Francis testified they discussed alternative compounds at the December 2010 CCL

---

[86] As found *supra*, the Government did not possess Exhibits 133-134. The Government possessed and produced Exhibit 13.

meeting. *See* Record Documents 921 at 33-34 (Francis testifying that manufacturers primarily considered AM-2201 for an alternative compound that "skirted the ban or moved [them] ahead of the ban") & 923 at 28 (Green testifying the "whole discussion was trying to find something that was going to be similar to 18 that didn't cost an arm and a leg, that had the same similar effect, and that wouldn't get us in trouble with the analogue law"). But the exhibits described *supra* are not necessarily inconsistent with this testimony. Stanford assumes the co-defendants, who were actively attempting to change their products to avoid the pending ban, would include specific chemical names in their minutes and agenda. Further, that the agenda and minutes do not explicitly state they discussed alternative compounds does not mean alternative compounds were not discussed. Indeed, the minutes and agenda make clear that the primary focus of the meeting was discussing the DEA ban and various methods of challenging that ban, and those methods could reasonably include discussing alternative chemicals. Finally, Stanford assumes they would not have considered AM-2201 as a substitute because they had previously purchased AM-2201.

Even if the Court assumes these exhibits demonstrate that Green and Francis testified falsely, that inconsistency is not material. The purpose of the December 2010 CCL meeting does not challenge any of the facts upon which Stanford was ultimately convicted. Whether the co-defendants discussed alternative compounds at this meeting or instead focused entirely on challenging the ban itself has no bearing at all on the fact that the co-defendants decided to use AM-2201 in Mr. Miyagi. Thus, Exhibits 13 and 133-134 are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether the co-defendants discussed alternative compounds at the December 2010 CCL meeting.[87] *See* Record Document 1292 at 87, 136. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 13 and 133-134, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### d.  Testing Other Chemical Compounds

Stanford argues Green falsely testified about trying "15 to 20 compounds before finally settling on AM-2201." Record Document 1292 at 91. For this argument, Stanford relies on attachments to Green's § 2255 motion.[88]

---

[87] Stanford makes several additional arguments related to the December 2010 CCL meeting. First, Stanford argues the co-defendants would not have discussed replacing JWH-018 at this meeting because "NutraGenomics NEVER used JWH-018 in Mr. Miyagi" so there was "no need to replace it." Record Document 1292 at 136. The Court has dispensed with this portion of Stanford's argument *supra*. Second, Stanford contends "NutraGenomics was already distributing AM-2201 since September 2010." *Id.* Third, Stanford contends the co-defendants did not discuss manufacturing standards at this meeting, which presumably impeaches Francis's testimony. *See id.* The Court dispenses with this argument *infra*. Finally, Stanford argues Francis presented false testimony in relation to the discussion about labeling that occurred at this meeting. *See id.* at 137. The Court dispenses with this argument *infra*.

[88] As noted many times previously, Stanford has not shown the Government pretrial possessed these exhibits, which were attached to a motion filed several years after Stanford's trial.

Specifically, Stanford relies on lab reports and a formula spreadsheet attached to Green's § 2255 motion. The Court has already discussed the lab reports *supra*. The spreadsheet indicates that "WP-1" contained RCS-4, AM-2201, JWH-122, 5MeoDalt, and Silica. *See* Record Document 1240-1 at 37. Stanford concludes this spreadsheet was created on January 20, 2011. *See* Record Document 1292 at 90. However, while the top of the spreadsheet has what appears to be a file name that includes January 20, 2011, the spreadsheet also includes the date "11/21/2017" in the date column. Record Document 1240-1 at 37. The Court will assume *arguendo* that the spreadsheet was, in fact, created on or around January 20, 2011.

Ultimately, the Court finds these exhibits are not material. Stanford argues these attachments "prove that Mr. Miyagi went from using JWH-081 and 250 in December 2010 to AM-2201, RCS-4, JWH-122, 5Meo Dalt, and Silica," which is "contrary to Green's sworn testimony that they tried 15 to 20 compounds before finally settling on AM-2201." Record Document 1292 at 91. Green did testify he "must have tried at least 15 or 20 different compounds" before deciding to use AM-2201. Record Document 923 at 29-30. But the proffered attachments are not inconsistent with that testimony.

First, Stanford ignores that the lab reports are testing different versions of Mr. Miyagi. The December 16, 2010, lab report tested Mr. Miyagi X; the December 29, 2010, lab report tested Mr. Miyagi Zero. *See* Record Document 1240-1 at 33-34. The January 2011 spreadsheet is for "WP-1." *Id.* at 37. Additionally, Stanford seemingly ignores the second December 29, 2010, lab report that indicates JWH-250 and JWH-081 were present in Mr. Miyagi Melt. *See id.* at 35.

Stanford's argument additionally relies on several assumptions. First, Stanford assumes Green would have sent each compound he tested for lab reports. Second, Stanford assumes Green would have tested each compound at RTP Labs. Without making those assumptions, these lab reports do not necessarily demonstrate that Green falsely testified about testing multiple compounds.

Finally, even if this Court assumes *arguendo* the attachments are somehow inconsistent with Green's testimony, that inconsistency is not material. How many products Green tested has no bearing on the fact that Mr. Miyagi contained AM-2201 during the relevant time. Nor does it negate Stanford's extensively documented involvement in the various conspiracies at issue.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Green tried multiple compounds before deciding to use AM-2201 in Mr. Miyagi. *See* Record Document 1292 at 89. These *Brady*, *Giglio*, and *Napue* claims, premised on Green's § 2255 exhibits, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to the co-defendants' testimony about changing the synthetic cannabinoid in Mr. Miyagi from JWH-

018 to AM-2201. This category encompassed his arguments that (1) the co-defendants falsely testified about switching the formula because of the federal ban; (2) Green falsely testified about when he learned of the DEA's proposed ban on certain synthetic cannabinoids and when he swapped to AM-2201; (3) Green falsely testified that the focus of a December 2010 CCL meeting was finding a chemical replacement for JWH-018; and (4) Green falsely testified about trying multiple chemical compounds before deciding to use AM-2201. *See* Record Document 1292 at 77-78, 87, 89-90. These claims were predicated on Green's § 2255 filings and Stanford's Exhibits 8, 10-11, 13-16, and 133-134. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### 3.  ZZ-1 [Exhibits 25-26 & 72-78]

Stanford makes two arguments regarding Green's testimony about considering replacing AM-2201 with ZZ-1: (1) Green falsely testified about Francis informing him that ZZ-1 could replace AM-2201, and (2) Green knew ZZ-1 was banned and thus would not have considered it as a replacement. *See* Record Document 1292 at 59. The Court addresses each in turn.

First, Stanford contends Green testified falsely about Francis notifying him that ZZ-1 could replace AM-2201 in Mr. Miyagi because "[s]uppressed evidence proves that Green/NutraGenomics started using ZZ-1 in April 2011, over six months before Francis

supposedly brought ZZ-1 to Green as a replacement for AM-2201." *Id.* Stanford relies on Exhibits 25-26 and 72-77.[89]

The Court begins its materiality analysis with a summary of the relevant testimony. During direct examination, Green testified he began looking for a replacement chemical for AM-2201 after he learned Louisiana had banned AM-2201. *See* Record Document 923 at 45-46. He further testified that Francis "e-mailed [him] some information and actually talked to [him] on the phone about [ZZ-1] . . . because [Green] was the one in charge of the different formulas." *Id.* at 46. During cross-examination, Green again reiterated that Francis brought ZZ-1 to his attention as a replacement product in late November 2011. *See id.* at 61. Stanford then presented Defense Exhibit 37, which is substantively identical to Stanford's Exhibit 77, and questioned Green as follows:

> Q    This is Defense 37.
>      Do you see the date on this e-mail?
>
> A    Yes, I do.
>
> Q    And what does it say in the subject line?
>      Can you read: Final details regarding ZZ-1?
>
> A    Yes, I see that.
>
> Q    And it's to Drew [Green] and Tommy [Malone]?
>
> A    Yes.
>
> Q    And this shows that it happened in September, September 20th of 2011, right?

---

[89] As found *supra*, the Government possessed but did not produce Exhibits 25 and 26. The Government did not possess Exhibits 72-77, but the Court notes Stanford seems to have admitted Exhibit 77, or at least a portion thereof, at trial. *See* Record Document 864-1 at 56-57. This trial submission suggests Exhibit 77 was not suppressed from Stanford.

A    Yes.

Q    Not like what you testified earlier, after November, 2011, correct?

A    Correct.

. . .

Q    And one of the last things you testified to the jury was that what you had just told them in your time line was truthful. Do you remember saying that?

A    Yes.

*Id.* at 61-62. In sum, Green testified Francis brought ZZ-1 to his attention as a replacement for AM-2201 in November 2011, but Stanford presented evidence suggesting Green actually learned about ZZ-1 by at least September 20, 2011.

With this testimony in mind, the Court turns now to Stanford's exhibits. Exhibits 25 and 26 support that NutraGenomics sold ZZ-1 in July 2011 and August 2011. *See* Record Documents 1292-25 at 2 & 1292-26 at 7-8. Exhibit 72 is an April 20, 2011, RTP Labs lab report of "ZZ1." Record Document 1292-72 at 3. Exhibit 73 includes July 16, 2011, and September 19, 2011, email discussions between Malone, Lin Zhang ("Zhang"),[90] and Green about ZZ-1. *See* Record Document 1292-73. Exhibit 74 includes August 29, 2011, and September 6, 2011, email discussions between Zhang, Green, and Malone about a ZZ-1 shipment. *See* Record Document 1292-74. Exhibit 75 is an email from Malone to Natures Uphoria sales staff about a bonus for selling ZZ-1. *See* Record Document 1292-75. Exhibit 76 is an email string including Malone, Green, Ackerman, Barrow, and a person named Dion Moss wherein they discuss a ZZ-1 shipment. *See* Record Document 1292-76. Finally, Exhibit 77 is a September 20-21, 2011, email

---

[90] Lin Zhang was a Chinese supplier.

discussion between Zhang, Malone, Green, and Francis about ZZ-1. *See* Record Document 1292-77. As mentioned *supra*, Exhibit 77 is substantively identical to Defense Exhibit 37, which Stanford presented at trial. *Compare* Record Document 1292-77 *with* 864-1 at 56-57.

Stanford argues Exhibits 25-26 and 72-77 "are Brady/Giglio evidence" that prove "NutraGenomics was using ZZ-1 long before November 22, 2011." Record Document 1292 at 60. While these exhibits do support that NutraGenomics used ZZ-1 before November 22, 2011, these exhibits are not inconsistent with Green's testimony because they do not establish that NutraGenomics used ZZ-1 in *Mr. Miyagi* before November 22, 2011. Put differently, these exhibits do not address whether Francis may have informed Green that ZZ-1 could act as a substitute for AM-2201 in Mr. Miyagi.

Further, Stanford specifically impeached Green at trial on when exactly he learned about ZZ-1 from Francis. *See* Record Document 923 at 61-62. Additional evidence of the purportedly inconsistent timeline would be cumulative and thus not material. For that reason alone, this Court could find these exhibits are not material.

Finally, even assuming this evidence does impeach Green, that impeachment does not go to a material fact at issue. Whether and when Green considered ZZ-1 as a replacement for AM-2201 does not obviate the fact that the co-defendants participated in a conspiracy to distribute AM-2201 during the relevant time period.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis notified Green that ZZ-1 could replace AM-2201 in Mr. Miyagi. *See* Record Document 1292 at 59. These *Brady*, *Giglio*,

147

and *Napue* claims, premised on Exhibits 25-26 and 72-77, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

Stanford next contends Green learned in September 2011 that ZZ-1 was banned in Louisiana, so he "would not have considered replacing one banned substance with another banned substance." Record Document 1292 at 59. Stanford relies on Exhibit 78 for this claim.[91] Stanford argues the same testimony about ZZ-1 summarized *supra* is impeached, so the Court begins this materiality analysis with a summary of Exhibit 78. Exhibit 78 is a September 23, 2011, email chain between Francis, Green, Malone, and Barrow in which Francis informs them that "UK3," another name for ZZ-1, "will not be allowed in . . . Louisiana." Record Document 1292-78 at 1.

Ultimately, the Court finds Exhibit 78 is not material. Even assuming this evidence is inconsistent with Green's testimony that he considered ZZ-1 as a replacement for AM-2201, it does not impeach him on a material or essential fact issue. Once again, whether and when Green considered ZZ-1 as a replacement has no bearing on Stanford's involvement. Further, "[e]ven if Green were mistaken concerning ZZ-1, that does not

---

[91] As found *supra*, the Government did not possess Exhibit 78.

148

change the fact that Mr. Miyagi contained AM-2201, a controlled substance analogue, during the time period alleged in the Superseding Indictment." Record Document 1305 at 38. Substantial evidence at trial demonstrates that co-defendants, including Stanford, participated in a scheme to distribute AM-2201 during the relevant time.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Green would have considered replacing AM-2201 with ZZ-1. *See* Record Document 1292 at 59. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibit 78, fail for lack of materiality. This exhibit does not "undermine confidence in the verdict" and, as such, is not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [this exhibit] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to ZZ-1. This category encompassed his arguments that (1) Green testified falsely about Francis informing him that ZZ-1 could replace AM-2201, and (2) Green knew ZZ-1 was banned and thus would not have considered it as a replacement. *See* Record Document 1292 at 59. These claims were predicated on Exhibits 25-26 and 72-78. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### 4.  Substantial Similarity [Exhibits 9-12 & 17]

The Court prefaces this analysis with a summary of what it instructed the jury

regarding substantial similarity:

> A controlled substance analogue is defined in 21 U.S.C. Section
> 802(32)(A)(i)-(iii) as a substance:
>
> One, the chemical structure of which is substantially similar to the chemical
> structure of a controlled substance in Schedule I or II; and either
>
> Two, the substance has a stimulant, depressant, or hallucinogenic effect on
> the central nervous system that is substantially similar to or greater than
> the stimulant, depressant, or hallucinogenic effect on the central nervous
> system of a controlled substance in Schedule I or II; or
>
> Three, with respect to a particular person, such person represents or
> intends the substance to have a stimulant, depressant, or hallucinogenic
> effect on the central nervous system that is substantially similar to or
> greater than the stimulant, depressant, or hallucinogenic effect on the
> central nervous system of a controlled substance in Schedule I or II.

Record Document 927 at 88. Stanford argues the Government used false testimony from

Green and Francis to establish that JWH-018 and AM-2201 were substantially similar. *See*

Record Document 1292 at 91-92, 95-96. Stanford relies on Green's § 2255 motion and

Exhibits 9-12 and 17 for this claim.[92]

The Court begins its materiality analysis with a summary of the relevant testimony.

At trial, Green, who was also a chemist for Nutragenomics, testified on direct examination

as follows:

Q      Now, let me ask you about -- let's talk about AM-2201.

_____

[92] As found *supra*, the Government did not possess Exhibits 9 and 11-12. The Government
possessed and produced Exhibit 10. The Government possessed and did not produce
Exhibit 17. As for the exhibits attached to Green's § 2255 filings, the Court has found the
Government possessed but did not produce the NutraGenomics business record,
interview summary, and DEA report. The Government did not possess the attached lab
reports and affidavit.

> You said you tried some other compounds and you got to AM-2201, right?

A     Correct.

Q     Ultimately can you describe in detail why you settled on AM-2201?

A     Well, AM-2201 had the most similar effect to 018. It also didn't cause a lot of the side effects that JWH-018 had as far as on that mania side I was talking about. And it was the closest.

> There was nothing else out there that we had tried through sampling that was even remotely close as far as the effects.

Record Document 923 at 30. Green later testified:

Q     When you settled on JWH-018 -- I mean, when you moved away from JWH-018 and you settled on AM-2201 because of this ban, did you have the occasion to look at the chemical structure of both 18 and AM-2201?

A     Yes.

Q     And not as an expert, but just in your experience in looking at chemical structures, on the face of the two structures, did the two have any similarities?

A     They were almost identical.

Q     When you say almost identical, in looking at them, what does that mean?

A     That means it just had one little fluorine, you know, molecule, out of the actual compound itself. JWH-018 didn't have that fluorine, so the only difference was one molecule.

*Id.* at 31-32. Francis similarly testified during his re-direct examination that "JWH-018 and AM-2201" were "virtually identical" in effect. Record Document 922 at 173-74.

Stanford's argument that this testimony is false is an amalgamation of claims dispensed with *supra*, including his contentions that (1) Francis never purchased and tried JWH-018 from NutraGenomics (which relies on Green's § 2255 filings and Exhibit 17), (2) JWH-018 was never used in Mr. Miyagi (which relies on Green's § 2255 filings and Exhibits 8-12 and 17), and (3) Green did not test multiple compounds before deciding to use AM-

2201 (which relies on Green's § 2255 filings). *See* Record Document 1292 at 91-92, 95-96. These claims do not have merit because they rely on assumptions and misrepresentations of both testimony and evidence. Put differently, this evidence, even when considered collectively, does not support that Green and Francis testified falsely as to the substantial similarity of JWH-018 and AM-2201.

However, even if Green and Francis testified falsely, other substantial evidence corroborates the two substances' chemical similarities. At trial, multiple experts testified as to the substantial similarity both in chemical structure and in effect between AM-2201 and JWH-018. *See* Record Document 922 at 202-13 (Terrance Boos, a chemistry expert, testifying that AM-2201 was substantially similar in chemical structure to JWH-018), 235-40 (Jordan Trecki, a pharmacology expert, testifying that AM-2201 was substantially similar in effect), 251-68 (Jeffrey Moran, an experimental pharmacologist expert, testifying that JWH-018 and AM-2201 were substantially similar in effect). Because Green's and Francis's testimonies are strongly corroborated by substantial expert testimony, the Court finds any impeachment of Green and Francis's testimonies through these exhibits is not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis and Green could testify as to AM-2201's substantial similarity to JWH-018. *See* Record Document 1292 at 91-92, 95-96. These *Brady*, *Giglio*, and *Napue* claims, premised on Green's § 2255 filings and Exhibits 9-12 and 17, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal

quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### 5. DEA Divergent Opinions [Exhibits 18-21]

Stanford raises two primary arguments regarding the DEA's dissenting opinions as to whether UR-144 and JWH-250 were controlled substance analogues of JWH-018. First, Stanford contends the Government failed to disclose this evidence in violation of *Brady*. *See* Record Document 1292 at 97-101. Second, Stanford contends the Government "knowingly present[ed] false evidence and perjured testimony to the Grand Jury" and at trial regarding the controlled substance analogue status of UR-144 and JWH-250. *See id*. at 99-100. The Government asserts this claim is procedurally barred because Stanford had these reports in his possession and could have raised this issue on appeal. *See* Record Document 1305 at 58-60.

The Court agrees these claims are procedurally barred. As found *supra*, the Government produced Exhibits 18-21 to Stanford prior to trial. Consequently, Stanford cannot establish cause for his failure to raise these claims on appeal. A *Brady* violation can constitute cause and prejudice, *see Thompson*, 916 F.3d at 455, but the Government produced these exhibits to Stanford. Because the Government produced these exhibits to Stanford, Stanford cannot show a *Brady* violation predicated on the suppression of those exhibits. Additionally, the factual and legal bases of any *Brady*, *Giglio*, and *Napue* claims as to those exhibits were reasonably available to Stanford on appeal. That Stanford

failed to raise those claims is not cause excusing procedural default. *See Murray*, 477 U.S. at 486. Thus, the Court finds Stanford has not shown that "some objective factor external to the defense impeded counsel's efforts to comply with the [relevant] procedural rule," *Vargas-Soto*, 35 F.4th at 993, and his *Brady*, *Giglio*, and *Napue* claims predicated on Exhibits 18-21 are procedurally barred.

Even assuming *arguendo* the claims are not procedurally barred, the Court finds those claims without merit. All references to UR-144 and JWH-250 were struck from the indictment and did not serve as a basis for Stanford's convictions and sentences. *See* Record Document 591. Further, to the extent Stanford argues these exhibits would have allowed him to highlight the lack of an agreed upon methodology, Stanford specifically cross-examined Dr. Terrance Boos on that issue. *See* Record Document 922 at 226. Thus, contrary to Stanford's assertion, he was, in fact, able to "highlight[] the lack of an agreed upon methodology for determining analogue status . . . ." Record Document 1292 at 100. Additional evidence of the DEA's dissent and lack of agreed upon methodology would be "merely cumulative of other evidence in the record" and presented at trial. *Brumfield*, 89 F.4th at 514-15 (internal quotations omitted). Thus, Exhibits 18-21 are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to the DEA's dissenting opinions as to whether UR-144 and JWH-250 were controlled substance analogues. *See* Record Document 1292 at 97-101. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 18-21, fail for procedural default because the factual and legal bases for these claims were reasonably available to Stanford prior to and during his appeal. These claims further fail for lack of

materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

In sum, the Court has now found that Stanford's *Brady*, *Giglio*, and *Napue* claims related to Mr. Miyagi's chemical composition are without merit. First, the Court addressed Stanford's claim that the co-defendants falsely testified about using JWH-018 in Mr. Miyagi. As part of this claim, Stanford argued that (1) Barrow, Green, Francis, and Agent DeSalvo falsely testified that NutraGenomics used JWH-018 in Mr. Miyagi, and (2) Francis falsely testified about purchasing JWH-018 from NutraGenomics. *See* Record Document 1292 at 76-93. These *Brady*, *Napue*, and *Giglio* claims were predicated on Green's § 2255 filings and Exhibits 8-12 and 17. These claims failed for lack of possession, lack of suppression, lack of materiality, or all the foregoing.

Second, the Court addressed Stanford's claim that the co-defendants falsely testified about the switch to AM-2201. As part of this claim, Stanford argued that (1) the co-defendants falsely testified about switching Mr. Miyagi's formula because of the federal ban; (2) Green falsely testified about when he learned of the DEA's proposed ban on certain synthetic cannabinoids and when he swapped to AM-2201; (3) Green and Francis falsely testified that the focus of a December 2010 CCL meeting was finding a chemical replacement for JWH-018; and (4) Green falsely testified about trying multiple chemical

compounds before deciding to use AM-2201. *See id.* at 77-78, 87, 89-90. These *Brady*, *Napue*, and *Giglio* claims were predicated on Green's § 2255 filings and Stanford's Exhibits 8, 10-11, 13-16, and 133-134. These claims failed for lack of possession, lack of suppression, lack of materiality, or all of the foregoing.

Third, the Court addressed Stanford's claim that Green falsely testified about considering ZZ-1 as a replacement for AM-2201. As part of this claim, Stanford argued that (1) Green testified falsely about Francis informing him that ZZ-1 could replace AM-2201, and (2) Green knew ZZ-1 was banned and thus would not have considered it as a replacement. *See id.* at 59. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 25-26 and 72-78. These claims failed for lack of possession, lack of materiality, or both.

Fourth, the Court addressed Stanford's claim that Green and Francis testified falsely as to substantial similarity. *See* Record Document 1292 at 91-92, 95-96. These *Brady*, *Giglio*, and *Napue* claims were predicated on Green's § 2255 filings and Exhibits 9-12 and 17. These claims failed for lack of possession, lack of suppression, lack of materiality, or all the foregoing.

Fifth, the Court addressed Stanford's claim that the DEA had not conclusively determined the analogue status of AM-2201, JWH-081, JWH-250, and UR-144 at the time of Stanford's indictment. As part of this claim, Stanford argued the Government withheld exculpatory evidence and/or solicited false testimony related to the DEA's dissenting opinions about the controlled substance analogue status of UR-144 and JWH-250 prior to his indictment. *See* Record Document 1292 at 97-101. These *Brady*, *Giglio*, and *Napue*

claims were predicated on Exhibits 18-21. These claims failed for procedural default, lack of suppression, and lack of materiality.

Thus, Stanford's *Brady*, *Giglio*, and *Napue* claims based on Mr. Miyagi's chemical composition are without merit and do not entitle Stanford to relief under 28 U.S.C. § 2255.

### iv. Roles in the Conspiracy [Exhibits 8, 22-30, 32, 37, 60, 67-70, 83-91, 93-111, 122-123, 125-131, 135-139, 147-148, 150, 153-160, & 163]

This claim category generally addresses Stanford's arguments that the Government withheld exculpatory evidence and/or solicited false testimony in relation to various people's roles in the conspiracy. This category includes Stanford's claims that (1) the Government withheld evidence of Mones's involvement with Green, Malone, and NutraGenomics; (2) the Government and the co-defendants minimized Wirtshafter's role in the conspiracy; (3) the Government withheld evidence establishing that numerous attorneys represented the co-defendants; (4) Francis falsely testified that Dr. Lantz wrote favorable opinion letters in exchange for payment; and (5) Francis falsely testified about communications he had with Stanford.

The Court addresses each claim in turn.

### 1. Mones [Exhibits 22-30, 32, & 83-91]

Mones represented Green in this matter. *See* Record Document 115 (granting Mones's motion to appear pro hac vice). Stanford argues the Government's "suppressed evidence of Mones' in-depth and ongoing involvement" with NutraGenomics, Green, and Malone prevented Stanford from "us[ing] it in his defense, impeach[ing] Green's

testimony, and undermin[ing] the credibility of the prosecution's entire case."[93] Record

Document 1292 at 104. Before the Court details Stanford's individual claims in relation to

Mones, the Court finds it would be helpful to first summarize Green's testimony about

Mones. During his cross-examination by Stanford, Green testified as follows:

Q    And after your business was raided, did you hire a lawyer?

A    Yes. Actually I had an attorney already on retainer.

Q    And who was that?

A    Stuart Mones.

Q    Okay. And he's a criminal defense lawyer?

A    Correct.

Q    And you already had him on retainer?

A    Absolutely.

Q    Is that kind of a -- do you see anything wrong with that?

A    Something was wrong. We knew what we were doing was wrong, and, you know, we knew we needed counsel. So in the event that something like that happened, we had to be prepared for it.

And we had shut down two or three months prior to being raided knowing that the hammer was going to come down and we needed to get out. So, yeah, we had him on retainer.

Record Document 923 at 106-07. On re-direct, Green testified:

Q    And what was Stuart Mones's role for you in this case?

A    Well, Stuart Mones was there to make sure that -- well, we had an investigation from Kansas. That's how he did away with Kansas and just wiped that state off the map on our sales. This goes back to early 2011.

_____

[93] A preliminary concern with these documents is whether the Government would have access to communications between Mones, Green, and Malone. Stanford fails to address the Government's contention that attorney-client confidentiality would have barred discovery of these exhibits. *See* Record Document 1305 at 39 ("[T]he government could not have gained access to these communications as they would have been subject to the attorney-client privilege.").

> So we retained Stuart Mones on retainer from that point forward to represent us in the event that any other states were going to come forward and come after us from a criminal standpoint.
>
> Q    You mentioned several entities that y'all were part of, two in particular being Coalition for Cognitive Liberty and the Retail Compliance Association?
>
> A    Yes.
>
> Q    The attorney, Mr. Mones, who had a retainer, did he take a role and was his name in any of the documents for the Retail Compliance Association or Coalition of Cognitive Liberty?
>
> A    No.
>
> Q    Did he ever issue any checks on behalf of the Retail Compliance Association?
>
> A    No.
>
> Q    Did he ever seek to be paid from you a percentage from your sales from drug proceeds?
>
> A    No.

*Id.* at 136-37.

In his § 2255 motion, Stanford avers suppressed evidence proves (1) Green falsely testified about why he hired Mones, and (2) Mones "was significantly more in-depth and involved than merely being on retainer as stand-by counsel." Record Document 1292 at 107-08. In his reply, Stanford argues Mones's representation of NutraGenomics resulted in a conflict of interest and that the Government's knowledge of that representation "created an affirmative duty to notify the court and/or file a motion for a conflicts hearing."[94] Record Document 1314 at 37. The Court addresses each claim in turn.

---

[94] While Stanford alludes to a "conflict of interest" in his § 2255 motion, he does so only in summarizing Green's § 2255 motion. *See* Record Document 1292 at 103 ("The crux of Green's § 2255 argument is that Mones' involvement created an actual conflict of interest . . . . As it relates to Stanford, Mones' involvement is Brady/Giglio evidence . . . ."). Thus, Stanford did not initially make an independent claim based on this conflict of interest.

### a. Why Green Hired Mones [Exhibits 83-84]

Stanford argues Green "falsely testified that Mones was hired to handle a Kansas investigation and thereafter he remained on a stand-by retainer in case any other states initiated an investigation." Record Document 1292 at 107. Stanford relies on Exhibit 83-84 and Green's § 2255 filings.[95]

The Court begins its materiality analysis with a summary of these exhibits. Green's § 2255 filings indicate payments to Bruce Harvey ("Harvey"), Mones's law partner. *See* Record Document 1229-1 at 43-45. Exhibit 83 is a March 8, 2011, email string including Malone, Green, and Harvey wherein Malone represents that they need Harvey to interpret the Federal Analogue Act and advise them about whether their business complies with that law. *See* Record Document 1292-83 at 1. Exhibit 84 is a March 8, 2011, email chain between Malone, Green, and Natures Uphoria employees wherein Malone informs sales staff "[a]bsolutely no sales into Kansas from this point forward." Record Document 1292-84 at 1.

---

It is not clear why Stanford waited to enunciate such a claim until the filing of his reply. Stanford is not proceeding *pro se* in these matters. His counsel should be aware this Court can properly refuse to consider claims raised for the first time in a reply brief. *See Cajeli v. United States*, No. 13-CR-0038, 2020 WL 1650823, at *6 (E.D. Tex. Mar. 26, 2020); *United States v. Armstrong*, 951 F.2d 626, 630 (5th Cir. 1992). Nevertheless, the Court finds that the "interests of justice would be better served by addressing the merits [rather than] dismissing the [new claim] as time barred." *Day v. McDonough*, 547 U.S. 198, 210 (2006) (internal quotations omitted).

[95] As found *supra*, the Government did not possess Exhibits 83-84. The Court further finds the Government did not possess the portion of Green's § 2255 filings referred to by Stanford for this claim. Those documents indicate payments to Bruce Harvey, and Stanford does not explain how the Government would have had access to those documents. *See* Record Document 1229-1 at 43-45.

Ultimately, the Court finds these exhibits are not material. Stanford argues Green's § 2255 filings and Exhibit 83 show Green and Malone hired Mones on March 10, 2011, "to work with them on [legal] compliance." Record Document 1292 at 107. A review of those exhibits demonstrates otherwise. Exhibit 83 and Green's § 2255 filings concern Harvey, not Mones. Put differently, these exhibits do not demonstrate why Green hired Mones and thus do not establish that Green testified falsely.[96]

As for Exhibit 84, Stanford argues this exhibit shows "NutraGenomics stopped all sales to Kansas before Mones was hired," which purportedly "proves Mones had absolutely nothing to do with stopping sales into Kansas." *Id.* at 107-08. But this exhibit, too, does not impeach Green. Even if Mones did not initiate the initial cessation of sales into Kansas, that does not foreclose the possibility that Mones advised Malone and Green to later permanently cease sales. Further, Stanford's own exhibits attached to his § 2255 motion demonstrate that Mones did assist with the Kansas investigation. *See* Record Documents 1292-89, 1292-90, & 1292-91. Thus, Green's § 2255 filings and Stanford's Exhibits 83-84 do not impeach Green's testimony. Even if these exhibits do suggest an inconsistency, that inconsistency is immaterial. Why Malone and Green hired Mones has

---

[96] Stanford additionally argues that Exhibit 83 proves "Malone and Green believed they were being compliant and wanted to remain compliant with the law." Record Document 1292 at 109. From there, he argues Green falsely testified that he "knew what [they] were doing was wrong . . . and knew [they] needed counsel." Record Document 923 at 106. The Court notes this argument seemingly contradicts Stanford's earlier assertions that Green knew he was distributing synthetic cannabinoids illegally into Louisiana without a protection agreement and thus would not have needed Stanford's assurances to continue doing so. *See* Record Document 1292 at 22 ("In September 2010, cooperating co-defendants started distributing Mr. Miyagi to Louisiana customers knowing it was illegal and without a protection agreement.").

no bearing on any fact at issue and does not negate the substantial evidence supporting Stanford's involvement.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to why Green and Malone hired Mones. *See* Record Document 1292 at 107. These *Brady*, *Giglio*, and *Napue* claims, premised on Green's § 2255 filings and Exhibits 83-84, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### b. Mones's Involvement [Exhibits 22-30, 32, 85-91]

Stanford makes three primary arguments in relation to Mones's involvement. First, he contends Mones "was the one advising Green on Louisiana law and compliance issues." *See* Record Document 1292 at 104. Second, Stanford contends Mones altered evidence in the Kansas investigation "to protect Green, Malone, and NutraGenomics from potential criminal liability." *Id.* at 111. Finally, Stanford contends "Mones' involvement and the fact that he was paid with money derived from the sale of AM-2201 and Mr. Miyagi made him an unindicted coconspirator with Green, Malone, and Barrow as well as a defense witness." *Id.* at 110. The Court addresses each contention in turn.

First, Stanford contends suppressed evidence "prove[s] that Green was relying on Mones' advice to continue distributing synthetic cannabinoids, AM-2201, and Mr. Miyagi to Louisiana," which "completely undermines and discredits the prosecution's fabricated narrative of a protection agreement between Stanford and the Louisiana Attorney General." *Id.* at 111. Stanford relies on Exhibits 22-30, 32, 85-86, and 88 for this argument.[97]

For this materiality analysis, Stanford makes very specific arguments for each exhibit, so the Court will briefly summarize the contents of those exhibits where necessary and then analyze the materiality. To begin, Stanford cites Exhibits 22-30 and 32[98] to establish "NutraGenomics was distributing synthetic cannabinoids and Mr. Miyagi to hundreds of Louisiana customers before and during Mones' involvement with NutraGenomics and Green." *Id.* at 106. From there, Stanford assumes "Mones knew about and discussed with Green the distribution of synthetic cannabinoids and Mr. Miyagi to Louisiana." *Id.* However, these exhibits in no way demonstrate Mones was aware of this distribution, and they certainly do not suggest that Mones, who is not licensed to

---

[97] As found *supra*, the Government possessed but did not produce Exhibits 22-30 and 32. The Government did not possess Exhibits 85-86 and 88.

Stanford also relies on statements made by Green in his § 2255 motion. He has not established the Government's pretrial possession of statements made by Green in a § 2255 motion filed after Stanford's trial. As such, the Court did not consider these statements.

[98] The Court discussed these exhibits in-depth *supra* but notes here that they detail NutraGenomics shipments of various synthetic cannabinoids, including Mr. Miyagi, to Louisiana customers throughout 2010 and 2011. These exhibits do not reference Mones, and Mones is not included in the emails found in those exhibits.

practice in Louisiana,[99] discussed this distribution with Green or advised him regarding the same.

To establish Mones's knowledge of that distribution, Stanford relies on a different set of exhibits: Exhibits 85-86 and 88. Exhibit 85 is a March 24, 2011, email between Malone, Mones, Green, Barry Covert ("Covert"),[100] and others wherein Malone asks Covert to send Mones "all the information on the suit [Covert] [] prepared to file against the federal gov't." Record Document 1292-85 at 1. Exhibit 85 contains no indication that the information about the suit was sent to Mones, but regardless, it does not establish that Mones was aware of the distribution into Louisiana and advised Green regarding that distribution.

Exhibit 86 is a March 24, 2011, email chain between Malone, Mones, Green, Covert, and others. *See* Record Document 1292-86. In this email chain, Covert sends the information requested in Exhibit 85 to other attorneys but does not send it to Mones because there is no "joint agreement in place." *Id.* at 1. Covert later sends Mones "the Eastern District of Kentucky documents." *Id.* at 5. While the email string reflects that various documents were sent to Mones, Exhibit 86 does not contain those documents. The Court will not speculate as to the contents of those documents. Moreover, Stanford fails to explain how Exhibit 86 demonstrates that Mones knew about the distribution into

---

[99] Mones was barred in Georgia and represented Green pro hac vice in the instant proceedings. *See* Record Documents 80 at 1 & 115.

[100] Barry Covert was an attorney associated with Malone and Green.

*Louisiana* or otherwise advised Green regarding the same. Taking the email on its face, those documents would have concerned Kentucky. *See id.* at 5.

Exhibit 88 is an April 8, 2011, email string including Ryan Brents ("Brents"),[101] Malone, Green, and Mones. *See* Record Document 1292-88. In this email string, Malone asks Brents to "give [] Mones access to the NG shared files" because "[h]e needs to see all of the lab reports we have from RTP from day 1." *Id.* at 1. Brents provides Mones with log-in information and explains that Mones can "view lab reports, SMS history, customer data, etc." *Id.* at 2. Stanford argues "[t]his evidence proves that Mones had total access to all of NutraGenomics business records, lab reports, spreadsheets, and emails." Record Document 1292 at 108. However, in no way does Exhibit 88 demonstrate that Mones had access to every single NutraGenomics document, including the ones upon which Stanford relies to establish Mones knew of the distribution into Louisiana (Exhibits 22-30 and 32). Stanford assumes this is the case because Mones had access to "NG shared files," Record Document 1292-88 at 1, but the email does not indicate what those shared files are and certainly does not suggest those shared files include the ones cited by Stanford. As such, this exhibit, too, fails to demonstrate that Mones knew of the distribution into Louisiana. It further fails to establish that Mones *advised* Green about that distribution.[102]

As detailed *supra*, none of these exhibits "offer[] evidence of Mones assisting the conspiracy to distribute controlled substance analogues, assisting in trafficking

---

[101] Ryan Brents was an employee at NutraGenomics.

[102] Indeed, Stanford provides the Court with no evidence of Mones and Green discussing distribution into Louisiana or Mones providing legal advice to Green about the same. He simply assumes these conversations happened with no proof to that effect.

misbranded drugs, or laundering tainted proceeds." [103] Record Document 1305 at 40. As such, these exhibits are not material for the reason Stanford claims. But regardless of what these exhibits demonstrate or fail to demonstrate, the fact remains that Mones's involvement in no way undermines Stanford's role in the conspiracies at issue here. Mones was not licensed in Louisiana; Stanford was. Trial evidence showed the co-defendants relied on Stanford's legal advice because they were distributing into Louisiana, the state in which Stanford was barred. Further, substantial evidence demonstrates that Stanford participated in the conspiracies at issue here. In sum, Exhibits 22-30, 32, 85-86, and 88 do not demonstrate that Mones knew of the distribution into Louisiana and advised Green regarding the same. As such, the exhibits in no way "undermine[] and discredit[] the prosecution's fabricated narrative of a protection agreement between Stanford and the Louisiana Attorney General" and thus are not material. Record Document 1292 at 111.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony that purportedly proved Green relied on Mones's advice to continue distributing AM-2201 into Louisiana. *See id.* at 104, 111. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 22-30, 32, 85-86, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not

---

[103] Relatedly, Stanford speculates that because "Green and Malone worked closely with Mones," Mones "would have known about the NutraGenomics/Pinnacle agreement with Buswell and approved it." Record Document 1292 at 104. None of the exhibits cited by Stanford in this section establish that Mones knew about the Buswell distribution agreement or approved of that agreement. Nor do these exhibits establish that Mones worked so closely with Malone and Green that the Court can safely presume Mones somehow knew and approved of this distribution. As such, this claim fails for lack of materiality, and any associated *Brady*, *Giglio*, and *Napue* claims are without merit.

material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

Second, Stanford contends Mones altered evidence in a federal investigation in Kansas "to protect Green, Malone, and NutraGenomics from potential criminal liability." Record Document 1292 at 111. Stanford relies on Exhibits 89-91.[104]

Ultimately, the Court finds these exhibits are not material because Stanford's argument hinges on a mischaracterization of the evidence found therein. Exhibit 89 is a May 2, 2011, email string involving Mones, Malone, Green, Brents, and other individuals. *See* Record Document 1292-89. In this email string, Mones asks Malone to reprint the "invoices for any shipment to Kansas since the companies [sic] inception . . . in the original condition." *Id.* at 1. Mones states he believed the invoices he received included a warning that was not originally present because that warning was "now automatically added to every invoice." *Id.* Brents informed Mones that he was "correct" and that he could "reproduce the template" from an original invoice to make the reprinted invoices accurate "if [he could] obtain a copy of any invoice that may have been sent several months ago." *Id.* at 2.

---

[104] As found *supra*, the Government did not possess Exhibits 89-90. The Government possessed but did not produce Exhibit 91.

Stanford argues this email chain evidences that Mones altered invoices to protect Malone and Green. *See* Record Document 1292 at 111. However, Exhibit 89 actually demonstrates that Mones was trying to ensure the Kansas investigators received accurate invoices. Because Exhibit 89 does not demonstrate that Mones "intentionally altered copies" to hinder the Kansas investigation in order to protect Green and Malone, *see id.*, Stanford's proffered materiality argument fails.

The Court likewise concludes that Exhibits 90 and 91 are not material. Exhibit 90 is an August 5, 2011, email wherein Mones asks Green and Malone to respond to a Kansas investigator's request "for follow up documentation."[105] *See* Record Document 1292-90 at 1. This exhibit does not in any way demonstrate that "Mones was obstructing justice and lying to a federal prosecutor conducting an ongoing investigation to protect Green and Malone." Record Document 1292 at 112-13. As such, Stanford's proffered materiality agreement fails.

As for Exhibit 91, this exhibit is a September 15, 2011, email that Mones sent to the Kansas investigators. *See* Record Document 1292-91. Attached to that email is the "response to [the agent's] follow up questions." *Id.* at 1. In this response, Mones represents that "the products listed were bulk chemicals for research purposes and were sold for any legal purpose that did not involve human consumption." *Id.* at 3. Stanford

---

[105] Stanford argues the attached letter "indicates the U.S. Attorney's office for the District of Kansas" was "requesting additional documentation on the amount of products sold, product ingredients, description of product usage, and advertising information on the products." Record Document 1292 at 112. However, the letter itself is not included in Stanford's Exhibit 90, and the Court shall not speculate as to the contents of that letter.

contends Mones "intentionally provided false information to a federal prosecutor conducting an ongoing investigation when he" submitted this response. Record Document 1292 at 112. Of course, this argument presupposes Mones was aware Green and Malone were distributing synthetic cannabinoids for human consumption. Stanford has not shown Mones was actually aware that synthetic cannabinoids were being sold for human consumption. Exhibit 91 does not disturb that conclusion. As such, Stanford's proffered materiality agreement fails.

In any event, Mones's representation in a Kansas investigation and the legal advice he gave his clients in a separate criminal matter is clearly not material. This representation does not in any way undermine Stanford's convictions. Indeed, the Court notes this evidence far exceeds the bounds of what would have been considered relevant at trial, and the Court consequently would not have allowed questioning on this tangent. Mones was not a witness at trial. Thus, this "impeachment," to the extent it exists, is not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to Mones hindering a federal criminal investigation to protect Green, Malone, and NutraGenomics. *See id.* at 111. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 89-91, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be

entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

Finally, Stanford contends "Mones' involvement and the fact that he was paid with money derived from the sale of AM-2201 and Mr. Miyagi made him an unindicted coconspirator with Green, Malone, and Barrow as well as a defense witness." Record Document 1292 at 110. However, Stanford does not offer any evidence of Mones receiving payments from the sales of AM-2201 proceeds other than Green's unsubstantiated allegations.[106]

Further, as evidenced *supra*, Mones's involvement with NutraGenomics generally does not indicate, or even suggest, he was involved with the conspiracies at issue here. Stanford additionally cites Exhibit 87 as evidence that Mones helped Green and Malone establish a "Dutch company." This April 2011 email chain does not include Mones and does not provide any evidence that Mones actually established that company. *See* Record Document 1292-87. Notwithstanding that lack of evidence, Stanford does not explain the relevance or materiality of this exhibit, and the Court shall not make that argument for him. In any event, that Mones may have helped Green and Malone create a foreign company would in no way undermine confidence in Stanford's convictions because it has no bearing on the conspiracies at issue here. The possible culpability of another individual

---

[106] Stanford cites several checks attached to Green's § 2255. Those exhibits do not in any way establish, or even suggest, that Green paid Mones with proceeds from AM-2201 or that Mones knew the source of any such proceeds. *See* Record Documents 1229-1 at 43-45 & 1240-1 at 2-6. Notably, the checks in Record Document 1229-1 were for Bruce Harvey, not Mones. *See* Record Document 1229-1 at 43-45.

in the conspiracies for which Stanford was convicted does not undermine the jury's verdict as to Stanford. Thus, none of the exhibits previously cited herein, including Exhibit 87, are material.

The Court has now addressed each of Stanford's claims related to Mones's involvement. That is, the Court has addressed Stanford's argument that Mones was an unindicted co-conspirator and defense witness. *See* Record Document 1292 at 110-11. This category encompassed Stanford's arguments that (1) Green relied on Mones's advice to continue distributing AM-2201 into Louisiana; (2) Mones hindered a federal criminal investigation to protect Green, Malone, and NutraGenomics; and (3) Mones was extensively involved with Green and Malone  and received proceeds from the distribution of AM-2201. *See id.* at 104, 110-11. These claims were predicated on Green's § 2255 filings and Exhibits 22-30, 32, and 85-91. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### c. Conflict of Interest [Exhibits 22-30, 32, and 83-91]

In his reply brief, Stanford argues the Government "knew that Mones represented NutraGenomics, Green, and Malone" and thus had "an affirmative duty to notify the court and/or file a motion for a conflicts hearing." Record Document 1314 at 37. He maintains this "'actual conflict of interest [] should have barred [Mones] from representing Green." Record Document 1292 at 39. In his response to the Court's minute entry regarding possession, Stanford expands on this claim, stating "Malone never signed or filed a waiver of conflict free counsel regarding Mones' representation of Green" and that "[t]he conflict

of interest between Mones and his clients, Green and Malone, is unwaivable." Record Document 1386 at 8 n.8. Stanford relies on the exhibits discussed *supra*: Exhibits 22-30, 32, and 83-91.[107]

Ultimately, the Court finds these exhibits are not material, for Stanford fails to explain how a conflict of interest between Mones, Malone, and Green affected *Stanford's* right to a fair trial or *Stanford's* representation. Any conflict of interest, if it existed, was between Mones, Green, and Malone, not Stanford. Mones did not represent Stanford because Stanford proceeded *pro se*. Notably, this Court has already considered and rejected Green's claim that Mones had a conflict of interest. *See* Record Document 1315 at 26-29. In so finding, the Court noted "Green ha[d] not identified any particular way in which Mones rendered objectively unreasonable counsel simply due to the sheer fact that Mones first represented NutraGenomics." *Id.* at 29. The Court further found Green failed to demonstrate prejudice from any such conflict because "the record contains no indication that Mones suffered from a division of loyalty, that the alleged breach compromised the quality of Green's defense, or that Mones failed to diligently work in Green's interest." *Id.*

Plainly, if Green, a party to the alleged conflict, did not have a viable claim, Stanford, who was not represented by Mones, certainly does not. Even if the Government should have notified the Court of Mones's prior representation of NutraGenomics,[108]

---

[107] As found *supra*, the Government possessed but did not produce Exhibits 22-30, 32, and 91. The Government did not possess Exhibits 83-90.

[108] Again, the Government did not possess the exhibits supporting Mones's involvement with NutraGenomics, Malone, and Green prior to trial. As such, the Government would

Stanford has failed to demonstrate he was prejudiced by any such failure. He directs the Court to no adverse effects of this representation on his case, and he fails to explain how the Government's alleged suppression of this information affected his trial beyond the allegations dispensed with *supra*.

Accordingly, Stanford has failed to demonstrate that Exhibits 22-30, 32, and 83-91 are material. Stanford has not shown any such alleged conflict affected his right to a fair trial or otherwise undermines confidence in any of his convictions. *See Wearry*, 577 U.S. at 392; *Brumfield*, 89 F.4th at 519. As such, Stanford's *Brady*, *Giglio*, and *Napue* claims predicated on Exhibits 22-30, 32, 83-91 fail for lack of possession, lack of materiality, or both.

The Court has now addressed each of Stanford's claims related to Mones's involvement. This category encompassed his arguments that (1) Green falsely testified about why he hired Mones; (2) Mones "was significantly more in-depth and involved than merely being on retainer as stand-by counsel[;]" and (3) the Government's knowledge of Mones's representation of NutraGenomics "created an affirmative duty to notify the court and/or file a motion for a conflicts hearing." Record Documents 1292 at 104, 107-08, 110-11 & 1314 at 37. These claims were predicated on Green's § 2255 filings and Exhibits 22-30, 32, and 83-91. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

---

not have known it needed to notify the Court. For that reason, Stanford's claim fails. Here, the Court is simply assuming *arguendo* that the Government was aware of that conflict.

## 2. Wirtshafter [Exhibits 37, 60, 67-70, 93-111, 122-123, 125-131, 135-136, 138-139, & 148]

Don Wirtshafter ("Wirtshafter") is "a lawyer who specialized in cannabinoids." *Stanford I*, 823 F.3d at 825. Stanford argues Green and Francis testified falsely as to the nature and extent of Wirtshafter's involvement with NutraGenomics and the co-defendants. *See* Record Document 1292 at 113. Specifically, Stanford contends suppressed evidence establishes that Wirtshafter received higher compensation for his work than testified to by Green, advised Green and Malone to mislabel their products, and was actively involved with the Coalition for Cognitive Liberty ("CCL"), the California Retail Compliance Association ("RCA"), Green, and Malone. *See id.* at 113-15. Therefore, Stanford contends Green "minimiz[ed] Wirtshafter's involvement" and that Francis "testif[ied] falsely regarding the labeling of synthetic cannabinoid products." *Id.* at 114. Relatedly, Stanford contends Barrow testified falsely that he would have changed Mr. Miyagi's label had Stanford advised him to do so. *See id.* at 139-40. The Court divides these claims into the following categories: (1) Wirtshafter's compensation, (2) Wirtshafter's advice regarding mislabeling, and (3) Wirtshafter's involvement with the co-defendants.

The Court will address each of these claims in turn but begins its analysis by acknowledging several difficulties with Stanford's arguments. First, Stanford's motion often intermingles claims about Wirtshafter with those about Francis, the CCL, and the RCA. For example, Stanford argues suppressed evidence of Wirtshafter's involvement also impeaches Francis's testimony regarding Francis's role in the CCL and the California RCA. *See e.g. id.* at 116 (stating Wirtshafter "was the individual responsible for developing

training material for retail stores, contrary to Francis' testimony"). Consequently, his arguments often reference other sections and evidence presented therein. The difficulty arises in that Stanford sometimes simply directs the Court to exhibits in preceding sections without identifying what specific exhibits he refers to. *See e.g.*, *id.* at 123 ("Exhibits from the above section prove that the CCL was organized to raise legal challenges to the proposed DEA ban and that Francis was never part of the creation, formation, or incorporation of the CCL."). The Court has done its best to parse and separate Stanford's arguments while also ensuring it discusses each of the relevant exhibits. However, if any argument was not made clear in Stanford's motion, the Court will not make that argument on his behalf.

Second, as will be discussed *infra*, Stanford's claims miss the forest for the trees in that any inconsistencies related to Wirtshafter's involvement do nothing to undermine confidence in any of the verdicts sustaining Stanford's convictions. The evidence proffered by Stanford indicates Wirtshafter's legal association with the co-defendants ended in April 2011, several months prior to Stanford joining the conspiracy. *See* Record Document 1292-101 at 1 (an April 12, 2011, email from Wirtshafter stating he has attached his invoice for his "final billing for representing the RCA"). Stanford further fails to proffer any evidence suggesting Wirtshafter was aware of the Curious Goods distribution agreement and the sale or distribution of a controlled substance analogue into Louisiana. Thus, contrary to Stanford's assertions, evidence related to Wirtshafter's involvement does nothing to undermine confidence in any of the verdicts sustaining Stanford's convictions.

The Court turns now to its analysis of Stanford's claims.

### a. Wirtshafter's Compensation [Exhibits 93-101]

Stanford argues Green testified falsely as to Wirtshafter's compensation because "[i]nvoices and emails prove that Wirtshafter's compensation was budgeted at [$12,000] per month." Record Document 1292 at 130. He cites Exhibits 93-101.[109]

The Court begins its materiality analysis with a summary of Green's testimony. At trial, Green testified as follows during his direct examination:

A    We were tracking every single state and what was being banned. We had an independent attorney, Don Wirtshafter, who we were paying to do this.

Q    Okay. And were you paying him monthly?

A    Yes, we were.

Q    Okay. Approximately how much were you paying him originally?

A    One thousand dollars.

Q    Per month?

A    Per month, yes.

. . .

Q    Okay. Did you have the occasion to pay him more than $1,000?

A    Yes.

Q    How much did you end up paying him?

A    Fifteen hundred, approximately, somewhere in that ballpark.

Record Document 923 at 20-21.

Exhibits 93-101 do support that Wirtshafter received more than $1,000 to $1,500 per month. *See* Record Documents 1292-93 at 2 ($1,200 invoice); 1292-94 at 3 ($2,200

---

[109] As found *supra*, the Government did not possess Exhibits 93-101.

invoice); 1292-95 (November 30, 2010, email to Wirtshafter indicating he has been mailed two checks for a total of $5,200); 1292-96 at 2, 9 ($12,478.58 invoice; Wirtshafter approximated legal expenses of $12,000 per month); 1292-97 at 3 ($7,262.67 invoice); 1292-98 at 2 ($7,344 invoice); 1292-99 at 2 ($8,617 invoice); 1292-100 at 2 ($7,280.80 invoice); & 1292-101 at 4 ($10,012 invoice). However, while this evidence may impeach Green, that impeachment is not material. How much Wirtshafter was paid was not a fact at issue. Further, there is no evidence Wirtshafter was aware of or participated in the conspiracies of which Stanford was convicted. How much compensation Wirtshafter received is neither relevant nor material and certainly does not refute the substantial evidence supporting Stanford's own involvement.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to Wirtshafter's compensation. *See* Record Document 1292 at 130. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 93-101, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### b. Mislabeling [Exhibits 37, 67-70, 106, 108, 110-111, 123, 129-131, 135-136, & 148]

Stanford argues suppressed evidence proves Wirtshafter, not Stanford, "advised NutraGenomics and CCL members to mislabel synthetic products with 'Not Intended for

Human Consumption'" and further "advocated for retail store owners to educate their employees to never discuss synthetic cannabinoids in any way with customers that implied consumption [] and not to mention effects." Record Document 1292 at 114. Stanford maintains he "had no involvement, input, or authority regarding the use of and/or removal of the 'Not For Human Consumption' label" on Mr. Miyagi. *Id.* at 139. Included in this category are Stanford's claims that (1) Wirtshafter advised Green and Malone to mislabel their products, and they labeled their products pursuant to that advice; (2) Francis falsely testified that Wirtshafter opposed labeling products with "Not For Human Consumption," and (3) Francis falsely testified that he advised against the use of "Not For Human Consumption." *See id.* at 118-19, 125, 139-40.

At the outset, the Court notes Stanford need not have had "involvement, input, or authority regarding the use of and/or removal of" the label on Mr. Miyagi to be convicted of Count Two, the conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce. *Id.* at 139. "The crime of conviction at issue is not creating, editing, or designing a label on a misbranded drug[.] [] [T]he crime is conspiracy to introduce a misbranded drug in interstate commerce." Record Document 1305 at 28. Indeed, at trial, the Government argued Stanford's role in this conspiracy was not that "he misbranded the drugs[,] . . . had anything to do with its packaging[,] [or] . . . shipped the material" but rather that he "ma[d]e sure the drugs kept coming down to Louisiana" through his promises of protection to the co-defendants. Record Document 927 at 112. Stanford wholly fails to connect Wirtshafter's input and advice regarding the label to Stanford's own role. With this in mind, the Court turns now to Stanford's claims.

To begin, Stanford argues suppressed evidence proves Wirtshafter "directed the use of 'Not For Human Consumption' on the labeling of synthetic cannabinoid products, including Mr. Miyagi." Record Document 1292 at 139. Stanford relies on Exhibits 37, 67-70, 106, 108, 110-111, and 135-136 for this claim.[110] The proffered materiality of these exhibits is their ability to impeach Barrow's testimony and to demonstrate that Stanford had no role in Count Two, the conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce. *See id.* at 139-40.

Exhibits 37, 67-70, 106, 108, 110-111, and 135-136 support that Wirtshafter advised Green and Malone to use "Not Intended for Human Consumption" on their product labels and that Green and Malone did, in fact, use that wording at times. *See* Record Documents 1292-37 at 3 (September 28, 2010, email from Malone stating an attorney advised him to label the product as "potpourri" and to use "Not Intended For Human Consumption" instead of "Not for human consumption"); 1292-67 at 1, 4 (March 2, 2011, email from Wirtshafter sending a warranty including the "not intended for human consumption" language); 1292-68 at 1, 3 (March 2, 2011, email from Wirtshafter sending a warranty including the same language); 1292-69 at 1, 3 (March 2, 2011, email from Malone sending a warranty to himself including the same language); 1292-70 at 1, 4 (March 2, 2011, email from Wirtshafter sending a warranty including the same language); 1292-108 (August 28, 2010, email from Wirtshafter advising Malone to use "Not intended for human consumption" instead of "Not For Human Consumption"); 1292-110 at 6

---

[110] As found *supra*, the Government did not possess Exhibits 37, 67-70, 106, 108, 110-111, and 135-136.

(August 30-31, 2010, email string wherein Malone states, "Mislabeling? We want to label it 'Not Intended for Human Consumption.'"); 1292-111 at 1-2 (September 21, 2010, email from Malone stating "[w]e need to say "Not Intended For Human Consumption" according to Don Wirtshafter"); 1292-135 at 2, 9-11 (March 2, 2011, email from Wirtshafter to Malone, Green, and others sending "CCL Packaging and Promotion Guidelines" and a warranty stating "This product is not intended for human consumption"); & 1292-136 at 2 (March 6, 2011, from Wirtshafter to Malone stating, "Besides 'These products are not intended for human consumption' what else to [sic] you think this placard needs to say?'").

Stanford maintains that had he been able to present this suppressed evidence "the jury would have known that Stanford had no involvement, input, or authority regarding the use of and/or removal of the 'Not For Human Consumption' label on synthetic cannabinoid products and Mr. Miyagi." Record Document 1292 at 139. He further argues this evidence demonstrates "Green and Malone were following the advice of attorney Wirtshafter to mislabel Mr. Miyagi and to avoid any implications of consumption/smoking." *Id.* at 119.

Fatal to Stanford's materiality arguments is his mischaracterization of the evidence upon which he relies. While these exhibits do support that Wirtshafter advised Green and Malone to use "not intended for human consumption" on their packaging, Count Two was premised on the use of "not for human consumption." *See* Record Documents 57 at 9 ("Through the duration of this conspiracy, certain conspirators packaged . . . 'Mr. Miyagi' [] into packaging that on the exterior stated, . . . Warning: Our Potpourri is not for human

180

consumption.") (emphasis removed) & 927 at 111 (Government in closing argument

stating, "He's selling a misbranded drug. He's selling a drug that says 'not for human

consumption.'"); *see also Stanford I*, 823 F.3d at 823 (noting that the defendants sold

Mr. Miyagi as potpourri labeled with "not for human consumption"). Indeed, Barrow

specifically testified on his re-direct examination about the "not for human consumption"

label:

> Q    Early on, was Mr. Stanford advised of the strategy behind the labeling and the strategy behind "not for human consumption"?
>
> A    Yes.
>
> . . .
>
> Q    Did Mr. Stanford, when looking at the package at some of your several meetings that he attended with you -- did he ever look at the product and tell you, hey, guys, as an attorney, this is mislabeled here and this is not right?
>
> A    No.
>
> Q    Okay. Did he ever say, guys, you've got a drug here that is being smoked and you're telling people they can't consume it? Did he ever tell you, you shouldn't label it that way?
>
> A    No. If he had, we would have asked for an alternate label.

Record Document 924 at 242-43.

Therefore, while the purportedly suppressed evidence does suggest Malone and

Green at one point relied on Wirtshafter's advice to label their products with "Not

Intended for Human Consumption," they did not use his proffered wording on the

products sold into Louisiana that were at issue in this conspiracy. Quite plainly, the

suppressed evidence does not prove the labeling at issue here "was a decision made by

Green and Malone, unquestionably accepted and used by Barrow, and endorsed by Wirtshafter and Francis." Record Document 1292 at 140. Consequently, it neither impeaches Barrow's trial testimony nor lessen Stanford's role in Count Two.[111]

For these same reasons, Stanford's argument that Francis testified falsely about that Wirtshafter opposed labeling products with "Not For Human Consumption" fails. The exhibits cited above demonstrate that Wirtshafter advocated for using "not intended for human consumption" instead of "not for human consumption." *See* Record Documents 1292-37 at 3; 1292-67 at 1, 4; 1292-68 at 1, 3; 1292-69 at 1, 3; 1292-70 at 1, 4; 1292-108; 1292-110 at 6; 1292-111 at 1-2; 1292-135 at 2, 9-11; & 1292-136 at 2. Put differently, the exhibits show that Wirtshafter did, in fact, oppose the use of "not for human consumption," which is exactly what Francis testified to at trial. *See* Record Document 921 at 31, 43. Consequently, this evidence is not "contrary to [] Francis' testimony that Wirtshafter was the most outspoken in opposing the use of 'not for human consumption' on the labeling of synthetic cannabinoid products." Record Document 1292 at 118. These *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality.

---

[111] That "Nutragenomics and Pinnacle created Mr. Miyagi's label prior to Stanford's involvement was a well-known and a well-established fact at trial." Record Document 1305 at 28-30. Stanford fails to explain the relevance and materiality of Wirtshafter's involvement as it pertains to his convictions, and this failure is especially heightened considering that Wirtshafter advocated for a different label than was ultimately used.

Further, in an audio recording of a meeting taking place after the December 2011 raid of NutraGenomics Stanford discusses the "not for human consumption" language and acknowledges that the compound in Mr. Miyagi "is more or less activated or works when it's ingested by smoking it." Record Document 863-6 at 64. This statement suggests Stanford was aware of Mr. Miyagi's misbranding.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Wirtshafter advised the co-defendants to mislabel their products and whether Wirtshafter opposed labeling products with "Not For Human Consumption." *See id.* at 118-19, 139-40. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 37, 67-70, 106, 108, 110-111, and 135-136, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

Relatedly, Stanford argues "[s]uppressed evidence proves . . . Francis never advised anyone that the labeling on the products was deficient" and that he instead advocated for "mislabeling products[,] educating distributors and retailers," creating "new products to get around the analogue statute" and lobbied senators to use language that would allow for the use of "not for human consumption." Record Document 1292 at 125-26, 139. He relies on Exhibits 123, 129-131, and 148 for this claim.[112]

The Court begins this materiality analysis with Francis's testimony. At trial, Francis testified as follows during his direct examination:

A    We had an initial meeting in December -- I think it was the 16th, December 16th of 2010. And in that meeting we had the 30 manufacturers I was speaking about earlier.

---

[112] As found *supra*, the Government did not possess Exhibits 123, 129-131, and 148.

During that meeting there was a period of time, a matter of hours, that were dedicated to hearing what attorneys had to say in regard to these products.

. . .

None of them agreed with the labeling as it stood. And it wasn't just this particular label, but any of the labels that indicated it was potpourri, they felt like that was just ridiculous.

. . .

Q    Let me ask you, did you actually advise other individuals of this information about the labeling being deficient and that it wouldn't be helpful?

A    I did. I advised them in a more abstract sort of way. I tried to -- being on the regulating end of this -- or the so-called regulating end of this, my goal was to just kind of find them and bring them to attorneys. You know, say there's this opinion out there, there's this opinion out there, and somewhere in the middle of this probably lies what you should do; but I don't know what that is, and you should certainly contact an attorney.

. . .

Q    Despite what you would advise and despite what you had talked about with Mr. Wirtshafter, there was a decision made to the contrary of that, correct?

A    That's correct.

Q    And ultimately there was a decision made to misbrand the product?

A    The decision was made to maintain labeling as it stood, to maintain the not-for-human-consumption label and to not disclose on the packages what the active ingredient was.

Q    So this was an industry decision?

A    Yes.

Record Document 921 at 42-44.

Stanford argues Francis's testimony was false because Exhibits 123, 129-131, and 148 demonstrate Francis advocated for mislabeling products with "not for human consumption" and thus would not have advised anyone at the meeting to not use that

language. *See* Record Document 1292 at 125-26, 139. These exhibits do support that Francis advocated for labeling products with "not for human consumption," educating distributors and retailers to avoid mentioning human use implications, and creating new products to get around the analogue statute.[113] *See* Record Documents 1292-123 at 5-7 (November 15, 2010, CCL press kit drafted by Francis that states a position of the CCL is that "[t]he label of 'Not For Human Consumption' is a technical label . . . the equivalent to 'Off Label Prescribing' by physicians"); 1292-129 at 3 (November 19, 2010, email string wherein Francis states the CCL could say "[t]he Coalition does not support the use of [benign synthetic cannabinoids] out of their labeling" and that "Incense is aromatherapy");  1292-130 at 1 (November 23, 2010, email string wherein Francis informs CCL members that "we cannot represent the product as anything other than incense for use as labeled"); & 1292-131 at 2 (November 27-28, 2010, email string wherein Francis states they can use alternative products to circumvent the DEA ban).

This evidence likewise demonstrates that Francis lobbied senators to use language that would protect the co-defendants' products. *See* Record Document 1292-148 at 2-3 (March 29, 2011, email from Francis stating that he plans to meet with two senators "to

---

[113] Most of these exhibits were sent in relation to the CCL and Francis's work on the CCL's behalf. *See* Record Documents 1292-123 (a CCL press kit); 1292-129 at 3 (Francis stating how the CCL could respond to a certain argument); & 1292-130 at 1-2 (email sent by Francis to CCL members). Stanford does not explain how the CCL's opinions are the same as Francis's.

offer language that would appear to ban the product directly but leave the 'not for human consumption' as the caveat for sales").[114]

But Stanford's materiality argument misses the mark for two important reasons. First, Stanford only directs the Court to testimony from Francis discussing his advice as to labeling. Evidence that he advocated for alternative delivery methods, *see* Record 1292-131 at 2, would not impeach his testimony about labeling. Stanford does not direct the Court to any testimony that would be impeached by this exhibit. *See* Record Document 1292 at 128 (Stanford arguing Exhibit 131 "proves that Francis is aggressively advocating for alternative delivery methods for the synthetic cannabinoids to get around the ban which is contrary to his testimony" but failing to identify any contrary testimony). Because Exhibit 131 does not impeach Stanford, this materiality argument fails.

Second, Francis was charged alongside Stanford in Count Two, the conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce. *See* Record Document 57 at 6-10. Evidence that Francis advocated for mislabeling in no way undermines any of *Stanford's* convictions, including Stanford's conviction for Count Two. To the extent this evidence is inconsistent with Francis's testimony that he advised against this language at a December 2010 meeting, that impeachment is not material. Whether Francis advised for or against that language at a December 2010 meeting does not undermine any facts at issue. This meeting predates Stanford's involvement in the

---

[114] This email was sent after the December 2010 meeting. An email sent after that meeting would not impeach Francis's testimony that he advocated against the use of that language at the meeting.

misbranding conspiracy by several months, and Francis was indicted alongside Stanford for that conspiracy. Further, regardless of Francis's advice for or against that language, Mr. Miyagi was labeled with "not for human consumption" and distributed in interstate commerce.[115] Thus, these exhibits are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis opposed labeling products with "Not For Human Consumption." *See* Record Document 1292 at 125-26, 139. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 123, 129-131, and 148, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to Wirtshafter's advice regarding mislabeling. This category encompassed his arguments that (1) Wirtshafter, not Stanford, advised Green and Malone to mislabel their products, and they labeled their products pursuant to that advice; (2) Francis falsely testified that Wirtshafter opposed labeling products with "Not For Human Consumption," and (3) Francis falsely

---

[115] The Court notes that Francis testified that, while he did not come up with the "not for human consumption" language found on Mr. Miyagi, he did "encourage[] that to be on the packages." Record Document 921 at 201.

testified that he advised against the use of "Not For Human Consumption." *See* Record Document 1292 at 118-19, 125, 139-40. These claims were predicated on Exhibits 37, 67-70, 106, 108, 110-111, 123, 129-131, 135-136, and 148. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### c. Nature and Extent of Wirtshafter's Involvement[116] [Exhibits 60, 93-107, 109, 122, 125-129, & 138-139]

Stanford argues Green testified falsely as to both the nature and extent of Wirtshafter's involvement with NutraGenomics and the co-defendants. *See* Record Document 1292 at 114. Specifically, Stanford contends Green minimized Wirtshafter's involvement because suppressed evidence establishes that Wirtshafter was actively involved with both the CCL and the California RCA, advised Green and Malone to mislabel their products,[117] and assisted Green and Malone with other aspects of their business. *See id.* at 113-15. Relatedly, Stanford contends Wirtshafter did not draft a monthly newsletter as testified to by Green. *See id.* at 133. Importantly, Wirtshafter did not testify at trial. Stanford's argument is to the impeachment of Green, not Wirtshafter.

---

[116] Stanford additionally argues certain evidence impeaches Francis's testimony about his own involvement and role with the CCL and the RCA. The Court address these arguments *infra* in the relevant section.

[117] The Court has already addressed the claims related to mislabeling *supra* but notes here that even if that evidence is considered alongside evidence of Wirtshafter's other involvement, Stanford's claims still fail for lack of materiality for the same reasons previously set forth and for the same reasons set forth in this section.

Stanford relies on Exhibits 60, 93-107, 109, 122, 125-129, and 138-139 for his claim that Green minimized Wirtshafter's involvement by testifying that Wirtshafter only created a monthly newsletter.[118] The Court begins its materiality analysis with a summary of the exhibits.

Exhibits 104, 106, 107, 109, and 128 support that Wirtshafter advised Malone and Green on various aspects of their businesses and was otherwise involved with those businesses. *See* Record Documents 1292-104 at 1 (Wirtshafter advising Malone about whether a Georgia state ban encompassed certain chemicals); 1292-106 at 4, 6 (Malone asking Wirtshafter to "review the attached terms and conditions" for the "new affiliate website(s)" and Wirtshafter saying he will "review these in the next day or two"); 1292-107 at 5-8 (Wirtshafter's draft of the terms and conditions); 1292-109 at 4 (Wirtshafter stating he will review a section of the "Nature's Euphoria" website); & 1292-128 (Wirtshafter asking to participate in a telephone call between Green and another lawyer so he can discuss "strategy, division of labor and containing costs" and get that lawyer's thoughts on "[their] envisioned strategies"). Exhibits 104 and 105 suggest Wirtshafter received and used synthetic cannabinoids from NutraGenomics in June 2010. *See* Record Documents 1292-104 at 1 & 1292-105 at 3.

Exhibits 94 and 127 support that Wirtshafter was involved with the CCL. *See* Record Documents 1292-94 at 3 (Wirtshafter invoice for "[r]esearch and support for the Coalition we are trying to build") & 1292-127 at 1, 3 (Wirtshafter receiving an email

---

[118] As found *supra*, the Government did not possess Exhibits 60, 93-104, 106-107, 109, 122, 125-129, and 138-139. The Government possessed but did not produce Exhibit 105.

containing "CCL Discussion topics for [a] conference call" on November 16, 2010). Exhibits 125, 126, and 128 do not independently suggest Wirtshafter's involvement with the CCL.[119]

Exhibits 122, 129, and 138 support that Wirtshafter repeatedly advocated for the creation of an association for retailers and/or manufacturers that was distinct from the CCL.[120] *See* Record Documents 1292-122 at 2 (Wirtshafter stating "we will need to create or revive a retailers association and take action on their behalf"); 1292-129 at 2 (Wirtshafter explaining to Francis that manufacturers should not be associated with the CCL); & 1292-138 at 1-2 (Wirtshafter reiterating the need for separate organizations). Exhibit 139 supports that Wirtshafter said he would form the RCA in San Francisco, California. *See* Record 1292-139 at 8. In Exhibit 97, Wirtshafter's invoice charged for "[r]esearch and support for the [RCA]. Incorporation," which supports that he played a

---

[119] For Exhibits 125 and 126, Wirtshafter was not included in those email chains, and Wirtshafter was not mentioned in those emails. *See* Record Documents 1292-125 & 1292-126. For Exhibit 128, Wirtshafter asks to participate in a call between Green and another attorney in order to discuss "strategy, division of labor and containing costs" and "[their] envisioned strategies." Record Document 1292-128. Although Stanford contends this call was about the CCL, the exhibit itself does not refer to the CCL or otherwise indicate that was the purpose of the call. Stanford's speculation as what this exhibit is does not change its contents. Even if the Court were to find that these exhibits suggest Wirtshafter was involved with the CCL, the Court would find they are not material for the same reasons set forth herein.

[120] In this section of his § 2255 motion, Stanford additionally argues he would have used Exhibits 97, 138, and 139 to show "Francis didn't even understand the issues that retail stores were facing and that he was relying on [] Wirtshafter's guidance 'to get informed.'" Record Document 1292 at 142. Similarly, Stanford contends he would have used Exhibit 147 to show Francis was "out of touch with the CCL and its membership." *Id.* at 147. Stanford does not explain the materiality or relevance of these conclusions or of this evidence. The Court will not make materiality arguments on his behalf. As such, the Court finds these *Brady*, *Giglio*, and *Napue* claims, to the extent they exist, are without merit.

role in the incorporation of the RCA.[121] Record Document 1292-97 at 3. Finally, Exhibit 60 supports that Wirtshafter accepted a lot of responsibilities on behalf of his position within the RCA. *See* Record Document 1292-60 at 5-6. In Exhibit 60, Wirtshafter explains his responsibilities "are . . . solely to the RCA." *Id.* at 5. Wirtshafter states he is the RCA's legal director and is responsible for "long term legal strategy," "keeping an eye on state and local level developments [and] recommending when [he] thinks the RCA can be useful" in challenging those bans, "review[ing] . . . RCA promotional materials before publication," and "develop[ing] training materials for the retail stores" "with Bo [Kenney] and others." *Id.* at 5-6.

Because these exhibits demonstrate that Wirtshafter did more than draft a monthly newsletter, they arguably impeach Green's testimony.[122] However, that impeachment does not go to a material fact at issue. Wirtshafter's involvement in no way undermines Stanford's role in the conspiracies at issue here. "Testimony concerning Wirtshafter's role . . . cannot shed light . . . on Stanford's actions with Curious Goods and Stanford's RCA." Record Document 1305 at 41. Stanford's proffered evidence does not connect Wirtshafter with the co-defendants' distribution into Louisiana, which is what was at issue for Stanford's trial. Events occurring outside of the Western District of Louisiana and outside

---

[121] However, the Court notes the actual incorporation documents submitted at trial demonstrate that Francis was listed as the incorporator. *See* Record Document 863-2 at 36-38 (certified records for the Retail Compliance Association from California Secretary of State that were signed by "Dan Francis, Incorporator").

[122] While Green limited his testimony to the newsletter, at trial, "[t]he government offered testimony concerning the creation of the [CCL] and the California RCA, and Wirtshafter's role in them." Record Document 1305 at 40. Stanford omits this testimony from this argument, likely because it further undercuts his materiality argument.

of the time frame of the conspiracies do not undermine confidence in any of the verdicts sustaining Stanford's convictions. Further, that Wirtshafter may have advised the co-defendants does not preclude that the co-defendants also relied on Stanford's advice. This is especially so considering that Stanford was barred in Louisiana and thus would presumably have more knowledge of the laws and regulations promulgated in Louisiana. Finally, substantial evidence demonstrates that Stanford participated in the conspiracies at issue here.

Stanford additionally argues that, "[l]ike Mones, Wirtshafter was an attorney who was paid with proceeds derived directly from the sale of synthetic cannabinoid products including Mr. Miyagi[,] [and] [l]ike Mones, Wirtshafter was not charged and/or prosecuted for his involvement . . . ."  Record Document 1292 at 133. But like Mones, Stanford fails to proffer any evidence establishing that Wirtshafter received proceeds derived from the sale of synthetic cannabinoids, let alone the sale of synthetic cannabinoids in *Louisiana*. He likewise does not show Wirtshafter was part of (or even aware of) the conspiracies at issue in this indictment.[123] And, like with Mones, the possible culpability of another

_____

[123] For this same reason, Stanford's emphasis on "Wirtshafter's . . . actual use of synthetic cannabinoids" is misplaced. Record Document 1292 at 116. Wirtshafter's receipt and purported consumption of synthetic cannabinoids in June 2010 predates the conspiracies at issues here by several months. *See* Record Documents 1292-104 at 1 & 1292-105 at 3. That receipt and consumption likewise predates the federal ban, and Wirtshafter represents that his state had not yet banned synthetic cannabinoids. *See* Record Document 1292-104 at 1 ("Ohio has not caught up with the trend to ban these substances."). As such, Stanford has failed to establish the materiality and relevance of Wirtshafter's "actual use of synthetic cannabinoids." Record Document 1292 at 116.

individual in the conspiracies for which Stanford was convicted does not undermine the jury's verdict as to Stanford.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to Wirtshafter's involvement with the co-defendants and NutraGenomics. *See id.* at 113-15. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 60, 94, 104-107, 109, 122, 125-129, and 138-139, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

Relatedly, Stanford argues Green falsely testified because suppressed evidence proves "Wirtshafter never invoiced them for a monthly state ban newsletter." Record Document 1292 at 134. Instead, he maintains that Barry Covert, an attorney associated with Green and Malone, "took on the responsibility of updating 'the State Ban Chart on a regular basis'" and that Covert "prepared a detailed state analogue statutes chart for all the states with an analogue statute." *Id.*

Stanford relies upon Exhibits 93-103 for this claim.[124] The Court begins its materiality analysis with a summary of these exhibits. Exhibits 93-94 and 96-101 are

---

[124] As found *supra*, the Government did not possess Exhibits 93-103.

Wirtshafter's invoices. *See* Record Documents 1292-93 at 2 (September 2010 invoice for "[c]onsultation and review of website"); 1292-94 at 3 (October 2010 invoice for ("[r]esearch and support for the Coalition . . . Background work on spice issues"); 1292-96 at 9 (December 2010 invoice for "[r]esearch and support for the [RCA]. Prepare for litigation on Spice issues. Discussions . . . Attending conference in Atlanta, communicate with leaders of Drug Policy Movement, feelers to SBA. Research previous cases, meeting . . ."); 1292-97 at 3 (January 1-15, 2011, invoice for "[r]esearch and support for the [RCA]. Incorporation. Prepare website and promotional materials. Attend AVN show . . . Continued research into Cannabinoid issues"); 1292-98 at 2 (January 16-31, 2011, invoice for "[r]esearch and support for the [RCA]. State Research, Municipal Research, Work on Website, Continued research into Cannabinoid issues"); 1292-99 at 2 (February 1-14, 2011, invoice; charged tasks are essentially the same as the previous invoice); 1292-100 at 2 (February 15-28, 2011, invoice for essentially the same tasks); & 1292-101 at 4 (March 1-April 5, 2011, invoice for essentially the same tasks as well as "Update State Lists"). Exhibit 95 is a November 30, 2010, email from Philip B. Clemons, Jr. ("Clemons"), a NutraGenomics employe, to Wirtshafter, Malone, and Green indicating that payment for two of Wirtshafter's invoices has been mailed. *See* Record Document 1292-95.

Exhibit 102 is a February 2-4, 2011, email string including Wirtshafter, Green, Malone, Francis, Covert, and another individual. *See* Record Document 1292-102. On February 2, Wirtshafter provided a "table of chemicals banned by states." *Id.* at 1. He stated he "keep[s] finding new bills, so this list is still in progress." *Id.* On February 4,

Covert responded and referenced "an earlier discussion . . . that our office would update the State Ban Chart on a regular basis." *Id.*

Exhibit 103 is a March 8, 2011, email from Covert to Bo Kenney, Green, and Malone. *See* Record Document 1292-103. Covert stated he "had our clerks put together [a] chart detailing state analog statutes that we could locate." *Id.* at 1. He noted that Wirtshafter "previously created a chart dealing with substances, but [Covert] [did] not think that it dealt with analog's [sic]." *Id.*

Based on these exhibits, Stanford argues Wirtshafter never drafted a monthly state ban newsletter because his invoices did not reference or charge for a newsletter and Covert assumed responsibility for updating "the State Ban Chart." Record Document 1292 at 133-34. The Court does not agree that these exhibits impeach Green's testimony that Wirtshafter drafted a newsletter. *See* Record Document 923 at 20-21.

First, the Court cannot confirm it received all of Wirtshafter's invoices. Notably, Exhibit 95 references a check to Wirtshafter "for the two invoices totaling $5200.00." Record Document 1292-95. The only invoices provided to the Court that are dated prior to November 30, 2010, total $3,400. *See* Record Documents 1292-93 at 2 ($1,200) & 1292-94 at 3 ($2,200). Stanford does not address this discrepancy. In light of this discrepancy, the Court cannot conclude it received all the relevant invoices and further cannot find that Wirtshafter *never* invoiced for a newsletter.

Second, Stanford appears to conflate a newsletter with a state ban chart. Covert assumed responsibility for updating a state ban chart that was accessible by various parties. *See* Record Documents 1292-102 & 1292-103. Stanford asks this Court to read

195

this email as Covert assuming responsibility to draft and send a newsletter to those included in the email as opposed to Covert assuming responsibility to "update the State Ban Chart on a regular basis." Record Document 1292-102 at 1. A chart is not the same thing as a newsletter. The Court will not speculate as to anything beyond the plain text of this email. Put differently, the Court will not assume, as Stanford does, that a state ban chart and a state ban newsletter are the same thing.

Third, Stanford asks this Court to assume Wirtshafter did not draft a newsletter because he did not specifically and discretely charge for drafting a newsletter. This argument ignores that Wirtshafter's invoices are short and replete with general tasks. Wirtshafter does not specifically identify what "[r]esearch and support" entails, and tasks such as "[r]esearch and support for the [RCA]" may reasonably encompass drafting and issuing a state ban newsletter. *See* Record Documents 1292-96 at 9; 1292-97 at 3; 1292-98 at 2; 1292-99 at 2; 1292-100 at 2; & 1292-101 at 4.

Even if these exhibits can be interpreted as being inconsistent with Green's testimony, the Court finds that impeachment is not material. Whether Wirtshafter drafted a newsletter was not a material fact at issue. Quite simply, the drafting of that newsletter would not undermine confidence in any of the verdicts sustaining Stanford's convictions. Consequently, these exhibits are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Wirtshafter actually drafted a monthly newsletter. *See* Record Document 1292 at 133-34. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 93-101, fail for lack of materiality. These exhibits do not

196

"undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to Wirtshafter's involvement. This category encompassed his arguments that (1) Wirtshafter received higher compensation than testified to by Green; (2) Wirtshafter advised Green and Malone to mislabel their products; and (3) Green minimized Wirtshafter's involvement. *See* Record Document 1292 at 113-15, 133-34. These claims were predicated on Exhibits 37, 60, 67-70, 93-111, 122-123, 125-131, 135-136, 138-139, and 148. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### 3.  Other Attorneys [Exhibit 137]

Stanford argues that "[s]uppressed evidence proves that Green, Malone, NutraGenomics, and the CCL were represented by numerous attorneys with significant experience and expertise." Record Document 1292 at 180. Stanford specifically relies on Exhibit 137.[125]

---

[125] As found *supra*, the Government did not possess Exhibit 137.

The Court begins its materiality analysis with a summary of this exhibit. Exhibit 137 is a December 13, 2010, email from Van Watkins ("Watkins")[126] containing a list of attorneys working for "DGTM Management, Inc.[127] . . . and the CCL." Record Document 1292-137 at 1-2. The list designates the attorneys' "respective scopes of work," which include legal entities, tax, FDA compliance, website and marketing guidelines, disclaimers, criminal defense, advertising, first amendment, etc. *Id.*

Stanford contends this list is favorable because it shows "the CCL was well organized, well financed, and was represented by a number of highly qualified attorneys." Record Document 1292 at 181. However, he fails to explain the significance of the CCL's legal representation as it pertains to his own convictions. Stanford does not connect any of these attorneys to the conspiracies to distribute AM-2201, money launder, or introduce a misbranded drug. Further, this email was sent several months prior to Stanford's involvement and thus it may not accurately represent CCL's legal staff during the relevant time. Additionally, Stanford worked for the Louisiana branch of the RCA, not the CCL. Lastly, taking Stanford's conclusion on its face, the representation "by a number of highly qualified attorneys," *see id.*, does not negate Stanford's own involvement. In all, Stanford fails to explain how this evidence undermines confidence in any of the verdicts sustaining his convictions.

---

[126] Watkins signed this email as the "Senior VP" of NutraGenomics. Record Document 1292-137 at 2.

[127] According to Watkins, DGTM Management, Inc. is a "Holding Company for all [their] legal entities." Record Document 1292-137 at 4. Malone informs Watkins that he should "use nutragenomics instead of dgtm." *Id.* at 2.

Stanford makes two additional arguments for materiality. First, he argues this evidence "proves that the co-defendants were extremely sophisticated and knowledgeable regarding the laws and regulations affecting synthetic cannabinoids as well as proper labeling of their products." *Id.* What Stanford ignores is that evidence at trial fully supports that the co-defendants were actively monitoring and reviewing these laws in an effort to skirt them. In any event, this exhibit, standing alone, does not show that the co-defendants were "extremely sophisticated and knowledgeable." *Id.* This exhibit shows only that several attorneys worked for the CCL in a variety of legal fields. As such, this materiality argument likewise fails.

Second, Stanford contends this evidence "impeaches the testimony of cooperating co-defendants and undermines all credibility in the prosecution's case . . . ." *Id.* at 181-82. However, he does not identify any testimony purportedly impeached by this exhibit. That is his burden to meet. Because he has failed to explain what, if any, testimony is impeached, the Court finds he has failed to demonstrate materiality on this ground.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to other attorneys representing the CCL. *See id.* at 180-82. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibit 137, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury"

such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### 4. Dr. Lantz [Exhibits 8 & 153-160]

Dr. Lantz is a chemist who worked for Rocky Mountain Instrumental Labs. Stanford argues Francis falsely testified "that Dr. Lantz was an unethical chemist who tailored his opinions to suit the needs of NutraGenomics and/or Pinnacle for a price." Record Document 1292 at 163. Relatedly, Stanford argues "[t]here is no evidence that Francis [or other attorneys] ever wrote an opinion letter opining on whether a certain chemical was or was not an analogue or homologue." *Id.* at 168.

Stanford relies on Exhibits 8 and 153-160 to establish Francis testified falsely about Dr. Lantz being an unethical chemist.[128] The Court begins its materiality analysis by summarizing Francis's testimony about Dr. Lantz. On direct examination, Francis testified as follows:

> Q    And in addition to lab reports for items that were purportedly tested by retail outlets to accompany their synthetic drugs that they were selling, did you also come across individuals who were writing opinion letters as to certain chemicals as to whether or not they were either analogues or homologues?
>
> A    Yeah, including myself, lawyers and chemists.
>
> Q    . . . Are you familiar with this company, Rocky Mountain Instrumental Laboratories, Incorporated?
>
> A    Yes, I am.
>
> Q    In particular, are you familiar with Robert Lantz?
>
> A    Yes, I am.
>
> Q    And what was Mr. Lantz known as in your industry?

---

[128] As found *supra*, the Government did not possess Exhibits 8 and 153-160.

A       Mr. Lantz was sort of, at least in our group, the Pinnacle Products and NutraGenomics group, for sure known as a chemist that would write favorable letters on the compounds. In other words, he would write what we wanted to hear. When we needed to say something wasn't an analogue or wasn't related to banned compounds, we would go to Dr. Lantz, and Dr. Lantz would find a way to word that scientifically for us.

Q       Did he do this for free?

A       No, no. He charged a lot of money. Anywhere from $5,000 to $7,000 is my understanding.

Record Document 921 at 38-39.

Stanford contends Francis falsely testified because Exhibits 8 and 153-160 prove "Dr. Lantz provided straightforward opinions, accurate chemical analysis, and charged reasonable fees consistent with other labs." Record Document 1292 at 163. The attached exhibits do generally support that Dr. Lantz advised Malone on whether certain chemical substances were homologues or analogues and that they would discuss Dr. Lantz's findings in the chemical analysis in-depth.

However, Francis is only included in Exhibits 155 and 156. Exhibit 155 supports that Malone asked Dr. Lantz for his opinion on whether a substance was an analogue, and Dr. Lantz reported that he believed it was not but noted similarities. *See* Record Document 1292-155 at 1. Malone forwards that conversation to Francis, Wirtshafter, and Green. *See id.* Exhibit 155 does not include any opinion letter nor does it discuss the same. As for Exhibit 156, in this email string between Wirtshafter, Malone, Francis, Green, and Dr. Lantz, Wirtshafter emailed Dr. Lantz to say that the best way Dr. Lantz could help "as a chemist is to help [Wirtshafter] craft the letter I sent you into something I can send to each of the big testing labs. I am seeking helpful responses from their rejections." Record Document 1292-156 at 3. This exhibit does not indicate that Dr. Lantz always

201

"provided straightforward opinions, accurate chemical analysis, and charged reasonable fees consistent with other labs." Record Document 1292 at 163. Thus, neither Exhibit 155 nor 156, standing alone or considered together, impeach Francis.

Even if Exhibits 8 and 153-160 can be interpreted as impeaching Francis, that impeachment is not material. Any inconsistency, if it exists, is so minor that it does not suggest a reasonable probability in a different outcome. Whether Dr. Lantz was ethical is, quite simply, not a fact at issue for Stanford's convictions. Dr. Lantz's personal character is wholly irrelevant for the conspiracies at issue here. As such, these exhibits are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Dr. Lantz drafted favorable opinion letters in exchange for payment. *See* Record Document 1292 at 163, 168. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 8 and 153-160, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

Relatedly, Stanford argues "[t]here is no evidence that Francis ever wrote an opinion letter opining on whether a certain chemical was or was not an analogue or homologue." Record Document 1292 at 168. Therefore, he contends Francis falsely

202

testified that he had given opinion letters. *See id.* He further contends Francis falsely

testified about "lawyers" giving opinion letters because "there is no evidence that

Wirtshafter, Covert, Mones, or any other attorney associated with this case ever authored

an opinion letter on the analogue or homologue statute of a chemical." *Id.* He relies on

the same exhibits discussed *supra*: Exhibits 8 and 153-160.

These exhibits in no way preclude opinion letters by Francis or attorneys.[129] Those

exhibits solely concern opinions letters from Dr. Lantz. While Stanford may speculate as

such, his speculation does not rise to a showing of materiality.[130] Further, even if these

exhibits can be interpreted as impeaching Francis, that impeachment is not material.

---

[129] Tellingly, perhaps, Stanford omits Exhibit 124 from this discussion (and, indeed, does not cite it at all in his § 2255 motion although it is attached). Exhibit 124 is a November 11, 2010, email string including Wirtshafter, Malone, and Green. *See* Record Document 1292-124. In this email string, Wirtshafter informs Green and Malone of the specific conflict of interests that would arise if he were to provide legal advice to other individuals. *See id.* at 1. He then states that "[l]egal opinion letters are something we should think about anyway" because "[h]aving a current letter from an attorney giving an opinion the activity is legal can destroy whatever proof the prosecution can come up with." *Id.* He informs Green and Malone that if they consent to him representing the other individuals, he would "examine the product or products" and "then issue [] an opinion letter that clears that specific product from legal issues." *Id.* He tells Green and Malone to "send [him] the formula" if they think he "should proceed on this." *Id.* Malone responds, "We want you to represent us first. And, if we can help others, and you make $, then that is cool too." *Id.* at 2. This exchange suggests Wirtshafter may have written an opinion letter for Malone, Green, or others, which would counter Stanford's argument that Francis testified falsely when he said other attorneys drafted opinion letters. *See* Record Document 1292 at 168.

[130] The Court notes here that Stanford has raised a similar claim in the past. That is, Stanford alleges the Government withheld information that would show a lack of certain evidence. Put differently, "[i]n making these arguments, [Stanford] actually seeks to prove a negative." Record Document 961 at 15. As the Court previously found, "without specific reference to what [information was] withheld," any *Brady* claims fail in light of the Government's submission "that it satisfied all of its disclosure requirements." *Id.* The Court reaches the same conclusion here.

Whether Francis or other attorneys drafted opinion letters has no bearing on any fact at issue for Stanford's convictions.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis or other attorneys drafted opinion letters. *See id.* These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 8 and 153-160, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to Dr. Lantz. This category encompassed his arguments that (1) Francis falsely testified that Dr. Lantz drafted favorable opinion letters in exchange for payment, and (2) Francis falsely testified that he and other attorneys drafted opinion letters. *See* Record Document 1292 at 168. These claims were predicated on Exhibits 8 and 153-160. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### 5. Francis's Testimony Regarding Communications with Stanford [Exhibits 142, 147, 150, & 163]

Stanford argues Francis falsely testified about communications he had with Stanford. *See* Record Document 1292 at 173, 176-79. First, Stanford contends Francis falsely testified about using his landline to contact Stanford prior to November 8, 2011.

*See id.* at 173. Second, Stanford seems to argue Francis either falsely testified that emails were missing from evidence or that the Government suppressed those emails. *See id.* at 176-79. Third, Stanford argues Francis falsely testified that he was paid to make a presentation to Stanford. *See id.* at 178-79. The Court addresses each in turn.

First, Stanford argues Francis falsely testified about using his landline to contact Stanford prior to November 8, 2011. *See id.* at 173. Stanford maintains "[s]uppressed evidence proves Francis used his cell phone for all of his business calls." *Id.* at 174. Stanford cites Exhibits 142, 147, 150, and 163 in support.[131] In these emails, Francis lists his cell phone number as his direct line in his signature. *See* Record Documents 1292-142 at 1, 1292-147 at 1, 1292-150 at 1,[132] & 1292-163. Based on that signature, Stanford concludes, without further evidence, Francis falsely testified about using his land line to make most of his phone calls. *See* Record Document 1292 at 173-74.

The Government contends this claim is procedurally barred because "Stanford raised th[is] claim on appeal . . . , and it was rejected." *See* Record Document 1305 at 43. On appeal, Stanford asserted a *Napue* challenge premised on his allegation that Francis falsely testified about calling Stanford before November 2011. *See Stanford I*, 823 F.3d at 839. Stanford relied on his own cell phone records to support that claim. *See id.* The Fifth Circuit rejected his argument, finding that "Stanford's claim about the phone records—even if true—does not rise to the level of materiality." *Id.*

---

[131] As found *supra*, the Government did not possess Exhibits 142, 147, 150, and 163.

[132] The Court notes Francis's cell phone number is not notated as Francis's direct line in Exhibit 150, but that number is included in the signature line. *See* Record Document 1292-150 at 1.

The Court is not convinced that the Fifth Circuit's ruling procedurally defaults Stanford's § 2255 claim. While the Fifth Circuit considered the same underlying general contention—that is, whether Francis falsely testified about communicating with Stanford prior to a certain point—it did so based on different arguments and evidence advanced by Stanford. Here, Stanford's argument seeks to undermine Francis's credibility that the call took place at all by attacking Francis's testimony as to the type of phone Francis would have used to make the call. This Court will not presume the Fifth Circuit would reach the same conclusion if it had these emails before it. The Court further notes "[a] *Brady* violation can provide cause and prejudice to overcome a procedural bar on a habeas claim." *Thompson*, 916 F.3d at 455. Therefore, the Court, out of an abundance of caution, finds that Stanford's *Brady*, *Giglio*, and *Napue* claims related to Francis's landline are not procedurally barred.

Nevertheless, the Court finds these claims without merit. Exhibits 142, 147, 150, and 163 do not demonstrate that Francis's testimony was false. Francis testified as follows during Stanford's cross examination of him at trial:

> Q    Okay. Now, you told this jury that at some point in August I called you or we spoke on the phone, right?
>
> A    Uh-huh.
>
> Q    And it would have been your cell phone, correct?
>
> A    No. It would have been my house phone.
>
> Q    Okay.
>
> A    I primarily only used -- I had an office in my house. I primarily used that phone.
>
> Q    Did you have a cell phone?
>
> A    I did.

. . .

Q     Okay. Do you have any phone records at all that reflect that you called me in August?

A     I'm sure they exist. I don't have them, no.

Q     Do you know if the government has any?

A     I don't know.

Record Document 921 at 215. Francis later testified:

A     That is my cell phone number.

Q     Okay. Has your cell phone number called my cell phone number?

. . .

A     Numerous times.

Q     Okay. Do you recall the first time? When was the first time you called me?

A     I don't know what the exact first time was, but it seems to me it was probably right around the middle of August of 2011, because we made contact which resulted in that e-mail where I attached those documents.

Q     Okay.

A      But I don't think I used my cell phone. Like I said before, I had a home office, and I did most of my phone calls from the land line. It had a headset, had a much longer charge, wasn't counted against data or minute plans.

Q     Okay. Let me ask you a very simple, straightforward question. *As you sit here today, you're saying in August, if we talked, you don't know which phone you used*, whether it was your cell phone or your land line. Would that be accurate?

A     *That's accurate*.

*Id.* at 261 (emphasis added). The above testimony demonstrates Francis did not conclusively know which phone he used to call Stanford. That testimony further demonstrates Francis regularly used his home office to make phone calls. Exhibits 142,147, 150, and 163 do suggest Francis listed his cell phone number as his direct line

in his email signature. *See* Record Documents 1292-142, 1292-147, 1292-150, & 1292-163. But this evidence does not contradict Francis's contention that he used his home office to make calls when he was at home. Even if these exhibits do suggest Francis testified falsely, that impeachment is not material. As the Fifth Circuit explained, "even if no call occurred, Francis's emails to Stanford make it obvious that he was communicating with Stanford as early as August, which undermines Stanford's contention that he did not become involved in the conspiracy until later." *Stanford I*, 823 F.3d at 839.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis falsely testified about using his landline to contact Stanford prior to November 8, 2011. *See* Record Document 1292 at 173-74. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 142, 147, 150, and 163, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

As noted *supra*, Stanford appears to articulate two other *Brady*, *Giglio*, and *Napue* claims premised on Francis's testimony regarding their communications. First, Stanford seems to a raise a claim based on Francis's testimony that all their communications were not available because "[t]here's a section of emails that are missing from the evidence." Record Document 921 at 259-60. The Court does not consider any *Brady*, *Giglio*, and

208

*Napue* claims premised on this testimony (if such claims do exist), for Stanford wholly fails to establish that the Government possessed this evidence. The Government did not subpoena Francis's emails, *see* Record Document 904 at 6, so it cannot be said to have suppressed the same. Stanford further fails to identify the materiality of this testimony or even whether such testimony was, in fact, false. As such, any *Brady*, *Giglio*, and *Napue* claims premised on this argument fails for lack of possession and materiality.[133]

Similarly, Stanford seems to argue Francis falsely testified about being paid to make a presentation to Stanford. *See* Record Document 1292 at 178-79. Stanford maintains "the prosecution produced no such check [for a presentation] at trial because one did not exist." *Id.* at 179. Plainly, if that check did not exist, the Government could not be said to have possessed and/or suppressed the same. To circumvent this conclusion, Stanford argues the Government suppressed evidence that "NutraGenomics and Pinnacle Products kept meticulous records, especially financial records." *Id.* He does not identify any specific evidence for the Court's consideration. Regardless, any such evidence would not be material. Evidence (or the lack thereof) suggesting that Francis was paid for a presentation would not undermine confidence in Stanford's conviction because it does not obviate the fact that Francis and Stanford were communicating in August. Any *Brady*, *Giglio*, and *Napue* claims premised on this argument fails for lack of possession and materiality.

---

[133] The Court additionally notes that it discussed a similar claim by Stanford in the memorandum ruling denying his motion for a new trial. *See* Record Document 961 at 14-16 (denying Stanford's *Brady* claim premised on the alleged withholding of emails from Francis's "two other e-mail accounts" that were used to communicate with Stanford).

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to communications between Francis and Stanford. *See* Record Document 1292 at 173, 176-79. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 142, 147, 150, and 163, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

In sum, the Court has now found Stanford's *Brady*, *Giglio*, and *Napue* claims related to the involvement of other people's roles in the conspiracy are without merit. First, the Court addressed Stanford's claim that the Government withheld evidence of Stuart Mones's involvement with Green and Malone. *See* Record Document 1292 at 104, 107. As part of this claim, Stanford argued (1) Green falsely testified about why he hired Mones; (2) Mones "was significantly more in-depth and involved than merely being on retainer as stand-by counsel[;]" and (3) the Government's knowledge of Mones's representation of NutraGenomics "created an affirmative duty to notify the court and/or file a motion for a conflicts hearing." *Id* at 104, 107-08, 110-11 & 1314 at 37. These *Brady*, *Napue*, and *Giglio* claims were predicated on Green's § 2255 filings and Exhibits 22-30, 32, and 83-91. These claims failed for lack of possession, lack of materiality, or both.

210

Second, the Court addressed Stanford's claim that the Government and the co-defendants minimized Wirtshafter's role in the conspiracy. *See id.* at 113-15. As part of this claim, Stanford argued (1) Wirtshafter received higher compensation than testified to by Green; (2) Wirtshafter advised Green and Malone to mislabel their products; and (3) Green minimized Wirtshafter's involvement. *See id.* at 113-15, 118-19, 125, 130, 133, 139-40. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 37, 60, 67-70, 93-111, 122-123, 125-131, 135-136, 138-139, and 148. These claims failed for lack of possession, lack of materiality, or both.

Third, the Court addressed Stanford's claim that the Government withheld evidence establishing that numerous attorneys represented the co-defendants. *See id.* at 180-82. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibit 137. These claims failed for lack of possession and lack of materiality.

Fourth, the Court addressed Stanford's claim that Francis falsely testified that Dr. Lantz wrote favorable opinion letters in exchange for payment and that Francis falsely testified that he and other attorneys wrote opinion letters. *See id.* at 163, 168. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 8 and 153-160. These claims failed for lack of possession and lack of materiality.

Finally, the Court addressed Stanford's claim that Francis falsely testified about communications he had with Stanford. *See id.* at 173, 176-79. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 142, 147, 150, and 163. These claims failed for lack of possession and lack of materiality.

Thus, Stanford's *Brady*, *Giglio*, and *Napue* claims based on other people's roles in the conspiracies are without merit and do not entitle Stanford to relief under 28 U.S.C. § 2255.

### v. CCL [Exhibits 14-16, 112-123, 125, 127, 132-134, & 145-146]

The Coalition for Cognitive Liberty ("CCL") was a "political action committee for the synthetic marihuana industry." *Stanford I*, 823 F.3d at 823. This claim category generally addresses Stanford's arguments that the Government withheld exculpatory evidence and/or solicited false testimony in relation to the CCL. This category includes Stanford's claims that (1) Francis falsely testified that he formed the CCL; (2) Francis falsely testified that he formed the CCL to create manufacturing standards for the industry; and (3) Francis falsely testified that he and Malone ran the CCL.

### 1. Formation of CCL [Exhibits 14 & 112-121]

Stanford argues Francis testified falsely at trial that he formed the CCL. *See id.* at 122. He maintains suppressed evidence proves "Francis was never part of the creation, formation, or incorporation of the CCL." Record Document 1292 at 123. Stanford specifically relies on Exhibits 14 and 112-121.[134]

The Court begins its materiality analysis with a summary of Francis's testimony. Francis testified as follows during his direct examination:

Q      Do you know when and how you became involved in the synthetic cannabinoid industry?

A      I do. I was seeking the compounds myself as a result of seeing a news story back in early 2010, March of 2010, and I came across a

---

[134] As found *supra*, the Government did not possess Exhibits 14 and 112-121.

> company called NutraGenomics. I began a business relationship with them, and over time that relationship grew into a request for me to start some sort of political action committee or industry style association for the sake of moving the industry forward or creating standards.

Record Document 921 at 25. On cross-examination, Francis testified as follows:

> Q    And at some point you became involved with the business of Tommy Malone and Drew Green, their company called NutraGenomics; is that right?
>
> A    That's correct. I wasn't involved in their business, but I was a customer.
>
> Q    And you went from being a customer to working with them and/or for them?
>
> A    Really neither. I formed an organization that they provided money to get started. I still wasn't working necessarily for them or necessarily with them, although they were part of it, but -- so were all the members of the organization.
>
> Q    Okay. And the first organization you're talking about is the Coalition for Cognitive Liberty; is that right?
>
> A    That's right.
>
> Q    And who incorporated that?
>
> A    I'm really not positive. I believe Drew Green incorporated that.

*Id.* at 195. Francis then stated, he was "at least initially the executive director, but [he] didn't have anything to do with the paperwork filing, signing anything, the responsibility of it, bank accounts or anything like that." *Id.* at 196.

Stanford argues Exhibits 14 and 112-121 prove "Francis had absolutely nothing to do with the creation and formation of the CCL" and that he was instead "hired after the fact[135] as a lobbyist/consultant." Record Document 1292 at 123. According to the exhibits produced by Stanford in his § 2255 motion, the CCL was incorporated as a non-profit

---

[135] "After the fact" in this context presumably means after the formation of the CCL.

corporation in Georgia on November 16, 2010. *See* Record Document 1292-126 at 1. Exhibits 118-121 support that Francis was hired as the "Executive Director and lobbyist for the Coalition" on or about November 1, 2010, prior to the official incorporation of the CCL. *See* Record Document 1292-118 at 2-3 (November 1, 2010, email from Malone to Wirtshafter, Green, and other attorneys informing them that Francis will serve as the executive director and lobbyist; November 9, 2010, email from Malone to the same individuals stating Francis has been hired); 1292-119 (November 2, 2010, email from Francis to Malone sending a "consulting contract"); 1292-120 (November 2-3, 2010, email discussion between Malone and Francis regarding Francis's compensation); & 1292-121 (November 8, 2010, email string including Watkins, Green, and Malone that has Francis's consulting agreement attached).

Exhibits 112-117 support that Wirtshafter, Green, and Malone were actively working towards creating the CCL throughout October 2010 prior to hiring Francis as the executive director and lobbyist. *See* Record Document 1292-112 (October 7, 2010, email string including Wirtshafter, Malone, and Green in which Wirtshafter forwards an email he sent to other attorneys about stalling the DEA ban); 1292-113 at 1-2 (October 10-11, 2010, email string including Wirtshafter, Malone, Green, and another individual that references raising money and hiring an attorney); 1292-114 at 1 (October 11-12, 2010, email string including Green, Watkins, and Cheryl Shaw, an attorney, in which Watkins informs Shaw that Green wants to set up a tax-exempt organization with the name "Coalition for Cognitive Liberty"); 1292-115 at 2 (October 18, 2010, email string including Wirtshafter, Green, Malone and others in which they plan a conference call for "Spice

214

Industry Representatives" to "mount an industry response to the efforts of the [DEA] to ban Spice Incense products"); 1292-116 at 1 (October 18, 2010, email from Wirtshafter to Green remarking, "So far this coalition we are building is working great"); & 1292-117 at 2 (contribution list sent on October 29, 2010, that indicates the CCL had received $39,500 in donations). Stanford additionally cites Exhibit 14, but this exhibit, contrary to Stanford's assertion, does not discuss the CCL or otherwise suggest that Francis was not involved in that organization's creation or formation. *See* Record Document 1292-14 (Green, Malone, and Wirtshafter discussing the impending DEA ban in late September 2010).

The above exhibits, except for Exhibit 14, suggest that Wirtshafter, Green, and Malone were working together to form the CCL prior to Francis being hired but that Francis was hired prior to CCL's incorporation. Stanford contends these exhibits thus impeach Francis because they prove "Francis had absolutely nothing to do with the creation and formation of the CCL" and that he was instead "hired after the fact as a lobbyist/consultant." Record Document 1292 at 123.

The Court does not agree these exhibits demonstrate Francis testified falsely. Certainly, Stanford's exhibits suggest Wirtshafter, Green, and Malone had started fundraising, building a coalition of lawyers, and working on a plan to stall the DEA's ban, but that does not preclude the fact that Francis also worked towards forming the CCL. Perhaps tellingly, Stanford omits Exhibit 125, which is attached to his motion, from this discussion entirely. Exhibit 125 includes a redlined version of Francis's proposed business plan for the CCL that was sent on November 15, 2010, one day prior to the incorporation

215

of the CCL. *See* Record Document 1292-125 at 1-2, 6-13. This exhibit suggests Francis played an instrumental role in the formation of the CCL.

Further, in making this argument, Stanford ignores that Francis was not a party to the prior communications between Wirtshafter, Green, and Malone. He assumes Francis would know of those communications but provides no proof. Based on the communications including Francis, it is entirely possible that Francis believed he formed the CCL.

Even if the Court assumes Stanford's conclusion that Francis testified falsely, that impeachment is not material. Whether Francis formed the CCL has no bearing on any of Stanford's convictions. Quite simply, the formation of the CCL was not a fact at issue at trial. Any inconsistencies in Francis's testimony about the formation of the CCL do not undermine Stanford's involvement and do not support a reasonable probability that the outcome would change if such evidence was presented. Thus, these exhibits are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis formed the CCL. *See* Record Document 1292 at 122-23. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 14 and 112-121, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have

affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C.

§ 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### 2. Purpose of CCL [Exhibits 14-16, 112-118, 122-123, 125, 127, & 132-134]

Stanford argues "Francis falsely testified that he formed the CCL to implement

manufacturing standards for synthetic cannabinoid products." Record Document 1292 at

122. Stanford relies on Exhibits 14-16, 112-118, 121-123, 125, 127, and 132-134.[136]

The Court begins its materiality analysis with a summary of Francis's testimony

about the purpose of the CCL. At trial, Francis testified as follows during his direct

examination:

Q    Let me ask you about your relationship with NutraGenomics and
     these gentlemen. You mentioned they asked you to form [the CCL]?

A    Correct.

. . .

Q    What was the objective as to why the Coalition for Cognitive Liberty
     was formed? What was it going to do?

A    The purpose of it was to create standards for manufacturers for
     making the products.

Q    And when you say for making the products, making what?

A    It was the so-called potpourri product or the fake pot product as it
     is known.

Q    Okay. And you say manufacturing standards. What type of
     manufacturing standards were y'all hoping to develop and pass on
     to other manufacturing companies?

A    Primarily we were trying to develop manufacturing standards to
     determine the quantity of the compounds that would be in it and
     create a consistency in that.

---

[136] As found *supra*, the Government did not possess Exhibits 14-16, 112-118, 121-123, 125, 127, and 132-134.

Q    Let me ask you to stop right there. When you say quantity of compounds, do you mean how potent each product was that was being made?

A    Right, which could be determined by a ratio of weight of plant material versus the weight of the chemical.

Q    So just to dumb it down for me, the amount of synthetic drug chemical that you're placing into the vegetable material?

A    Correct.

Q    Okay. So y'all are trying to develop standards in that regard into a finished product, how it was going to be made and how strong it was going to be?

A    Right. Because one of the big concerns, obviously, from my standpoint personally, was the likelihood that these were very potent chemicals. It takes a very small amount to deliver effect. I had experienced that. To know that these things were just being randomly mixed was a concern. You're going to have problems where some are extremely powerful and others maybe not powerful at all.

Q    Also in these standards, there were certain packaging standards decided upon, correct?

A    That's correct.

Q    Certain labeling decisions that everyone agreed that they were going to move forward with?

A    That's right.

Record Document 921 at 29-31. Stanford argues suppressed evidence proves "the CCL was organized to raise legal challenges to the proposed DEA ban" and that "the reason for forming the CCL had nothing to do with implementing manufacturing standards for synthetic cannabinoids." Record Document 1292 at 122-23. Therefore, Stanford contends Francis "falsely testified that he formed the CCL to implement manufacturing standards for synthetic cannabinoid products." *Id.* at 122.

Stanford divides the exhibits into two groups. First, he argues Exhibits 14-16 and 112-118 "prove that Wirtshafter, Green, and Malone's only focus is to organize a coalition

of manufacturers and put together a legal team to challenge the proposed federal ban."
*Id.* at 120. Second, he argues Exhibits 122-123, 125, 127, and 132-135 prove "Francis
never mentioned manufacturing standards" in CCL-related documents and that
manufacturing standards were not discussed at the December 2010 CCL meeting. *Id.* at
125. The Court addresses each contention in turn. Ultimately, the court finds these
exhibits are not material both because they do not necessarily impeach Francis and
because any such impeachment, should it exist, is not material.

The Court begins with Stanford's contention that Exhibits 14-16 and 112-118
establish that "Wirtshafter, Green, and Malone's only focus is to organize a coalition of
manufacturers and put together a legal team to challenge the proposed federal ban." *Id.*
at 120. Exhibits 14, 15, and 16 are emails between Green, Malone, and Wirtshafter sent
from September 24, 2010, to September 27, 2010. *See* Record Documents 1292-14,
1292-15, & 1292-16. In these emails, Green, Malone, and Wirtshafter discuss the DEA's
temporary ban on synthetic cannabinoids. *See* Record Documents 1292-14, 1292-15, &
1292-16. In Exhibit 15 specifically, they discuss how they can fight the ban, and
Wirtshafter states they "can definitely fight" but "that all we can expect to do is slow [the
DEA] down." Record Document 1292-15 at 1-2. Exhibits 112-117 (summarized *supra*)
show that Wirtshafter, Green, and Malone were actively working towards creating the
CCL and raising funds to stall the DEA ban. *See* Record Documents 1292-112, 1292-113,
1292-114, 1292-115, 1292-116, & 1292-117. Exhibit 118, also summarized *supra*, shows
the CCL hired Francis as the executive director and lobbyist for the CCL on or about
November 1, 2010. *See* Record Document 1292-118 at 2-3.

The Court finds these exhibits do not necessarily impeach Francis. All these communications, except for Exhibit 118, predate Francis's involvement with the CCL and do not preclude the truthfulness of Francis's testimony. Stanford has not shown Francis would have knowledge of these communications. Further, that the CCL was initially formed to stall the ban does not mean the co-defendants did not use the CCL to create manufacturing standards. Put differently, while Wirtshafter, Green, and Malone may have been initially focused on stalling the ban, this fact would not preclude that the focus of the organization broadened over time. Nor do these exhibits preclude that Francis's focus would have included manufacturing standards. As such, these exhibits do not seem to impeach Francis.

The Court reaches a similar conclusion for Exhibits 121-123, 125, 127, and 132-134. As stated *supra*, Stanford contends these exhibits show "Francis never mentioned manufacturing standards" in CCL-related documents and that the CCL did not discuss manufacturing standards at the December 2010 CCL meeting. Record Document 1292 at 125. The Court acknowledges that Francis does not mention manufacturing standards in his consulting agreement, initial CCL press kit, CCL business plan, CCL discussion topics for a November 2010 meeting, and CCL agenda for a November 2010 conference call. *See* Record Documents 1292-121 at 3-6; 1292-122 at 5-8; 1292-125 at 6-13; 1292-127 at 3; & 1292-132 at 2. However, contrary to Stanford's assertion, manufacturing standards were mentioned in other CCL-related documents and at the December 2010 CCL meeting. *See* Record Documents 1292-123 at 7 (Francis including "[e]stablish manufacturing standards and testing protocols" and "[e]stablish standards for dosing and

product concentrations" when discussing the "Coalition position" for a "manageable legal regulation" in his November 15, 2010, press kit); 1292-133 at 5 (including "[s]tandardizing product packaging" in the agenda for the December 2010 CCL meeting); & 1292-134 at 4-6 (referencing a "discussion . . . of establishing a protocol / recommended guidelines in the manufacturing, distribution, and final sales of products" and a vote "[t]o establish a recommended quality control standards . . . and letter of compliance or code of conduct" in the minutes for the December 2010 CCL meeting). Based on the foregoing, CCL members were concerned with creating manufacturing standards. Put differently, this evidence does not show that "the reason for forming the CCL had nothing to do with implementing manufacturing standards for synthetic cannabinoids." Record Document 1292 at 122.

In any event, even if Exhibits 14-16, 112-118, 121-123, 125, 127, and 132-135 can be interpreted as impeaching Francis, that impeachment is not material. Stanford fails to identify the relevance of the CCL as it pertains to his convictions. Evidence of the purpose of that organization does not undermine any fact at issue for Stanford's convictions. This is especially so considering that manufacturing standards were at least *a* purpose of the CCL, if not necessarily the primary purpose. The Court further notes these communications and the formation of the CCL predate Stanford's involvement in the conspiracies by several months, a fact which also cuts against the relevance and materiality of this evidence.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether the CCL was formed to create

manufacturing standards. *See id.* at 122. These *Brady*, *Giglio*, and *Napue* claims,

premised on Exhibits 14-16, 112-118, 121-123, 125, 127, and 132-134, fail for lack of

materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are

not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th

at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is

any reasonable likelihood [these exhibits] could have affected the judgment of the jury"

such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392

(internal quotations omitted).

### 3.  Francis's Role in the CCL [Exhibits 145-146]

Stanford argues Francis falsely testified "he and Malone ran the CCL" because

suppressed evidence proves "Francis is not a member of the CCL board of directors or a

member of the 'Inner Circle.'" Record Document 1292 at 145. Stanford relies on Exhibits

145-146.[137]

The Court begins its materiality analysis with a summary of Francis's testimony. At

trial, Francis testified as follows during his cross-examination:

Q    Do you remember attending a meeting December 10th for the
     Cognitive Liberty at the Doubletree Hotel in Roswell, Georgia?

A    Yes, I do.

Q    And you were introduced as the executive director of the Coalition?

A    I was at that time. I think it was just in its forming stages at that
     time. The officers and such and the different roles were elected
     during that meeting.

. . .

---

[137] As found *supra*, the Government did not possess Exhibits 145-146.

Q    Did you have anything to do with the incorporation of the Coalition?

A    No, I did not -- in what context do you mean that? I think I was at least initially the executive director, but I didn't have anything to do with the paperwork filing, signing anything, the responsibility of it, bank accounts or anything like that.

Q    You were just named the executive director and you ran it?

A    Yes.

Q    Did anybody else run it?

A    Tommy Malone.

Q    You and Tommy Malone?

A    Yes.

Q    Anyone else?

A    No.

Record Document 921 at 196-97.

Stanford argues Exhibits 145-146 impeach this testimony because they demonstrate Francis was not part of the CCL's "Inner Circle." Record Document 1292 at 145-46. The Court does not agree these exhibits impeach Francis's testimony.

At the outset, Stanford seems to conflate "inner circle" with running the CCL. Stanford does not direct the Court to testimony from Francis claiming to be a member of the inner circle. For this argument to make logical sense, the Court must presume one must be part of the inner circle to help Malone run the CCL. The Court must additionally ignore the exhibits previously cited by Stanford that show Francis was hired as the executive director of the CCL. *See* Record Document 1292-118 at 2-3; 1292-119; 1292-120; & 1292-121. Those exhibits are entirely consistent with Francis's testimony that he was initially the executive director and helped Malone run the CCL. *See* Record Document 921 at 196-97.

Even assuming being a member of the inner circle was a prerequisite for helping Malone run the CCL, Stanford's exhibits still do not impeach Francis's testimony. Certainly, Exhibits 145-146 reference an "inner circle" and omit Francis from those communications. *See* Record Document 1292-145 at 1 ("Please note the email addresses. This is the Inner Circle.")[138] & 1292-146 at 1 ("I have sent this only to the Steering Committee or IC as Tommy [Malone] calls it."). However, in making his materiality argument, Stanford omits pertinent testimony from Francis that explains why Francis was omitted from these emails. Specifically, Francis testified he was "effectively removed from any influence in the coalition" following the formation of the RCA "around January of 2011." Record Document 921 at 203. At that time, Francis "took it upon [him]self" to "work[] full time for the [RCA]." *Id.* at 203-04.

The emails in Exhibits 145 and 146 were sent in February 2011 after Francis was "removed from any influence in the coalition." *See id.* at 203; 1292-145 at 1; & 1292-146 at 1. Email communications to the CCL's "inner circle" after January of 2011 would not impeach Francis's testimony that he was initially the executive director before being removed from that position. As such, Exhibits 145-146 are not material because they do not impeach Francis.[139] Even if the Court assumes an inconsistency, the Court would still

---

[138] Exhibit 145 does not explicitly reference the CCL. *See generally* Record Document 1292-145. This exhibit also has a header at the top stating, "BioGenixUSA Mail - Inner Circle," which suggests the individuals included in that email comprised the "BioGenixUSA . . . Inner Circle," not the CCL inner circle. *Id.* at 1. Nevertheless, the Court assumes *arguendo* that this exhibit refers to the CCL's inner circle.

[139] Perhaps tellingly, Stanford omits Exhibit 139, which is attached to his motion, from this discussion. Exhibit 139 is a December 18, 2010, email string including Wirtshafter, Francis, Malone, and others. *See* Record Document 1292-139. In this email string, Malone

conclude these exhibits are not material. Whether Francis initially helped run the CCL or was part of the CCL's inner circle several months prior to Stanford's involvement has no bearing on any fact at issue. Thus, Exhibits 145-146 are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis helped Malone run the CCL. Record Document 1292 at 145. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 145-146, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

In sum, the Court has now found Stanford's *Brady*, *Giglio*, and *Napue* claims related to the CCL are without merit. First, the Court addressed Stanford's claim that Francis falsely testified about forming the CCL. *See* Record Document 1292 at 122-23. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 14 and 112-121. These claims failed for lack of possession and lack of materiality.

Second, the Court addressed Stanford's claim that Francis falsely testified that the CCL was formed to create manufacturing standards for the industry. *Id.* These *Brady*,

_____

informs Wirtshafter that "Bo Kinney [sic] should be included in all of the 'inner circle' communications." *Id.* at 2. Francis was included in these emails. *See id.* Therefore, Exhibit 139 suggests Francis was a member of the inner circle in December 2010.

*Napue*, and *Giglio* claims were predicated on Exhibits 14-16, 112-118, 121-123, 125, 127, and 132-134. These claims failed for lack of possession and lack of materiality.

Finally, the Court addressed Stanford's claim that Francis falsely testified he and Malone ran the CCL. *Id.* at 145. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 145-146. These claims failed for lack of possession and lack of materiality.

Thus, Stanford's *Brady*, *Giglio*, and *Napue* claims based on the CCL is without merit and do not entitle Stanford to relief under 28 U.S.C. § 2255.

### vi. California RCA [Exhibits 11, 60, 97, 101-103, 108, 122, 129, 138-144, 146-150, & 160-165]

The Retail Compliance Association ("RCA") was an organization incorporated under California law created "to keep retailers abreast of the latest regulatory developments and to track legislation affecting cannabinoids." *Stanford I*, 823 F.3d at 823. When the Court refers to RCA in this section, it refers only to the California RCA and not the Louisiana branch that was later formed by Stanford and Francis.

This claim category generally addresses Stanford's arguments that the Government withheld exculpatory evidence and/or solicited false testimony in relation to the California RCA. This category includes Stanford's claims that (1) Francis falsely testified he incorporated the RCA as a for-profit corporation; (2) Francis falsely testified he created training materials and tracked state and federal laws regarding synthetic cannabinoids; (3) Francis falsely testified Wirtshafter was still working as a full-time staff attorney for the RCA on August 22, 2011; (4) Francis falsely testified the RCA employed

226

a sales strategy that involved giving lab reports to customers; and (5) Francis falsely testified about the RCA in general.[140] The Court addresses each in turn.

### 1. Incorporation of RCA [Exhibits 97, 122, 129, 138-140, & 148]

Stanford argues "Francis testified falsely about having formed the RCA, as well as about its status as a for-profit organization." Record Document 1292 at 149. The Court separates this argument into two parts: first, that Francis lied about forming the RCA; second, that Francis lied about forming the RCA as a for-profit organization. *See id.* Before the Court turns to Stanford's arguments, the Court begins by summarizing Francis's testimony at trial:

On direct examination, Francis testified as follows:

Q    And you actually developed a version of this [the RCA] that was ultimately incorporated in California early on, correct?

A    That's correct.

Q    And there were certain things that you did as being part of the Retail Compliance Association, correct?

A    Yes.

Q    In forming it, did you form it as a for-profit or nonprofit entity?

. . .

A    Yeah. Ultimately I found myself in charge of filing for the nonprofit status and chose not to do that.

Q    And why?

---

[140] Stanford relatedly argues "suppressed evidence proves that most of Francis' testimony was false and the prosecution knew it." Record Document 1292 at 180. Where Stanford has actually identified that testimony, the Court has considered whether his evidence demonstrates that testimony's falsity. However, the Court will not scour the record and make claims on Stanford's behalf. If Stanford did not specifically direct the Court to false testimony, the Court did not consider a claim that Francis testified falsely.

A     Because there were already significant legal hurdles that we were dealing with, such as the labeling, the fact that it's a drug, and it seemed like bringing on the additional regulatory burden of nonprofit with people that are already unwilling to do anything about the already questionable activity seemed like a bad idea. You know, that we're not going to maintain this either.

Q     Now, again, you formed the Retail Compliance Association, right?

A     Yeah.

Record Document 921 at 47-48.[141]

On cross-examination, Francis stated he initially incorporated the RCA as a non-profit corporation but "never submitted" the paperwork to finalize the non-profit status. Record Document 922 at 7. On re-direct examination, Francis reiterated that he never finalized forming the RCA as a non-profit. *See id.* at 174-75. With this testimony in mind, the Court now turns to Stanford's arguments.

First, Stanford argues "Francis had nothing to do with forming and/or incorporating the RCA" because suppressed evidence shows "Wirtshafter conceived of the RCA [and] incorporated the RCA . . . ." Record Document 1292 at 146-47. Stanford relies on Exhibits 97, 122, 129, and 138-140.[142]

---

[141] Stanford contends that, during Francis's testimony, he "separat[ed] himself from others with whom he worked and with whom he claimed promoted the mislabeling of synthetic cannabinoids in what Francis called 'already questionable activities.'" Record Document 1292 at 149. He argues "Exhibits 129, 130, and 131 prove Francis was a leading proponent of mislabeling and other questionable activities." *Id.* The Court finds these exhibits do not impeach Francis in any way. That Stanford interprets Francis's testimony in a certain way does not make that testimony false. In any event, Francis was indicted alongside his co-defendants. *See* Record Document 57. As such, the Court finds these exhibits do not impeach Francis and are not material for this reason.

[142] As found *supra*, the Government did not possess Exhibits 97, 122, 129, and 138-140.

Exhibits 122, 129, and 138 support that Wirtshafter repeatedly advocated for the creation of an association for retailers and/or manufacturers distinct from the CCL. *See* Record Documents 1292-122 at 1-2; 1292-129 at 1-2; & 1292-138 at 1-2. Exhibits 97 and 139 support that Wirtshafter said he would incorporate the RCA and charged for that incorporation. *See* Record Documents 1292-97 at 3 & 1292-139 at 8. Exhibit 140 supports that the RCA was incorporated on January 18, 2011, but that email does not indicate who incorporated it. *See* Record Document 1292-140 at 1.

Ultimately, while these exhibits support Wirtshafter played a role in forming the RCA, they do not impeach Francis. In making this argument, Stanford ignores the incorporation documents for the RCA. The actual incorporation documents submitted at trial demonstrate that Francis was listed as the incorporator. *See* Record Document 863-2 at 36-38 (certified records for the Retail Compliance Association from California Secretary of State that were signed by "Dan Francis, Incorporator"). These certified records demonstrate that Francis did, in fact, incorporate the RCA, which is entirely consistent with his testimony. As such, Exhibits 97, 122, 129, and 138-140 do not impeach Francis and are not material for the reason advanced by Stanford.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis formed the California RCA. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 97, 122, 129, and 138-140, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of

229

establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

Second, Stanford argues Francis falsely testified he incorporated the RCA as a for-profit corporation. *See* Record Document 1292 at 148-49. Stanford relies on Exhibits 140 and 148.[143] Exhibit 140 includes a March 13, 2011, email from Malone to Green and other individuals. *See* Record Document 1292-140 at 1. In this email, Malone sends information about the RCA. *See id.* This information indicates the RCA was incorporated on January 18, 2011, with a San Francisco, California address. *See id.* Although Stanford states this email demonstrates the RCA was incorporated as a non-profit, *see* Record Document 1292 at 142, the email itself does not state whether the RCA was incorporated that way. As such, this exhibit does not impeach Francis's testimony.

Exhibit 148 is a March 28-April 1, 2011, email string including Francis, Green, and Malone. *See* Record Document 1292-148. In this email string, Francis discusses merging the RCA with "the Small Business Alliance, the other group that is out of California trying to do the same as the RCA." *Id.* at 1. Francis later informs them that the Small Business Alliance did not want to merge, and he proposes two options. *See id.* at 4. He states he can either take "full control of all aspects of the RCA and move forward with the organization" or "dissolve the RCA." *Id.* He informs them that if they dissolve the RCA,

---

[143] As found *supra*, the Government did not possess Exhibits 140 and 148.

"the 18k will have to go to the government since it is still a 501c6 corp." *Id.* A "501c6 corp" is a "[b]usiness league[] . . . not organized for profit . . . ." 26 U.S.C. § 501(c)(6).

Arguably, Exhibit 148 suggests the RCA was a non-profit corporation in early 2011, which would seem to impeach Francis's testimony that he did not finalize incorporating the RCA as a non-profit. However, while this may impeach Francis's testimony, the Court finds that impeachment is not material. Whether the California RCA was a non-profit or for-profit corporation has no bearing on the ultimate facts at issue in Stanford's case. Regardless of the California RCA's non-profit status, substantial evidence supports Stanford's convictions. Further, these communications predate Stanford's involvement in the conspiracies by several months. Thus, while this exhibit may impeach Francis, that impeachment is not material. The Court would reach the same conclusion even if it were to find that Exhibit 140 impeaches Francis.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis incorporated the California RCA as a for-profit corporation. *See* Record Document 1292 at 148. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 140 and 148, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to the incorporation of the California RCA. That is, the Court addressed Stanford's arguments that Francis falsely testified about forming the California RCA and that Francis falsely testified about incorporating the California RCA as a for-profit corporation. *See* Record Document 1292 at 146-49. These claims were predicated on Exhibits 97, 122, 129, 138-140, and 148. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### 2. Francis's Role in the California RCA [Exhibits 60, 97, 102-103]

Stanford makes two arguments related to Francis's role in the RCA. First, Stanford argues Francis falsely testified about creating a police interaction guide because "[s]uppressed evidence clearly proves that was Wirtshafter's responsibility." Record Document 1292 at 155. Second, Stanford argues Francis falsely testified about being responsible for tracking different state or federal laws. *See id.* at 156. The Court addresses each in turn.

First, Stanford relies on Exhibits 60 and 97 to establish that Francis was not responsible for creating a police interaction guide.[144] The Court begins this materiality analysis with a summary of Francis's testimony. At trial, Francis testified during his direct examination that he sent several documents to Stanford on August 22, 2011, including a "Police Interaction Guide." Record Document 921 at 65-66. During his cross-examination, Francis testified as follows about that document:

---

[144] As found *supra*, the Government did not possess Exhibits 60 and 97.

Q    Now, let's talk about your Police Interaction Guide. It looks like you created this sometime before December of 2010. Is that accurate?

A    Yes.

Q    The Retail Compliance Association Police Interaction Guide, right?

A    Right.

Q    And you told this jury you didn't even incorporate the RCA until January of 2011; is that right?

A    That's correct.

Q    Okay. So you created this document in anticipation of incorporating an RCA?

A    That's right. It's an old document. It was cut and pasted primarily with edits to form it around the RCA. I cut and pasted the majority of that off of an attorney's website. They put it up there to use it as you want, print it, put it in your car, whatever, have it with you so you know what to do. He was primarily a drunk-driving style attorney, so he had a website soliciting people that way. It was sort of the freebie he had on his website, and it was adapted.

*Id.* at 264-65.

Stanford argues Exhibits 60 and 97 establish that creating the police interaction guide "was Wirtshafter's responsibility." Record Document 1292 at 155. The Court does not agree. While Exhibit 60 indicates Wirtshafter assumed responsibility for "develop[ing] training materials for the retail stores," Wirtshafter states he will be developing those materials "with Bo and others." Record Document 1292-60 at 6. "Others" can reasonably encompass Francis.

As for Exhibit 97, Wirtshafter charged for "prepar[ing] website and promotional materials" in January 2011. Record Document 1292-97 at 3. Stanford interprets this to mean Wirtshafter billed for "writ[ing] promotional materials like the retail display guideline and the police interaction guide." Record Document 1292 at 131-32. Thus, Stanford jumps to the conclusion that the promotional materials include training materials.

233

Notably, however, Wirtshafter distinguishes between promotional materials and training materials when discussing his responsibilities to the RCA. *See* Record Document 1292-60 at 5-6. And, as previously stated, Stanford ignores that Wirtshafter said he would develop those materials with others and that others would not preclude Francis.

Finally, and most importantly, Stanford ignores his own Exhibit 143. Exhibit 143 is a February 8, 2011, email string between Francis, Wirtshafter, Green, Malone, and others. *See* Record Document 1292-143. In this email string, Francis clarified what resources RCA members could access and how plaintiffs were chosen. *See id.* at 1. In one email, Francis states, "These are the documents as the [sic] stand today . . . The police Interaction Guide is an example of the form that RCA Members will recieve [sic] their legal assistance when requested." *Id.* at 4-5. Attached to one of the emails in this string is an "RCA Police interaction guide.pdf." *Id.* at 5. If Francis did not draft the guide as he testified, he certainly promulgated it.

In light of the foregoing, Exhibits 60 and 97 do not establish that Francis testified falsely about creating the police interaction guide. *See* Record Document 1292 at 155. Exhibit 143 demonstrates Francis created a version of the police interaction guide for the RCA, and Exhibit 60 states Wirtshafter would work with others to develop the training materials. Even if Wirtshafter was primarily responsible for drafting the training materials, including the police interaction guide, this evidence shows Francis also assumed that

responsibility and drafted a guide. Accordingly, Exhibits 60 and 97 do not impeach Francis's testimony on this point and are not material.[145]

To the extent these exhibits can be interpreted to impeach Francis, "[w]hether Francis or Wirtshafter drafted a document does nothing to undermine the evidence of Stanford's guilt." Record Document 1305 at 48. Evidence shows "Francis sent the documents at issue to Stanford in an effort to help begin the Louisiana RCA. If Wirtshafter was the original author of those documents . . . , this does not help Stanford's defense one iota" because it remains undisputed that Stanford received those documents and later helped form the RCA alongside Francis. *Id.*

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis drafted the police interaction guide for the RCA. *See* Record Document 1292 at 155. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 60 and 97, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

---

[145] To the extent Stanford argues Francis falsely testified about why or when he created this document, any such impeachment on that point, should it exist, is immaterial. Evidence about when or why the guide was drafted does not undermine confidence in Stanford's convictions. Stanford still received that document from Francis, and substantial evidence still supports Stanford's involvement in these conspiracies.

Second, Stanford relies on Exhibits 60 and 102-103 to establish that Francis was "never tasked with tracking different state or federal laws."[146] Record Document 1292 at 156. The Court begins this materiality analysis with a summary of Francis's testimony. During his direct examination, Francis testified as follows:

> Q    Now, early on, as part of the Retail Compliance Association, were you engaged in tracking different laws that were designed to target and ban the synthetic cannabinoid industry?
>
> A    Yeah. That was my primary role.

Record Document 921 at 50.

Exhibits 60 and 102-103 support that Francis did not explicitly assume responsibility for tracking various laws and that other individuals maintained a chart cataloguing those laws. *See* Record Documents 1292-60 at 2; 1292-102 at 1 (attorney saying he would take on the responsibility to "update the State Ban Chart on a regular basis"); & 1292-103 at 1 (attorney sending a "State Analog Statute Chart"). Even if these exhibits can be seen as inconsistent with Francis's testimony, that impeachment is not material. Whether Francis was responsible for tracking state or federal laws as part of his responsibilities with the California RCA has no bearing on any of the facts at issue underpinning Stanford's convictions. Evidence that Francis was not responsible for tracking these laws would not undermine any of Stanford's convictions or otherwise undercut Stanford's involvement in these conspiracies.[147] Thus, these exhibits are not material.

---

[146] As found *supra*, the Government did not possess Exhibits 60 and 102-103.

[147] Once again, the Court notes that this evidence predates Stanford's involvement by several months.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis tracked state and federal laws as part of his role in the RCA. *See* Record Document 1292 at 156. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 60 and 102-103, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of Stanford's claims related to Francis's role in the RCA. That is, the Court has addressed Stanford's arguments that Francis falsely testified that he created the police interaction guide and that he tracked state and federal laws. *See* Record Document 1292 at 155-156. These claims were predicated on Exhibits 60, 97, and 102-103. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

### 3. Wirtshafter's End of Employment with the RCA [Exhibits 101 & 148-49]

Stanford argues Francis falsely testified about when Wirtshafter stopped working for the California RCA. *See* Record Document 1292 at 153-54. Stanford relies on Exhibits 101 and 148-149.[148]

The Court begins this materiality analysis by summarizing the relevant portion of Francis's testimony. On cross-examination, Francis testified as follows:

> Q    Okay. So you're sending me this in August, on August 22nd [2011], and you're representing to me that you have a full-time staff attorney, the legal director, Don Wirtshafter. Isn't that what that document says?
>
> A    That's right, for the RCA that he controlled. There were three entities, so it's not one entity we're speaking of. And the RCA that this is about was in fact operated by Don Wirtshafter who was its staff attorney.
>
> . . .
>
> Q    Was Mr. Wirtshafter a full-time staff lawyer with the RCA on August 22nd of 2011?
>
> A    When you say the RCA, define that better for me. Which RCA?
>
> Q    The RCA that you are listing up here. It only shows one RCA. Do you see any other RCA?
>
> A    There's multiple entities at this point in time called the RCA. I'm trying to identify which one you're attributing it to, because I think it's clear that Don Wirtshafter had his own RCA that he was operating, and he was in fact working with this law firm, and he was in fact the single staff attorney.

---

[148] As found *supra*, the Government did not possess Exhibits 101 and 148-149.

Record Document 921 at 234-35. Stanford argues Exhibits 101 and 148-149 "prove[] there was only one (1) RCA that Wirtshafter worked for[,] and he ceased working for it on April 1, 2011."[149] Record Document 1292 at 154.

These exhibits support that Wirtshafter stopped working for the California RCA in April 2011. *See* Record Document 1292-101 at 1 (Wirtshafter sending his "final billing" for the RCA on April 12, 2011); 1292-148 at 5 (Malone stating Wirtshafter is owed payment for his RCA services in a conversation about the RCA merger); & 1292-149 (Wirtshafter stating he "stopped all work on the RCA's behalf and will submit [his] final bill shortly" on April 1, 2011). But even if this evidence is inconsistent with Francis's testimony, that inconsistency is not material. When Wirtshafter stopped working for the California RCA has no bearing any of the facts at issue here. Stanford has not shown that Wirtshafter had any involvement with the Louisiana conspiracies with which Stanford was charged, and he has not shown how Wirtshafter's involvement affects Stanford's role in those conspiracies. This evidence further suggests Wirtshafter stopped working for the RCA several months prior to Stanford joining the conspiracies. Stanford has failed to show how an attorney's cessation of employment prior to the conspiracies beginning would undermine any of the facts at issue for his convictions. Thus, these exhibits are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to when Wirtshafter stopped working for the

---

[149] The Court assumes *arguendo* there is no other entity called the RCA that Wirtshafter was part of but notes here that Stanford's exhibits do not necessarily foreclose the possibility that Wirtshafter was operating another entity.

California RCA. *See* Record Document 1292 at 153-54. These *Brady*, *Giglio*, and *Napue*
claims, premised on Exhibits 101 and 148-149, fail for lack of materiality. These exhibits
do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577
U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford
has failed to meet his burden of establishing that "there is any reasonable likelihood
[these exhibits] could have affected the judgment of the jury" such that he would be
entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations
omitted).

### 4. Sales Strategy of the RCA[150] [Exhibits 11, 108, & 160-162]

Stanford makes two arguments regarding Francis's testimony about the RCA sales
strategy. First, he argues Francis falsely testified "when he claimed that he built the RCA
sales strategy around misbranding products" because "[s]uppressed evidence proves
labeling Mr. Miyagi as potpourri and misbranding happened long before" the creation of
the RCA. Record Document 1292 at 155. Second, he argues Francis falsely testified "that
part of the RCA's sales strategy was to use lab reports that did not show which chemicals
were in the products" because "NutraGenomics [] requested that the testing lab produce
test results in two formats" "[p]rior to the creation of the . . . RCA." *Id.* at 170. Because
these arguments are similar—that is, Stanford claims the RCA did not use a certain sales
strategy because NutraGenomics had already been using that strategy prior to the RCA's
creation—the Court addresses these claims simultaneously.

---

[150] For this section, it is not entirely clear whether Stanford is referring to the Louisiana
branch or California branch of the RCA.

Stanford relies on Exhibits 11, 108, and 160-162.[151] The Court begins its materiality analysis with Francis's testimony. Francis testified as follows during his direct examination about misbranding:

> Q    Giving what you had to adopt and deal with, did you implement -- assist in implementing a sales strategy devoted to kind of the idea of misbranding and selling these things as potpourri?
>
> A    Yeah. We created something called the display guidelines.

Record Document 921 at 49. Francis testified as follows about the lab reports during his direct examination:

> Q    What was the purpose of acquiring lab reports, and how were the lab reports used in conjunction with the finished Mr. Miyagi product or other synthetic cannabinoids that were manufactured and sold at the retail level?
>
> A    That's a long answer. The purpose of the lab reports was to -- it really was multi-faceted. The main purpose was to represent what was not in the package. . . .
>
> The purpose of that was to bring a sense of security to the retailer so that they felt as though it had been tested, and that it was legal for them, that they could confidently sell the products, even though they really didn't know what was in it, and you can't see what's in it, and they could only see what was not in it. It was intended to move the marketing forward.

---

[151] As found *supra*, the Government did not possess Exhibits 11, 108, and 160-161. The Government possessed and produced the attachment in Exhibit 162 but did not possess the email string.

Stanford also refers to RTP Labs lab reports in Green's § 2255 filings, nothing that those "lab tests show what percentage of a chemical is in a product and others show which chemicals are not in the product." Record Document 1292 at 171. Stanford does not direct the Court to any specific pages and instead refers the Court to "R.Doc. 1240, Exhibit 4, In Globo." Record Document 1292 at 171. Green did not separate his exhibits numerically on the docket, which would require this Court to scour the 89 pages of his exhibits for the lab reports referenced by Stanford. This the Court will not do so.

Q    What was the strategy behind not actually putting simply what was in it?

A    Well, to put what was in it would move us into a different category again of clear FDA guidelines, and we thought we were skirting that by the not-for-human-consumption label. So the not-for-human-consumption label was in lieu of listing the specific ingredients.

*Id.* at 34-35. Francis then testified:

Q    And on here it says (as read): Many manufacturers and distributors have been supplying products with lab tests that are there to verify what is (and then in all caps) NOT in the products. These tests are important and must accompany, or at least be on file, for any product you offer. It is important that you call the lab and verify that the test you were given was for the product that you are selling. In the next paragraph you go on to say: The lab tests do not show what is in the products. They typically only show what is not. Correct?

A    Correct.

Q    Was this part of the RCA strategy and sales strategy that you implemented through the RCA?

A    Yes, it was.

*Id.* at 75.

Stanford contends Francis's testimony was false because the co-defendants misbranded their products and requested "that the testing lab produce test results in two formats" before "the creation of . . . the RCA." Record Document 1292 at 155, 170. Stanford additionally contends this testimony was false because "customers who questioned what chemical was and/or was not in the product were able to address their concern with NutraGenomics directly and were also encouraged to contact the testing lab." *Id.* at 171.

Exhibit 108 supports that Wirtshafter informed Malone that he "like[d] 'Not intended for human consumption'" for the label. Record Document 1292-108. This exhibit

242

does not impeach Francis. As explained extensively *supra*, the "not intended for human consumption" language was not at issue during Stanford's trial. Instead, the misbranding indictment and subsequent conviction stemmed from the use of "not for human consumption." *See e.g.,* Record Document 57 at 9. Further, even assuming NutraGenomics and other co-defendants previously misbranded their products, that fact would not preclude the RCA (either the Louisiana or California branch) from adopting that as part of a sales strategy. Finally, any impeachment suggested by this exhibit is not material. Whether the RCA adopted this as a strategy does not negate that the co-defendants, including Stanford, actually participated in the misbranding. Nor does it negate the substantial evidence of Stanford's involvement.

As for the lab reports, Exhibits 160 and 161 do support that NutraGenomics ordered lab reports from RTP Labs in two formats prior to the creation of the RCA. *See* Record Documents 1292-160 at 1-2 (December 30, 2011, email from Malone to Dr. Lantz informing him that "RTP provides 2 reports," one that states "[w]hat is in" the product and another that states "[w]hat isn't in it") & 1292-161 at 1 (August 23, 2010, email from Malone to Alston Sykes, a chemist at RTP Labs, stating that some tests "need to just state [] [w]hat is not in it"). Exhibits 11 and 162 additionally support that Green authorized at least one customer to talk with Sykes at RTP Labs directly to discuss the lab reports. *See* Record Documents 1292-11 at 1 (July 27, 2010, email from Green to Sykes and Harris stating that he gives Sykes "permission to talk with West Harris about the test results") & 1292-162 (July 2010 emails between Malone, Green, and the customer discussing the lab reports in which Green informs the customer that he can contact Sykes directly).

However, that NutraGenomics previously ordered these lab reports in a certain way or authorized certain customers to contact the labs does not preclude that Francis incorporated that report format as an RCA sales strategy. Further, even if these exhibits can be interpreted as impeaching Francis, that impeachment is not material. Why the lab reports were formatted that way has no bearing on any fact at issue underpinning Stanford's convictions. Evidence related to why the lab reports were formatted a certain way does not negate that the lab reports were so formatted. And, as explained many times *supra*, Stanford's convictions are supported by substantial evidence in the record. Thus, these exhibits are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether Francis falsely testified "that he built the RCA sales strategy around misbranding products" and lab reports that did not show what was in the product. Record Document 1292 at 155, 170. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 11 and 160-162, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### 5.  The RCA Generally [Exhibits 139, 141-144, 146-148, 150, & 163-165]

The Court prefaces this analysis by noting that many of Stanford's claims in this section are more akin to personal attacks against Francis than legal arguments supporting Stanford's requested relief. Additionally, Stanford does not always make his materiality arguments clear. Many of his arguments involve actions that predate by many months his involvement in the crimes which form the basis of his convictions. Finally, for some arguments, Stanford appears to use his attached exhibits to impeach other exhibits. For example, Stanford cites Exhibit 144, which is an RCA press release stating, "[t]he RCA has recently been able to stall the DEA's effort to ban five synthetic cannabinoids." Record Document 1292-144 at 1. Stanford argues this press release is false because "[t]here is zero evidence proving that the RCA was 'able to stall the DEA's efforts . . . .' Obviously, Francis is spreading false information and wishful thinking." Record Document 1292 at 145.

Despite these complications, the Court has done its best to parse Stanford's argument in this section. The Court surmises the following claims. First, Stanford argues Francis and the Government "presented a false narrative to the jury regarding the RCA and Francis's role with the RCA" because suppressed evidence proves the "RCA was a money pit that accomplished NOTHING."[152] *Id.* at 148. Second, Stanford makes a few specific materiality arguments related to certain exhibits, which the Court discusses *infra*. The Court addresses each in turn.

---

[152] The Court notes that Francis testified on direct examination that the RCA had not been "effective in stopping any of the bans." Record Document 921 at 55-56.

First, Stanford cites Exhibits 139, 141-144, 146-148, 150, and 163-165[153] to support that Francis's portrayal of the RCA was false.[154] Fatal to Stanford's materiality argument for these exhibits is his failure to identify the purportedly false testimony. Although he contends "[t]his evidence completely undermines most, if not all of Francis' false testimony regarding his portrayal of the RCA," *see id.* at 158, Stanford does not direct the Court to any specific testimony from Francis about the RCA beyond the testimony discussed *supra*.[155] That is Stanford's burden. The Court will not scour Francis's testimony, which spans over 400 pages, to find support for Stanford's claims. *See* Record Documents 921 at 24-278 & 922 at 6-189. The Court further notes that any such impeachment, should it exist, would not undermine Stanford's convictions. The success or failure of an organization that, according to Stanford, ceased to effectively operate several months *prior to* Stanford's involvement and creation of a separate entity does nothing to disturb his verdicts.[156]

---

[153] As found *supra*, the Government did not possess Exhibits 139, 141-144, 146-148, 150, and 163-165.

[154] The Court notes here that some of these exhibits are simply discussions about the RCA and do not suggest that the RCA was a failed entity. *See* Record Documents 1292-141 (discussion about upcoming conference call discussing lawsuits and membership for the RCA and CCL); 1292-143 (Francis discussing RCA documents); 1292-144 (RCA press release).

[155] As for the testimony discussed *supra*, the Court has already found that any inconsistencies, should they exist, are not material.

[156] Relatedly, Stanford argues "the CCL was actually the organization with an active membership, financial resources, and an experienced legal team," and the "RCA was formed to shield CCL members and organizational objectives from law enforcement." Record Document 1292 at 158. Stanford does not explain the relevance or the materiality of this argument. He also does not direct the Court to any false testimony in relation to this contention. Nevertheless, the Court finds that evidence about the CCL's membership,

246

In conclusion, Stanford argued Francis and the Government presented a false portrayal of the RCA. *See* Record Document 1292 at 148. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 139, 141-144, 146-148, 150, and 163-165, fail for lack of materiality. Stanford failed to identify any purportedly false testimony other than the testimony discussed *supra*. Consequently, the Court found that these claims fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

Stanford next appears to raise a few materiality arguments pertaining to specific exhibits. These exhibits include Exhibits 148 and 163-165. The Court addresses each exhibit and the attendant argument in turn.

Exhibit 148 is a March 28-April 1, 2011, email string including Francis, Green, and Malone. *See* Record Document 1292-148. In this email string, Francis discusses merging the RCA with "the Small Business Alliance." *Id.* at 1. Green says he "would prefer it goes to the SBA and we stay out of it altogether." *Id.* Francis says he "proposed a 5k per month funding for 3 months" for the merger. *Id.* at 2. He states this funding is "a small price to

---

resources, and legal team and evidence about why the co-defendants initially formed the California RCA would not undermine confidence in any of the verdicts sustaining Stanford's convictions and thus is not material.

pay to shift the liability over to another focus than us." *Id.* at 3. After Francis informs Green and Malone that the merger has failed, Malone responds that the merger vote did not pass by the CCL and says he "thought [Francis] and RCA were a conflict of interests." *Id.* at 4-5.

Stanford argues the suppression of this evidence prevented him from knowing that "Green, Malone, and Francis all considered the RCA a liability." Record Document 1292 at 152. Stanford additionally contends this evidence "would have allowed Stanford to present the jury with an accurate understanding of Francis' actual mindset, which was in direct contrast with the prosecution's fictious portrayal of Francis as well as in direct contrast to Francis's testimony." *Id.* Finally, Stanford contends the conflict alluded to by Malone was "another material issue that Stanford was prevented from presenting to the jury on cross examination." *Id.* at 152-53.

This exhibit is not material for any of the reasons advanced by Stanford. Evidence that Green, Malone, and Francis considered the California RCA to be a liability would not undermine confidence in Stanford's convictions. Quite simply, their opinions regarding an organization that predates Stanford's involvement in the conspiracy by several months are not relevant for any fact at issue. For the same reasons, evidence that Malone believed Francis had a conflict of interest with the California RCA is not material. As for Stanford's contention that this exhibit is "in direct contrast with the prosecution's fictious portrayal of Francis as well as in direct contrast to Francis's testimony," *see id.*, at 152, Stanford once again fails to direct the Court to specific testimony. For that reason, this

materiality argument fails. Because each of these materiality arguments fail, Stanford has failed to establish that Exhibit 148 is material.

Exhibit 163 includes a forwarded January 27, 2011, email from Francis to two individuals stating, "we want to run a 90 day PR campaign" and asking if they know of a "serious power hitter to handle this PR campaign, we have 40k to put down and about 100k we can spend." Record Document 1292-163. Stanford contends "[s]uppressed evidence proves that the CCL was funding all RCA activities," so "[a]n interesting question would have been, where is the $40,000 Francis is claiming he has to put down along with the $100,000 he has available to spend . . . ?" Record Document 1292 at 157. It is unclear whether Stanford is attempting to impeach Francis's email or if he is arguing this line of questioning is material. Regardless, the Court finds this exhibit is not material. Whether Francis had funding from the CCL to run a PR campaign in January 2011 has no bearing on any fact at issue. This evidence plainly does not undermine confidence in any of the verdicts sustaining Stanford's convictions. Thus, this exhibit is not material.

Finally, Stanford's next materiality argument requires the Court to jointly consider Exhibits 164 and 165. Exhibit 164 includes a February 10, 2011, email from Covert to Malone, Wirtshafter, Green, Francis, Barrow, and others. *See* Record Document 1292-164 at 4-5. Covert states "the RCA is an organization for the retailers to lobby, engage in public relations, gather information, resources and materials, and 'educate' their members," not for "engag[ing] in litigation or threaten[ing] litigation" because "their budget simply does not allow for litigation." *Id.* at 4. Exhibit 165 includes the minutes for a February 14, 2011, CCL meeting. *See* Record Document 1292-165 at 1, 3-4. In this

meeting, the CCL voted "to transfer funds from CCL to RCA. Purpose being that we need to act on some of the state actions and did not want the CCL to be the organization that was spearheading the challenge. Per [Wirtshafter] it was advised that we should have the RCA be the front line . . . ." *Id.* at 3.

Stanford argues Exhibits 164 and 165 show "Covert and Wirtshafter disagreed on the role of the RCA." Record Document 1292 at 158. Plainly, these exhibits have no bearing on any fact at issue. Evidence about how two attorneys viewed the California RCA would not undermine confidence in any of the verdicts sustaining Stanford's convictions. Thus, these exhibits are not material.

The Court has now addressed each of Stanford's claims related to the portrayal of the California RCA generally. This category encompassed his arguments that (1) Francis falsely testified about the RCA in general, (2) suppressed evidence shows Francis, Green, and Malone considered the RCA to be a liability, (3) suppressed evidence shows Francis had a conflict with the California RCA, (4) suppressed evidence shows Francis was representing to other individuals that the RCA had funding for a PR campaign, and (5) Barry Covert and Don Wirtshafter disagreed about the role of the RCA. *See id.* at 146-49, 152-58, 170. These claims were predicated on Exhibits 139, 141-144, 146-148, 150, and 163-165. The Court has found that each of these *Brady*, *Giglio*, and *Napue* claims fail for lack of materiality. As such, these claims do not entitle Stanford to relief under 28 U.S.C. § 2255.

In sum, the Court has now found Stanford's *Brady*, *Giglio*, and *Napue* claims related to the RCA are without merit. First, the Court addressed Stanford's claim that

Francis falsely testified that he incorporated the RCA as a for-profit corporation. *See* Record Document 1292 at 146-49. As part of this claim, Stanford argued Francis testified falsely about forming the RCA and about forming it as a for-profit organization. *See id.* These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 97, 122, 129, 138-140, and 148. These claims failed for lack of possession and lack of materiality.

Second, the Court addressed Stanford's claim that Francis falsely testified that he created training materials and tracked state and federal laws regarding synthetic cannabinoids. *See id.* at 155-156. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 60, 97, and 102-103. These claims failed for lack of possession and lack of materiality.

Third, the Court addressed Stanford's claim that Francis falsely testified that Wirtshafter was still working as a full-time staff attorney for the RCA on August 22, 2011. *See id.* at 153-54. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 101 and 148-149. These claims failed for lack of possession and lack of materiality.

Fourth, the Court addressed Stanford's claim that the RCA employed a sales strategy that involved misbranding and giving misleading lab reports to customers. *See id.* at 155, 170. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 11, 108, and 160-162. These claims failed for lack of possession, lack of suppression, lack of materiality, or all of the foregoing.

Finally, the Court addressed Stanford's claim that Francis falsely testified about the RCA in general. As part of this claim, Stanford argued Francis presented a false narrative to the jury regarding the RCA. *See id.* at 148. Stanford additionally argued suppressed

evidence showed that Francis, Green, and Malone considered the RCA to be a liability, Francis had a conflict with the California RCA, Francis was representing to other individuals that the RCA had funding for a PR campaign, and Covert and Wirtshafter disagreed about the role of the RCA. *See id.* at 152-53, 157-58. These claims were predicated on Exhibits 139, 141-144, 146-148, 150, and 163-165. These claims failed for lack of possession and lack of materiality.

Thus, Stanford's *Brady*, *Giglio*, and *Napue* claims based on the California RCA are without merit and do not entitle Stanford to relief under 28 U.S.C. § 2255.

### vii.  Green's Cooperation with the Government [Exhibits 2-6 & 92]

This claim category generally addresses Stanford's arguments that the Government withheld exculpatory evidence and/or solicited false testimony in relation to Green's cooperation with the Government. This category includes Stanford's claims that (1) Green worked with the prosecution prior to his indictment, and (2) the Government did not disclose its promises of leniency with Green to Stanford and the Court.

### 1.  When Cooperation Began [Exhibits 2-6]

Stanford argues Green falsely testified that he did not start cooperating with the Government prior to Green's indictment. *See* Record Document 1292 at 9. Stanford contends "Green's cooperation started on August 2, 2012." *Id.* at 8. Because Stanford was indicted on September 4, 2012, *see* Record Document 57, Stanford contends Green's

testimony that he did not cooperate with the Government prior to his indictment was false. *Id.* at 9. Stanford relies on Exhibits 2-6.[157]

Ultimately, the Court finds Exhibits 2-6 are not material, for Stanford's argument relies principally on an omission of Green's testimony. The Court thus finds it prudent to discuss Green's testimony regarding his cooperation here. On cross-examination, Green testified as follows:

> Q    How long afterwards -- well, let me get a time line.
>
> Exactly when were you raided in July?
>
> A    Approximately July 27th, 2012. Around late July, yeah.
>
> Q    Okay. Do you see this? This is an indictment filed September 4th of 2012. That's within a week of the time that you're raided, correct?
>
> A    No. That's a month and a half, sir.
>
> Q    Okay. You're right. July, August.
>
> So within a month and a half, you and your lawyer were already cooperating with the government?
>
> A    Well, yeah. We got indicted.
>
> Q    You were cooperating with the government before you were indicted; isn't that true?
>
> A    No.
>
> Q    You didn't have any discussions, you and your lawyer, with any of the agents or prosecutors in this case prior to September 4th?
>
> . . .
>
> A    We went there to hear exactly what kind of evidence they had. I realized what I was doing was wrong, and I had been playing the shell game long enough. . . .

---

[157] As found *supra*, the Government did not possess Exhibits 2-4 and 6. The Government possessed but did not produce Exhibit 5.

Record Document 923 at 111-12. On re-direct examination, the Government explicitly corrected Green's testimony:

> Q    There was an original indictment with your partners, Mr. Boyd Barrow, Josh Espinoza, and then Mr. Richard Buswell here locally, correct?
>
> A    Correct.
>
> Q    That indictment came May 18th, 2012, correct?
>
> A    Correct.
>
> Q    Shortly thereafter your doors were kicked in, right?
>
> A    That's right.
>
> Q    *Is that why you started cooperating with the government before the superseding indictment?*
>
> A    *Yes.*
>
> Q    So it wasn't like you were indicted and all of a sudden -- as Mr. Stanford was showing you, just the one portion of the other indictment -- you just started cooperating, right?
>
> A    Correct.

*Id.* at 125 (emphasis added).

Thus, while Green initially testified on cross-examination that he did not cooperate prior to the indictment, the Government corrected that testimony at the first opportunity. Stanford's argument ignores that the Government explicitly corrected Green's testimony on the stand.[158] In light of the Government confirming before the jury that Green

---

[158] At this juncture, the Court notes that some of the arguments raised herein, including this one, are so frivolous that the Court considered holding a show cause hearing. Federal Rule of Civil Procedure 11(b)(3) provides that a lawyer, in presenting a motion to the Court for its consideration, represents that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . (3) the factual contentions have evidentiary support . . . ." Additionally, the Western District of Louisiana has adopted the Rules of Professional Conduct of the Louisiana State Bar Association. *See* LR83.2.4. Rule 3.1 of the Rules of Professional Conduct of the Louisiana State Bar Association likewise provides that attorneys "shall not bring . . . a

cooperated prior to his indictment, this evidence would not impeach Green. Consequently, Exhibits 2-6[159] are not material.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to when Green started cooperating with the Government. *See* Record Document 1292 at 8-9. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 2-6, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

---

proceeding . . . unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law." Rule 3.3(a) of the Rules of Professional Conduct of the Louisiana State Bar Association provides that an attorney "shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

In making this argument, Stanford ignores that Green testified on re-direct that he started cooperating with the Government before the superseding indictment. This is but one example of Stanford's pattern of omitting or mischaracterizing evidence that wholly rebuts his claims. The Court finds these omissions and misrepresentations are borderline sanctionable.  These omissions and misrepresentations often, if not always, demonstrate the frivolity of Stanford's arguments.

[159] The Court notes that Exhibits 2-4 and 6 are flight records and do not in any way suggest that Green was cooperating with the Government at that point. *See* Record Document 1292-2, 1292-3, & 1292-4. The Court further notes that Exhibit 6 includes tickets for a flight *after* the superseding indictment was filed. *See* Record Document 1292-6.

### 2. Alleged Promise of Leniency [Exhibits 5-6 & 92]

Stanford argues "[t]he prosecution made promises of leniency to [] Green in exchange for his guilty plea, cooperation, and testimony against Stanford," and neither Green nor the Government disclosed those promises of leniency. Record Document 1292 at 70-71. Specifically, Stanford avers the Government promised Green it "would not pursue a leadership enhancement under the Sentencing Guidelines and that he would not be prosecuted by any other jurisdictions where he had distributed synthetic cannabinoids." *Id.* The Government maintains that it did not make any such promises. *See* Record Document 1305 at 57-58. Stanford relies on Exhibits 5-6 and 92.[160]

The exhibits upon which Stanford relies do not support the existence of undisclosed promises of leniency. In Exhibit 5, Agent White states he will be "coordinating all requests for information/cooperation from all districts." Record Document 1292-5 at 2. Exhibit 6 is a Delta flight itinerary indicating that Mones and Green would fly to New Orleans, Louisiana, on September 6, 2012. *See* Record Document 1292-6 at 1. Exhibit 92 includes several emails supporting that Green cooperated with Agent White. *See* Record Document 1292-92. In one email, Green states he is "working with a bunch of districts." *Id.* at 69. None of these exhibits, considered individually or together, demonstrate that the Government promised Green leniency should he cooperate.

Stanford additionally relies on statements made in Green's § 2255 motion. However, Green's unsupported and unsworn statements do not overcome his sworn

---

[160] As found *supra*, the Government did not possess Exhibit 6. The Government possessed but did not produce Exhibits 5 and 92.

statements at his plea hearing. At this plea hearing, Green affirmed no one had "made any promise . . . to [him] other than the plea agreement that induced [him] to plead guilty." Record Document 88 at 29-30. Additionally, in his plea agreement, Green expressly "affirm[ed] that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with [his] decision to plead guilty except those set forth in this plea agreement." Record Document 87 at 7. The plea agreement makes no mention of the alleged promise not to prosecute Green in other jurisdictions or to not pursue a leadership enhancement. *See generally id.* Finally, at trial, Green again testified about his plea agreement, confirming there were no promises made to him in exchange for his testimony. *See* Record Document 923 at 48-52. In light of this sworn testimony, the Court finds that Green's unsubstantiated statements do not support Stanford's claim that Green and the Government failed to disclose any promises of leniency.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to undisclosed promises of leniency made to Green "in exchange for his guilty plea, cooperation, and testimony against Stanford." Record Document 1292 at 71. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 5-6 and 92, fail for lack of materiality, for they do not support the existence of any promises of leniency made by the Government. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could

have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

In sum, the Court has now found Stanford's *Brady*, *Giglio*, and *Napue* claims related to Green's cooperation with the Government are without merit. First, the Court addressed Stanford's claim that the Government withheld exculpatory evidence and/or solicited false testimony related to when Green started cooperating with the Government. *See* Record Document 1292 at 8-9. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 2-6. These claims failed for lack of possession, lack of materiality, or both. Second, the Court addressed Stanford's claim that the Government withheld exculpatory evidence and/or solicited false testimony related to undisclosed promises of leniency made to Green. *See id.* at 70-71. These claims were predicated on Exhibits 5-6 and 92. These claims failed for lack of possession, lack of materiality, or both. Thus, Stanford's *Brady*, *Giglio*, and *Napue* claims based on Green's cooperation are without merit and do not entitle Stanford to relief under 28 U.S.C. § 2255.

### viii.  Miscellaneous Claims [Exhibits 151-152, 166]

This category includes Stanford's claims that (1) Francis testified falsely about receiving a PowerPoint presentation from Terrence Boos[161] from the DEA website ("Boos document"), (2) Francis testified falsely that NutraGenomics conducted a study to determine the turnaround time from concept-of-chemical to retail availability in order to

---

[161] Terrence Boos was a chemist who worked for the Drug and Chemical Evaluation Section of the DEA Office of Diversion Control.

circumvent federal and state bans, and (3) NutraGenomics used online sales affiliates to distribute its products. The Court addresses each in turn.

### 1. Boos Document [Exhibit 166]

Stanford argues Francis testified falsely about retrieving the Boos document from the DEA website prior to sending it to Stanford. *See* Record Document 1292 at 179-80. He relies on Exhibit 166.[162]

The Court begins its materiality analysis with Francis's testimony. On cross-examination by Stanford, Francis testified as follows:

> Q    Okay. Now, also on the 22nd [of September 2011], in addition to sending me the links to the federal legislative bills, you also sent to me, which is Government 228, an RCA DEA Boos(2).pdf. Do you remember doing that?
>
> A    I do.
>
> . . .
>
> Q    Where did you get this document?
>
> A    I got it off the DEA website, the Diversion Control website.

Record Document 921 at 251-52.

Stanford relies on Exhibit 166 to show Francis's testimony was false. Exhibit 166 is a September 8, 2011, email from Malone to Green and Barrow forwarding an email from Alexander Reece, a co-defendant. *See* Record Document 1292-166. Reece had previously sent Malone a "boos.pdf," stating that it contained "great info and a road map

---

[162] As found *supra*, the Government did not possess Exhibit 166.

to Analogs and isomers."[163] *Id.* at 1-2. That attached PDF was the Boos document. *See id.* at 3-58.

Stanford contends Exhibit 166 "proves Reece sent the Boos pdf document to Malone, who passes it on to Green and Barrow, who then surely gave it to Francis." Record Document 1292 at 180. Stanford argues that had he been given this evidence, he "would have been able to expose Francis a pathological liar to the jury, as well as the fact that Francis lied about small things, medium things, and big things." *Id.* As with many of Stanford's arguments, this materiality argument hinges on Stanford's own speculation. Stanford provides the Court with no evidence suggesting that Malone, Green, Barrow, or Reece sent Francis the Boos document. That Malone, Green, and Barrow received the document from one source does not mean Francis could not have retrieved that document from a different source. While Stanford may believe Francis is a "pathological liar," this exhibit in no way proves or even suggests that.

In any event, regardless of *how* Francis received the document, the fact remains that it was sent to Stanford and Stanford possessed it prior to trial, facts that Stanford does not in any way dispute or challenge. Thus, even if this exhibit does impeach Francis, that impeachment is not material because it does not undermine confidence in the verdict.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to how Francis received the Boos document.

---

[163] Thus, this exhibit, too, shows "the ways that co-conspirators were tracking the DEA's knowledge of synthetic cannabinoids and which chemicals the DEA considered analogues." Record Document 1305 at 45.

Record Document 1292 at 179-80. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibit 166, fail for lack of materiality. This exhibit does not "undermine confidence in the verdict" and, as such, is not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [this exhibit] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### 2.  Turnaround Time Study [Exhibits 151-152]

Stanford argues Francis falsely testified that "NutraGenomics [] conducted a study to determine the turnaround time from concept-of-chemical to availability in retail stores." Record Document 1292 at 160. Stanford relies on Exhibit 151-152.[164]

The Court begins its materiality analysis with the relevant testimony. At trial, Francis testified as follows during his direct examination:

> Q    Did the industry stick with the chemicals that were going to be banned or did they make a change and shift to a chemical that was not being targeted?
>
> A    So long as they were foreseeable, it would shift.
>
> Q    Okay. And how quickly, in your experience, was the synthetic cannabinoid industry able to shift and get products on the shelves that were not targeted products for a ban?
>
> A    We actually tracked that one time, and it came out to be within 21 days from concept of chemical to what was retail available.
>
> . . .

---

[164] As found *supra*, the Government did not possess Exhibits 151 and 152.

Q       Are you aware that, in order to ban a product, either by way of temporary banning authority or otherwise, that there has to be 30 days notice given before a ban is to take effect?

A       Yes.

Q       That's certainly enough time to make the shift before law enforcement can intervene and regulate, correct?

A       Yeah. That was the purpose of doing that research was to find out if that swap window -- if that could be done in a time frame less than 30 days.

Q       So the industry is a little bit faster than law enforcement?

A       Nine days.

Record Document 921 at 51-52. Stanford argues Francis "fabricated" this study because Exhibit 151 proves "the only time that '21 day'[165] was ever mentioned in thousands of emails during 2010 and 2011, between cooperating co-defendants, and others involved in the synthetic cannabinoid business was NutraGenomics' 21 Day Return Policy on products." Record Document 1292 at 160.

Certainly, Exhibit 151 does support the existence of a "21 day refund policy." Record Document 1292-151 at 1-2 (Malone explaining to Wirtshafter the purpose of the refund policy). However, this exhibit does not in any way disclaim that Francis or other co-defendants conducted a study. Stanford's materiality argument is constructed from speculation and assumption. He assumes that when Francis says "we," Francis means NutraGenomics and not necessarily the industry generally. He assumes evidence of this

---

[165] The Court highlights the use of quotes by Stanford here. It is unclear whether Stanford searched only for this phrase or attempted to use variations thereof.

study would have been documented through emails, and he further assumes Green would have received and saved emails about that study in his "data base." From there, he speculates that the Government and Francis "morphed NutraGenomics' 21 day refund policy into a 21 day turnaround from concept-of-chemicals for Mr. Miyagi to the finished product on the retail shelf." Record Document 1292 at 161. Finally, Stanford assumes "[a] compensation plan, based upon returns within 21 days, and a study showing that it takes 21 days to get new product[s] on the shelf are [] mutually exclusive." Record Document 1305 at 49.

Plainly, this exhibit does not impeach Francis. Indeed, the Court notes Francis was not even included in the email communications in Exhibit 151. Any "impeachment" is derived from a series of assumptions and speculations by Stanford. Even if Exhibit 151 does impeach Francis, that impeachment is not material. Whether a study was officially conducted or not, substantial evidence at trial demonstrates that the co-defendants, and the industry generally, were swapping chemicals and products to stay ahead of bans.

Stanford additionally cites Exhibit 152, claiming this exhibit "dispels the 21 day lie told by the prosecution through Francis to the jury." Record Document 1292 at 162. Exhibit 152 includes an October 7, 2010, email from Wirtshafter to a person who owned shops in Texas. *See* Record Document 1292-152 at 1-2. Wirtshafter states, "I need to disabuse you of your thinking that the chemists of the world will stay a step ahead of the DEA. . . . This might have been true a few years ago . . . Now [the DEA has] the Analogues Act . . . ." *Id.* at 1. Malone, who was blind copied, asks Wirtshafter for more context. *See id.* Wirtshafter responds that he was informing someone that he could not "count on the

next chemicals to be clear of DEA interference." *Id.* at 2. He further explains, "when the [DEA] succeeds in banning the seven chemicals . . . they will actually be banning a huge number of compounds. The problem becomes that it is difficult for a chemist to make a clear judgment on this issue." *Id.*

Stanford interprets this exhibit to mean that Wirtshafter is "clearly stat[ing] that switching drugs to stay ahead of bans will no longer work." Record Document 1292 at 162. He maintains "[t]his is significant because throughout the trial the prosecution continually told the jury that co-defendants were constantly switching chemicals to stay one step ahead of law enforcement." *Id.* at 163. But where this argument falters is that substantial evidence at trial did, in fact, demonstrate that the co-defendants were switching chemicals to avoid bans. Further, Exhibit 152 in no way refutes that the co-defendants used AM-2201, a controlled substance analogue, in their products and distributed the same. Nor does it refute that this product was misbranded and that the co-defendants laundered money from that product's sales. Put differently, Exhibit 152 does not undermine confidence in any of the verdicts sustaining Stanford's convictions.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to whether the co-defendants conducted a 21-day study "to determine the turnaround time from concept-of-chemical to availability in retail stores." *Id.* at 160. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 151-152, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden

of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

### 3.  Online Sales Affiliates [Exhibits 37 & 106-109]

Stanford argues the Government withheld exculpatory evidence establishing that "NutraGenomics used online sales affiliates who earned commissions for selling products including Mr. Miyagi." Record Document 1292 at 101. He relies on Exhibits 37 and 106-109.[166]

These exhibits generally support that NutraGenomics used online affiliates to distribute its products. *See generally* Record Documents 1292-37, 1292-106, 1292-107, 1292-108, & 1292-109. However, Stanford fails to identify the materiality of this program. Stanford states only that he "was completely unaware of this fact at trial because the prosecution suppressed all evidence relating to the affiliates program." Record Document 1292 at 101. He does not explain how this information is exculpatory or impeaching. He does not direct the Court to false testimony related to this program. And he certainly does not  explain how this evidence affects his own convictions. Whether NutraGenomics used online affiliates to distribute its products does not negate that NutraGenomics products were distributed into Louisiana and that Stanford was involved in conspiracies related to that distribution.

---

[166] As found *supra*, the Government did not possess Exhibits 37 and 106-109.

In conclusion, Stanford argues the Government withheld exculpatory evidence and/or solicited false testimony related to the NutraGenomics online affiliates program. *See id.* at 101. These *Brady*, *Giglio*, and *Napue* claims, premised on Exhibits 37 and 106-109, fail for lack of materiality. These exhibits do not "undermine confidence in the verdict" and, as such, are not material. *Wearry*, 577 U.S. at 392 (internal quotations omitted); *Brumfield*, 89 F.4th at 519. Therefore, Stanford has failed to meet his burden of establishing that "there is any reasonable likelihood [these exhibits] could have affected the judgment of the jury" such that he would be entitled to relief under 28 U.S.C. § 2255. *Wearry*, 577 U.S. at 392 (internal quotations omitted).

The Court has now addressed each of the miscellaneous claims. First, the Court addressed Stanford's claim that Francis falsely testified about how he received the Boos document. *See* Record Document 1292 at 179-80. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibit 166. These claims failed for lack of possession and lack of materiality. Second, the Court addressed Stanford's claim that Francis falsely testified that the co-defendants conducted a 21-day study "to determine the turnaround time from concept-of-chemical to availability in retail stores." *Id.* at 160. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 151-152. These claims failed for lack of possession and lack of materiality. Finally, the Court addressed Stanford's claim that the Government withheld exculpatory evidence related to the NutraGenomics online affiliates program. *See id.* at 101. These *Brady*, *Napue*, and *Giglio* claims were predicated on Exhibits 37 and 106-109. These claims failed for lack of possession and lack of materiality.

Thus, Stanford's *Brady*, *Giglio*, and *Napue* claims based on the protection agreement are without merit and do not entitle Stanford to relief under 28 U.S.C. § 2255.

With the conclusion of this section, the Court has now addressed each of Stanford's *Brady*, *Giglio*, and *Napue* claims and found them without merit. Through this motion, Stanford aims to prove his right to a fair trial was violated by presenting for the Court's consideration 166 exhibits of allegedly suppressed evidence. Despite the sheer numerosity of his claims, Stanford fails to demonstrate any *Brady*, *Giglio*, or *Napue* violation. Stanford often rests his arguments on mischaracterizations, assumptions, speculations, and innuendos. When these deficiencies are addressed, Stanford's materiality arguments crumble. What remains, if anything, are minor falsehoods that do not go to an essential issue at trial and do not, in any way, undermine confidence in the jury's verdict as to any of his counts. Stanford further ignores the vast array of evidence presented at trial that supports his convictions, such as "bank records, emails, corporate filings, and recorded conversations with Stanford." Record Document 1305 at 33-34.

The exhibits presented in Stanford's § 2255 motion do not in any way undermine his conviction for a conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce. Substantial evidence at trial still establishes, beyond a reasonable doubt, that Stanford participated in this conspiracy. Nor do Stanford's exhibits undermine his convictions for money laundering conspiracy and specific instances of money laundering. Substantial evidence at trial still establishes, beyond a reasonable doubt, that Stanford participated in a conspiracy to launder proceeds derived from the distribution of a controlled substance analogue and that he personally received those

proceeds. Even assuming there were minor, immaterial falsehoods presented at Stanford's trial, "this challenged testimony collectively only amounts to mere inconsistencies that do not create a 'reasonable probability' in a different outcome." Record Document 961 at 27.

Accordingly, Stanford's *Brady*, *Giglio*, and *Napue* claims premised on the exhibits attached to his motion are without merit. These claims fail for either lack of possession, lack of materiality, or both. As such, Stanford's *Brady*, *Giglio*, and *Napue* claims do not entitle him to relief under 28 U.S.C. § 2255.

### c. Cumulative Effect of Alleged *Brady*, *Giglio*, and *Napue* Violations

Stanford argues the Court must additionally consider the cumulative effect of the alleged *Brady*, *Giglio*, and *Napue* violations to determine if he is entitled to relief. *See* Record Document 1292 at 14. He contends that, "[v]iewed separately or collectively, the [proffered] evidence was favorable and material to [his] defense and its suppression undermines all confidence in the outcome of the trial by undermining the entire adversarial process." *Id.* at 2.

First, the Court has considered each of Stanford's arguments and found he has failed to meet his burden on his *Brady*, *Giglio*, and *Napue* claims for either lack of possession, lack of materiality, or both. "[N]on-errors have no weight in a cumulative error analysis." *Stanford I*, 823 F.3d at 843 (quoting *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012)). Combining this immaterial evidence does not make it material. Quite simply, "the whole is the sum of the parts." *Stanford I*, 823 F.3d at 841. What is meritless remains meritless for the same reasons previously set forth herein. "[T]here is

nothing to accumulate." *Id.* at 843 (alteration in original) (quoting *Delgado*, 672 F.3d at 344).

Nevertheless, the Court further addresses Stanford's contention that his immaterial impeachments[167] would have "destroy[ed] the believability and credibility of key prosecution witnesses." Record Document 1292 at 16. For example, as briefly discussed *supra*, Stanford believes this allegedly suppressed evidence would have "expose[d] Francis as a pathological liar to the jury." *Id.* at 180. He makes similar claims regarding Green, Barrow, and Espinoza. *See e.g., id.* at 45, 68. This argument fails for several reasons.

As with many of Stanford's arguments, this materiality argument hinges on his own speculation and multiple assumptions. Stanford first assumes the evidence he proffers actually impeaches the witnesses on material issues. But, as explained extensively *supra*, for nearly all the exhibits, "it is questionable whether one could describe the inconsistencies as false, let alone material." *Stanford I*, 823 F.3d at 841 (describing other allegations of false testimony by Stanford). Often, Stanford relies on either mischaracterizations of the evidence or of the witnesses' testimonies to advance his impeachment arguments. Plainly, however, he cannot create an impeachment by pasting his own unfounded impressions on that evidence and testimony.

---

[167] Stanford fails to identify additional false testimony beyond that discussed *supra*. The Court will not scour the trial transcript record for possible impeachments on Stanford's behalf. As such, this section is limited to specifically discussing whether the immaterial impeachments dispensed with *supra* entitle Stanford to a new trial when considered collectively. Put differently, the Court considers whether these alleged impeachments, considered together, undermine confidence in the jury's verdict.

Stanford next assumes this Court would have allowed these exhibits to have been admitted, even for purposes of impeachment. This is especially so considering that the exhibits do not impeach evidence or testimony that is false, much less material. Stanford's jury trial lasted ten days, and the jury heard testimony from over twenty witnesses. The Court could not, and would not, have allowed impeachment on many of the topics discussed herein. Many of the impeachments identified by Stanford are not just immaterial but irrelevant—they concern organizations and people that predated Stanford's involvement by several months. These exhibits do not undermine or lessen Stanford's involvement in the conspiracies for which he was being tried. That is, nearly all this evidence falls outside of the scope of these conspiracies.

Stanford next assumes if he impeached a witness on an immaterial issue, the jury would have wholly discounted the entirety of that witness's testimony and further would have found him not guilty of the conspiracies at issue. Put differently, Stanford asks this Court to speculate that the jury would have given the co-defendants' entire testimony no weight had he been able to impeach them on immaterial issues and that, without that testimony, the jury would not have convicted him. This argument contains two false assumptions.

First, Stanford assumes that impeachment of a witness on an immaterial matter wound have rendered their entire testimony unbelievable. But that is not how credibility assessments work. The Court instructed the jurors that they were "the sole judges of the credibility or believability of each witness and the weight to be given to each witness's testimony." Record Document 927 at 77. The Court further instructed the jury that they

"should decide whether [they] believe all, some part, or none of what each person had to say and how important that testimony was." *Id.* As such, the Court will not speculate as to how the jury would have weighed each witness's testimony had Stanford been able to present this purported impeachment evidence.

Second, Stanford assumes that if he had been able to impeach his co-defendants with this allegedly suppressed evidence, the jury would not have convicted him. This assumption contains another assumption—that is, that the jury would not have believed the testimony of ALL the co-defendants, not just entirely but collectively as well. This assumption also ignores that the co-defendants were not the only witnesses at trial. As noted above, there were over twenty witnesses who testified at the ten-day trial, including law enforcement, representatives from the Attorney General's office, and Brady Brecker, a Curious Goods franchisee. Testimony of non-co-defendants at the trial demonstrated that Stanford conspired in the Mr. Miyagi scheme, including selling the scheme to franchisees and handling interactions with law enforcement in an attempt to cover up the scheme. The jury also considered substantial physical evidence connecting Stanford to the co-defendants beyond the co-defendants' own testimony. This evidence included email correspondence, audio recordings,[168] checks from the co-defendants, RCA

---

[168] In one of these audio recordings, Stanford expressly states that he "met with[] someone at the AG's office" to talk about the federal legislation and that "they were of the same opinion that I am. Okay. The feds haven't I-outlawed any of this non-specific compound." Record Document 863-6 at 45. Stanford later states, "in talking to the AG's office, they agreed with me on stuff that they interpreted it to mean the exact same way that I did. . . . And the AG said this is what they're focusing on right now until federal legislation changes." *Id.* at 60-61.

documents, and documents showing a dramatic increase in purchases of Mr. Miyagi following Stanford's involvement.

Ultimately, the Court finds these immaterial impeachments, even considered collectively, do not undermine confidence in the verdicts sustaining Stanford's convictions. Impeachment evidence has been found to be material where it "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration." *Sipe*, 388 F.3d at 478 (internal quotations omitted). Here, the impeachment evidence does not go to an essential issue. Further, the jury considered substantial physical evidence connecting Stanford to the co-defendants and the convictions of which he was convicted. This evidence strongly corroborates Stanford's guilt. In light of this substantial evidence, the fact that Stanford's exhibits do not always impeach the witnesses as he claims, and the immateriality of any remaining impeachments, the Court finds Stanford's exhibits do not undermine confidence in any of the verdicts sustaining his convictions. As this Court previously explained:

> The alleged peripheral inconsistencies upon which [Stanford] focuses . . . were immaterial to the trial's outcome. The jury's verdict, instead, was supported by the records, checks, and witness testimony detailing [Stanford's] personal participation in the conspiracy, and it is this very evidence that [Stanford] ignores. Even assuming there were minor falsehoods presented at trial, this challenged testimony collectively only amounts to mere inconsistencies that do not create a "reasonable probability" in a different outcome.

Record Document 961 at 27.

Accordingly, Stanford's *Brady*, *Giglio*, and *Napue* claims premised on Exhibits 1-166 are without merit and do not entitle him to relief under 28 U.S.C. § 2255. As such,

Stanford's motions to vacate, set aside, or correct his judgment and sentence [Record Documents 1287 & 1292] are **DENIED**.

### III.   Requests for an Evidentiary Hearing

Stanford's § 2255 motions include requests for an evidentiary hearing. *See* Record Documents 1287 & 1292. Stanford argues his motion "raises specific and detailed issues of fact, supported by evidence, that proves the prosecution obtained its conviction through the suppression of Brady/Giglio evidence and the knowing use of false testimony." *See* Record Document 1292 at 17. Therefore, Stanford asserts this Court must hold an evidentiary hearing on his motions. *See id.* at 17-20. The Court does not agree.

A court may deny a § 2255 motion without an evidentiary hearing if "(1) the movant's claims are clearly frivolous or based upon unsupported generalizations, or (2) the movant would not be entitled to relief as a matter of law, even if his factual assertions were true." *United States v. Harrison*, 910 F.3d 824, 826-27 (5th Cir. 2018), *as revised* (Dec. 19, 2018). For the reasons discussed *supra*, Stanford's claims are clearly frivolous and/or based upon unsupported generalizations. Even if this Court were to assume Stanford's factual assertions were true, that is, that the exhibits are authentic and accurate and the Government possessed this information, his claims still would not entitle him to relief as a matter of law. As such, Stanford's requests for an evidentiary hearing are **DENIED**.

**<u>Conclusion</u>**

For the reasons assigned herein, **IT IS ORDERED** that Stanford's § 2255 motion [Record Document 1287] and amended § 2255 motion [Record Document 1292] are **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Stanford's requests for an evidentiary hearing [Record Documents 1287 & 1292] are **DENIED**.

Pursuant to Rule 11(a) of the Rules governing § 2255 proceedings for the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the petitioner. Unless a Circuit Justice or a Circuit or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeal. In this case, a certificate of appealability is **DENIED** because Stanford has failed to demonstrate a substantial showing of the denial of a constitutional right.

**THUS DONE AND SIGNED** this 16th day of October, 2025.

_____
ELIZABETH E. FOOTE
UNITED STATES DISTRICT JUDGE